UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

MICHAEL SILER,

                                        Plaintiff,

v.                                                                  9:19-cv-00427
                                                                    (DNH/TWD)

FLETCHER, et al.,

                                        Defendants.
_____

APPEARANCES:                                          OF COUNSEL:

MICHAEL SILER
Plaintiff, *pro se*
18-B-0821
Five Points Correctional Facility
Caller Box 119
Romulus, NY 14541

HON. LETITIA JAMES                              LAUREN ROSE EVERSLEY, ESQ.
Attorney General for the State of New York    Assistant Attorney General
Counsel for Defendants
The Capitol
Albany, NY 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

### **REPORT-RECOMMENDATION AND ORDER**

        This matter has been referred for a Report-Recommendation by the Honorable David N.

Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).

Michael Siler ("Plaintiff"), an inmate in the custody of the New York State Department of

Corrections and Community Supervision ("DOCCS"), brings this *pro se* action pursuant to 42

U.S.C. § 1983.  (Dkt. No. 1.)  Plaintiff alleges that Sergeant Fletcher and Corrections Officers

Russell and Hollenback (collectively, "Defendants") violated his constitutional rights under the

Eighth Amendment.  *Id.*  Defendants now move for summary judgment on the grounds that Plaintiff failed to exhaust his administrative remedies before commencing this action, as required by the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a).  (Dkt. No. 54.)  For the following reasons, the Court recommends denying Defendants' motion.

## I.    BACKGROUND[1]

Plaintiff alleges Defendants subjected him to excessive force on February 8, 2019, at Upstate Correctional Facility ("Upstate").  (Dkt. No. 1 at 4-6.[2])  He alleges Russell and Hollenback carried him into a cell and "slammed" him onto the floor.  *Id*. at 4.  While Fletcher watched and stated, "no hits in the face," Russell and Hollenback punched and kicked Plaintiff in the head, upper torso, and between his legs.  *Id*.  Russell put his knee on Plaintiff's neck while Hollenback repeatedly kicked Plaintiff in the groin.  *Id*. at 5.  Russell and Hollenback used a bedsheet to "hog tie" Plaintiff, wrapping the sheet around his neck, wrist, and ankles, and slid him under the bottom bunk.  *Id*.  Fletcher stated, "Just so you know Siler, we all come from a long family of Klansmen" and threatened to kill Plaintiff while using racial slurs.  *Id*.  Plaintiff sustained a bloody nose and multiple lacerations to his face, neck, ankles, and head.  *Id*.  Plaintiff urinated blood for forty-eight hours and suffered from pain in his lower abdomen.  *Id*. at 5-6.

---

[1]  The facts will be related herein in the light most favorable to Plaintiff as the nonmoving party. *See Rattner v. Netburn*, 930 F.2d 204, 209 (2d Cir. 1991) ("In assessing the record . . . to determine whether there is a genuine issue as to any material fact, the court is required to resolve all ambiguities and draw all factual inferences in favor of the party against whom summary judgment is sought.").

[2]  Page references to documents identified by docket number are to the page numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office.  Paragraph numbers are used where documents identified by the CM/ECF docket number contain consecutively numbered paragraphs.  Unless noted, excerpts from the record are reproduced exactly as they appear in the original and errors in spelling, punctuation, and grammar have not been corrected.

On February 11, 2019, while housed in the Special Housing Unit ("SHU"), Plaintiff submitted a grievance concerning the excessive force incident at issue. (Dkt. No. 54-3 at 46; Dkt. No. 58 at 3-4.) Because he did not receive a response from Upstate that his grievance was received, Plaintiff submitted a second grievance on February 20, 2019. (Dkt. No. 54-3 at 47-46.) The next day, on February 21, 2019, Plaintiff was transferred to Clinton Correctional Facility ("Clinton"). (Dkt. No. 54-4 at ¶ 4.) Thereafter, Plaintiff sent two letters to Upstate's Superintendent inquiring about his grievances. (Dkt. No. 54-3 at 52.)

On March 5, 2019, after not receiving any indication that either of his grievances had been received and filed at Upstate, Plaintiff submitted a third grievance at Clinton concerning the excessive force incident at issue. *Id.* On March 22, 2019, Plaintiff was transferred to Great Meadow Correctional Facility. (Dkt. No. 58 at 4-5.)

Plaintiff commenced this action on April 8, 2019,[3] without having received any indication that any of his three grievances had been filed. (Dkt. No. 54-3 at 56-58, 62.)

## II.    LEGAL STANDARDS

### A.    Summary Judgment

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). The party moving for summary judgment bears the initial burden of showing, through the production of

---

[3]  Although the prisoner mailbox rule presumes that the date of filing is the date the inmate delivers the complaint to the prison guard for mailing, i.e., the date he or she signs the complaint, *see Noble v. Kelly*, 246 F.3d 93, 97 (2d Cir. 2001), Plaintiff explained at his deposition that he gave his complaint to another inmate to mail. (Dkt. No. 54-3 at 54-56.) Thus, construing all facts in Plaintiff's favor, the Court agrees with Defendants that Plaintiff's complaint was "filed" on April 8, 2019, the date indicated on the postmark of the envelope containing the complaint. The complaint was received by the Clerk's office on April 10, 2019.

admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Gourd*, 467 F.3d 263, 272–73 (2d Cir. 2006). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

The Second Circuit instructs that on summary judgment motions, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005). In other words, "a nonmoving party must offer some hard evidence showing that [his] version of the events is not wholly fanciful." *Id*. (citation and internal quotation marks omitted). Accordingly, statements "that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is

proceeding *pro se*, the court is obligated to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994).

### B.    Exhaustion

Pursuant to the PLRA, "[n]o action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  The exhaustion requirement applies to all inmate suits about prison life.  *See Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004) (citing *Porter v. Nussle*, 534 U.S. 516, 532 (2002)), *abrogated on other grounds by Ross v. Blake*, 578 U.S. 632, 648 (2016).  "Generally, if a plaintiff . . . fails to follow each of the required steps prior to commencing an action, he has failed to exhaust his administrative remedies as required under the PLRA."  *Sanders v. St. Mary*, No. 9:19-CV-1314 (BKS/TWD), 2021 WL 1575944, at *4 (N.D.N.Y. Apr. 22, 2021), *report and recommendation adopted*, 2021 WL 1999781 (N.D.N.Y. May 19, 2021); *see also Ruggiero v. Cty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits).") (cleaned up).  "On a motion for summary judgment, "[t]he defendant bears the burden of proving that the administrative remedies available to the plaintiff were not exhausted prior to the initiation of a civil action."  *McMillian v. Walters*, No. 9:16-CV-0277 (MAD/DJS), 2017 WL 8894737, at *2 (N.D.N.Y. Dec. 18, 2017), *report and recommendation adopted*, 2018 WL 879270 (N.D.N.Y. Feb. 14, 2018).

To exhaust administrative remedies, "the inmate must complete the full administrative review process set forth in the rules applicable to the correctional facility in which he or she is

incarcerated." *Cuadrado v. Brueault*, No. 9:14-CV-1293 (DNH/CFH), 2015 WL 1606178, at *3

(N.D.N.Y. Apr. 8, 2015); *see Jones v. Bock*, 549 U.S. 199, 218 (2007).  "Courts in [] this Circuit

have long recognized [DOCCS' three-step Inmate Grievance Program ("IGP")] procedure as an

'available' remedy for purposes of the PLRA."  *Hall v. Cty. of Saratoga*, No. 10-CV-1120

(NAM/CFH), 2013 WL 838284, at *1-2 (N.D.N.Y. Mar. 6, 2013).

The grievance process begins with filing a complaint within 21 days of the alleged

incident.  7 N.Y.C. § 701.5(a)(1).  Typically, inmates file the grievances directly with the IGP

grievance clerk.  However, in situations where the inmate is housed in the SHU, he may give the

grievance complaint to a correction officer to file for him.  *Id.* § 701.7.  The inmate's

administrative remedies consist of a three-step grievance and appeal procedure: (1) investigation

and review of the grievance by the Inmate Grievance Resolution Committee ("IGRC"); (2) if

appealed, review of the IGRC's determination by the superintendent of the facility; and (3) if

superintendent's decision is appealed, review and final administrative determination by the

Central Office Review Committee ("CORC").  *See id.* § 701.5.

"There is also an expedited procedure for complaints raising bona fide issues of

harassment or other misconduct by DOCCS staff, which bypasses the IGRC."  *Ferguson v.

Mason*, No. 9:19-CV-927 (GLS/ATB), 2021 WL 862070, at *2 (N.D.N.Y. Jan. 7, 2021), *report

and recommendation adopted*, 2021 WL 531968 (N.D.N.Y. Feb. 12, 2021) (citing 7 N.Y.C.R.R.

§ 701.8).  Once a complaint is given a number and recorded by the IGP clerk, the grievance is

forwarded directly to the superintendent of the facility "for prompt review, investigation, and

decision," after which the inmate may appeal any negative determination to CORC.  *Id.*

While the PLRA mandates exhaustion of administrative remedies, it "contains its own,

textual exception to mandatory exhaustion."  *Ross v. Blake*, 578 U.S. at 648.  An administrative

procedure is "unavailable" when (1) "it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) it is "so opaque that it becomes, practically speaking, incapable of use"; or (3) "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id*. at 643-44; *see also Wilson v. Snyder*, No. 9:19-CV-420 (DNH/CFH), 2019 WL 8192227, at *4 (N.D.N.Y. Dec. 5, 2019), *report and recommendation adopted*, 2020 WL 1140666 (N.D.N.Y. Mar. 9, 2020).

## III.    DISCUSSION

### A.    The Parties' Contentions

Defendants argue Plaintiff's complaint should be dismissed in its entirety because, despite the availability of the grievance procedure, he commenced this action before exhausting his administrative remedies.  (Dkt. No. 54-1.)  To that end, Defendants submit declarations from the IGP Supervisors at Upstate and Clinton, along with the IGP Assistant Director of DOCCS.  (Dkt. Nos. 54-4, 54-5, 54-6.)

Sherri Debyah, the IGP Supervisor at Upstate, declares that on February 20, 2019, Plaintiff filed a grievance complaint (Grievance No. UST-64704-19), wherein he alleged that he "was subjected to use of force and assaulted by officers after being escorted to his cell on February 8, 2019."  (Dkt. No. 54-4 at ¶ 19.)  Due to the nature of the complaint, Grievance No. UST-64704-19 was forwarded to Upstate's Superintendent.  *Id*. at ¶ 20.  On May 31, 2019, the Superintendent denied Grievance No. UST-64704-19.  *Id*.  Plaintiff did not, however, appeal Grievance No. UST-64704-19 to CORC.  *Id*. at ¶ 22.  Further, upon review of the records maintained in Upstate's grievance office, Debyah declares there is no record that Plaintiff wrote

to or appealed the Superintendent's lack of response to CORC, or filed any other grievance relating to the claims in the present action. *Id*. at ¶ 23.

Christine Gregory, the IGP Supervisor at Clinton, declares that on March 5, 2019, Plaintiff filed a grievance complaint (Grievance No. CL-75464-19) wherein he alleged that he had been assaulted by four officers in the presence a sergeant on February 8, 2019, while housed at Upstate. (Dkt. No. 54-5 ¶ 19.)  Due to the nature of the complaint, Grievance No. CL-75464-19 was forwarded to Clinton's Superintendent. *Id*. at ¶ 20.  On April 11, 2019, Clinton's Superintendent's office received a letter from Plaintiff dated April 4, 2019, requesting a decision on Grievance No. CL-75464-19. *Id*. at ¶ 21.  By letter dated April 11, 2019, Gregory responded to Plaintiff's letter and informed him that Grievance No. CL-75464-19 was pending a Superintendent's review. *Id*. at ¶ 22.  She advised that any untimely response to a grievance may be appealed by submitting a letter to the IGP office. *Id*.  On April 29, 2019, the Clinton IGP received a letter from Plaintiff dated April 21, 2019, wherein he requested that the IGP forward Grievance No. CL-75464-19 to CORC. *Id*. at ¶ 23.  Gregory responded informing Plaintiff that his grievance would be appealed to CORC per his request. *Id*. at ¶ 24.

Rachel Sequin, the Assistant Director of the DOCCS IGP, declares that CORC received Plaintiff's appeal of Grievance No. CL-75364-19 on May 3, 2019. (Dkt. No. 54-6 at ¶ 14.)  CORC issued a determination denying Grievance No. CL-75464-19 on September 3, 2020. *Id*. at ¶ 16.

In response to Defendants' motion, construed liberally, Plaintiff argues his administrative remedies were unavailable. (Dkt. No. 58.)  Specifically, Plaintiff explains that he continued to "go off of his first grievance timeframes", i.e., the first grievance he submitted and dated February 11, 2019, and commenced this action on April 8, 2019, after having not received any

response from Upstate.  *Id*. at 4-5.  Plaintiff further points out that at the time he commenced this action, he had not received any acknowledgment or response as to his second grievance (Grievance No. UST-64704-19) or third grievance (Grievance No. CL-75364-19), dated February 20, 2019, and March 5, 2019, respectively.  *Id*. at 5, 6, 14.

In their reply, Defendants assert Plaintiff's arguments are misplaced.  (Dkt. No. 59.) Defendants argue (a) Upstate has no record of a grievance dated February 11, 2019, (b) Plaintiff never corresponded with Upstate concerning Grievance No. UST-64704-19, (c) Plaintiff never appealed Grievance No. UST-64704-19 to CORC, and (d) Plaintiff did not contact Clinton's Superintendent concerning Grievance No. CL-75464-19 until *after* he commenced this action. *Id*. at 4.

B.      **The Court's Analysis**

Whether a plaintiff exhausted his administrative remedies is a legal question that requires a defendant to produce reliable evidence of availability.  *See Coleman v. Nolan*, No. 9:15-CV-40 (ATB), 2018 WL 4732778, at *4 (N.D.N.Y. Oct. 2, 2018).  "[O]nce a defendant has produced reliable evidence that such remedies were generally available, and the plaintiff nevertheless failed to exhaust those remedies, the plaintiff must then counter the defendant's proof by showing that, as to him or her, the remedy was unavailable."  *Id*. (citing *Smith v. Kelly*, 985 F. Supp. 2d 275, 284 (N.D.N.Y. 2013)).  As such, "'the burden of production' may shift to a plaintiff when a court considers whether the grievance process was unavailable[.]"  *Id*. (citations omitted).

Here, the Court finds Defendants have satisfied their initial burden of demonstrating remedies were generally available to Plaintiff, and that Plaintiff nevertheless failed to exhaust

those remedies prior to commencing this action.  (Dkt. Nos. 54-4, 54-5, 54-6.)  The inquiry
therefore turns on whether Plaintiff's administrative remedies were unavailable under *Ross*.

*Williams v. Correction Officer Priatno* instructs that administrative remedies are
unavailable to a plaintiff where a grievance is "unfiled and unanswered" because "the process to
appeal . . . is prohibitively opaque, such that no inmate could actually make use of it."  829 F.3d
118, 126 (2d Cir. 2016).  There, the plaintiff alleged that, while housed in the SHU, he drafted a
grievance that he delivered to a correction officer to forward to the grievance office on his
behalf.  *Id*. at 120-121.  Approximately two weeks later, the plaintiff was transferred to a
different facility.  *Id*. at 121.  He never received a response to his grievance, and alleged that it
was never filed by the officer to whom he had given it.  *Id*.  The plaintiff never appealed the
grievance.  *Id*.  The Court found that "in giving his grievance to the correction officer, Williams
exhausted all administrative remedies that were available to him."  *Id*. at 126.[4]

Notably, the plaintiff in *Williams* also supported his allegation of unavailability "by
providing the court with the date he filed the grievance, the procedure for how he filed it, and the
timeline for roughly when [] subsequent follow-up conversations occurred."  *Ozzborn v. Cornell*,
No. 9:17-CV-1039 (MAD/ATB), 2021 WL 2227829, at *4 (N.D.N.Y. June 2, 2021) (citing
*Williams*, 829 F.3d at 121).  In applying *Williams*, this Court has held that it is sufficient for a
plaintiff to "submit [] a sworn statement that he gave his grievance to a correction officer," and
the plaintiff is "not then required to produce a greater amount of evidence than normally required
of a non-movant at the summary judgment stage."  *Hudson v. Kirkey*, No. 9:20-CV-0581

---

[4]  "That *Williams* was decided on a motion to dismiss and not on a summary judgment motion
does not change the analysis." *Medina v. Napoli*, 725 F. App'x 51, 54 (2d Cir. 2018) (summary
order) (reversing grant of summary judgment and remanding to the district court to apply
*Williams*).

(LEK/DJS), 2021 WL 1966721, at *4 (N.D.N.Y. May 17, 2021) (citing *McLean v. LaClair*, No. 9:19-CV-1227, (LEK/ATB) 2021 WL 671650, at *8 (N.D.N.Y. Feb. 22, 2021)).

Recently, Magistrate Judge Hummel surveyed cases applying *Williams*. *See Tillman v. Phillips*, No. 9:19-CV-1597 (LEK/CFH), 2021 WL 5233308, at *5-6 (N.D.N.Y. Nov. 10, 2021) (collecting cases applying *Williams*), *report and recommendation adopted*, 2021 WL 5768393 (N.D.N.Y. Dec. 6, 2021).  Since *Williams*, this Court has denied summary judgment on exhaustion grounds "where a plaintiff does not have a copy of the grievance, was not confined in the SHU, and has not submitted any contemporaneous correspondence inquiring about the status of his grievance, but submitted a sworn response and testified under oath that he submitted a handwritten grievance and that he verbally followed up with the grievance office."  *Id.* (citing *Maldonado v. Mandalaywala*, No. 9:17-CV-1303 (BKS/TWD), 2020 WL 1159426, at *17 (N.D.N.Y. Feb. 12, 2020), *report and recommendation adopted*, 2020 WL 1157643 (N.D.N.Y. Mar. 10, 2020)).  This Court has also denied summary judgment where the plaintiff testified that he wrote two grievances, handed one to a grievance officer while housed in the general population, and another to a prison guard while housed in the SHU, but "he made no attempt to follow up or otherwise appeal to the superintendent."  *Britt v. Carberry*, No. 9:17-CV-0234 (MAD/DEP), 2019 WL 3365766, at *10 (N.D.N.Y. Mar. 22, 2019), *report and recommendation adopte*d, 2019 WL 2437912 (N.D.N.Y. June 11, 2019).

By contrast, this Court has granted a defendant's motion for summary judgment where the plaintiff testified during a "deposition that he filed a grievance by leaving a plain envelope addressed to the grievance committee for the mail personnel to collect," but did not submit documentary evidence to support the contention and did not verbally follow up with anyone at the prison about the grievance.  *Ozzborn*, 2021 WL 2227829, at *4-5; *see also Sankara v.*

*Montgomery*, No. 9:16-CV-00885 (FJS/TWD), 2018 WL 4610686, at *8 (N.D.N.Y. June 25, 2018) (finding the plaintiff's exhaustion claim insufficient where the plaintiff "provided no evidence that he actually did write grievances; when they were written; the content of the grievances . . . the officers named in the grievance(s) . . . ; the specific steps taken by [the plaintiff] to provide them to an officer to send to the grievance office; and any specific follow up with the grievance office[.]") *report and recommendation adopted*, 2018 WL 3408135 (N.D.N.Y. July 13, 2018).

According to Defendants, summary judgment is warranted because the record plainly demonstrates that Plaintiff was not "tripped up" by the procedural requirements associated with the grievance process. (Dkt. No. 59 at 4.) Rather, Defendants contend the record shows Plaintiff knew how to follow the grievance procedure in that he sent a follow up letter to the Clinton IGP Supervisor concerning the status of Grievance No. CL-75464-19, and later appealed the Clinton Superintendent's lack of response to CORC. *Id*. Nevertheless, because Plaintiff's first inquiry as to the status of Grievance No. CL-75464-19 came nearly thirteen days *after* he commenced this action summary judgment is warranted. *Id*.

However, viewed in the light most favorable to the non-moving party, the Court finds this case more analogous to fact patterns where a grievance was submitted but never filed or answered. As noted, Plaintiff testified under oath that he filed a grievance concerning the February 8, 2019, incident on "February 11th, which was a Monday, in Upstate." (Dkt. No. 54-3 at 46; *see also id*. at 47 ("The first grievance, I mailed out on the 11th. I gave that letter to the officer on the 11th."); *id*. at 77 ("I personally stuck that [grievance] through the door, and the officers came and took it and put it in the mail.").) The Upstate IGP, however, has no record of this complaint. (Dkt. No. 54-4 at ¶ 23.) Plaintiff further explained that he "never got a

notification, letting [him] know that they got [his] grievance.  That's why [he] filed . . . the

second one." *Id*. at 47-46 (referring to Grievance No. UST-64704-19 as "the second one.").

Moreover, Plaintiff transferred facilities after attempting to file the first grievance, contributing

to the potential unavailability as "[t]he regulations plainly do not provide guidance on how a

transferred inmate can appeal his grievance with the original facility without having received a

response." *Williams*, 829 F.3d at 126.

Plaintiff also testified that, while housed at Clinton, he wrote two letters to the

Superintendent of Upstate, dated March 4 and 8, 2019, concerning that status of his two

grievances.  *Id*. at 52-53, 76.  Again, the Upstate IGP has no record of any such correspondence.

(Dkt. No. 54-4 at ¶ 23.)  During his deposition, Plaintiff explained that he did not have copies of

the first grievance or the follow-up letters he sent to Upstate's Superintendent because his

property was lost in draft.  (Dkt. No. 54-3 at 55;[5] *see also id*. at 14 (also testifying that he could

not review any documents in preparation for his December 20, 2020, deposition because his

property "was lost in draft").)

After having not received *any* response from Upstate whatsoever, Plaintiff filed a third

grievance at Clinton (Grievance No. CL-7565361-19) on March 5, 2019.  (Dkt. No. 54-3 at 48.)

Plaintiff then followed up with Clinton's Superintendent by letter dated April 4, 2018.  (Dkt. No.

---

[5]  Plaintiff stated, "In that discovery there should be more letters, showing that I wrote to these
superintendents.  I had -- I had carbon copies, but I--my property was lost in draft.  I had carbon
copies of everything -- of all the letters that I wrote.  That's just one letter.  I wrote, like, five
letters because in the grievance -- in the P.L.R.A., it tells you -- the Prison Litigation Reform
Act, it tells you that if you don't -- if you don't receive a decision in a certain amount of time,
you can appeal on your own to the next step."  (Dkt. No. 54-3 at 55.)  While certainly not
dispositive, the Court notes records submitted by Seguin indicate Plaintiff submitted Grievance
DS-0101-20 to CORC titled, "Missing Property."  (Dkt. No. 54-6 at 6.)

54-5 at ¶ 21.) It was only then, after having not received *any* correspondence from either the

Upstate IGP or Clinton IGP, that Plaintiff commenced this action on or about April 8, 2019.

Considering this Court's responsibility to draw reasonable inferences in Plaintiff's favor,

Plaintiff has raised a genuine issue of material fact as to the availability of administrative

remedies.  *See, e.g.*, *Hudson*, 2021 WL 1966721, at *4; *see also Thaxton v. Simmons*, No. 9:10-

CV-1318 (MAD/RFT), 2013 WL 4806457, at *4 (N.D.N.Y. Sept. 9, 2013) ("[A] question of fact

exists as to whether [p]laintiff never filed his initial grievance on April 29, as [d]efendants claim,

or that, as [p]laintiff claims, he filed a timely grievance that was lost or tampered with by

[d]efendants."); *Terry v. Hulse*, No. 16-CV-252, 2018 WL 4682784, at *9 (S.D.N.Y. Sept. 28,

2018) (denying summary judgment where the record contains sufficient detail regarding the

plaintiff's attempts to file grievances) (collecting cases); *see also LionKingzulu v. Jayne*, 714 F.

App'x 80, 82 (2d Cir. 2018) (summary order) ("LionKingzulu's allegation that he filed a timely

grievance while at Wende [Correctional Facility] but the grievance was not processed or

accepted . . . presents a stronger argument that remedies were unavailable."); *see also Woodward

v. Lytle*, No. 9:16-CV-1174 (NAM/DEP), 2018 WL 4643036, at *4-5 (N.D.N.Y. Sept. 27, 2018)

(finding an issue of fact as to the availability of the grievance process where plaintiff drafted and

submitted a grievance that was never filed or answered) (collecting cases).

Lastly, Defendants' contention that Plaintiff was eventually able to successfully navigate

the IGP at Clinton, and appealed Grievance No. CL-7565361-19 to CORC, does not necessarily

weaken Plaintiff's unavailability argument.  The fact that Plaintiff submitted a grievance at

Clinton and contacted the Superintendent when he did not timely receive a response and

thereafter, appealed to CORC, could suggest that absent interference at Upstate, he could comply

with the IGP.  *See Burrell v. Zurek*, No. 9:17-CV-0906 (LEK/TWD), 2019 WL 4051596, at *3

(N.D.N.Y. Aug. 28, 2019).

In sum, the Court finds unresolved issues of material fact regarding the availability of

administrative remedies.  Summary judgment is accordingly precluded.

**WHEREFORE**, it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 54) be

**DENIED**; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-

Recommendation, along with copies of the unpublished decisions cited herein in accordance

with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2008) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file

written objections to the foregoing report.[6]  Such objections shall be filed with the Clerk of the

Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL**

**PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing

*Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) (per curiam)); 28 U.S.C.

§ 636(b)(1); Fed. R. Civ. P. 72, 6(a).

Dated:  December 17, 2021
        Syracuse, New York

Therese Wiley Dancks
United States Magistrate Judge

---

[6]  If you are proceeding *pro se* and are served with this Order and Report-Recommendation by
mail, three additional days will be added to the fourteen-day period, meaning that you have
seventeen days from the date the Order and Report-Recommendation was mailed to you to serve
and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a
Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day
that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

2021 WL 1575944
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Naji SANDERS, Plaintiff,
v.
Corrections Officer Kevin ST. MARY,
Corrections Officer Troy Matthie, Defendants.

9:19-CV-1314 (BKS/TWD)
|
Signed 04/22/2021

**Attorneys and Law Firms**

NAJI SANDERS, Plaintiff, pro se, 18-A-0885, Great
Meadow Correctional Facility, Box 51, Comstock, New York
12821.

OF COUNSEL: LAUREN ROSE EVERSLEY, ESQ.,
Assistant Attorney General, HON. LETITIA JAMES,
Attorney General for the State of New York, Attorney for
Defendants, The Capitol, Albany, NY 12224.

## ORDER AND REPORT-RECOMMENDATION

THÉRÈSE WILEY DANCKS, United States Magistrate
Judge

**\*1** Naji Sanders ("Plaintiff"), an inmate in the custody
of the New York State Department of Corrections and
Community Supervision ("DOCCS"), commenced this *pro
se* civil rights action under 42 U.S.C. § 1983, asserting
claims arising out of his incarceration at Upstate Correctional
Facility ("Upstate CF"). (Dkt. No. 11, Plaintiff's second
amended complaint.) Correction Officers Kevin St. Mary
and Troy Mathie (collectively "Defendants") now move for
summary judgment, in lieu of an answer, pursuant to Rule
56 of the Federal Rules of Civil Procedure. (Dkt. No. 25.)
In short, Defendants argue Plaintiff commenced this action
before completing the grievance process. (Dkt. No. 25-1.)
For the reasons set forth below, the Court recommends
that Defendants' motion be granted and Plaintiff's case be
dismissed without prejudice.

## I. DISCUSSION

### A. Background

In his second amended complaint, Plaintiff alleges that, on
September 25, 2019, Defendants tightened his handcuffs to a
point where he suffered cuts and bruises and they slammed his
thumb into a cell's feed slot. (Dkt. No. 11 at 3.) The District
Court construed Plaintiff's second amended complaint as
alleging Eighth Amendment excessive force claims against
Defendants. (Dkt. Nos. 7, 12.)

Defendants now bring a motion for summary judgment in
lieu of an answer. (Dkt. No. 25.) In their motion, Defendants
argue Plaintiff's claims are the proper subject for a grievance
under the applicable grievance procedures, but Plaintiff filed
this action in federal court before he completed the grievance
process. (Dkt. No. 25-1 at 9-10.) In declarations filed in
connection with their motion, Defendants demonstrated that
Plaintiff filed grievances related to the above-mentioned
incident on October 7, 2019, the Superintendent denied
these grievances on September 13, 2019, and the Central
Office Review Committee ("CORC") denied the grievances
on January 29, 2020. (Dkt. No. 25-3 at ¶¶ 16-19; Dkt.
No 25-4 at ¶ 16.) Thus, according to Defendants, because
Plaintiff commenced this action on October 11, 2019—before
he completed the administrative grievance procedure—the
second amended complaint should be dismissed for failure to
exhaust. (Dkt. No. 25-1.)

Plaintiff's response to Defendants' motion for summary
judgement does not address the substance of Defendants'
arguments regarding exhaustion. Rather, he asserts in a
conclusory fashion that the motion should be dismissed
because it is, among other things, "a nefarious dilatory tactic
insidiously calculated to eschew any accountability for the
crimes committed against this ... Plaintiff." (Dkt. No. 36 at
2.) He further argues that it is illegal to impose a condition
precedent—such as exhaustion—on his right to access to the
courts. *Id.* at 4. Further, Plaintiff appears to challenge the
competency of the evidence Defendants provided in their
motion. Specifically, he asserts that, because Donna Wilcox
and Rachel Seguin are not parties of this action they cannot be
fact witnesses and the Court should disregard their affidavits
in support of Defendants' motion for summary judgment. *Id.*
at 3-4.

### B. Standard of Review

#### 1. Plaintiff's Failure to Respond to
#### Defendants' Statement of Material Facts

**\*2** While courts are required to give due deference to a plaintiff's *pro se* status, that status "does not relieve [a *pro se*] plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003). Here, Plaintiff failed to challenge the statement of material facts filed by Defendants in the manner required under N.D.N.Y. L.R. 7.1(a)(3). [1], [2]

[1]      The Local Rules were amended effective January 1, 2021. In the amendment, L.R. 7.1 was dissected and various subsections were renumbered and relocated to correspond with the appropriate Federal Rule. The relevant substance of the rules did not change. In the currently operative version of the Local Rules, L.R. 56.1 deals with summary judgement motions. However, because these motions were filed in 2020, the Court refers to the Local Rules as they existed at that time.

[2]      Local Rule 7.1(a)(3) requires the opposing party to file a response to the movant's Statement of Material Facts. Under the rule, the response "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises." N.Y.N.D. L.R. 7.1(a)(3).

Where, as in this case, a party has failed to respond to the movant's statement of material facts in the manner required under L.R. 7.1(a)(3), the facts in the movant's statement to which the plaintiff has not properly responded will be accepted as true (1) to the extent that they are supported by evidence in the record, and (2) provided that the nonmovant, if proceeding *pro se*, has been specifically advised of the possible consequences of failing to respond to the motion. [3] *See Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).

[3]      Defendants provided Plaintiff with the requisite notice of the consequences of his failure to respond to the motion. (Dkt. No. 58 at 3.)

Accordingly, the facts set forth in Defendants' Statement of Material Facts (Dkt. No. 25-2) that are supported by record evidence and are uncontroverted by nonconclusory allegations in Plaintiff's second amended complaint and verified opposition submissions will be accepted as true. *See McAllister v. Call*, No. 9:10-CV-610 (FJS/CFH), 2014 WL 5475293, at \*3 (N.D.N.Y. Oct. 29, 2014) (finding allegations in plaintiff's verified complaint sufficient to controvert facts in statement of material facts on motion for summary judgment); *Douglas v. Perrara*, No. 9:11-CV-1353 (GTS/RFT), 2013 WL 5437617, at \*3 (N.D.N.Y. Sept. 27, 2013) ("Because Plaintiff has failed to raise any question of material fact, the Court will accept the facts as set forth in Defendants' Statement of Facts Pursuant to Rule 7.1(a)(3) ... supplemented by Plaintiff's verified complaint ... as true."). As to any facts not contained in Defendants' Statement of Material Facts, in light of the procedural posture of this case, the Court is "required to resolve all ambiguities and draw all permissible factual inferences" in favor of Plaintiff. *Terry*, 336 F.3d at 137.

As noted above, Plaintiff contends Defendants' statement of material facts should be ignored because he argues Donna Wilcox and Rachel Seguin are incompetent fact witnesses. (Dkt. No. 36.) Plaintiff is mistaken. These affidavits are from people who have personal knowledge of DOCCS' Inmate Grievance Program and they set out facts that would be admissible in evidence. *See* Fed. R. Civ. P. 56(c)(4). Thus, the Court finds these affidavits are acceptable evidence and can be used to support Defendants' motion for summary judgment.

**\*3** Moreover, the Second Circuit has ruled that "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules," including local rules relating to requirements regarding the submission of and response to statements of material facts on summary judgment motions, and to "conduct an assiduous review of the record." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (citation and internal quotation marks omitted). In deference to Plaintiff's *pro se* status, the Court has reviewed the entire record.

### 2. Summary Judgment Standard

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, no genuine issue of material fact exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). A dispute of fact is "genuine" if "the [record] evidence is such

2021 WL 1575944

that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248.

**C. Analysis**

The Prison Litigation Reform Act of 1995 ("PLRA"), provides, in pertinent part, "[n]o action shall be brought with respect to prison conditions under section 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion is required for "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). "[E]xhaustion is mandatory under the PLRA and ... unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007); *see also Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016) (stating that the mandatory language of § 1997e(a) forecloses judicial discretion to craft exceptions to the requirement). To properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the institution to which they are confined. *Jones*, 549 U.S. at 218 (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)); *see also Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (exhaustion necessitates "using all steps that the [government] agency holds out, and doing so properly"). Because non-exhaustion is an affirmative defense, the defendant bears the burden of showing a failure to meet exhaustion requirements. *See Jones*, 549 U.S. at 216.

DOCCS has a well-established three-step administrative review process, Inmate Grievance Program ("IGP"), which oversees the manner in which issues are resolved by affording inmates "an orderly, fair, simple and expeditious method for resolving grievances." 7 N.Y.C.R.R. § 701.1(a). Concerns "about the substance or application of a written or unwritten policy, regulation, procedure or rule of [DOCCS]," as well as complaints of "employee misconduct meant to annoy, intimidate or harm an inmate" may be filed. *Id.* § 701.2(a)-(e).

First, an inmate must file a complaint with the facility's IGP clerk within twenty-one calendar days of the alleged occurrence. *Id.* § 701.5(a). A representative of the facility's inmate grievance resolution committee ("IGRC") has sixteen calendar days from receipt of the grievance to informally resolve the issue. *Id.* § 701.5(b)(1). If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen calendar days of receipt of the grievance, *id.* §

701.5(b)(2), and issues a written decision within two working days of the conclusion of the hearing. *Id.* § 701.5(b)(3).

**\*4** Second, a grievant may appeal the IGRC decision to the facility's Superintendent within seven calendar days of receipt of the IGRC's written decision. *Id.* § 701.5(c)(1). If the grievance involves an institutional issue (as opposed to a DOCCS-wide policy issue), the Superintendent must issue a written decision within twenty calendar days of receipt of the grievant's appeal. *Id.* § 701.5(c)(3)(ii).

Third, a grievant may appeal to CORC within seven working days of receipt of the Superintendent's written decision. *Id.* § 701.5(d)(1)(i). CORC is to render a written decision within thirty calendar days of receipt of the appeal. *Id.* § 701.5(d)(3)(ii).

The Second Circuit has long recognized this procedure as an "available remedy" for purposes of the PLRA. *See Hall v. Cty. of Saratoga*, No. 10-CV-1120 (NAM/CFH), 2013 WL 838284, at *1-2 (N.D.N.Y. Mar. 6, 2013). Generally, if a plaintiff, as here, fails to follow each of the required steps prior to commencing an action, he has failed to exhaust his administrative remedies as required under the PLRA. *See Ruggiero v. Cty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." (quotation marks and citations omitted)).

Nevertheless, while the PLRA mandates exhaustion of administrative remedies, it also "contains its own, textual exception to mandatory exhaustion." *Ross*, 136 S. Ct. at 1858. More specifically, Section 1997e(a) provides only those administrative remedies that "are available" must first be exhausted. 42 U.S.C. § 1997e(a); *Ross*, 136 S. Ct. at 1858 ("[T]he exhaustion requirement hinges on the availability of administrative remedies[.]" (quotation marks and citations omitted)). In the PLRA context, the Supreme Court has determined "availability" means "an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." *Ross*, 136 S. Ct. at 1859 (quotation marks and citations omitted).

There are three circumstances in which a court may find a facility's internal administrative remedies are not available under the PLRA. *Id.* at 1859-60. First, "an administrative procedure is unavailable when (despite what regulations or

guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 1859. "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* Finally, an administrative remedy is not "available" when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

The question as to whether the plaintiff has exhausted his administrative remedies is a question of law. *See Snider v. Melindez*, 199 F.3d 108, 113-14 (2d Cir. 1999). Thus, an inmate's failure to exhaust administrative remedies is properly considered on a motion for summary judgment in lieu of an answer. *Crichlow v. Fischer*, No. 6:15-CV-06252 EAW, 2017 WL 920753, at *5 (W.D.N.Y. Mar. 7, 2017) (citing *Crenshaw v. Syed*, 686 F. Supp. 2d 234, 236 (W.D.N.Y. 2010) (granting a motion for summary judgment made in lieu of an answer where inmate failed to exhaust administrative remedies)).

**\*5** Here, the record evidence in this case establishes the following timeline:

*September 25, 2019* – Plaintiff alleges Defendants used excessive force against him during a cell extraction. (Dkt. No. 11.)

*October 7, 2019* – Plaintiff filed two inmate grievances regarding the September 25, 2019 assault. (Dkt. No. 25-2 at ¶¶ 15, 16.)

*October 11, 2019* – Plaintiff commenced this action in federal court. (Dkt. No. 1.)

*November 13, 2019* – the Superintendent found both of Plaintiff's grievances were unsubstantiated. (Dkt. No. 25-2 at ¶¶ 17, 18.)

*November 27, 2019* – Plaintiff appealed both grievances to CORC. *Id.* at ¶ 19.

*January 29, 2020* – CORC issued a joint determination denying both grievances. *Id.* at ¶ 20.

Therefore, the undisputed facts demonstrate that Plaintiff commenced this action before he completed the administrative review process. (Dkt. No. 25-2 at ¶ 21.[4]) When a prisoner fails to properly exhaust his administrative remedies before filing suit, the action must be dismissed. *Burgos v. Craig*, 307 F. App'x 469, 471 (2d Cir. 2008)

("[Exhaustion] must be completed before suit is filed, and completing the exhaustion requirements only after filing suit is insufficient." (citation omitted)); *Neal v. Goord*, 267 F.3d 116, 121-22 (2d Cir. 2001), *abrogated in part on other grounds by Porter*, 534 U.S. 516.

[4]    Moreover, there is no evidence in the record showing the grievance procedure "operate[d] as a simple dead end" to Plaintiff, nor is there any evidence to establish an issue of fact as to unavailability due to an "opaque" administrative scheme. *See Ross*, 136 S. Ct. at 1859-60. There also is no evidence prison administrators prevented Plaintiff from using the grievance procedure due to "machination, misrepresentation, or intimidation." *Id.*

Dismissal is appropriate even if—as is the case here— the plaintiff's claim has since been exhausted. *See Mateo v. Alexander*, No. 08–cv-8797(RJH), 2010 WL 431718, at *3 (S.D.N.Y. Feb. 9, 2010); *Mendez v. Artuz*, No. 01-cv-4157(GEL), 2002 WL 313796, at *2 (S.D.N.Y. Feb. 28, 2002); *Bowie v. Woodruff*, No. 9:18-CV-0266 (BKS/ML), 2019 WL 7606078, at *5 (N.D.N.Y. Sept. 20, 2019), *report and recommendation adopted*, 2019 WL 5445519 (N.D.N.Y. Oct. 23, 2019) ("The fact that Bowie subsequently exhausted his administrative remedies [in the sense that CORC issued a decision on his grievance] is irrelevant as he was required to properly exhaust before he sued"); *Scott v. Uhler*, No. 16-CV-403, 2019 WL 5197139, at *5, (N.D.N.Y. July 31, 2019) ("Receiving a decision from CORC after filing a federal lawsuit does not satisfy the PLRA's requirement that administrative remedies be exhausted before filing suit, and any such action must be dismissed without prejudice"). Furthermore, a post-exhaustion amendment of the complaint cannot cure an exhaustion defect existing at the time the action was commenced. *Livingston v. Hoffnagle*, No. 9:17-CV-1158 (MAD/DEP), 2019 WL 409366, at *4 (N.D.N.Y. Feb. 1, 2019) (citation omitted). "Were the rule otherwise, prisoners would have little reason to wait for the administrative process to play itself out before filing suit, which would defeat the purpose of the exhaustion requirement 'to reduce the quantity and improve the quality of prisoner suits [and to afford] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.' " *Animashaun v. Afify*, 470 F. Supp. 3d 294, 297 (W.D.N.Y. 2020) (quoting *Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (alterations in original) (other citations omitted)).

**Sanders v. St. Mary, Slip Copy (2021)**

2021 WL 1575944

**\*6** In such a case as this, dismissal is *without prejudice*, and the case may be refiled. *See Brown v. Napoli*, 687 F. Supp. 2d 295, 298 (W.D.N.Y. 2009); *Chisholm v. New York City Dep't of Correction*, No. 08 Civ. 8795, 2009 WL 2033085, at \*3 (S.D.N.Y. July 13, 2009); *Doe v. Goord*, No. 04 CV 0570, 2004 WL 2829876, at \*8 (S.D.N.Y. Dec. 10, 2004) ("Dismissal of an action for failure to exhaust administrative remedies ordinarily is without prejudice."). Such a remedy is appropriate because "[f]ailure to exhaust administrative remedies is often a temporary, curable procedural flaw." *Acosta v. Corrections Officer Dawkins*, No. 04 Civ. 6678, 2005 WL 1668627, at \*4 n.6 (S.D.N.Y. July 14, 2005) (quoting *Berry v. Kerik*, 366 F.3d 85, 87 (2d Cir. 2003)).

In sum, the Court finds Defendants have adequately demonstrated Plaintiff failed to exhaust his administrative remedies before filing suit in federal court, and Plaintiff has not plausibly explained why any exception to exhaustion should apply. Therefore, the Court recommends that this action be dismissed without prejudice.

**II. CONCLUSION**

After carefully considering the record, the Court finds Plaintiff failed to exhaust his administrative remedies.

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 25) be **GRANTED**; and it is further

**RECOMMENDED** that Plaintiff's second amended complaint (Dkt. No. 11) be **DISMISSED WITHOUT PREJUDICE**; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2008) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. [5] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) (per curiam)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a).

[5]     If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

**All Citations**

Slip Copy, 2021 WL 1575944

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 1999781
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Naji SANDERS, Plaintiff,
v.
Kevin ST. MARY, et al., Defendants.

9:19-cv-1314 (BKS/TWD)
|
Signed 05/19/2021

**Attorneys and Law Firms**

Plaintiff pro se: Naji Sanders, 18-A-0885, Great Meadow Correctional Facility, Box 51, Comstock, NY 12821.

For Defendants: Letitia James, Attorney General of the State of New York, Lauren Rose Eversley, Assistant Attorney General, of Counsel, The Capitol, Albany, NY 12224.

**MEMORANDUM-DECISION AND ORDER**

Brenda K. Sannes, United States District Judge:

 *1 Plaintiff Naji Sanders, a New York State inmate proceeding *pro se*, commenced this civil rights action asserting claims under 42 U.S.C. § 1983 arising out of his incarceration at Upstate Correctional Facility. (Dkt. No. 1). On September 15, 2020, Defendants filed a motion for summary judgment under Fed. R. Civ. P. 56 seeking dismissal because Plaintiff failed to exhaust his administrative remedies before commencing this action. (Dkt. No. 25). Plaintiff filed a response on November 5, 2020, and Defendants filed a reply on December 7, 2020. (Dkt. Nos. 36, 38). This matter was assigned to United States Magistrate Judge Thérèse Wiley Dancks who, on April 22, 2021, issued a Report-

Recommendation recommending that Defendants' motion for summary judgment be granted and that this action be dismissed without prejudice because Plaintiff commenced this action before he completed the administrative review process. (Dkt. No. 44). Magistrate Judge Dancks advised the parties that under 28 U.S.C. § 636(b)(1), they had fourteen days within which to file written objections to the report, and that the failure to object to the report within fourteen days would preclude appellate review. (Dkt. No. 44, at 11–12).

As no objections to the Report-Recommendation have been filed, and the time for filing objections has expired, the Court reviews the Report-Recommendation for clear error. *See Petersen v. Astrue*, 2 F. Supp. 3d 223, 228–29 (N.D.N.Y. 2012); Fed. R. Civ. P. 72(b) advisory committee's note to 1983 amendment. Having reviewed the Report-Recommendation for clear error and found none, the Court adopts the Report-Recommendation in its entirety.

For these reasons, it is

**ORDERED** that the Report-Recommendation (Dkt. No. 44) is **ADOPTED** in its entirety; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 25) is **GRANTED,** and Plaintiff's second amended complaint (Dkt. No. 11) is **DISMISSED WITHOUT PREJUDICE** for failure to exhaust administrative remedies; and it is further

**ORDERED** that the Clerk serve a copy of this Order upon the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2021 WL 1999781

---

**End of Document**                        © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:19-cv-00427-DNH-TWD    Document 62    Filed 12/17/21    Page 22 of 193

McMillian v. Walters, Not Reported in Fed. Supp. (2017)

2017 WL 8894737

2017 WL 8894737
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Herman Carlee MCMILLIAN, Plaintiff,
v.
Daniel WALTERS, Correctional Officer, Defendant.

Civ. No. 9:16-CV-0277 (MAD/DJS)
|
Signed 12/18/2017

**Attorneys and Law Firms**

HERMAN CARLEE MCMILLIAN, 90-T-5238, Auburn Correctional Facility, P.O. Box 618, Auburn, New York, pro se.

HON. ERIC T. SCHNEIDERMAN, Attorney General of the State of New York, OF COUNSEL: MICHAEL G. MCCARTIN, ESQ., Assistant Attorney General, The Capitol, Albany, New York 12224, Attorney for Defendant.

**REPORT-RECOMMENDATION and ORDER**

DANIEL J. STEWART, United States Magistrate Judge

 **\*1** *Pro se* Plaintiff Herman Carlee McMillian commenced this action, pursuant to 42 U.S.C. § 1983, asserting claims for violations of his constitutional rights that allegedly occurred while he was incarcerated at Auburn Correctional Facility ("Auburn") in the custody of the Department of Corrections and Community Supervision ("DOCCS"). Dkt. No. 2, Compl. Following an initial review by the Honorable Mae A. D'Agostino, United States District Judge, conducted pursuant to 28 U.S.C. §§ 1915(e) and 1915A, the only claims that remain in this action are an Eighth Amendment excessive force and First Amendment retaliation claim against Defendant Daniel Walters. Dkt. No. 16, Dec. & Order, dated June 1, 2016. Presently before the Court is Defendant's Motion for Summary Judgment, which seeks dismissal of Plaintiff's remaining claims on the ground that Plaintiff has failed to exhaust his administrative remedies. Dkt. No. 44, Def.'s Mot. Summ. J. Plaintiff has filed a Response, Dkt. No. 47, Pl.'s Resp., and Defendant has filed a Reply, Dkt. No. 48, Def.'s Reply. For the reasons that follow, the Court recommends that Defendant's Motion be **granted** and this action **dismissed**.

**I. SUMMARY JUDGMENT STANDARD**

Pursuant to FED. R. CIV. P. 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ).

To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin*, 344 F.3d at 289 (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) and *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). Furthermore, where a party is proceeding *pro se*, the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994), *accord, Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995). Nonetheless, summary judgment is appropriate "[w]here the record taken as a whole could not

McMillian v. Walters, Not Reported in Fed. Supp. (2017)

2017 WL 8894737

Case 9:19-cv-00427-DNH-TWD    Document 62    Filed 12/17/21    Page 23 of 193

lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II. EXHAUSTION

### A. Exhaustion Procedure

**\*2** The Prison Litigation Reform Act ("PLRA") provides, in pertinent part, that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Supreme Court has held that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002) (citation omitted). Exhaustion in prisoner cases covered by § 1997e(a) is mandatory. *Id.* at 524; *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016) (stating that mandatory language of § 1997e(a) forecloses judicial discretion to craft exceptions to the requirement). Furthermore, § 1997e(a) requires "proper exhaustion," which means using all steps of the administrative process and complying with "deadlines and other critical procedural rules." *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). The defendant bears the burden of proving that the administrative remedies available to the plaintiff were not exhausted prior to the initiation of a civil action. *Howard v. Goord*, 1999 WL 1288679, at \*3 (E.D.N.Y. Dec. 28, 1999).[1]

---

[1]    Exhaustion of administrative remedies is an affirmative defense which must be raised by the defendant. *See Jenkins v. Haubert*, 179 F.3d 19, 28-29 (2d Cir. 1999). Defendant properly raised the affirmative defense in his Answer. Dkt. No. 26 at ¶ 12.

In New York, the administrative remedies consist of a three-step Inmate Grievance Program ("IGP"). First, a grievance is submitted to the Inmate Grievance Resolution Committee ("IGRC"), a committee comprised of both inmates and facility employees. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5(b). An inmate must submit a grievance "within 21 calendar days of the alleged occurrence." *Id.* at § 701.5(a). In addition, an inmate may request an extension of the time limit within forty-five days of the date of the alleged occurrence. *Id.* at § 701.6(g). The IGRC reviews and investigates the formal complaint and then issues a written determination. *Id.* at § 701.5(b). Second, upon appeal of the IGRC decision, the superintendent of the facility reviews the IGRC's determination and issues a decision. *Id.* at § 701.5(c). Finally, upon appeal of the superintendent's decision, the Cental Office Review Committee ("CORC") makes the final administrative determination. *Id.* at § 701.5(d). Only upon exhaustion of all three levels of review may a prisoner seek relief in federal court. *Bridgeforth v. Bartlett*, 686 F. Supp. 2d 238, 239 (W.D.N.Y. 2010) (citing, *inter alia*, *Porter v. Nussle*, 534 U.S. at 524); *see also Neal v. Goord*, 267 F.3d 116, 121 (2d Cir. 2001), *overruled on other grounds by Porter v. Nussle*, 534 U.S. 516.

### B. Plaintiff's Failure to Exhaust Administrative Remedies

It is undisputed that Plaintiff did not exhaust his administrative remedies relative to the incident alleged in the Complaint. There is no record on file at Auburn of a grievance filed by Plaintiff relative to the incident. Dkt. No. 44-7, Decl. of Cheryl Parmiter, dated Mar. 2, 2017, at ¶ 9; *see also* Dkt. No. 44-8, Parmiter Decl., Ex. A. Nor is there any record that Plaintiff appealed a grievance relative to the incident to CORC. Dkt. No. 44-4, Decl. of Jeffery Hale, dated Feb. 23, 2017, at ¶ 12. Furthermore, at his deposition, Plaintiff admitted that he did not file a grievance regarding the incident alleged in this action. Dkt. No. 44-10, Decl. of Justin L. Engel, Esq., dated Mar. 7, 2017, Dep. of Herman Carlee McMillian, dated Jan. 6, 2017 ("Pl.'s Dep.") at p. 30.

### C. Whether Plaintiff's Failure to Exhaust Administrative Remedies may be Excused

A prisoner's failure to exhaust administrative remedies may nonetheless be excused if remedies were unavailable to the inmate. *Ross v. Blake*, 136 S. Ct. at 1858. As the Supreme Court recently stated, "[a]n inmate ... must exhaust available remedies, but need not exhaust unavailable ones." *Id.* The Court stated three potential circumstances where administrative remedies may be unavailable: (1) where the administrative procedure technically exists but operates as a "dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) where the administrative scheme is "so opaque that it becomes, practically speaking, incapable of use"; and (3) where prison

Case 9:19-cv-00427-DNH-TWD    Document 62    Filed 12/17/21    Page 24 of 193

McMillian v. Walters, Not Reported in Fed. Supp. (2017)
2017 WL 8894737

administrators "thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1859-60. [2]

[2]    The Second Circuit previously set forth a three-part inquiry for when a failure to exhaust may be excused: "(1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the prisoner's failure to comply with the exhaustion requirement." *Ruggiero v. Cty. of Orange*, 467 F.3d 170, 175 (2d Cir. 2006) (citing *Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004) ). The Second Circuit has stated that "*Ross* largely supplants our *Hemphill* inquiry by framing the exception issue entirely within the context of whether administrative remedies were actually available to the aggrieved inmate." *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 123 (2d Cir. 2016).

**\*3** Plaintiff offers no excuse for his failure to exhaust his administrative remedies, and indeed, his opposition to Defendant's Motion does not address Defendant's exhaustion argument. *See* Pl.'s Resp. It is undisputed that Auburn has a grievance program, which inmates were informed of during orientation. Parmiter Decl. at ¶ 3. Plaintiff admitted that he was familiar with the DOCCS IGP and had filed grievances in the past. Pl.'s Dep. at pp. 29-30. He stated, however, that he did not file a grievance because he believed it would be futile due to the staff's bias against him on account of his criminal charge. *Id.* at p. 31. An inmate's belief that administrative remedies would be futile is not a valid excuse establishing the unavailability of such remedies. *See Harrison v. Goord*, 2009 WL 1605770, at \*4 (S.D.N.Y. June 9, 2009) (stating that "[p]risoners are required to exhaust their administrative remedies 'even if they believe that administrative remedies would be ineffective or futile' "). Plaintiff has not shown that the administrative procedures operated as a "dead end,"

were so "opaque" that they were incapable of use, or that prison staff prevented him from filing a grievance. *Ross v. Blake*, 2016 WL 3128839, at \*7-8. Accordingly, the Court recommends that Defendant's Motion be **granted**.

## III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED**, that Defendant's Motion for Summary Judgment (Dkt. No. 44) be **GRANTED** and this action be **DISMISSED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) [3] days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) ); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).

[3]    If you are proceeding *pro se* and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. FED. R. CIV. P. 6(a)(1)(C).

**All Citations**

Not Reported in Fed. Supp., 2017 WL 8894737

---

Case 9:19-cv-00427-DNH-TWD    Document 62    Filed 12/17/21    Page 25 of 193

McMillian v. Walters, Not Reported in Fed. Supp. (2018)

2018 WL 879270

2018 WL 879270
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Herman Carlee MCMILLIAN, Plaintiff,
v.
Daniel WALTERS, Correctional Officer, Defendant.

9:16-cv-277 (MAD/DJS)
|
Signed 02/14/2018

**Attorneys and Law Firms**

HERMAN CARLEE MCMILLIAN, 90-T-5238, Auburn Correctional Facility, P.O. Box 618, Auburn, New York 13021, pro se.

OFFICE OF THE NEW YORK STATE ATTORNEY GENERAL, OF COUNSEL: MICHAEL F. MCCARTIN, AAG, The Capitol, Albany, New York 12224, Attorneys for Defendant.

## ORDER

Mae A. D'Agostino, U.S. District Judge

**\*1** Plaintiff *pro se* Herman Carlee McMillian, an inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), commenced this civil rights action against Defendant Daniel Walters ("Defendant") pursuant to 42 U.S.C. § 1983 asserting claims arising from an incident that allegedly occurred while he was incarcerated at the Auburn Correctional Facility ("Auburn"). *See generally* Dkt. No. 82.

On March 7, 2017, Defendant filed a motion for summary judgment seeking dismissal of Plaintiff's Eighth Amendment excessive force and First Amendment retaliation claims. *See* Dkt. No. 44. Defendant argues that Plaintiff failed to exhaust all administrative remedies available to him under the Prison Litigation Reform Act ("PLRA"). *See* Dkt. No. 44-2, 1937 WL 30643 at 8.[1] In a December 2017 Report-Recommendation and Order, Magistrate Judge Stewart recommended granting Defendant's motion for summary judgment after finding that it was uncontested that Plaintiff failed to initiate any administrative proceeding prior to filing his complaint in federal court. *See* Dkt. No. 82 at 2.

1    The cited page numbers for docket entries in this Order refer to those assigned by the Court's electronic filing system ("ECF").

In reviewing a report and recommendation, a district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). When a party makes specific objections to a magistrate judge's report, the district court engages in *de novo* review of the issues raised in the objections. *See id.*; *Farid v. Bouey*, 554 F.Supp.2d 301, 307 (N.D.N.Y. 2008). When a party fails to make specific objections, the court reviews the magistrate judge's report for clear error. *See Farid*, 554 F.Supp.2d at 307; *see also Gamble v. Barnhart*, No. 02-CV-1126, 2004 WL 2725126, *1 (S.D.N.Y. Nov. 29, 2004).

On December 27, 2017, Plaintiff submitted objections to Magistrate Judge Stewart's Report-Recommendation and Order. *See* Dkt. No. 84. The first paragraph of Plaintiff's objections addressed the issue of exhaustion. *See id.* at 1. Plaintiff argued that he was not required to file an administrative grievance because this is a civil action based upon a violation of his constitutional rights which "is not an administration violation." *Id.* at 1. The remainder of the objections dealt with the merits of Plaintiff's constitutional claims, which are irrelevant to the issues before the Court.

A court may grant a motion for summary judgment only if "the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law." *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted). When analyzing a summary judgment motion, the court " 'cannot try issues of fact; it can only determine whether there are issues to be tried.' " *Id.* at 36-37 (quotation and other citation omitted).

**\*2** In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable factual inferences in favor of the nonmoving party. *See id.* at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513-14, 91 L.Ed. 2d 202 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's statement of material facts; rather, the court must be satisfied that the citations to evidence in the record support the movant's

McMillian v. Walters, Not Reported in Fed. Supp. (2018)

2018 WL 879270

assertions. *See Giannullo v. City of N.Y.*, 322 F.3d 139, 143 n.5 (2d Cir. 2003).

Moreover, "in a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell*, 289 F.Supp.2d 289, 295 (N.D.N.Y. 2007) (quoting *Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed. 2d 652 (1972)) (other citations omitted). "Indeed, the Second Circuit has stated that '[i]mplicit in the right to self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training.' " *Govan*, 289 F.Supp.2d at 295 (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)). "This liberal standard, however, does not excuse a *pro se* litigant from following the procedural formalities of summary judgment." *Id.* (citing *Showers v. Eastmond*, No. 00 CIV. 3725, 2001 WL 527484, at *1 (S.D.N.Y. May 16, 2001)).

The Prison Litigation Reform Act ("PLRA") states that "[n]o action shall be brought with respect to prison conditions under section 1979 of the Revised Statutes of the United States (42 U.S.C. § 1983), or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). This exhaustion requirement applies to all suits brought by inmates regarding aspects of prison life, including allegations of constitutional deprivations such as "excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). Inmates must exhaust all available administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *See Giano v. Goord*, 380 F.3d 670, 675 (2d Cir. 2004), *abrogated on other grounds by Ross v. Blake*, ––– U.S. –––, 136 S.Ct. 1850, 195 L.Ed.2d 117 (2016). The failure to exhaust is an affirmative defense that must be raised by the defendants and, as such, it is the defendants' burden to establish that the plaintiff failed to meet the exhaustion requirements. *See Jones v. Bock*, 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007); *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004); *Key v. Toussaint*, 660 F.Supp.2d 518, 523 (S.D.N.Y. 2009) (citations omitted).

The Supreme Court has held that in order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules. *See Jones*, 549 U.S. at 218-19, 127 S.Ct. 910 (citing *Woodford v. Ngo*, 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006)). In *Woodford*, the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. *See Woodford*, 548 U.S. at 90-103, 126 S.Ct. 2378.

New York State has a three-step administrative review process. First, a grievance is submitted to the Inmate Grievance Resolution Committee ("IGRC") which reviews and investigates the formal complaint before issuing a written determination. *See* 7 N.Y.C.R.R. § 701.5(b). Second, an adverse decision by the IGRC may be appealed to the Superintendent of the Facility. *See id.* at § 701.5(c). Third, an adverse decision by the Superintendent may be appealed to Central Office Review Committee ("CORC"), which makes the final determination within the administrative review process. *See id.* at § 701.5(d). If all three of these levels of review are exhausted, then the prisoner may seek relief in federal court pursuant to section 1983. *See Bridgeforth v. DSP Bartlett*, 686 F.Supp.2d 238, 239 (W.D.N.Y. 2010) (citing *Porter*, 534 U.S. at 524, 122 S.Ct. 983); *Singh v. Goord*, 520 F.Supp.2d 487, 495-96 (S.D.N.Y. 2007) (quoting *Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004)). When a plaintiff presents a claim arising "directly out of a disciplinary or administrative segregation hearing ... (*e.g.*, a claim of denial of procedural due process), he exhausts his administrative remedies by presenting his objections in the administrative appeals process, not by filing a separate grievance instead of or in addition to his ordinary appeal." *Sweet v. Wende Corr. Facility*, 514 F.Supp.2d 411, 413 (W.D.N.Y. 2007) (internal quotation and citations omitted); *see also Davis v. Barrett*, 576 F.3d 129, 131-32 (2d Cir. 2009).

**\*3** Although administrative remedies generally must be exhausted, a prisoner need not exhaust remedies if they are not "available." *Ross v. Blake*, ––– U.S. –––, 136 S.Ct. 1850, 1855, 195 L.Ed.2d 117 (2016). "First, an administrative remedy may be unavailable when 'it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates.' " *Williams v. Priatno*, 829 F.3d 118, 123 (2d Cir. 2016) (quoting *Ross*, 136 S.Ct. at 1859). "Second, 'an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use.' " *Id.* (quoting *Ross*, 136 S.Ct. at 1859). "In other words, 'some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it.' " *Id.* at 123-24 (quoting *Ross*, 136 S.Ct. at 1859). "Third, an administrative remedy may be unavailable 'when prison administrators

Case 9:19-cv-00427-DNH-TWD    Document 62    Filed 12/17/21    Page 27 of 193

McMillian v. Walters, Not Reported in Fed. Supp. (2018)

2018 WL 879270

thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.' " *Id.* at 124 (quoting *Ross*, 136 S.Ct. at 1860). [2]

[2]    In *Ross*, the Court rejected the Second Circuit's "extra-textual" exception to the PLRA's exhaustion requirement which allowed the taking into account of "special circumstances" to justify a prisoner's failure to comply with administrative procedural requirements. *See Ross*, 136 S.Ct. at 1856-57. Rather, it held that the only limit to the PLRA's exhaustion requirement "is the one baked into its text: An inmate need exhaust only such administrative remedies as are 'available.' " *Id.* at 1862; *see also Williams*, 829 F.3d at 123 (recognizing that the framework set forth in *Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004) and *Hemphill v. New York*, 380 F.3d 680 (2d Cir. 2004), setting forth a "special circumstances" exception to the PLRA's exhaustion requirement has been abrogated in part by *Ross*). As such, the Supreme Court specifically found that an inmate's mistaken belief that he has exhausted his administrative remedies, even where that belief seems reasonable, does not make the administrative remedy unavailable. *See id.* at 1858.

After *de novo* review, it is clear that Plaintiff was required to exhaust his administrative remedies. As a general matter, the Supreme Court in *Porter* established that even civil claims based on constitutional deprivations still require inmates to exhaust administrative remedies. *See Porter*, 534 U.S. at 532, 122 S.Ct. 983. Turning to the recognized exceptions to the administrative exhaustion requirement, Plaintiff has failed to establish that any of them apply. Plaintiff did not provide any evidence that would suggest that the administrative procedures act as a dead end. Although Plaintiff stated in his deposition that the grievance process "didn't do anything" for him in the past, Dkt. No. 44-10 at 29:22-23, a record of administrative defeats for a single prisoner is not sufficient evidence to effectively indict the system. Similarly, the fact that Plaintiff had initiated the grievance procedures in the past but failed to do so here demonstrates that at least the initial step of the process, which Plaintiff failed to engage in, was not so opaque as to be unavailable. *See id.*; Dkt. No. 44-6 at 3. Finally, Plaintiff has failed to provide any evidence suggesting that the prison administrators thwarted his attempts to utilize the process. Instead, Plaintiff admits that he actively chose to forgo the IGRC processes because he believed the nature of the crime underlying his incarceration would prejudice the IGRC against him. *See* Dkt. No. 44-10 at 31:2-17. However, other than this statement, which merely demonstrates Plaintiff's subjective belief of bias, Plaintiff introduced no evidence to support this belief. As such, the Court is unable to find a question of fact over whether the administrators were interfering with Plaintiff's access to administrative remedies. Therefore, after *de novo* review, the Court concludes that Plaintiff was not excused from exhausting his administrative remedies prior to bringing this action in federal court. As it is undisputed that Plaintiff did not exhaust his administrative remedies, the Court adopts Magistrate Judge Stewart's Report-Recommendation and Order.

**\*4** Accordingly, the Court hereby

**ORDERS** that Magistrate Judge Stewart's Report-Recommendation and Order (Dkt. No. 82) is **ADOPTED** in its entirety for the reasons stated therein; and the Court further

**ORDERS** that Defendant's motion for summary judgment (Dkt. No. 44) is **GRANTED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendant's favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2018 WL 879270

---

End of Document

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 1606178
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Dimas CUADRADO, Plaintiff,

v.

BRUEAULT, Correction Officer, Coxsackie
Correctional Facility, Defendant.

No. 9:14–CV–1293 (DNH/CFH).
|
Signed April 8, 2015.

**Attorneys and Law Firms**

Dimas Cuadrado, Comstock, NY, pro se.

Hon. Eric T. Schneiderman, Rachel M. Kish, Esq., Ass't
Attorney General, Albany, NY, for Defendant.

**DECISION and ORDER**

DAVID N. HURD, District Judge.

**\*1** Pro se plaintiff Dimas Cuadrado brought this civil rights
action pursuant to 42 U.S.C. § 1983. On March 17, 2015,
the Honorable Christian F. Hummel, United States Magistrate
Judge, advised by Report–Recommendation that defendant's
motion to dismiss pursuant to Federal Rule of Civil Procedure
12(b)(6) be granted. Plaintiff timely filed objections to the
Report–Recommendation.

Based upon a de novo review of the portions of the Report–
Recommendation to which plaintiff objected, the Report–
Recommendation is accepted and adopted in all respects. *See*
28 U.S.C. § 636(b)(1).

Therefore, it is

ORDERED that

1. Defendant Brueault's motion to dismiss is GRANTED;

2. To the extent plaintiff asserts claims against defendant
Brueault in his official capacity, those claims are
DISMISSED WITH PREJUDICE;

3. All remaining claims are DISMISSED WITHOUT
PREJUDICE based on plaintiff's failure to fully exhaust
administrative remedies;

4. The Central Office Review Committee ("CORC") is
directed to render a decision on plaintiff's pending grievance
within thirty days of the date of this Decision and Order, that
is, by May 8, 2015;

5. If plaintiff does not receive a decision from the CORC
by May 8, 2015, administrative remedies may be deemed
unavailable to him and he may therefore be excused from
exhausting;

6. In the event plaintiff does not receive a decision from the
CORC by May 8, 2015, he may refile this suit indicating such;

7. In the event plaintiff does receive a decision from the
CORC by Mail 8, 2015, he may refile this suit indicating such;
and

8. The Clerk is directed to serve a copy of this Decision and
Order upon the parties in accordance with the Local Rules.

IT IS SO ORDERED.

DIMAS CUADRADO, Plaintiff,

v.

STATE OF NEW YORK; BRUEAULT, Correction Officer,
Coxsackie Correctional Facility; Carrol, Correction Officer,
Coxsackie Correctional Facility; and Millet, Correction
Officer, Coxsackie CorrectionalFacility,

Defendants.

**REPORT–RECOMMENDATION AND ORDER** [1]

[1]   This matter was referred to the undersigned for
report and recommendation pursuant to 28 U.S.C.
§ 636(b) and N.D.N.Y.L.R. 72.3(c).

CHRISTIAN F. HUMMEL, United States Magistrate Judge.

Plaintiff *pro se* Dimas Cuadrado, an inmate who was, at all
relevant times, in the custody of the New York Department
of Corrections and Community Supervision ("DOCCS"),
brings this action pursuant to 42 U.S.C. § 1983 alleging that

Cuadrado v. Brueault, Not Reported in F.Supp.3d (2015)

2015 WL 1606178

defendant Brueault violated his constitutional rights under the Eighth Amendment. Compl. (Dkt. No. 1). [2] At all relevant times, plaintiff was an inmate incarcerated at Coxsackie Correctional Facility ("Coxsackie"). Additional defendants were named, but the claims against them have since been dismissed. Dkt. No. 10. Plaintiff demands monetary damages in the amount of $2,000,000 from New York State, "paid dental expenses, the removement [sic] from [Coxsackie] correctional facility," [3] and the suspension of the "officer." Compl. at 5. For the following reasons, it is recommended that Brueault's motion for dismissal be granted.

[2]    This action was administratively closed on October 21, 2014 due to plaintiff's failure to properly certify his in forma pauperis ("IFP") application. Dkt. No. 4. The action was reopened on November 14, 2014 after plaintiff properly complied with the filing fee requirements. Dkt. No. 7.

[3]    Plaintiff was moved to Great Meadow Correctional Facility located in Comstock, New York sometime after filing this action.

## II. Background

**\*2** The allegations of plaintiff's complaint are viewed as true. *See* subsection III(A) *infra*. Plaintiff alleges that on October 13, 2014 he was on his way to Jewish services when he was approached by Officer Brueault and asked to "get on the wall for a 'pat frisk.' " Compl. at 5. While plaintiff obeyed Brueault's order, other officers notified Brueault that "the area was 'clear' ". *Id.* Brueault then swung and hit plaintiff in his face, breaking his jaw and rendering him unconscious. *Id.* Plaintiff regained consciousness while the other officers "beat on [him] until a sergeant came." *Id.*

## III. Discussion [4]

[4]    All unpublished opinions cited to by the Court in this Report–Recommendation are, unless otherwise noted, attached to this Recommendation.

Plaintiff contends that defendant Brueault violated the Eighth Amendment by using excessive force during the October 13 incident. Compl. at 5. Brueault argues that plaintiff has failed to exhaust his administrative remedies as required under 42 U.S.C. § 1997e(a), the Prison Litigation Reform Act

("PLRA") and that the Eleventh Amendment bars the claims against Brueault in his official capacity. Dkt. No. 13–1.

### A. **Legal Standard**

Rule 12(b)(6) authorizes dismissal of a complaint that states no actionable claim. When considering a motion to dismiss, "a court must accept the allegations contained in the complaint as true, and draw all reasonable inferences in favor of the non-movant." *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d.Cir.1994). However, this "tenet ... is inapplicable to legal conclusions[; thus, t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 554, 555 (2007) (holding that "entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action ... [as] courts are not bound to accept as true a legal conclusion couched as a factual allegation.")).

Accordingly, to defeat a motion to dismiss, a claim must include "facial plausibility ... that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678 (citing *Twombly,* 550 U.S. at 556 (explaining that the plausibility test "does not impose a probability requirement ... it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct].")); *see also Arar v. Ashcroft,* 585 F.3d 559, 569 (2d Cir.2009) (holding that, "[o]n a motion to dismiss, courts require enough facts to state a claim to relief that is plausible ....") (citations and internal quotation marks omitted). Determining whether plausibility exists is a "context-specific [task] that requir[es] the reviewing court to draw on its [judicial] experience and common sense." *Iqbal,* 556 U.S. at 663–64 (citation omitted).

When, as here, a party seeks judgment against a *pro se* litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit has stated,

**\*3** [t]here are many cases in which we have said that a *pro se* litigant is entitled to "special solicitude,"... that a *pro se* litigant's submissions must be construed "liberally," ... and that such submissions must be read to raise the strongest arguments that they "suggest".... At the same time, our cases have also indicated that we cannot read into *pro se*

submissions claims that are not "consistent" with the *pro se* litigant's allegations ... or arguments that the submissions themselves do not "suggest"... that we should not "excuse frivolous or vexatious filings by *pro se* litigants". and that *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law[.]"

*Id.* (citations and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191–92 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se,* ... a court is obliged to construe his pleadings liberally.' " (citations omitted)).

## A. Exhaustion

Brueault contends that his motion to dismiss must be granted because plaintiff failed to exhaust administrative remedies. Specifically, Brueault argues that plaintiff failed to wait until he received a decision on his final appeal before commencing this action. Under the PLRA, an inmate must exhaust all administrative remedies before bringing an action for claims arising out of his or her incarceration. *Porter v. Nussle,* 534 U.S. 516, 524 (2002); *see also Woodford v. Ngo,* 548 U.S. 81, 82 (2006). To exhaust administrative remedies, the inmate must complete the full administrative review process set forth in the rules applicable to the correctional facility in which he or she is incarcerated. *Jones v. Bock,* 549 U.S. 199, 218 (2007) (internal citation omitted). The exhaustion requirement applies even if the administrative grievance process does not provide for all the relief requested by the inmate. *Nussle,* 534 U.S. at 524.

Although the Supreme Court has deemed exhaustion mandatory, the Second Circuit has recognized that "certain caveats apply." *Ruggiero v. County of Orange,* 467 F.3d 170, 175 (2d Cir.2006) (citing *Giano v. Goord,* 380 F.3d 670, 677 (2d Cir.2004)). Thus, a court must conduct a three-part inquiry to determine whether an inmate's failure to follow the applicable grievance procedures is fatal to his or her claims. A court must consider whether:

> (1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such a way as to estop

> them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the prisoner's failure to comply with the exhaustion requirement.

*Ruggiero,* 467 F.3d at 175 (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)).

**\*4** Administrative remedies are unavailable when there is no "possibility of ... relief for the action complained of." *Abney v. McGinnis,* 380 F.3d 663, 667 (2d Cir.2004) (citing *Booth v. Churner,* 532 U.S. 731, 738 (2001)). The test to determine the availability of an administrative remedy is an objective one: whether "a similarly situated individual of ordinary firmness" would have deemed it available. *Hemphill,* 380 F.3d at 688 (citation omitted). Unavailability may be found in circumstances "where plaintiff is unaware of the grievance procedures or did not understand it ... or where defendants' behavior prevents plaintiff from seeking administrative remedies." *Hargrove v. Riley,* No.04–CV– 4587 (DST), 2007 WL 389003, at \*8 (E.D.N.Y. Jan. 31, 2007) (internal citations omitted). Further, "where a prisoner has made a 'reasonable attempt' to file a grievance, and prison officials have prevented the prisoner from filing that grievance, the grievance procedures are not 'available' to the defendant, and thus, the [PLRA] does not preclude the prisoner from suing in federal court." *Thomas v. New York State Dep't of Corr. Servs.,* 00–CV–7163 (NRB), 2002 WL 31164546, at \*3 (S.D.N.Y. Sept. 30, 2002) (citations omitted).

Here, there is no dispute that at all relevant times, DOCCS had in place a three-step inmate grievance program. N.Y. COMP.CODES R. & REGS. tit. 7, § 701.5 (2014). First, the inmate is required to file a complaint with an inmate grievance program clerk ("IGP") within twenty-one days of the alleged action. *Id.* at § 701.5(a) (1). An IGP representative has sixteen calendar days to informally resolve the issue. *Id.* at § 701.5(b)(1). If no informal resolution occurs, the full IGP committee must hold a hearing within sixteen days of receipt of the grievance and must issue a written decision within two working days after conclusion of the hearing. *Id.* §§ 701.5(b)(2)(i), (ii). If unfavorable, a grievant may appeal the IGP committee's determination to the facility superintendent within seven calendar days of receipt of the determination. *Id.* § 701.5(c)(1). If the superintendent's determination is unfavorable, the grievant may take the third step of the

Case 9:19-cv-00427-DNH-TWD   Document 62   Filed 12/17/21   Page 31 of 193

grievance procedure by appealing to the central office review committee ("CORC") within seven days after receipt of the unfavorable superintendent's determination. *Id.* §§ 701.5(d) (i),(ii). CORC must issue a written decision within thirty days of receipt of the grievant's appeal. *Id.* § 701.5(d)(2)(ii).

Here, plaintiff presumably completed the first two steps of the administrative grievance process. His complaint states that his "grievance is still pending." Compl. at 5. Despite his claim otherwise, he has not completed the final step of the administrative grievance process as CORC has not yet addressed plaintiff's appeal. Dkt. No. 18. Plaintiff does not allege in his response that he failed to meet the exhaustion requirement due to administrative remedies being unavailable to him, nor does he allege that the defendant has waived the defense of failure to exhaust or acted in such a way as to estop him from raising such a defense. *Ruggiero,* 467 F.3d at 175. Plaintiff also does not allege any special circumstances that would justify his failure to comply with the exhaustion requirement. *Id.*

**\*5** As discussed, the exhaustion of administrative remedies must be fully completed prior to the filing of an action in federal court. *Neal v. Goord,* 267 F.3d 116, 123 (2d Cir.2001), *overruled on other grounds, Porter,* 534 U.S. at 532. Thus, "where it appears that plaintiff has begun, but not completed, the grievance procedure, the appropriate course would be to dismiss the action without prejudice to allow plaintiff to meet the exhaustion requirement." *Leal v. Johnson,* 315 F.Supp.2d 345, 347 (W.D.N.Y.2004). Dismissal is required even in cases where the exhaustion requirement is met subsequent to the filing of the complaint. *Rossi v. Fishcer,* 13–CV–3167 (PKC) (DF), 2015 WL 769551, at \*4 (S.D.N.Y. Feb. 24, 2015). Because plaintiff has not received a written decision from CORC yet, and has demonstrated no exception, he has not met the exhaustion requirement under the PLRA.

Accordingly, it is recommended that Brueault's motion for dismissal be granted on this ground, but that such dismissal be without prejudice.

**B. Eleventh Amendment**

Brueault argues that he is entitled to Eleventh Amendment immunity relating to plaintiff's claims against him in his official capacity. The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. A MEND. XI. "[D]espite the limited terms of the Eleventh Amendment, a federal court [cannot] entertain a suit brought by a citizen against his [or her] own State." *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U .S. 89, 98 (1984) (citing *Hans v. Louisiana,* 134 U.S. 1, 21 (1890)). Regardless of the nature of the relief sought, in the absence of the State's consent or waiver of immunity, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment. *Halderman,* 465 U.S. at 100. Section 1983 claims do not abrogate the Eleventh Amendment immunity of the states. See *Quern v. Jordan,* 440 U.S. 332, 340–41 (1979).

Moreover, suit against a state official in his or her official capacity is a suit against the entity that employs the official. *Faird v. Smith,* 850 F.2d 917, 921 (2d Cir.1988) (citing *Edelman v. Jordan,* 415 U.S. 651, 663 (1974)). "Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself," rendering the latter suit for money damages barred even though asserted against the individual officer in his official capacity. *Kentucky v. Graham,* 473 U.S. 159, 166 (1985).

Here, because plaintiff seeks monetary damages against Brueault for acts occurring within the scope of his duties, the Eleventh Amendment bar applies.

**\*6** Accordingly, it is recommended that Brueault's motion on this ground be granted.

## III. CONCLUSION

For the reasons stated above, it is hereby **RECOMMENDED** that defendant Brueault's motion for dismissal (Dkt. No. 13) of plaintiff's complaint (Dkt. No. 1) be **GRANTED;** and it is further

**RECOMMENDED** that:

1. all claims against defendant Brueault in his official capacity be dismissed with prejudice, and;

2. all other claims remaining in plaintiff's complaint be dismissed without prejudice, for plaintiff's failure to

2015 WL 1606178

exhaust his administrative remedies pursuant to 42 U.S.C. § 1997e(a).

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action, pursuant to local rules.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), 6(e).

Filed March 17, 2015.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 1606178

---

End of Document

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 838284
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

William HALL, Plaintiff,

v.

COUNTY OF SARATOGA, John Doe, Individually
and in his capacity as an Employee of the County
of Saratoga, New York, Sheriff's Department
and the Saratoga County Sheriff, Lt. Corbet,
Jane Doe, the persons intended being all Civilian
personnel as employees or under Contract as
independent medical personnel, Defendants.

No. 1:10–CV–1120 (NAM/CFH).
|
March 6, 2013.

**Attorneys and Law Firms**

Grasso, Rodriguez & Grasso, Nicholas J. Grasso, Esq., of
Counsel, Schenectady, NY, for Plaintiff.

Bailey Kelleher & Johnson, P.C., Nannette R. Kelleher, Esq.,
of Counsel, Albany, NY, for Defendants.

MEMORANDUM–DECISION and ORDER

NORMAN A. MORDUE, District Judge.

**I. INTRODUCTION**

*1 This action arises under the auspices of 42 U.S.C. §
1983. Plaintiff asserts that while he was an inmate at the
Saratoga County Correctional Facility ("SCCF"), defendants
denied him adequate medical care, committed a battery upon
him and are liable in negligence for personal injuries he
sustained while in their custody. Defendants have moved for
summary judgment dismissing the complaint. Plaintiff has not
submitted papers in opposition to this motion. [1]

[1]
    The Court's Docket indicates that defense counsel
    initially served plaintiff's counsel, Mr. Grasso,
    with the present motion papers via the Court's
    mandated electronic filing system ("CM/ECF")
    system, unaware that he is exempt from use of
    the ECF system as he has been in practice for

over fifty years. Mr. Grasso contacted the Court
on September 12, 2012, requesting an extension
due to his exemption and the fact that he had
just received notice that a dispositive motion had
been filed. Though defendants opposed his request,
the Court granted Mr. Grasso's request for a
thirty day extension to prepare responsive papers.
Mr. Grasso did not file his response papers as
ordered by October 12, 2012. On October 19, 2012,
this Court received additional correspondence
from defense counsel requesting that no further
extensions be granted to Mr. Grasso and that the
pending motion for summary judgment be granted
in its entirety. Mr. Grasso did not respond to
this correspondence. The Court granted the former
request and denied the latter pending review of the
motion on its merits. The Court has had no further
communication with Mr. Grasso.

**II. DISCUSSION**

A. *Standard of Review*

Summary judgment is appropriate when there is no genuine
issue with regard to any material fact, and the moving party is
entitled to judgment as a matter of law. *See Celotex Corp. v.
Catrett,* 477 U.S. 317, 322 (1986). Stated otherwise, summary
judgment is appropriate "[w]here the record taken as a whole
could not lead a rational trier of fact to find for the non-
moving party [.]" *Matsushita Elec. Indus. Co. v. Zenith Radio
Corp.,* 475 U.S. 574, 587 (1986). When deciding a summary
judgment motion, the Court must "resolve all ambiguities and
draw all factual inferences in favor of the party opposing
the motion." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d
Cir.1999).

When, as here, a summary judgment motion is unopposed,
"[t]he fact that there has been no [such] response ... does
not ... [by itself] mean that the motion is to be granted
automatically." *Champion v. Artuz,* 76 F.3d 483, 486 (2d
Cir.1996); *see also Vt. Teddy Bear Co. v. 1–800 Beargram
Co., Inc.,* 373 F.3d 241, 244 (2d Cir.2004). Instead, a court
must (1) determine what material facts, if any, are disputed
in the record presented on the motion; and (2) assure itself
that, based on those undisputed material facts, the law indeed
warrants judgment for the moving party. *See Champion,* 76
F.3d at 486. The motion may fail if the movant's submission
fails to establish that no material issue of fact remains for trial,
*Amaker v. Foley,* 274 F.3d 677, 681 (2d Cir.2001), or if the
"undisputed facts fail to show that the moving party is entitled

to judgment as a matter of law," *Vt. Teddy Bear,* 373 F .3d at 244 (internal citation and quotation marks omitted).

B. *Exhaustion of Administrative Remedies*
The Prisoner Litigation Reform Act of 1995 ("PLRA"), mandates exhaustion by prisoners of all administrative remedies before bringing an action regarding prison conditions of confinement. *See* 42 U.S.C. § 1997e(a). Specifically, the PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." *Id.* The Supreme Court has held that the PLRA's "exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002).

 **\*2** " 'Conditions of confinement' is not a term of art; it has a plain meaning." *Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999). "It quite simply encompasses all conditions under which a prisoner is confined for his term of imprisonment." *Id.* These include terms of disciplinary or administrative segregation such as keeplock or solitary confinement, as well as more general conditions affecting a prisoner's quality of life such as ... the deprivation of exercise, medical care, adequate food and shelter, and other conditions that, if improperly imposed, could violate the Constitution. *Id.* (citing *Figueroa v. Rivera,* 147 F.3d 77, 82 (1st Cir.1998); *Channer v. Mitchell,* 43 F.3d 786, 788 (2d Cir.1994)) (*per curiam* ). In short, any deprivation that does not affect the fact or duration of a prisoner's overall confinement is necessarily a condition of that confinement.

In *Hemphill v. New York,* 380 F.3d 680 (2d Cir.2004), the Second Circuit "read together," *Macias v. Zenk,* 495 F.3d 37, 41 (2d Cir.2007), a number of decisions and consolidated cases and formulated a three-part test for examining the scope of the PLRA's exhaustion requirement:

> Depending on the inmate's explanation for the alleged failure to exhaust, the court must ask whether administrative remedies were in fact available to the prisoner. The court should also inquire as to whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense. If the court finds that administrative remedies were available to the plaintiff, and that the defendants are not estopped and have not forfeited their non-exhaustion defense, but that the plaintiff nevertheless did not exhaust available remedies, the court should consider whether special circumstances have been plausibly alleged that justify the prisoner's failure to comply with administrative procedural requirements.

*Hemphill,* 380 F.3d at 686.

New York State law provides a three tier inmate grievance procedure applicable to plaintiff's claims. *See,* N.Y. Correct. Law § 139; N.Y. Comp.Codes R. & Regs. tit. 7, § 701.1 *et seq.* (2003). Courts in the this Circuit have long recognized this procedure as an "available" remedy for purposes of the PLRA. *See Mingues v. Nelson,* No. 96–CV–5396, 2004 WL 324898, at \*4 (S .D.N.Y. Feb. 20, 2004) (citing *Mojias v. Johnson,* 351 F.3d 606 (2d Cir.2003) and *Snider v. Melindez,* 199 F.3d 108, 112–13 (2d Cir.1999)). Richard Emery, the Chief Administrator with the rank of Colonel for SCCF submitted an affidavit wherein he averred that the facility maintained an inmate grievance program established by the New York State Department of Corrections and Community Supervision ("DOCCS") pursuant to the above-referenced law and regulations. Further, Emery stated that the grievance program is enumerated in the policies and procedures of SCCF and is distributed to each inmate in an Inmate Handbook. Review of the complaint and the entire record for that matter reveals no suggestion that plaintiff filed or attempted to pursue a grievance of his claims administratively at SCCF prior to filing the instant action.

 **\*3** Regarding part two of the *Hemphill* analysis, plaintiff does not allege in the complaint or anywhere in the record that defendants inhibited his ability to utilize the grievance

program which was indisputably available to him at SCCF. Finally, review of the record does not reveal any "special circumstances" which would justify plaintiff's failure to comply with administrative requirements prior to filing the present federal claim. *See Hemphill,* 380 F.3d at 686. Thus, the Court finds there is no genuine issue of material fact concerning plaintiff's failure to have exhausted administrative remedies prior to commencing his § 1983 claims against defendants. Based thereupon, these federal claims are subject to dismissal on procedural grounds.

### C. *Plaintiff's Claims Under 42 U.S.C. § 1983*

#### 1. Inadequate Medical Treatment

Even if the Court ignored plaintiff's procedural failings, his § 1983 claims fare no better on their merits. According to the complaint and his response to interrogatories filed in this matter, plaintiff claims that defendants violated the Eighth Amendment when failed to provide adequate medical care to him while he was an inmate at SCCF by: 1) failing to comply with care and treatment consistent with the diagnosis of renal failure; 2) failing to address the plugging of an A.V. fistula in his left arm in a timely fashion despite his complaints about it, putting a shunt in his neck; 3) not allowing him to shower or bathe for eight days which led to a septic infection; and 4) failing to follow a special diet of low calcium, phosphorous and potassium which was recommended by plaintiff's physician, Dr. Daoui and the Rubin Dialysis Center.

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments" on those convicted of crimes, which includes punishments that "involve the unnecessary and wanton infliction of pain." *Gregg v. Georgia,* 428 U.S. 153, 173 (1976) (citations omitted). The Eighth Amendment also applies to prison officials when they provide medical care to inmates. *See Estelle v. Gamble,* 429 U.S. 97, 103 (1976). To establish an unconstitutional denial of medical care, a prisoner must prove "deliberate indifference to [his] serious medical needs." *Id.* at 104.

The deliberate indifference standard embodies both an objective and a subjective prong. First, the alleged deprivation must be, in objective terms, "sufficiently serious." *Wilson v. Seiter,* 501 U.S. 294, 298 (1991). *See Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J., dissenting) (standard contemplates "a condition of urgency, one that may produce death, degeneration, or extreme pain") (citations omitted). Second, the charged official must act with a sufficiently culpable state of mind. *See Wilson,* 501 U.S. at

298. Deliberate indifference requires more than negligence, but less than conduct undertaken for the very purpose of causing harm. *See Farmer v. Brennan,* 511 U.S. 825, 835 (1994). More specifically, a prison official does not act in a deliberately indifferent manner unless that official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

**\*4** "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle v. Gamble,* 429 U.S. 97, 106 (1976). Nevertheless, a pattern of omissions may permit the inference of deliberate unconcern for the prisoner, and gross negligence by prison employees creates a strong presumption of deliberate indifference. *Doe v. New York City Department of Soc. Servs.,* 649 F.2d 134, 143–44, 145 (2d Cir.1981), *cert. denied,* 464 U.S. 864 (1983); *Langley v. Coughlin,* 715 F.Supp. 522, 537 (S.D.N.Y.1989). Furthermore, a health provider cannot claim to have exercised his or her "best judgment" where that judgment is based on a cursory examination or inadequate diagnostic procedures. *Williams v. United States,* 747 F.Supp. 967, 1009 (S .D.N.Y.1990). Finally, prison officials cannot defend practices that fall below the norm of what is generally accepted in the medical community merely on the ground that such practices are common throughout the correctional system. *See Todaro v. Ward,* 565 F.2d 48, 53 (2d Cir.1977).

Stephen Strader, the Medical Director at SCCF, who oversees all medical personnel at SCCF and participates in the care and treatment of all inmates at the facility, submitted an affidavit detailing the medical care provided to plaintiff during the relevant time period. According to Dr. Strader, plaintiff entered the facility on December 1, 2008, on a driving while intoxicated charge. Thus, he was automatically subject to monitoring for ETOH withdrawal. An Inmate Physical Assessment Form completed at the time of his arrival indicated that plaintiff was being treated for Stage IV Renal Disease. Dr. Strader explained that chronic renal disease is the gradual loss of kidney function which can occur over months or years. According to Dr. Strader, Stage IV is considered the most severe stage of the disease; it is usually irreversible and will often progress to complete kidney failure. At that point, Dr. Strader explained, the kidneys can no longer adequately filter waste and excess fluids from the body and dangerous levels of fluids, electrolytes and wastes can accumulate. Dr. Strader stated that the only option available to patients at this stage of kidney disease is dialysis or renal transplant.

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Dr. Strader noted that when an inmate enters SCCF with a chronic disease such as plaintiff's, the facility obtains the inmate's medical records when possible and facilitates continuing treatment by local specialists in accordance with security policies. According to Dr. Strader, inmates are transferred to all outside medical provider appointments by the Saratoga County Sheriff's Department road patrol unless emergency ambulatory services are required. Dr. Strader averred that review of plaintiff's medical records confirmed the diagnosis of Stage IV chronic kideny disease or renal failure and a medical evaluation by plaintiff's nephrologist prior to his incarceration evidenced worsening renal failure. Dr. Strader noted that when plaintiff entered SCCF, he had an A.V. fistula already in place. Dr. Strader explained that an A.V. fistula is essentially an artificial vein that connects directly to an artery. Dr. Strader stated that A.V. fistulas are commonly created surgically to be used for dialysis treatments. According to Dr. Strader, plaintiff's A.V. fistula was inserted in 2007 due to his progressing kidney disease and anticipation that dialysis would be necessary in the future.

 *5  Within the first few days of plaintiff's incarceration, SCCF contacted plaintiff's nephrologist, Dr. Daoui to determine when he would have to be seen and what treatment was necessary. According to Dr. Strader, Dr. Daoui advised that plaintiff would need monthly blood work to monitor his kidney function and electrolyte levels. Dr. Daoui asked that the results of the bloodwork be faxed to his office for review. Plaintiff saw Dr. Daoui for evaluation on January 9, 2009. Dr. Strader averred that in the course of his duties as the facility physician, he reviewed Dr. Daoui's notes and recommendations following each visit. Dr. Strader also stated that while it was his practice to defer to specialist recommendations, he maintained final authority over the medical treatment provided to inmates. Dr. Strader stated that his review of the notes from plaintiff's follow-up evaluation with Dr. Daoui on March 9, 2009, revealed worsening kidney function in the months prior to plaintiff's incarceration and Dr. Daoui's observation that plaintiff would likely soon need dialysis.

On May 11, 2009, Dr. Strader averred that Dr. Daoui recommended that plaintiff adhere to a low potassium diet. Dr. Strader understood this recommendation to require that plaintiff avoid eating excess potassium. According to Dr. Strader, limiting one's potassium intake is necessary in advanced stages of kidney disease. This is because when one's kidney's are failing, it leads to the inability to maintain a

normal potassium level as the kidneys begin to lose the ability to remove potassium from the blood. Dr. Strader stated that it was likely that the base diet provided to plaintiff at SCCF already contained lower levels of potassium than he would be ingesting outside the facility. Notably, Dr. Strader opined that "when a renal patient is placed on a low potassium diet, it is because his kidneys have already failed thereby leading to the inability to maintain normal potassium levels. A high potassium diet will not cause kidney failure." Nevertheless, as Dr. Daoui did not prescribe a specific level of potassium intake for plaintiff, SCCF medical staff advised the kitchen staff to restrict plaintiff's meals so they did not include overly high levels of potassium. Dr. Strader stated that SCCF also continued monitoring plaintiff's metabolic blood panel and electrolytes to gauge whether his kidney functions were worsening and unable to maintain normal potassium levels.

Dr. Strader also stated that in his May 9, 2009, office note, Dr. Daoui recommended that plaintiff start hemodialysis. Indeed, the Court notes that in the May 9, 2009, note, Dr. Dauoi changed plaintiff's diagnosis to " 'CKD' [or chronic kidney disease] stage 5." However, on May 17, 2009, days before plaintiff's dialysis was to start, he complained that the fistula in his left arm had stopped working. Dr. Strader averred that while he was not a nephrologist, he had a medical understanding of how fistulas are used, complications that can arise with a fistula, and what procedures may be needed to correct those complications. According to Dr. Strader, one complication that can arise is that a fistula can clot or clog which prevents fluid from passing through it. Dr. Strader's review of plaintiff's medical records revealed that a clot or clog in plaintiff's A.V. fistula had occurred at least one time before he entered SCCF. Dr. Strader stated that a clogged or clotted fistula is not a life threatening condition and it is unlikely to cause any pain to a patient. When it occurs, Dr. Strader stated that a nephologist will examine the fistula to determine if a surgical revision will need to be performed. If the patient is on dialysis, Dr. Strader stated that a temporary catheter is placed to allow continuing dialysis pending repair of the fistula.

 *6  When plaintiff complained that his fistula had stopped working, a nurse at SCCF contacted Dr. Daoui to see how he would like to proceed as plaintiff was scheduled to begin dialysis. Dr. Daoui recommended that a temporary catheter be placed to allow dialysis to proceed while the fistula was repaired. Dr. Strader said that he then scheduled a fistulogram, a procedure used to determine whether any fluid can pass through a fistula, for the beginning of June. On May 21,

2009, Dr. Strader stated that plaintiff underwent a procedure at Saratoga Hospital for the insertion of a temporary right internal jugular tunnel hemodialysis catheter. Following this procedure, Dr. Strader averred that Dr. Dempsey at Saratoga Hospital contacted SCCF and expressed concern regarding plaintiff being returned to the general inmate population with the catheter in place. Dr. Dempsey recommended that plaintiff be taken out of the general population to reduce the risk that the catheter would be pulled out which could cause plaintiff to bleed to death before medical help could arrive. Though plaintiff strenuously objected to the restriction, Dr. Strader stated that plaintiff was separated from the general population and placed on medical watch unit.

Dr. Strader stated that following the catheter insertion on May 21, 2009, showering restrictions were placed on plaintiff because it was deemed medically necessary to keep the catheter site dry. On May 28, 2009, SCCF medical staff were advised by plaintiff's specialists at the Rubin Dialysis Center that he could resume showering and the restriction was lifted. Plaintiff began his dialysis treatments on May 29, 2009, and received a total of 17 dialysis treatments between then and the time of his release from the facility in July 2009.

Dr. Strader opined to a reasonable degree of medical certainty that the treatment plaintiff received at SCCF did not hasten his kidney disease or cause his fistula to become clotted. Rather, according to Dr. Strader, the care and treatment provided to plaintiff at SCCF was in compliance with all accepted standards of care and in compliance with the recommendations of plaintiff's own specialists. Overall, Dr. Strader said that plaintiff's blood pressure and weight were monitored weekly and at times daily during his six month incarceration and blood work was performed once to twice monthly to monitor his kidney function and electrolyte levels. Plaintiff's medical records confirm Dr. Strader's statement that plaintiff was evaluated three times by his nephrologist and was in daily contact with the medical staff at SCCF. Dr. Strader averred:

> His medications were constantly monitored, he was placed on a restricted diet [ ], and relocated to a medical unit to ensure his safety. [Plaintiff's] records evidenced that his kidney was [sic] worsening with each visit to his nephrologist before he entered SCCF. [Plaintiff] received

the same care for his renal disease while at SCCF that he would have received had he not been incarcerated. I can affirm to a reasonable medical certainty that it was not [plaintiff's] incarceration which resulted in his requiring dialysis, but the natural progression of his disease.

a. Treatment of Plaintiff's Fistula

**\*7** Turning to plaintiff's claims of inadequate medical care, plaintiff alleges that defendants "fail[ed] to address the plugging of the A.V. fistula in his left arm in a timely fashion." Plaintiff testified at a 50–h hearing and at his deposition in connection with this matter that defendants waited five to six weeks to treat the clogged fistula. Notably, plaintiff did not allege or testify that the clogged fistula caused him extreme pain and there is no medical evidence in the record which indicate that the failure to treat plaintiff's condition immediately as he requested would or could have resulted in "death, degeneration or extreme pain." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (quoting *Nance,* 912 F.2d at 607). Based thereupon, defendants are correct when they argue that there is no evidence to support plaintiff's claim that failure to act immediately to remedy his clogged fistula, in and of itself, was a deprivation "sufficiently serious" to warrant review under the Eighth Amendment. *Wilson v. Seiter,* 501 U.S. at 298.

Nevertheless, even if a clogged fistula is a serious medical condition under the standard described in *Nance, supra,* the record here reveals that defendants' treatment of the problem was reasonable and in accordance with the directives of Dr. Daoui. Plaintiff alleges that SCCF's actions in evaluating the clogged fistula took too long and caused him to have a catheter inserted. However, it was Dr. Daoui who recommended insertion of the catheter to ensure plaintiff's dialysis treatments could start as scheduled. Plaintiff believes that he should have had the fistula repaired immediately instead of having to undergo placement of the catheter. However, it is well settled that "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention, are not adequate grounds for a Section 1983 claim. *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001). "These issues implicate medical judgments and, at worst, negligence amounting to

medical malpractice, but not the Eighth Amendment." *Id.*
(citing *Estelle v. Gamble,* 429 U.S. at 107

b. Inadequate Diet
The intentional failure to provide an inmate with a
medically prescribed diet for a prolonged period of time
can state a viable Eighth Amendment claim. *Abdush—
Shahid v. Coughlin,* 933 F.Supp. 168, 180 (N.D.N.Y.1996)
(citing *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983)
(Eighth Amendment's prohibition against cruel and unusual
punishment requires serving inmates nutritionally adequate
food prepared and served under conditions that do not
present imminent danger to health and well-being of inmates
who consume it)). However, the "objective component" of
an Eighth Amendment claim requires a plaintiff to show
evidence of some adverse health impact caused by the
discontinuance of or failure to provide the prescribed diet.
*Davidson v. Desai,* 817 F.Supp.2d 166, 190 (W.D.N.Y.2011).

 **\*8**  Plaintiff asserts that defendants failed to follow the
special diet of low calcium, phosphorous and potassium
recommended by his doctor and the specialists at the Rubin
Dialysis Center. However, there is no evidence in the record
that Dr. Daoui ever ordered that plaintiff's intake of calcium
and phosphorous be limited. Indeed, the only restriction Dr.
Daoui placed on plaintiff's diet was "low potassium." The
record shows that once, Dr. Daoui placed this restriction on
plaintiff's diet, the facility kitchen was made aware of the
restriction and plaintiff's diet was altered. Although plaintiff
asserts that his diet was not properly altered, defendants
are correct when they contend that plaintiff's blood levels
were continuously monitored and Dr. Daoui made no changes
based on his subsequent review of plaintiff's laboratory
results. Thus, there is no evidence that plaintiff received an
inadequate diet while incarcerated at SCCF. Moreover, there
is no objective evidence that the alleged inadequacy of his
diet caused any worsening of his health or renal condition.
As referenced above, Dr. Strader opined that high levels of
potassium do not cause kidney failure. Rather, Dr. Strader
noted that plaintiff's inability to maintain normal potassium
levels was due to the natural progression of his kidney disease.

c. Showering Restriction
Plaintiff asserts that he was not allowed to shower for several
days after placement of the catheter for dialysis and that this
caused a "septic infection." Regardless of whether restriction
of shower privileges for the time period in question rises to
level of denial of a serious medical need, there is no evidence

in the record that plaintiff ever developed any type of septic
infection while incarcerated at SCCF. Indeed, while plaintiff
testified at his 50–H hearing that he got a septic infection at
the site of the catheter placement and was "in the hospital for
four days," the Court finds no record of such a hospital visit
or infection his medical records. Moreover, the showering
restriction was implemented at the instruction of plaintiff's
specialists at the Rubin Dialysis Center who ordered that the
catheter site be kept dry. On the day that medical personnel at
SCCF were advised by the Rubin Dialysis Center that plaintiff
could resume showering, the restriction was lifted.

d. Overall Treatment of Plaintiff's Renal Disease
Plaintiff contends that the care he received at SCCF
resulted in his requiring dialysis and was not in his "best
interest." However, as referenced above, plaintiff entered the
facility with Stage IV renal disease and his medical records
demonstrate that his condition was worsening in the months
just prior to his incarceration. Plaintiff arrived at SCCF with
an A.V. fistula because his physician anticipated that he would
soon require dialysis. Within three months of entering the
facility, Dr. Daoui noted that plaintiff's bloodwork warranted
a change in his diet and the initiation of hemodialysis. The
record fully supports defendants' contention that it was the
natural progression of plaintiff's disease, not the care or
treatment he received at SCCF, which led to his requiring
dialysis. There is nothing in the record which suggests that
plaintiff's care and treatment at SCCF was not in accordance
with generally accepted medical principles and the advice and
recommendation of his own specialists.

 **\*9**  Consequently, there are no material questions of fact
concerning plaintiff's claims of inadequate medical treatment
under the Eighth Amendment and these claims must be
dismissed.

2. Excessive Force
Defendants contend that while plaintiff's complaint did allege
a claim for deliberate indifference to his medical needs, he did
not assert a claim under 42 U.S.C. § 1983 for excessive force.
Defendants argue that even if his complaint was deemed to
include a claim of excessive force under § 1983, it would still
fail. "The test of whether use of force in prison constitutes
excessive force contrary to the Eighth Amendment is whether
the force was used in a good-faith effort to maintain or restore
discipline, or maliciously and sadistically to cause harm."
*Scott v.Coughlin,* 344 F.3d 282, 291 (2d Cir.2003) (citing
*Hudson v. McMillian,* 503 U.S. 1, 7 (1992)). "The absence of

2013 WL 838284

serious injury is ... relevant to the Eighth Amendment inquiry, but does not end it." *Id.* (quoting *Hudson,* 503 U.S. at 7.)

In this case, plaintiff's complaint alleges simply that defendant Corbett struck him in the face with a dish, milk and other objects. The complaint does not assert that plaintiff suffered any injury as a result of this incident. In his response to interrogatories, plaintiff asserts further that on May 11, 2009, "Lt. Corbett committed an assault on [him] by intentionally smashing a plate of food against the edge of a table and hitting [plaintiff] in the face with it and then throwing a glass of milk in his face causing [plaintiff] reasonable apprehension of the immediate harmful and offensive contact, which was the food and milk hitting [his] face." However, in the Court's record, plaintiff's interrogatory responses are not complete and it is unclear whether they are signed or sworn to by plaintiff. At his 50–H hearing, plaintiff testified that he was "not real happy that Lieutenant Corbett threw that plate of food in my face and a glass of milk." Following this answer, there is only one additional page of testimony provided by defendant in which plaintiff testified further concerning the incident:

> I wasn't real happy about the shunt being put in my neck, and I told them that they lied to me and I wasn't pleased with it, and I told him, and I said, Give me a phone. I'll call my lawyer and I'll have this thing out of my neck tomorrow, and he smashed a plate of food into my face and threw a glass of milk at me and said, Do you know how much money they've spent on you upstairs over that? And I said, I don't care.

When plaintiff was asked what he meant when he said that Corbett "smashed a plate of food into [his] face," he said "The plate was sitting on the table, and we were arguing back and forth across the table, and he smashed it on the edge and it flipped up in my face."

In an affidavit submitted in connection with defendants' motion, Lt. Corbett averred:

> [Plaintiff] had recently returned from Saratoga Hospital, where he had

> a catheter inserted in his neck.... [Corbett] was advised by the on-duty nurse, R.N. Bilka, that [plaintiff] became angry upon learning that he was to be separated from general population.... As [plaintiff] was extremely agitated about this move, [Corbett] was asked to speak with him to attempt to calm him down.

**\*10** Corbett further stated that when he entered plaintiff's cell, he was "quite angry." "[Plaintiff] claimed that the hospital had lied to him by telling him that he could remain in general population. [Plaintiff]'s anger continued to escalate and he began yelling and threatened to remove the catheter himself."

> There was a metal table in the room that held [plaintiff]'s plate of food with a glass of milk. I sat across the table from [plaintiff] and reminded him that he was being separated from general population for his own safety. [Plaintiff's] temper was further escalated and I went to leave the holding cell to afford him the opportunity to calm down. When I rose from the table, my hand accidently knocked into [plaintiff]'s glass of milk, spilling milk on both [plaintiff] and me. I had [plaintiff] moved to another holding cell so that the cell could be cleaned while he had a chance to calm down.

> ...

> I understand that [plaintiff] has now alleged that I assaulted him by throwing the glass of milk at him during this incident. At no point, did I intentionally cause milk to spill on [plaintiff.] Had I acted in an aggressive manner towards [plaintiff] during that incident and physically assaulted him, the matter would have been reviewed by SCCF administration. Further, at no point did [plaintiff] complain of our interaction during his incarceration....

The force plaintiff describes herein not sufficiently serious or harmful to reach constitutional dimensions. *See Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993). Plaintiff does not maintain that he experienced any pain or injury as a result of the milk or food being allegedly thrown in his face, even assuming the incident occurred as he states. Moreover, plaintiff does not allege facts that show that Lt. Corbett used force "maliciously and sadistically to cause harm," rather than

"in a good-faith effort to maintain or restore discipline" or calm him down and prevent him from removing his catheter. *Hudson,* 503 U.S. at 7. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.1973). Indeed, not even "every **malevolent** touch by a prison guard gives rise to a federal cause of action." *Hudson,* 503 U.S. at 9. (emphasis added). Plaintiff has therefore not stated facts that meet either the objective or subjective component of the test used to determine whether Lt. Corbett's alleged excessive physical force constituted cruel and unusual punishment.

### D. Qualified Immunity

Even if the above were not true, Lt. Corbett and the other individually named defendant are also protected against plaintiff's various § 1983 claims by qualified immunity. As noted recently in the Supreme Court case of *Pearson v. Callahan,* 555 U.S.223, 129 S.Ct. 808, 815 (2009):

> The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. The protection of qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Groh v. Ramirez,* 540 U.S. 551, 567 (2004) (KENNEDY, J., dissenting) (citing *Butz v. Economou,* 438 U.S. 478, 507 (1978) (noting that qualified immunity covers "mere mistakes in judgment, whether the mistake is one of fact or one of law")).

**\*11** For example, excessive force claims are properly analyzed under the Fourth Amendment's "objective reasonableness standard," because of the uncertainty and rapidity inherent in police work. *Graham v. O'Connor,* 490 U.S. 386, 396 (1989). Indeed, *Graham* sets forth a list of factors relevant to the merits of the constitutional excessive force claim which include analysis of the crime at issue, the threat posed by a suspect and any attempt by the suspect to evade or resist arrest. *See id.* If an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed. *See id.* "[T]he concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct." *Saucier v. Katz,* 533 U.S. 194, 205 (2001), overruled on other grounds, *Pearson, supra:*

> It is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts. An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances. If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense.

*Id.* Indeed:

> [O]fficers can have reasonable, but mistaken, beliefs as to the facts establishing the existence of probable cause or exigent circumstances, for example, and in those situations courts will not hold that they have violated the Constitution. Yet, even if a court were to hold that the officer violated the Fourth Amendment by conducting an unreasonable, warrantless search, *Anderson [v. Creighton,* 483 U.S. 635 (1987) ] still operates to grant officers immunity for reasonable mistakes as to the legality of their actions.

*Id.* at 206 (emphasis added).

In the circumstances presented to defendant Corbett who was asked to attempt to calm plaintiff who was threatening to pull out his catheter which medical personnel said could cause him to bleed to death, he was justified in using a degree of force to prevent plaintiff from harming himself. However, Lt.

Corbett averred that no such force was necessary and that the spilled milk was simply an accident. While plaintiff's 50–H testimony indicated that defendant Corbett intentionally spilled milk and food on him, the Court's conclusion that no cause of action lies here is confirmed by the "uncontested fact that the force was not so excessive that [plaintiff] suffered hurt or injury." *See Saucier, supra,* 533 U.S. at 208.

At the very least, defendants Buttofocco and Smith have established that reasonably competent police officers could disagree on the question of excessive force in this case. Based thereupon, the motion by defendants to dismiss plaintiff's claim of excessive force on the alternative ground of qualified immunity must be granted.

E. State Law Claims

1. Battery

 **\*12** Defendants assert that plaintiff's cause of action for battery is barred by the statute of limitations. The normal statute of limitations for battery is one year. *See* N.Y. C.P.L.R. § 215(3). However, in this case, the defendant is a municipal subdivision so the one-year period is extended per General Municipal Law by 90 days. *See* N.Y. Gen. Municipal Law 50–i. Thus, plaintiff was required to file his complaint within one year and ninety days from the date the alleged battery occurred. Here, plaintiff testified at his 50–H hearing that the battery occurred on the "day that [he] got the shunt put in [his] neck," which his medical records establish was May 21, 2009. Plaintiff testified that the incident with Lt. Corbett happened "as soon as he returned from the hospital," for the outpatient procedure. Plaintiff filed his Summons and Complaint in New York Supreme Court for Saratoga County on August 26, 2010. Accordingly, plaintiff's complaint was filed one year and 96 days after the alleged battery occurred. As such, the Court agrees his action for battery is time-barred as a matter of law and must be dismissed.

2. Negligence

Plaintiff claims that defendants were negligent in failing to address his medical needs at SCCF in three ways: first, that they ignored refused to follow the dietary restrictions set by his nephrologist, Dr. Daoui; second, that they failed to timely address his A.V. fistula; and third, that they refused to allow him to shower following his catheter surgery which

resulted in a septic infection. Fatal to plaintiff's claims is the absence of any expert medical evidence submitted in support of thereof. "Whether the claim is grounded in negligence or medical malpractice, '[w]here medical issues are not within the ordinary experience and knowledge of lay persons, expert medical testimony is a required element of a *prima facie case* ' " *Myers v. State of New York,* 46 A.D.3d 1030, 1031 (3d Dep't 2007) (citing *Tatta v. State of New York,* 19 A.D.3d 817, 818 (3d Dep't 2005), *lv. denied* 5 N.Y.3d 712 (2005) quoting *Wells v. State of New York,* 228 A.D.2d 581, 582 (2d Dep't 1996), *lv denied* 88 N.Y.2d 814 (1996); *see Trottie v. State of New York,* 39 A.D.3d 1094, 1095 (3d Dep't 2007)). In *Myers,* the claimant inmate contended that medical personnel at the Sullivan Correctional Facility erred in the treatment of his knee injury by delaying necessary surgery. 46 A.D.3d at 1030. Specifically, the claimant alleged that he was required to undergo physical therapy, which he contended worsened his condition, instead of knee surgery, despite the medical personnel's knowledge that he had a foreign object lodged in his knee. *See id.* Following a trial, at which claimant was his only witness, the Court of Claims, in a written decision, dismissed the claim. *See id.* at 1030–31.

Plaintiff's claims of medical negligence are likewise subject to dismissal. Setting aside the proof offered by SCCF that its treatment of plaintiff was entirely reasonable and within the standards of care established by his own specialists, plaintiff has offered no expert medical evidence demonstrating that SCCF deviated from accepted standards of medical care and treatment in this case. Based thereupon, his claims of negligence or malpractice must be dismissed.

III. CONCLUSION

 **\*13** Based on the foregoing, it is therefore

ORDERED that defendants' motion for summary judgment (Dkt.# 24) is hereby GRANTED and it is further

ORDERED that the complaint is dismissed in its entirety.

IT IS SO ORDERED.

All Citations

Not Reported in F.Supp.2d, 2013 WL 838284

---

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 862070
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Michael FERGUSON, Plaintiff,

v.

Correction Sergeant Bryan D.
MASON, et al., Defendants.

No. 9:19-CV-927 (GLS/ATB)
|
Signed 01/07/2021

**Attorneys and Law Firms**

MARK D. GREENBERG, ESQ., for Plaintiff.

CHRISTOPHER LIBERATI-CONANT and MELISSA A. LATINO Asst. Attorneys General, for Defendants.

### REPORT AND RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge

 **\*1**  Michael Ferguson filed this action, under 42 U.S.C. § 1983, claiming that, his civil rights were infringed while he was in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") at the Clinton Correctional Facility ("Clinton"). Plaintiff alleges that, while responding to an assault on him by another inmate on August 26, 2016, defendants Sgt. Bryan Mason and Correction Officers ("CO") Kevin Dominie and John Lamora subjected plaintiff to excessive force, in violation of the Eighth Amendment. (Compl., Dkt. No. 1). Plaintiff also asserted a state-law negligence claim based on the same allegations.

On January 15, 2020, defendants moved for summary judgment based, in part, on plaintiff's alleged failure to exhaust his administrative remedies. (Dkt. Nos. 15, 16).[1] Plaintiff opposed the defense motion and cross-moved for summary judgment on the affirmative defense of failure to exhaust. (Dkt. No. 17).[2] On August 25, 2020, Senior U.S. District Judge Gary L. Sharpe referred the matter to me "to conduct an Exhaustion Hearing, and for the issuance of a Report and Recommendation as to whether plaintiff Michael Ferguson exhausted his administrative remedies before commencing the pending action." (Dkt. No. 22).

[1]  Defendants also moved to dismiss plaintiff's state law claims on grounds other than failure to exhaust. (Dkt. No. 15-11). Plaintiff did not respond to that aspect of the defense motion. Defendants previously filed, but then withdrew, a prior motion for summary judgment. (Dkt. Nos. 8, 13, 14).

[2]  Defendants (Dkt. No. 18) and plaintiff (Dkt. No. 21) filed further submissions with respect to these motions.

Five defense witnesses and the plaintiff testified during a remote video exhaustion hearing on November 5, 2020, the transcript of which appears at Dkt. No. 35.[3] The parties stipulated to the admission of eight plaintiff's exhibits (P-1 through P-8) and eight defense exhibits (D-1 through D-8). I advised the parties that I might rely on the declarations and exhibits that had been submitted in connection with the summary judgment motions, including the declarations of defense witness Rachel Sequin (Dkt. No. 15-2) and plaintiff (Ex. D-9), which were used during examinations of those witnesses at the exhaustion hearing. (*See* Tr. at 42-43, 191, 193-94, 198, 202-03). The parties submitted post-hearing letter briefs to supplement the arguments presented in connection with the summary judgment motions. (Dkt. Nos. 36, 37).

[3]  Subsequent references to the transcript of the hearing will be cited as "Tr."

Based upon the evidence presented at that hearing and the pre-and post-hearing submissions, I find that the defendants have sustained their burden of proving, by a preponderance of the evidence, that the grievance process was available to plaintiff and that he failed to exhaust his administrative remedies. The court concludes that plaintiff's version of events is exaggerated and contradicted by other persuasive evidence, and his claims that he was unable to file a timely grievance due to his physical disabilities and because numerous DOCCS staff refused his requests for assistance are not credible. Further, despite instructions from DOCCS central office on how he could follow up when his initial grievance submission was rejected as untimely, plaintiff did not complete the prescribed administrative process, as required. Accordingly, this court recommends that plaintiff's civil rights complaint be dismissed for failure to exhaust, and that his state negligence claims be dismissed on the grounds raised by the defendants, as to which plaintiff failed to respond.

Ferguson v. Mason, Slip Copy (2021)

2021 WL 862070

## I. Exhaustion of Administrative Remedies

### A. General Legal Standards

**\*2**  The Prison Litigation Reform Act, ("PLRA"), 42 U.S.C. § 1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action. The exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim. *See Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004) (citing *Porter v. Nussle,* 534 U.S. 516, 532 (2002)). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675.

The failure to exhaust is an affirmative defense that must be raised by the defendants. *Jones v. Bock*, 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007); *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004). As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements. *See, e.g., Key v. Toussaint*, 660 F. Supp. 2d 518, 523 (S.D.N.Y. 2009) (citations omitted).

The Supreme Court has held that in order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules. *Jones*, 549 U.S. at 218-19, 127 S.Ct. 910 (citing *Woodford v. Ngo*, 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006)). In *Woodford*, the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. 548 U.S. at 90-103, 126 S.Ct. 2378.

The grievance procedure in New York generally consists of a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee ("IGRC"). N.Y. Comp. Codes R. & Regs. ("N.Y.C.R.R."), tit. 7 §§ 701.5(a)(1) and (b). [4] An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. *Id.* § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee ("CORC"). *Id.* § 701.5(d). The court also notes that the regulations governing the Inmate Grievance Program ("IGP") encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." *Id.* § 701.3(a) (Inmate's

Responsibility). There is also an expedited procedure for complaints raising bona fide issues of harassment or other misconduct by DOCCS staff, which bypasses the IGRC, and initially refers the grievance to the facility superintendent or his designee for prompt review, investigation, and decision. *Id.* § 701.8. (*See* Tr. at 10, 48-49 (two-step grievance process applies to staff "misconduct" cases)).

[4]     These regulations are also set forth in DOCCS Directive # 4040, relating to the Inmate Grievance Program. (*See* Ex. D-6; Tr. at 10, 13, 46-47).

Per DOCCS regulations and DOCCS Directive # 4040, inmates typically have 21 days from the alleged incident to file a grievance. 7 N.Y.C.R.R. § 701.5(a). The regulations also provide that an IGP Supervisor may grant an exception to the 21-day time limit based upon mitigating circumstances, as long as the request is made within 45 days after the alleged incident. *See* 7 N.Y.C.R.R. § 701.6 (g)(1)(i)(a). *See also Adams v. O'Hara*, No. 16-CV-527, 2019 WL 652409, at *2 (N.D.N.Y. Feb. 15, 2019) (GTS/ATB) ("[I]f an inmate could not file such a complaint within the required time period after the alleged occurrence, he or she could apply to the facility's [IGP] Supervisor for an exception to the time limit based on mitigating circumstances."). "An inmate may pursue a complaint that an exception to the time limit was denied by filing a separate grievance." 7 N.Y.C.R.R. § 701.6 (g)(1)(ii)

**\*3**  The Second Circuit previously utilized a three-part inquiry to determine whether an inmate had properly exhausted his administrative remedies. *See Hemphill v. State of New York*, 380 F.3d 680, 686 (2d Cir. 2004). The *Hemphill* inquiry asked (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.*

However, the Supreme Court has now made clear that courts may not excuse a prisoner's failure to exhaust because of "special circumstances." *Ross v. Blake*, ––– U.S. ––––, 136 S. Ct. 1850, 1857, 195 L.Ed.2d 117 (2016). " '[M]andatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion.' " *Riles v. Buchanan*, 656 F. App'x 577, 580 (2d Cir. 2016) (quoting *Ross*, 136 S. Ct. at 1857). Although *Ross* did away with the "special circumstances" exception, the other two factors in *Hemphill*–availability and estoppel–are still valid. The court in *Ross* referred to "availability" as a "textual exception" to mandatory exhaustion, and "estoppel" has become one of the

three factors in determining availability. *Ross*, 136 S. Ct. at 1858. Courts evaluating whether an inmate has exhausted his or her administrative remedies must focus on whether those remedies were "available" to the inmate. *Id.; see also Riles*, 656 F. App'x at 580. An administrative procedure is "unavailable" when

> (1) "it operates a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates; (2) it is "so opaque that [it] becomes, practically speaking, incapable of use"; or (3) "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."

*Id.* (quoting *Ross*, 136 S. Ct. at 1859-60).

In *Ross*, the Supreme Court gave examples of the circumstances under which each of the above would apply. *Ross*, 136 S. Ct. at 1859-60. The first circumstance listed above involves a case in which the relevant "administrative procedure" lacks the authority to provide "any" relief. *Id.* at 1859. The second example is when the administrative procedure "exists," but is so complicated or "opaque" that no ordinary prisoner could "discern or navigate it." *Id.* Finally, administrative remedies are not available if prison administrators prevent inmates from taking advantage of the grievance process by misleading or threatening them, preventing their use of the administrative procedure. *Id.* at 1860.

**B. Exhaustion Hearings**

The Second Circuit has ruled that a plaintiff in a lawsuit governed by PLRA is not entitled to a jury trial relating to his exhaustion of administrative remedies. *Messa v. Goord*, 652 F.3d 305, 308-10 (2d Cir. 2011). Rather, PLRA exhaustion is a matter of judicial administration, and the court, not a jury, determines factual disputes regarding an inmate's alleged failure to exhaust. *Id.* at 308-08.

As noted above, the defendant bears the burden of proving that the administrative remedies available to the plaintiff were not exhausted prior to the initiation of a civil action. *See, e.g., Howard v. Goord*, No. 98-CV-7471, 1999 WL 1288679, at *3 (E.D.N.Y. Dec. 28, 1999). However, once a defendant has produced reliable evidence that such remedies were generally available, and the plaintiff nevertheless failed to exhaust those remedies, the plaintiff must then counter the defendant's proof by showing that, as to him or her, the remedy was unavailable.

*Smith v. Kelly*, 985 F. Supp. 2d 275, 284 (N.D.N.Y. 2013) (Suddaby, J.). "As a result, practically speaking, while the burden on this affirmative defense remains at all times on the defendant, the plaintiff may sometimes have to adduce evidence in order to defeat it." *Id.* While there is some ambiguity in the district court cases in the Second Circuit on this point, I agree with Magistrate Judge Peebles' cogent analysis that, while "the burden of production" may shift to a plaintiff when a court considers whether the grievance process was unavailable, the ultimate burden of proof, by a preponderance of the evidence, with respect to the exhaustion defense remains, at all times, with the defendant." *See, e.g., Grant v. Kopp*, No. 9:17-CV-1224 (GLS/DEP), 2019 WL 368378, at *4, 8 (N.D.N.Y. Jan. 3, 2019), report and recommendation *adopted*, 2019 WL 367302 (N.D.N.Y. Jan. 30, 2019).

**II. Facts**

**A. Undisputed Facts**

 **\*4** During the altercation on August 26, 2016 at Clinton, plaintiff struck his head and suffered a spinal cord injury, resulting in the immediate loss of upper and lower extremity function. (Ex. P-2, Bates No. 085; Tr. at 139-40). Later that day, plaintiff was admitted to the Albany Medical Center and, on August 27th, he underwent spinal surgery–"an uncomplicated anterior cervical diskectomy and interbody fusion." (Ex. P-2, Bates Nos. 085, 087). Plaintiff remained at the Albany Medical Center, under the continual one-on-one supervision of correctional officers from the Greene Correctional Facility ("Greene"), until September 22, 2016. (Tr. at 88-93, 191-93). On that date, plaintiff was transferred to the Regional Medical Unit ("RMU") at the Coxsackie Correctional Facility ("Coxsackie"). (Tr. at 191-92).

On October 31, 2016, while still confined at the Coxsackie RMU, plaintiff submitted a four-page "grievance" alleging that, on August 27, 2016,[5] he was assaulted by correction officers at Clinton who responded to his altercation with another inmate. (Ex. D-2). In that document, plaintiff stated that he was "crip[pled]/paralyze[d], just recover[ed] a little bit in my right hand to find the strength to write." (*Id.*). The IGP Supervisor returned his complaint to plaintiff, explaining:

> Pursuant to Directive #4040, 701.5, (a), (1), a complaint must be submitted to the clerk within 21 days of the

2021 WL 862070

alleged occurrence. You have not presented mitigating circumstances that would warrant accepting this complaint as a grievance beyond the timeframes set forth in Directive #4040. In addition it is noted that pursuant to Directive #4040, 701.6(g), (1), (i), (a), An exception to the (21 day) timeframe may not be granted more than 45 days after an alleged occurrence.

(Ex. D-3).[6] Plaintiff sent his grievance and the IGP Supervisor's response to the DOCCS central office in Albany. He was advised to file a further grievance, which plaintiff decided not to do, concluding that another grievance would be "irrelevant" given that he had already received a negative response to his initial grievance. (Tr. at 200-02; Ex. D-9 ¶ 10, Dkt. No. 17-2).[7]

[5]     Despite some confusion about the date of the incident during which plaintiff was injured, it is clear that it occurred on August 26, 2016. (Tr. at 20; Ex. P-2, Bates No. 085).

[6]     The parties agree that the 21-day deadline relating to the August 26, 2016 incident would have been September 17, 2016, and the 45-day deadline would have been October 10, 2016. (Tr. at 21).

[7]     Plaintiff acknowledged this communication with the central office in a prior declaration and during his hearing testimony, but neither side was able to locate or produce any related documentation. (Tr. at 202-03).

## B. The Defense Version of Disputed Facts

Defense witnesses, including Rachel Sequin, the current DOCCS Assistant Director for the Inmate Grievance Program and Jeffrey Hale, the current IGP Supervisor at Coxsackie and a former DOCCS Assistant Director for the IGP, testified about the availability of the inmate grievance program, both to DOCCS inmates being treated at the Albany Medical Center, and to those confined at the Coxsackie RMU. (Tr. at 7-19, 44-58, 92-93, 164-65). Ms. Sequin and Mr. Hale confirmed the basic steps and deadlines for the grievance process, as outlined above in the summary of applicable law, and explained the various ways in which DOCCS inmates

were informed about, and assisted with, that process. (Tr. at 9-15, 47-58).

As discussed below, plaintiff and his counsel did not question the general availability of the grievance process at these facilities and acknowledged plaintiff's familiarity with the rules relating to that process. (Tr. at 182-83, 189, 200). However, plaintiff contended that the program was "unavailable" to him in his particular circumstances. Plaintiff alleged that, given his slowly-improving paralysis due to his spinal injury, he was unable to personally write out a grievance during the 45-day period following the August 26, 2016 incident, and that his repeated requests for assistance from DOCCS personnel in writing out his grievance were rebuffed or ignored.

**\*5** Assistant Director Sequin acknowledged that DOCCS had no specific written protocol about how to assist an inmate housed in an outside hospital who was unable to write a grievance, and that DOCCS security staff was not specifically trained with respect to that unusual scenario. (Tr. at 22-24, 28-29). However, Ms. Sequin pointed to a provision in DOCCS Directive 4040 and the applicable DOCCS regulations which stated: "Reasonable Accommodations. The IGP supervisor will ensure that disabled inmates are provided the necessary assistance to facilitate their access to and use of the IGP." (Tr. at 27; Ex. D-6 § 701.3(g)). Ms. Sequin and Mr. Hale testified that the IGP Supervisor at Coxsackie made at least weekly rounds in the RMU and was trained to help inmates who required assistance with respect to the grievance process. (Tr. at 33, 37, 65-67, 69-70; D-6 § 701.6(a) ("An inmate may present or appeal a grievance unaided, or may be advised or assisted by a staff member or another inmate of his or her choosing....")). While the correction officers who testified were not clear as to whether they could help a disabled inmate by physically writing out his grievance, they stated that security staff was trained to refer such an unusual situation, which they never recalled encountering, to an IGP Supervisor or supervising officer. (Tr. at 94-95, 102-04, 168-69, 170, 177, 178-79).[8]

[8]     Ms. Sequin and Mr. Hale also testified that security staff was trained to refer unusual situations regarding the grievance process to the IGP or to superior officers, to help ensure that inmates received necessary assistance with respect to that process. (Tr. at 24, 29, 56-57, 69-71, 76-78).

Assistant Director Sequin testified that, although staff at DOCCS facilities would not have the discretion to accept a grievance that was filed more than 45 days after the related incident or staff conduct, DOCCS Directive 4040 explicitly allowed a separate grievance of a decision, at the facility level, not to accept an untimely grievance. (Tr. at 11, 34-35). Both she and former Assistant Director David Hale stated that the CORC could allow and, on occasion had allowed, a grievance first filed after the 45-day deadline to proceed if the inmate set forth sufficient mitigating circumstances in a follow-up grievance. (Tr. at 34-35, 50-52). Ms. Sequin testified that the CORC had no record of any appeal of a separate grievance filed by plaintiff regarding the decision of the IGP Supervisor at Coxsackie that his initial grievance was untimely. (Tr. at 36).

### C. Plaintiff's Version of Disputed Facts

Plaintiff testified that, as a result of a broken neck sustained during the August 26, 2016 incident, which he alleged was the result of excessive force used against him by the defendant officers, he "could not move from the neck down." (Tr. at 181, 188). Following spinal cord surgery and some physical therapy at Albany Medical Center, plaintiff experienced weakness in his hands and numbness, and he was able to move only his right toe and his left hand. (Tr. at 183-84). [9] Plaintiff was familiar with the grievance process, had filed grievances previously, and knew that he had to file a grievance about the August 26th incident within 21 days. (Tr. at 182-83, 185, 189). But, he was not physically able to write out a grievance and, when he requested assistance in writing his grievance from various officers guarding him, he was told that they could not do that. (Tr. at 183-85, 193). [10]

[9]    Plaintiff testified that he was right-handed. (Tr. at 186, 187).

[10]    Plaintiff stated that he also asked his nursing assistant for help writing his grievance, to no avail. (Tr. at 183-84). He was in a single room at the Albany Medical Center, so there was no one else he could ask for assistance with his grievance. (Tr. at 186).

When plaintiff was moved to the Coxsackie RMU, his right hand was still numb, and he could not hold a pen. (Tr. at 188). Even after some occupational therapy, plaintiff's hand became numb and started to hurt when he tried to start writing a paragraph of a grievance. (Tr. at 188, 194-95). A

no-contact order was put in place, so he was not able to seek assistance in writing a grievance from any other inmate. (Tr. at 186-87). Plaintiff asked "everyone [he] could for help filing a grievance"– the nurses, the correction officers, and the shift sergeants, including Sgt. Charles Bailey, who testified at the exhaustion hearing. (Tr. at 189-90, 198). None of the individuals who plaintiff asked for assistance were able or willing to help him write his grievance. (Tr. at 189-90).

**\*6** Plaintiff alleges that he did not have adequate functioning in his right hand to be able to write a grievance until October 31, 2016, following further occupational therapy. (Tr. at 187, 199; Ex. D-2). When that grievance was rejected by the IGP Supervisor at Coxsackie as untimely, plaintiff transmitted his grievance and the response to the DOCCS central office in Albany, but did not follow their advice to file a separate grievance because he had already received a negative response to his initial grievance. (Tr. at 201-202).

### III. Findings and Conclusions

#### A. Failure to Exhaust Administrative Remedies

The court heard plaintiff's testimony during the hearing, and has reviewed the corroborating and contrary evidence submitted. The court finds that the plaintiff exaggerated his version of events in a number of ways and was contradicted in several instances by other persuasive evidence, which casts considerable doubt on the credibility of plaintiff's testimony.

Plaintiff testified that he asked "everyone [he] could," both at Albany Medical Center and the Coxsackie RMU for assistance in writing out his grievance. (Tr. at 193, 198). Three defense witnesses who had contact with plaintiff between August and October 2016 testified that they had no recollection of plaintiff, or any other inmate, asking for their assistance in physically writing out a grievance. CO Wesley Holley guarded plaintiff at the Albany Medical Center during various shifts between August 31 and September 7, 2016. (Tr. at 90-91; Ex. D-7, Bates Nos. 20-21, 23-24, 30). While CO Holley had no specific recollection of plaintiff from 2016, he was certain that no inmate had ever asked him to write out a grievance. He would have viewed such a request as very unusual, and would have referred such an issue to his supervisor. (Tr. at 93-95, 102-04). Michael Gallagher was a contract registered nurse at the Coxsackie RMU who recalled having some contact with plaintiff in the Fall of 2016, but had no recollection of plaintiff asking for help filing a grievance. (Tr. at 110, 128, 148, 160-62).

2021 WL 862070

Charles Bailey was a supervising Sergeant at Coxsackie in September and October 2016 who, when on duty, made daily rounds in the RMU. Sgt. Bailey recalled frequent, if brief, contacts with the plaintiff, who was comfortable asking the Sergeant to address any issues the plaintiff had. (Tr. at 165-69, 170-71, 176-77; Ex. D-8). Plaintiff specifically testified that he asked Sgt. Bailey for assistance in writing out a grievance and was told that he could not help plaintiff. (Tr. at 190, 198-99). Sgt. Bailey emphatically testified he had no recollection of plaintiff stating that he was physically incapable of writing out a grievance, that he needed assistance with that, or that the RMU staff was preventing plaintiff from filing a grievance. (Tr. at 169-70, 177, 178-79).[11] The court found Sgt. Bailey's testimony particularly credible.

[11]    Plaintiff's counsel argued that the defense did not elicit sufficient witness testimony to rebut plaintiff's claims that he frequently asked for staff assistance in writing out a grievance. (Dkt. No. 37 at 2-4). However, four years after the relevant time period, the defense could not be expected to call every person who had contact with plaintiff between August 26 and October 31, 2016 in an effort to prove that plaintiff had not requested such assistance from anyone.

Perhaps the strongest evidence undermining plaintiff's claim that he frequently asked for staff assistance in writing out his grievance, is the fact that he made no mention of that when he finally submitted a grievance on October 31, 2016. In that four-page document, plaintiff explains at length the reasons for the delay in preparing the grievance, but fails to state that he was repeatedly denied help in writing out his grievance, either at the Albany Medical Center or at the Coxsackie RMU. (Ex. D-2).

**\*7** The documentary medical evidence, while not conclusive, casts further doubt on plaintiff's credibility and his claim that his injuries precluded him from writing a grievance prior to October 31, 2016. Plaintiff testified that, even after his surgery and some physical therapy at Albany Medical Center, he could not do anything due to numbness, including in his hands, and "the only thing that was moving at the time was my right toe and my left hand." (Tr. at 183-84). Plaintiff claimed that he could not hold a pen in his right hand or write more than his name due to numbness in his dominant right hand from the time he first arrived at the Coxsackie RMU through October 31st. (Tr. at 187, 188; Ex. D-9).

Plaintiff clearly suffered a debilitating incomplete spinal cord injury that initially resulted in the loss of use of his upper and lower extremities. (Ex. P-2, Bates No. 085; Tr. at 138). Following his surgery, plaintiff's motor function improved, but his sensation remained diminished. (Ex. P-2, Bates Nos. 086, 087). Plaintiff participated in physical and occupational therapy at Albany Medical Center but, upon discharge, he still needed further therapy "in order to strengthen his upper and lower extremities." (Ex. P-2, Bates Nos. 087, 090). However, when he was discharged from the hospital, plaintiff's right upper extremity strength was 5/5, significantly higher that the strength in his other extremities. (Ex. P-2, Bates No. 086).

Upon plaintiff's admission to the Coxsackie RMU, RN Lynch noted that plaintiff had neuropathy in his legs and feet and weakness in his left upper and lower extremities, but not in his right extremities. (Ex. D-4, Bates Nos. 0645, 065). The medical staff noted that, during his first few days at the RMU in September 2016, plaintiff had progressed to eating independently. They observed a loss of strength in plaintiff's left arm and leg, but 5/5 strength in his right upper and lower extremities. (Ex. D-4, Bates Nos. 092-095). Plaintiff continued to demonstrate full muscle strength in his upper right extremity on September 25th, October 2nd, and October 9th. (Ex. D-4, Bates Nos. 2616, 2618, 2620).[12] RMU medical records indicate that plaintiff complained of numbness in his right hand and leg, but these symptoms were first reported on October 15th–after the 45-day deadline for requesting leave to file a late grievance–and continued through December 22, 2016. (See Exs. P-3 through P-7).[13] It is puzzling to the court that, during the period when plaintiff complained of numbness in his right hand, he managed to write out and submit his four-page grievance, dated October 31st, but plaintiff claimed to be incapable of writing a grievance during the prior period when he was not reporting such symptoms.

[12]    The entries for the Assessment/Activity chart for plaintiff on September 22, 2016 suggested that plaintiff had diminished muscle strength in his right upper extremity, but Nurse Gallagher testified that the numbers in that grid appeared to be erroneously shifted upward and were meant to report full muscle strength. (Tr. at 121-26). In any event, other medical records from September 23rd reflect that plaintiff had full strength in his upper right extremity. (Ex. D-4, Bates Nos. 094, 095).

2021 WL 862070

Plaintiff's counsel emphasized a medical progress note on September 23 rd that plaintiff had a weak left hand grasp and a "mild" right hand grasp. (Tr. at 129-132; Ex. D-4, Bates No. 643). Nurse Gallagher testified that the "mild" terminology was not very descriptive, but that it suggested a relatively benign observation about plaintiff's ability to grasp with his dominant right hand. (Tr. at 131-32).

13    Plaintiff's counsel suggested that a September 22, 2016 Pain Assessment Form completed by Nurse Lynch, which did not reflect any complaints of numbness in plaintiff's right extremities, was incomplete and not credible. (Tr. at 147-49). However, Nurse Lynch also completed a detailed Admissions Assessment for plaintiff on September 22 nd, which documented a thorough assessment of plaintiff indicating the absence of neuropathy or weakness in plaintiff's right-side extremities. (Ex. D-4, Bates Nos. 060-067).

*8 Plaintiff's counsel elicited testimony from Nurse Gallagher suggesting that plaintiff's full muscle strength in his right arm and hand did not necessarily contradict plaintiff's claim of neurological issues with his dominant right hand or his professed inability to write. (Tr. at 134-36, 139-41, 143, 146, 156-58). However, the medical records, taken as a whole, persuade the court that, during at least part of the time period when plaintiff could have timely filed a grievance or requested leave to pursue a late grievance, he was substantially exaggerating the extent to which his injuries interfered with his ability to write with his dominant right hand.

Plaintiff acknowledged that he signed two documents on September 22, 2016, upon his admission to the RMU, but claimed that a nurse had to hold his hand to help him make his signature. (Tr. at 186, 196-97; Ex, D-4, Bates No. 2482, 2484). Defense counsel had plaintiff confirm his signature on his January 23, 2020 declaration, submitted in opposition to the defense summary judgment motion, which plaintiff acknowledged he signed without any assistance. (Tr. at 198). The court's comparison of plaintiff's signatures on the two documents in September 2016 to the very similar signature on his January 2020 declaration do not support the plaintiff's claim that a nurse was needed to provide plaintiff with physical assistance in signing his name on the earlier documents. If plaintiff had needed or accepted such help in

signing his name in September 2016, the 2016 and 2020 signatures would likely have been markedly different. [14]

14    A lay fact finder is permitted to evaluate the similarities of handwriting on documents. *See, e.g., United States v. Samet*, 466 F.3d 251, 255 (2d Cir. 2006) (recognizing that a trier of fact may be capable of comparing handwriting on different documents without the help of opinion testimony on that issue)*; Ladner v. City of New York*, 20 F. Supp. 2d 509, 516-17 (E.D.N.Y. 1998), *aff'd*, 181 F.3d 83 (2d Cir. 1999) (court, in the context of a dispositive motion, compares the handwriting on various ballots and concludes that they are not at all similar). The court would note that the extent of my reliance on this particular issue in my overall evaluation of plaintiff's credibility was minimal.

In the January 23, 2020 declaration plaintiff stated that, at least until October 31 st, he was under non-contact orders and was not allowed to get help from any other inmate at the RMU. (Ex. D-9 ¶¶ 3, 6, Dkt. No. 17-2). Presumably because the medical records introduced at trial indicated that plaintiff was on non-contact status at the RMU only from September 22, 2016 through September 27 th, he testified during the hearing that he was only on non-contract status for only a week or two. (Ex. D-4, Bates No. 647; Tr. at 193-95).

Based on the court's evaluation of the credibility of plaintiff and the defense witnesses, the court concludes that the defendants have sustained their burden to establish that the grievance process was available to plaintiff during at least part of the 21-day time period after the August 26, 2016 incident, which expired on September 17 th. I conclude that the plaintiff exaggerated the extent to which his injuries limited his ability to write, and I am not persuaded that he requested assistance in writing his grievance, as he claimed. While the security staff at the hospital might not have known exactly how to address a request from an inmate for help in writing a grievance, I credit the testimony of the defense witnesses that such a request would have been referred to someone, such as an IGP Supervisor, who would have arranged for the necessary assistance. [15]

15    CO Holley testified that the DOCCS staff at the Albany Medical Center came from the Greene Correctional Facility (Tr. at 88), so a patient/inmate

request concerning grievances could have been communicated to the IGP staff at Greene.

**\*9** Even if plaintiff's access to the grievance process had been more limited while he was being treated at the Albany Medical Center, he had the ability to request leave to file a late grievance once he was transferred to the Coxsackie RMU, on September 22, 2016, through the end of the 45-day deadline to do so–October 10th. Plaintiff's physical condition further improved during this time period, and the medical evidence indicates that he was not experiencing weakness or numbness in his dominant hand during this time. As the defense witnesses testified, the IGP Supervisor at Coxsackie and the supervising sergeants made periodic rounds in the RMU and could have addressed any issues plaintiff might have raised with respect to the grievance process.

Even though plaintiff first filed his grievance after the 45-day deadline for seeking leave to file a late grievance had passed, the IGP Supervisor still considered whether plaintiff had set forth mitigating circumstances that might have excused the delay in submitting the grievance. As noted, the plaintiff did not claim, in his grievance, that he requested assistance in writing his grievance and was refused help. "Filing an untimely grievance without subsequently obtaining a finding of mitigating circumstances is insufficient to exhaust one's available administrative remedies." *Adams v. O'Hara*, No. 9:16-CV-527 (GTS/ATB), 2019 WL 652409, at *7 (N.D.N.Y. Feb. 15, 2019) (collecting cases, including *Cole v. Miraflor*, 02-CV-9981, 2006 WL 457817, at *5 (S.D.N.Y. Feb. 23, 2006) ("Contrary to Cole's claim that administrative remedies were no longer available to him because DOC[C]S did not find mitigating circumstances to excuse his late grievance, ... the very fact that DOC[C]S' policies provide for the filing of late grievances where there are mitigating circumstances, demonstrates that administrative remedies were available to Plaintiff."), *aff'd*, 305 F. App'x 781 (2d Cir. 2009)). Based on this court's evaluation of the credibility of plaintiff's claims that he was not capable of writing a grievance before October 31, 2016 and that his requests for assistance from DOCCS staff were denied, I conclude that plaintiff failed to exhaust available administrative remedies because he failed to file a timely grievance or a timely request to file a belated grievance supported by an adequate showing of mitigating circumstances.

The IGP Supervisor's decision may have suggested that plaintiff had no further recourse with respect to his grievance, given the passing of the 45-day deadline. However, plaintiff acknowledged that someone from the Albany central office advised him of the remedy he could still pursue–a separate grievance. That advice was consistent with the provisions of § 701.6(g)(1)(ii) of DOCCS Directive 4040, which authorized a separate grievance when an IGP Supervisor denied a request for leave to file a late grievance. The testimony of both the current and former Assistant Directors for the IGP made clear that a follow-up grievance, if pursued through all of the steps of the process, could have resulted in plaintiff being allowed to pursue his initial grievance, even though it was filed after the 45-day deadline, if he could persuade the CORC that there were sufficient mitigating circumstances. Plaintiff chose not to pursue that option, based on his conclusion that it would be "irrelevant," notwithstanding the fact that his initial grievance failed to raise arguably mitigating circumstances that plaintiff now asserts–*i.e.*, that DOCCS staff denied his repeated requests for assistance in writing a grievance. Plaintiff's choice not to pursue the grievance process through all the prescribed steps independently supports a finding that he failed to exhaust available administrative remedies. *See, e.g.*, *Lopez v. Goodman*, No. 10-CV-6413, 2013 WL 3105550, at *3 (W.D.N.Y. June 18, 2013) ("The grievance procedure is not unavailable to an inmate simply because he missed an initial deadline for filing a grievance. If an inmate misses the deadline for filing, the IGP contains provisions for requesting an extension of time to file in cases of mitigating circumstances. 7 N.Y.C.R.R. § 701.6(g)(1)(i)(a). Moreover, a denial of an extension of time to file a grievance is itself a grievable complaint that may be pursued via the IGP. 7 N.Y.C.R.R. § 701.6(g)(1)(ii)."); *Tomony v. Cty. of Suffolk*, No. 10-CV-5726, 2013 WL 55821, at *4 (E.D.N.Y. Jan. 3, 2013) (plaintiff's failure to exhaust his administrative remedies by not availing himself of the steps established by § 701.6(g) with respect to untimely grievances "cannot be excused based upon plaintiff's mere speculation that his grievance would have been denied"); *Warren v. Bealey*, No. 9:12-CV-1318 (TJM/RFT), 2014 WL 4715863, at *11 & n.10 (N.D.N.Y. Sept. 22, 2014) (when defendant was given explicit instructions on how to follow up, pursuant to § 701.6(g), when his untimely grievance was rejected, and he failed to follow those instructions, he cannot be considered to have exhausted his administrative remedies).

**\*10** In opposing the defense summary judgment motion, plaintiff's counsel argued that the prescribed process for pursuing a separate grievance when plaintiff's initial grievance was rejected as untimely, was "unavailable" to plaintiff based on *Williams v. Priatno*, 829 F.3d 118, 123-27 (2d Cir. 2016). In *Williams*, the Second Circuit considered whether administrative remedies had been

"actually available" to the plaintiff under *Ross v. Blake*, after the district court granted the defendants' motion to dismiss for failure to exhaust. The plaintiff alleged that, while housed in the special housing unit ("SHU"), he drafted a grievance that he delivered to a correction officer to forward to the grievance office on his behalf. *Id.* at 120-121. Approximately two weeks later, the plaintiff was transferred to a different facility. *Id.* at 121. He never received a response to his grievance and alleged that it was never filed by the officer to whom he had given it. It was undisputed that plaintiff never appealed the grievance. *Id.*

The defendants in *Williams* argued that even if the grievance was never filed, the plaintiff was required to appeal it and complete the grievance process. *Id.* at 124. The defendants relied on a DOCCS regulation providing that "an inmate may appeal a grievance 'to the next step' if he does not receive a timely response." *Id.* (quoting N.Y.C.R.R. § 701.6(g)(2)).

> [D]efendants [outline] three options that would be presented to an inmate following his appeal of an unfiled grievance: (1) if it is still within 21 days of the incident, the inmate can re-file the complaint; (2) if it is beyond 21 days but within 45 days of the incident, the inmate can request an exception to the 21-day time limit if he can show mitigating circumstances; or (3) if it is more than 45 days since the incident, the inmate may file a separate complaint grieving the denial of an extension to the time limit.

*Id.* at 125. The *Williams* court rejected the defense arguments stating: "These options are pieced together from various provisions in the regulations that do not involve appeals of grievances but provide instructions on the timelines that apply to the filing of new complaints. See N.Y.C.R.R. tit. 7, § 701.5(a)(1); id. § 701.6(g)(1)(i)(a); id. § 701.6(g)(1)(ii)." Thus, *Williams* holds that "the process to appeal an unfiled and unanswered grievance is prohibitively opaque, such that no inmate could actually make use of it." *Id.* at 126.

The holding of the *Williams* case does not apply to plaintiff Ferguson's particular circumstances. In this case, DOCCS seeks to apply the procedures of § 701.6(g)(1) in the very situation in which they explicitly apply–explaining how an inmate may follow up when he is advised that a grievance has been reviewed at the facility level, but has been rejected as untimely. Moreover, plaintiff Ferguson concedes that he was advised by the DOCCS central office that he could pursue a separate grievance after his initial grievance was rejected as untimely, which advice was consistent with § 701.6(g)(1)(ii), as set forth in DOCCS Directive 4040–a publication readily available to DOCCS inmates. The court in *Williams* found that the administrative remedies were "unavailable" because the process was "so prohibitively opaque, such that no inmate could actually make use of it." 829 F.3d at 126. However, the plaintiff in this case was explicitly advised to use the process set forth in § 701.6(g)(1)(ii), but he decided to ignore that advice. Based on the record developed in this case, the procedures established by § 701.6(g)(1)(ii) were not futile or otherwise "unavailable" to plaintiff Ferguson. [16]

[16]   The Second Circuit in *Williams* stated that even though § 701.6(g)(1)(ii) "suggests that an inmate could file a separate complaint grieving the denial of an exception to the filing deadline, such a grievance would be futile given that the regulations do not give the IGP supervisor authority to grant an exception beyond 45 days of the initial incident." 829 F.3d at 125-26. However, there was evidence before this court from the exhaustion hearing that was not before the court in *Williams*, which reversed a motion to dismiss under Fed. R. Civ. P. 12(b)(6) based on exhaustion. In this case, the IGP Supervisor who rejected plaintiff's grievance as untimely based on the 45-day deadline still considered whether plaintiff offered sufficient mitigating circumstances to justify the delay in filing. The present and a former DOCCS Assistant Director for IGP both testified that CORC, on an appeal from a separate grievance of an IGP Supervisor's rejection of an initial grievance first filed past the 45-day deadline, had the discretion to allow an inmate to proceed with the initial grievance upon a showing of mitigating circumstances, and had, in fact, done so in some prior cases. Moreover, there is strong evidence that plaintiff was specifically advised that he could pursue such a separate grievance and chose to ignore that advice. In any event, based on this court's credibility determinations with respect to plaintiff's claims that he was unable to write a grievance prior to October 31, 2016 and that he made requests for assistance from

2021 WL 862070

DOCCS staff that were refused, a preponderance of evidence establishes his failure to exhaust available administrative remedies independently of his refusal to pursue a separate grievance of the rejection of his initial grievance as untimely.

### B. Plaintiff's State Law Negligence Claim

**\*11** Defense counsel correctly argues that "New York Correction Law § 24 bars federal suit on state-law claims against officers in their individual or personal capacities." *Gill v. Tuttle*, 93 F. App'x 301, 302 (2d Cir. 2004); *Parris v. New York State Dep't Corr. Servs.*, 947 F. Supp. 2d 354, 365-66 (S.D.N.Y. 2013) (N.Y. Correct. Law § 24 "is not a bar to claims against corrections officers and employees under § 1983. *See Haywood v. Drown*, 556 U.S. 729, 740-41, 129 S.Ct. 2108, 173 L.Ed.2d 920 ... (2009). However, it does provide immunity for claims under state laws. 'Such immunity is available whether the action is pursued in a state court or, under pendent jurisdiction, in a federal court.' ...")

To the extent plaintiff intended to pursue his state-law negligence claims for damages against the defendants in their official capacity, such claims would be barred by sovereign immunity under the Eleventh Amendment. *See, e.g., Gunn v. Bentivegna*, No. 1:20-CV-2440, 2020 WL 2571015, at \*2–3 (S.D.N.Y. May 19, 2020) (plaintiff's civil rights claims against DOCCS, as well as his claims for damages against the individual defendants in their official capacities, are barred under the doctrine of Eleventh Amendment immunity); *Chris*

*H. v. New York*, 764 F. App'x 53, 55 (2d Cir. 2019). Accordingly, this court recommends that plaintiff's state-law negligence claims against the named individual defendants be dismissed, without prejudice to their being filed against an appropriate party in the appropriate state court.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that the plaintiff's claims under 42 U.S.C. § 1983 be **DISMISSED**, based on his failure to exhaust available administrative remedies, and it is further

**RECOMMENDED** the plaintiff's state-law negligence claims be **DISMISSED WITHOUT PREJUDICE**, but without leave to amend in this action.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.

### All Citations

Slip Copy, 2021 WL 862070

---

**End of Document** © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 531968
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Michael FERGUSON, Plaintiff,
v.
Correction Sergeant Bryan D.
MASON et al., Defendants.

9:19-cv-927 (GLS/ATB)
|
Signed 02/12/2021

**Attorneys and Law Firms**

Mark D. Greenberg, Greenberg, Greenberg Law Firm, Hudson, NY, Eugene B. Nathanson, Office of Eugene Nathanson, New York, NY, for Plaintiff.

Christopher Liberati-Conant, Melissa A. Latino, New York State Attorney General, Albany, NY, for Defendants Correction Sergeant Bryan D. Mason, Correction Officer Kevin P. Dominie, Correction Officer John R. Lamora.

Christopher Liberati-Conant, New York State Attorney General, Albany, NY, for Defendant Correction Officers John Does.

**SUMMARY ORDER**

Gary L. Sharpe, U.S. District Judge

**\*1** Plaintiff Michael Ferguson commenced this action against defendants correction officers Sergeant Bryan D. Mason, Kevin P. Dominie, John R. Lamora, and John Does 1-3, alleging an Eighth Amendment excessive force claim pursuant to 42 U.S.C. § 1983, and a negligence claim pursuant to New York State law. (Compl., Dkt. No. 1.) Specifically, Ferguson alleges that he suffered serious injuries from being assaulted by defendants while he was in the custody of the New York State Department of Corrections and Community Supervision (DOCCS) at Clinton Correctional Facility. (*See generally* Compl.)

Defendants moved for summary judgment, arguing that Ferguson's excessive force claim should be dismissed because he did not exhaust his administrative remedies before commencing the instant action, and that his negligence claim should be dismissed pursuant to New York Correction Law

§ 24 and the Eleventh Amendment. (Dkt. No. 15, Attach. 11 at 4-10.) Ferguson then cross-moved for partial summary judgment, asserting that he is entitled to judgment as to the exhaustion issue, because the grievance process was unavailable to him. (Dkt. No. 17, Attach. 8 at 2-11.)

The court referred the motions to Magistrate Judge Andrew T. Baxter to conduct an exhaustion hearing and to issue a Report and Recommendation as to whether Ferguson exhausted his administrative remedies before commencing the pending action. (Dkt. No. 22.) On January 7, 2021, Judge Baxter issued a Report and Recommendation (R&R), which recommends that defendants' motion for summary judgment, (Dkt. No. 15), be granted, and Ferguson's cross-motion for partial summary judgment, (Dkt. No. 17), be denied, (Dkt. No. 38). Ferguson filed timely objections to the R&R. (Dkt. No. 39.)

For the reasons that follow, the R&R is adopted in its entirety, and defendants' motion for summary judgment is granted, Ferguson's cross-motion for partial summary judgment is denied, and Ferguson's complaint is dismissed.

Before entering final judgment, this court routinely reviews all report and recommendation orders in cases it has referred to a magistrate judge. If a party has objected to specific elements of the magistrate judge's findings and recommendations, this court reviews those findings and recommendations *de novo. See Almonte v. N.Y. State Div. of Parole*, No. Civ. 904CV484, 2006 WL 149049, at \*3 (N.D.N.Y. Jan. 18, 2006). In cases where no party has filed an objection, or only vague or general objections have been filed, this court reviews the findings and recommendations of the magistrate judge for clear error. *See id.* at \*5.

After a full hearing, where six witnesses testified, including Ferguson, Magistrate Judge Baxter determined that Ferguson was not credible with respect to his claim that DOCCS staff members refused his requests for assistance with filing a grievance; his version of the events is exaggerated and contradicted by persuasive evidence; and, "despite instructions from DOCCS central office on how he could follow up when his initial grievance submission was rejected as untimely, [Ferguson] did not complete the prescribed administrative process, as required." (Dkt. No. 38 at 3.) Accordingly, Magistrate Judge Baxter recommends judgment be entered in favor of defendants as to Ferguson's excessive force claim due to his failure to exhaust his administrative remedies. [1] (*Id.* at 13-25.)

2021 WL 531968

1    Judge Baxter also recommends summary judgment be granted as to Ferguson's negligence claim pursuant to New York Correction Law § 24 to the extent that Ferguson brings this claim against defendants in their individual capacities, and pursuant to the Eleventh Amendment to the extent that he brings the claim against them in their official capacities. (Dkt. No. 38 at 24-25 (citing *Gunn v. Bentivegna*, No. 1:20-CV-2440, 2020 WL 2571015, at *2-3 (S.D.N.Y. May 19, 2020); *Parris v. New York State Dep't Corr. Servs.*, 947 F. Supp. 2d 354, 365-66 (S.D.N.Y. 2013)) (other citations omitted).)

**\*2** Ferguson objected to the R&R, arguing that the R&R should be rejected because Magistrate Judge Baxter erred in finding that (1) Ferguson was not credible with respect to his allegation that he requested assistance from DOCCS staff with preparing a grievance; (2) Ferguson exaggerated his inability to write out a grievance; and (3) the grievance process was available to him after his initial grievance was denied as untimely. (Dkt. No. 39, Attach. 1 at 1.)

In support of his objections, Ferguson merely refers the court to arguments he previously made in his memorandum of law in support of his cross-motion for partial summary judgment and in his post-hearing submission. (Dkt. No. 39, Attachs. 1-3.) Indeed, Ferguson does not include any new analysis, and does not assert a specific error in Judge Baxter's legal reasoning; rather, he asserts, in conclusory fashion, that Judge Baxter was wrong with respect to the three issues noted above. (Dkt. No. 39, Attach. 1.) Accordingly, the objections amount to an attempt to re-litigate issues already considered and decided by Judge Baxter. (*Id.*)

Because the objections simply refer the court to arguments made before Magistrate Judge Baxter, and, thus, are an attempt to re-litigate issues already presented to and decided by him, (*see generally* Dkt. No. 17, Attach. 8; Dkt. No. 37; Dkt. No. 38; Dkt. No. 39, Attachs. 1-3), they are general and trigger clear error review only.[2] *See Smurphat v. Hobb*, No. 8:19-CV-804, 2021 WL 129055, at *2 (N.D.N.Y. Jan. 14, 2021) ("[W]hen an objection merely reiterates the *same arguments* made by the objecting party in its original papers submitted to the magistrate judge, the Court subjects that portion of the report-recommendation challenged by those arguments to only a *clear error* review." (citations omitted)); *see also Mario v. P&C Food Markets, Inc.*, 313 F.3d 758,

766 (2d Cir. 2002) ("Merely referring the court to previously filed papers or arguments does not constitute an adequate objection.").

2    Additionally, to the extent that Ferguson argues that the R&R should be rejected because Judge Baxter's credibility determinations are wrong, district courts are entitled to defer to the magistrate judge, who conducted the hearing and heard the witnesses testify, with respect to credibility. *See Carrion v. Smith*, 549 F.3d 583, 588 (2d. Cir. 2008) ("[A] district judge should normally not reject a proposed finding of a magistrate judge that rests on a credibility finding without having the witness testify before the judge." (citations omitted)); *McGinnis v. Crissell*, No. 9:13-CV-1538, 2019 WL 3228867, at *2 (N.D.N.Y. July 18, 2019) ("[A district court] is entitled to give a magistrate judge's findings of fact and credibility determinations such weight as [their] merit commands and the sound discretion of the judge warrants." (internal quotation marks and citations omitted)).

The court has carefully considered the R&R, and finds no clear error in Magistrate Judge Baxter's thorough analysis, which squarely addresses Ferguson's arguments and provides multiple, appropriate reasons for granting defendants' motion for summary judgment and denying Ferguson's cross-motion for partial summary judgment. Accordingly, the R&R is adopted in its entirety.

Accordingly, it is hereby

**ORDERED** that the Report and Recommendation (Dkt. No. 38) is **ADOPTED** in its entirety; and it is further

**ORDERED** that defendants' motion for summary judgment (Dkt. No. 15) is **GRANTED**; and it is further

**\*3 ORDERED** that Ferguson's cross-motion for partial summary judgment (Dkt. No. 17) is **DENIED**; and it is further

**ORDERED** that Ferguson's complaint (Dkt. No. 1) is **DISMISSED**; and it is further

**ORDERED** that the Clerk close this case; and it is further

**ORDERED** that the Clerk provide a copy of this Summary Order to the parties.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2021 WL 531968

---

**End of Document**                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 8192227
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Hasson WILSON, Plaintiff,

v.

SNYDER, et al., Defendants.

No. 9:19-CV-420 (DNH/CFH)
|
Signed 12/05/2019

**Attorneys and Law Firms**

Hasson Wilson, 18-A-1132, Great Meadow Correctional Facility, Box 51, Comstock, New York 12821, Plaintiff pro se.

OF COUNSEL: RICHARD C. WHITE, ESQ., Assistant Attorney General, Attorney General for the State of New York, The Capitol, Albany, New York 12224, Attorney for Defendants.

**REPORT-RECOMMENDATION AND ORDER** [1]

[1]    This matter was referred to the undersigned for Report-Recommendation and Order pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

CHRISTIAN F. HUMMEL, U.S. MAGISTRATE JUDGE

*1 Plaintiff pro se Hasson Wilson ("Plaintiff"), an inmate who was, at all relevant times, in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983, alleging that defendant [2] Snyder ("Defendant"), Deputy of Security at Marcy Correctional Facility ("Marcy")—who, at all relevant times, was employed at Marcy—violated his constitutional rights under the Eighth Amendment. See Dkt. No. 1 ("Compl."). [3] Presently pending before the Court is defendant's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."). See Dkt. No. 18. Plaintiff did not file a response. For the reasons that follow, it is recommended that defendant's motion be granted.

[2]    Plaintiff's complaint originally named three defendants in this action: Snyder, John Doe #1, and

John Doe #2. See Dkt. No. 1 ("Compl.") at 2-3. In response to plaintiff's June 2019 letter motion requesting to withdraw all claims against John Doe #1 and John Doe #2, the Court dismissed all claims asserted against those defendants without prejudice and ordered the Clerk of the Court to terminate them from the action. See Dkt. Nos. 13, 17. As the only defendant remaining in the action is Snyder, the Clerk of the Court is respectfully directed to modify the caption accordingly.

[3]    Following initial review of plaintiff's complaint pursuant to 28 U.S.C. § 1915(e)(2)(B), District Judge David N. Hurd dismissed plaintiff's Fourteenth Amendment Equal Protection claims without prejudice for failure to state a claim upon which relief may be granted. See Dkt. No. 7 at 10. The only claim remaining in the action is plaintiff's Eighth Amendment failure-to-protect claim against Snyder. See id.

**I. Background**

**A. Plaintiff's Complaint and Exhibits**

Plaintiff was transferred to Marcy on September 25, 2018. See Compl. at 5. Following his arrival, he asked a correctional officer ("C.O.") whether members of the Crips gang lived at Marcy and informed the C.O. that he had previously been a member of that gang when he resided at Rikers Island. See id. According to plaintiff, the C.O. stated that plaintiff would "definitely have problems [at Marcy because] Bloods is cutting your kind." Id.

On September 26, 2018, plaintiff attended a facility orientation where defendant spoke. See id. Later that day, plaintiff wrote defendant a letter in which he explained that he heard that someone was going to cut him in the main yard because of his past affiliation with the Crips gang and requested to be placed in protective custody. See Dkt. No. 1-1 at 1; see also Compl. at 6. On September 30, 2018, plaintiff wrote letters to the superintendent of Marcy and defendant in which he stated that he had heard rumors that someone from the Bloods gang was going to cut him and asked to be placed in protective custody. See Dkt. No. 1-1 at 2, 3; see also Compl. at 6. At 3:15 P.M. on October 3, 2018, plaintiff was "cut from behind by an inmate that couldn't be identified" while in the yard. Compl. at 6. On April 4, 2019, plaintiff submitted a letter addressed to the "Grievance Central Office" that stated, "I am

informing you that I filed a grievance alleging the facts of my claim on Oct[.] 3, 2019 incident but I was denied because I was too late, but I am filing with a higher agency affiliated with DOCCS." Dkt. No. 1-1 at 8. Plaintiff filed his present section 1983 lawsuit on April 8, 2019. See Compl. at 1.

### B. Defendant's Motion for Summary Judgment[4]

[4]      In support of this motion, defendant filed a Statement of Material Facts in compliance with N.D.N.Y.L.R. 7.1(a)(3), which provides, in relevant part, "[a]ny facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party." See Dkt. No. 18-5. Defendant specifically advised plaintiff of the consequences of failing to respond to the motion. See Dkt. No. 18 at 3. Plaintiff did not file a response despite being afforded a time extension. See Dkt. No. 23. Therefore, notwithstanding plaintiff's pro se status, the Court will "follow the practice of enforcing [N.D.N.Y.]L.R. 7.1(a)(3) and accept the facts set forth in [d]efendant['s] Material Statement of Facts as uncontroverted to the extent those facts are supported by record evidence." Richard v. LeClaire, 9:15-CV-00006 (BKS/TWD), 2019 WL 5197041, at *4 (N.D.N.Y. May 6, 2019).

**\*2** Defendant contends that plaintiff's complaint should be dismissed in its entirety for failure to exhaust administrative remedies because he did not file a grievance concerning the conduct in his complaint despite the Inmate Grievance Program ("IGP") being available to him. See Dkt. No. 18; see also Dkt. No. 18-1 at 7-9. In support of his motion, defendant submitted the sworn declaration of Erin Pfendler ("Pfendler"), the IGP Supervisor at Marcy, who stated that "[p]laintiff's claims in this action are the proper subject for a grievance under the IGP," but "[u]pon review of the records maintained in the grievance office at Marcy, [p]laintiff did not file any grievances related to his claims in this case." Dkt. No. 18-2 at 4 ¶¶ 13, 14. Pfendler explained that "there is an orientation program offered at Marcy that includes a presentation on the grievance policies and procedures set forth in [DOCCS] Directive # 4040" and that "[p]laintiff's Inmate Program Assignment history[ ] demonstrate[es] that [he] attended and successfully completed this orientation program on October 1, 2018 to October 7, 2018." Id. at 2 ¶ 4.

Further, defendant submitted the sworn declaration of Sally Reams ("Reams"), the IGP Supervisor at Fishkill Correctional Facility ("Fishkill"). See Dkt. No. 18-3 at 1 ¶ 1. Reams stated that plaintiff was "transferred from Marcy ... to Fishkill on or about October 18, 2018." Id. at 3 ¶ 10. Based on her "review of the records maintained in the grievance office at Fishkill, [p]laintiff did not file any grievances related to his claims in this case." Id. at 4 ¶ 14. In addition, defendant included the sworn declaration of Rachael Seguin ("Seguin"), the Assistant Director of the IGP for DOCCS. See Dkt. No. 18-4 at 2 ¶ 3. Seguin explained that, in her position as Assistant Director, she is "a custodian of the records maintained by the Central Office Review Committee ("CORC"), ... the body that renders the final administrative decision under DOCCS's [IGP] pursuant to 7 N.Y.C.R.R. § 701 et seq." Id. Seguin further declared that, "[u]pon review of the records maintained in the regular course of business by DOCCS, [p]laintiff did not appeal any grievance to CORC regarding his claims in this action." Id. at 3 ¶ 10. Moreover, concerning plaintiff's purported April 4, 2018 letter to CORC, Seguin stated that "[a] review of DOCCS records reveals that no such letter [was] received by CORC." Id. at ¶ 11.

### II. Discussion[5]

[5]      All unpublished opinions cited in this Report-Recommendation and Order, unless otherwise noted, have been provided to plaintiff.

### A. Legal Standard

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party has the burden of showing the absence of a genuine dispute of material fact by providing the Court with portions of "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which support the motion. Celotex, 477 U.S. at 322, 106 S.Ct. 2548; see FED. R. CIV. P. 56(c). A fact is material if it "might affect the outcome of the suit," as determined by the governing substantive law; a "dispute about a material fact

is 'genuine' ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248, 106 S.Ct. 2505.

If the moving party meets this burden, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." Id. at 248, 250, 106 S.Ct. 2505; see Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986) (citing Quarles v. Gen. Motors Corp. (Motors Holding Div.), 758 F.2d 839, 840 (2d Cir. 1985) (per curiam)). Furthermore, "mere conclusory allegations or denials ... cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (brackets omitted) (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)).

**\*3** Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. See Treistman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to special solicitude, that a pro se litigant's submissions must be construed liberally, and that such submissions must be read to raise the strongest arguments that they suggest. At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not consistent with the pro se litigant's allegations, or arguments that the submissions themselves do not suggest, that we should not excuse

> frivolous or vexatious filings by pro se litigants, and that pro se status does not exempt a party from compliance with relevant rules of procedural and substantive law....

Id. (internal quotation marks, citations, and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district courts that when [a] plaintiff proceeds pro se, ... a court is obligated to construe his pleadings liberally." (internal quotation marks and citations omitted)).

### B. Exhaustion

The Prison Litigation Reform Act ("PLRA") requires that a prisoner exhaust any administrative remedies available to him or her before bringing an action for claims arising out of his or her incarceration. See 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."). The exhaustion requirement applies " 'to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.' " Cucchiara v. Dumont, No. 9:18-CV-0182 (GLS/CFH), 2019 WL 2516605, at \*4 (N.D.N.Y. Apr. 26, 2019) (quoting Porter v. Nussle, 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002)). Further, the exhaustion requirement applies even where the prisoner seeks relief not available in the administrative grievance process, such as money damages. See Porter, 534 U.S. at 524, 122 S.Ct. 983. "To exhaust administrative remedies, the inmate must complete the full administrative review process set forth in the rules applicable to the correctional facility in which he or she is incarcerated." Cuadrado v. Brueault, No. 9:14-CV-1293 (DNH/CFH), 2015 WL 1606178, at \*3 (N.D.N.Y. Apr. 8, 2015); see Jones v. Bock, 549 U.S. 199, 218, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007).

While the Supreme Court has deemed exhaustion mandatory, the Second Circuit has recognized that "certain caveats apply." Ruggiero v. County of Orange, 467 F.3d 170, 175 (2d Cir. 2006) (internal quotation marks and citation omitted). Until recently, courts in this District followed a three-part test established by the Second Circuit in Hemphill v. New York,

380 F.3d 680, 686 (2d Cir. 2004). Under the test established in Hemphill, a plaintiff's failure to exhaust could be excused if a plaintiff established that his or her failure to exhaust was justified by "special circumstances." Id. However, in Ross v. Blake, the Supreme Court held that "[c]ourts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement." Ross v. Blake, ––– U.S. ––––, 136 S. Ct. 1850, 1862, 195 L.Ed.2d 117 (2016). Thus, the special circumstances exception previously promulgated by the Second Circuit in Hemphill is no longer consistent with the statutory requirements of the PLRA. See Williams v. Correction Officer Priatno, 829 F.3d 118, 123 (2d Cir. 2016).

**\*4** However, courts must still consider the PLRA's "textual exception to mandatory exhaustion." Ross, ––– U.S. ––––, 136 S. Ct. at 1858, 195 L.Ed.2d 117. Under this exception, courts must determine whether administrative remedies were "available" to a prisoner. Id. The Supreme Court identified three circumstances where administrative remedies may be unavailable to a prisoner. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end —with officers unable or consistently unwilling to provide any relief to aggrieved inmates." Id. at 1859 (citing Booth v. Churner, 532 U.S. 731, 736, 738, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001)). "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." Id. Lastly, administrative remedies are unavailable where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id. at 1860.

There is no genuine dispute that, at all relevant times, DOCCS had in place a well-established three-step administrative procedure for inmate grievances known as the IGP. See Dkt. No. 18-1 at 6-7; see also N.Y. COMP. CODES R. & REGS. (7 N.Y.C.R.R.) § 701.5. First, the inmate must file a complaint with an IGP clerk within 21 calendar days of the alleged incident. See 7 N.Y.C.R.R. § 701.5(a)(1). An IGP representative has 16 calendar days to informally resolve the issue. See id. at § 701.5(b)(1). If no informal resolution occurs, the Inmate Grievance Review Committee ("IGRC") must hold a hearing within 16 calendar days of receipt of the grievance and must issue a written decision within two working days after the conclusion of the hearing. See id. at § 701.5(b)(2)(i)-(ii). If the determination is unfavorable to the inmate, the inmate may appeal the IGRC's determination to the facility superintendent within seven calendar days of receipt of the determination. See id. at § 701.5(c)(1). If the

superintendent's determination is unfavorable to the inmate, the inmate may appeal to CORC within seven calendar days after receipt of the superintendent's determination. See id. at § 701.5(d)(1)(i). CORC must "review each appeal, render a decision on the grievance, and transmit its decision to the facility, with reasons stated, for the [inmate], the grievance clerk, the superintendent, and any direct parties within thirty 30 calendar days from the time the appeal was received." Id. at § 701.5(d)(3)(ii).

"Ordinarily, absent the finding of a basis to excuse non-compliance with this prescribed process, only upon exhaustion of these three levels of review may a prisoner seek relief pursuant to section 1983 in a federal court." Murray v. Goord, 668 F. Supp. 2d 344, 355-56 (N.D.N.Y. 2009). On a motion for summary judgment, "[t]he defendant bears the burden of proving that the administrative remedies available to the plaintiff were not exhausted prior to the initiation of a civil action." McMillian v. Walters, No. 9:16-CV-0277 (MAD/DJS), 2017 WL 8894737, at \*2 (N.D.N.Y. Dec. 18, 2017), report and recommendation adopted, No. 9:16-CV-277 (MAD/DJS), 2018 WL 879270 (N.D.N.Y. Feb. 14, 2018).

### 1. Plaintiff Failed to Exhaust his Administrative Remedies

Defendant has met his burden of establishing that no genuine issue of material fact exists concerning plaintiff's failure to exhaust his administrative remedies with respect to the claims asserted in this action. The sworn declarations of Pfendler and Reams make clear that neither Marcy nor Fishkill have any record of plaintiff filing a grievance relating to the claims in this action. See Dkt. No. 18-2 at 4 ¶ 14; Dkt. No. 18-3 at 4 ¶ 14. In addition, Seguin's sworn declaration establishes that DOCCS has no record of plaintiff filing an appeal of any grievance with CORC regarding his claims in this action. See Dkt. No. 18-4 at 3 ¶ 10. Thus, defendant has established that plaintiff never filed a grievance concerning his present claims and, therefore, did not even commence the available administrative review process.

**\*5** Nothing in the record controverts defendant's exhaustion evidence. Plaintiff's purported April 4, 2019 letter in which he states that he was appealing an untimely October 3, 2019 grievance to CORC fails to establish the existence of a material issue of fact. See Dkt. No. 1-1 at 8. Even assuming arguendo that plaintiff did send his April 4, 2019

letter to CORC, this informal letter does not satisfy the mandatory exhaustion requirement. See Rawls v. Rosenfeld, No. 9:16-CV-0582 (LEK/CFH), 2017 WL 7050648, at *7 (N.D.N.Y. Nov. 28, 2017) (holding that the plaintiff's informal letters to the superintendent and CORC did not satisfy the exhaustion requirement, as "[i]t is well-established in the Second Circuit that any informal resolution or relief outside of the administrative procedures does not satisfy exhaustion requirements."). Moreover, plaintiff's purported attempt at appealing an untimely grievance directly to CORC on April 4, 2019, cannot establish that he exhausted administrative remedies, as it omits the intermediate step in the DOCCS administrative review process of appealing a grievance to the superintendent. See 7 N.Y.C.R.R. § 701.5(c)(1); see also Smith v. Kelly, 985 F. Supp. 2d 275, 290 (N.D.N.Y. 2013) ("It would eviscerate the exhaustion requirement to deem an inmate to have exhausted his available administrative remedies where he files a grievance ... late ..., then skips the superintendent and appeals the rejection of his grievance (based on untimeliness) to CORC.").

Additionally, plaintiff's purported April 4, 2019 letter was submitted only four days prior to the filing of his present section 1983 lawsuit—well before the 30-day time period for CORC to issue a decision—and plaintiff has not proffered any evidence indicating that CORC ever considered any administrative appeal arising out of his claims in this action. See, e.g., Mayandeunas v. Bigelow, No. 9:18-CV-1161 (GTS/TWD), 2019 WL 5273527, at *6 (N.D.N.Y. May 21, 2019) (holding that the defendants satisfied their burden of demonstrating that the plaintiff failed to exhaust administrative remedies where the documentary evidence established that, at the time the plaintiff commenced his section 1983 action, his administrative appeal was pending before CORC and no evidence indicated that CORC had addressed his grievance), report and recommendation adopted, No. 9:18-CV-1161 (GTS/TWD), 2019 WL 3955484 (N.D.N.Y. Aug. 22, 2019). In any event, as Seguin indicated in her sworn declaration, DOCCS has no record of CORC receiving such letter. See Dkt. No. 18-4 at 3 ¶ 11.

Furthermore, no exception to the mandatory exhaustion requirement applies here. As Pfendler indicated, plaintiff was aware that the grievance procedure was available to him based on his attendance and completion of the Marcy orientation program and nothing in the record indicates otherwise. See Dkt. No. 18-2 at 2 ¶ 4. Based on the foregoing, it is recommended that defendant's motion for summary judgment be granted on the ground that plaintiff has failed to

exhaust administrative remedies and has not shown that those remedies were unavailable to him.

Where a claim is dismissed for failure to exhaust administrative remedies, dismissal without prejudice is appropriate if the time permitted for pursuing administrative remedies has not expired. See Berry v. Kerik, 366 F.3d 85, 87-88 (2d Cir. 2004). However, if a prisoner has failed to exhaust available administrative remedies and the time in which to exhaust has expired, it is proper for the court to dismiss the complaint with prejudice because any attempt to exhaust would be futile. See id. at 88; see also Richard v. LeClaire, No. 9:15-CV-00006 (BKS/TWD), 2019 WL 5197041, at *9 (N.D.N.Y. May 6, 2019) ("Because [the p]laintiff's failure to exhaust is at this point incurable, the Court recommends that summary judgment for failure to exhaust administrative remedies be with prejudice."). Here, the time for plaintiff to exhaust administrative remedies with respect to the alleged October 3, 2018 incident against Snyder has long since expired. Accordingly, it is recommended that plaintiff's complaint be dismissed in its entirety with prejudice.

### III. Conclusion

**WHEREFORE**, based on the findings set forth above, it is hereby:

**RECOMMENDED**, that defendant's Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56 (Dkt. No. 18) be **GRANTED WITH PREJUDICE** on the ground that plaintiff failed to exhaust administrative remedies; and it is further

**\*6  RECOMMENDED**, that plaintiff's complaint (Dkt. No. 1) be **DISMISSED IN ITS ENTIRETY**; and it is hereby

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order on all parties in accordance with Local Rules.

**IT IS SO ORDERED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS**

**WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed R. Civ. P. 6(a), 6(e), 72. [6]

[6]    If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Report-Recommendation & Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Id. § 6(a)(1)(C).

**All Citations**

Slip Copy, 2019 WL 8192227

---

**End of Document**                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.   6

Wilson v. Snyder, Not Reported in Fed. Supp. (2020)

2020 WL 1140666

2020 WL 1140666
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Hasson WILSON, Plaintiff,

v.

SNYDER, Deputy of Security, Marcy
Correctional Facility, Defendant.

9:19-CV-420 (DNH/CFH)
|
Signed 03/09/2020

**Attorneys and Law Firms**

HASSON WILSON, Plaintiff pro se, 18-A-1132, Sing Sing
Correctional Facility, 354 Hunter Street, Ossining, NY 10562

OF COUNSEL: KONSTANDINOS D. LERIS, ESQ.,
Ass't Attorney General, HON. LETITIA JAMES, Attorney
General for the State of New York, Attorney for Defendant,
The Capitol, Albany, NY 12224.

**DECISION and ORDER**

DAVID N. HURD, United States District Judge

*1  Pro se plaintiff Hasson Wilson brought this civil rights
action pursuant to 42 U.S.C. § 1983. On December 5, 2019,

the Honorable Christian F. Hummel, United States Magistrate
Judge, advised by Report-Recommendation that defendant's
unopposed motion for summary judgment be granted for
failure to exhaust administrative remedies. Plaintiff timely
filed objections to the Report-Recommendation.

Based upon a de novo review of the portions of the Report-
Recommendation to which plaintiff objected, the Report-
Recommendation is accepted and adopted in all respects. See
28 U.S.C. § 636(b)(1).

Therefore, it is

ORDERED that

1. Defendant's motion for summary judgment is GRANTED;
and

2. Plaintiff's complaint is DISMISSED in its entirety with
prejudice.

The Clerk is directed to enter judgment accordingly and close
the file.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2020 WL 1140666

End of Document                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:19-cv-00427-DNH-TWD   Document 62   Filed 12/17/21   Page 62 of 193
Coleman v. Nolan, Not Reported in Fed. Supp. (2018)
2018 WL 4732778

2018 WL 4732778
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Towaun COLEMAN, Plaintiff,
v.
Luke NOLAN, Defendant.

9:15-CV-40 (ATB)
|
Signed 10/02/2018

**Attorneys and Law Firms**

MICHAEL E. KOLB, ESQ., for Plaintiff.

ERIK BOULE PINSONNAULT, Asst. Attorney General, for
Defendant Nolan.

**DECISION AND ORDER**

ANDREW T. BAXTER, United States Magistrate Judge

 **\*1** Plaintiff Towaun Coleman filed this action pursuant
to 42 U.S.C. § 1983, alleging that, while an inmate at the
Clinton Correctional Facility ("Clinton"), he was deprived
of his civil rights by various individuals employed by the
New York State Department of Corrections and Community
Supervision ("DOCCS"). (Compl., Dkt. No. 1; Am. Compl.,
Dkt. No. 19). As a result of an initial review of plaintiff's
amended complaint and litigation of a defense motion to
dismiss before Senior District Judge Thomas McAvoy, the
only surviving cause of action arises from plaintiff's allegation
that, on December 4, 2014, defendant Correction Officer
Luke Nolan used excessive force against plaintiff by striking
him in the leg with a baton while plaintiff was asleep in
his cell. (See 6/24/2015 Decision and Order, Dkt. No. 21;
1/4/2016 Decision and Order, Dkt. No. 38).

Defendant Nolan subsequently moved for summary judgment
based on plaintiff's alleged failure to exhaust his
administrative remedies. (Dkt. No. 50). Adopting my Report-
Recommendation (Dkt. No. 53), Judge McAvoy denied
summary judgment, finding that there was a material issue of
fact as to whether the administrative grievance process was
"unavailable" to plaintiff under the particular circumstances
of this case. (6/14/2017 Decision and Order, Dkt. No. 57).
See Ross v. Blake, ⸺ U.S. ⸺, 136 S.Ct. 1850, 1858-60,

195 L.Ed.2d 117 (2016). On January 24, 2018, Judge McAvoy
appointed counsel to assist the formerly pro se plaintiff at a
trial on his excessive force claim, which was scheduled to
begin on September 17, 2018. (1/24/2018 Order, Dkt. No. 63;
Amended Pretrial Scheduling Order, Dkt. No. 64).

On April 20, 2018, defense counsel requested an evidentiary
hearing and judicial ruling on the issue of whether plaintiff
exhausted his administrative remedies, pursuant to Messa
v. Goord, 652 F.3d 305, 308-10 (2d Cir. 2011). (Dkt. No.
67). Judge McAvoy referred that motion to me to issue
a Report-Recommendation. (Dkt. No. 68). On May 14,
2018, Judge McAvoy re-assigned the case to me for all
further proceedings, including the entry of judgment, with the
consent of the parties. (See Dkt. Nos. 75, 76). The parties filed
various pre-hearing submissions with respect to exhaustion
issues. (Dkt. Nos. 71, 72, 78-81).

At a conference prior to the "exhaustion hearing," defense
counsel stipulated that a grievance process was in place
at Clinton while plaintiff was confined there, and that
DOCCS has no record that plaintiff filed a grievance or
grievance appeal relating to defendant Nolan's alleged use of
excessive force on December 4, 2014. (See 6/14/2018 Text
Minute Entry). Plaintiff contends, however, that he made two
unsuccessful attempts to file a grievance pursuant to DOCCS
procedures, and that, under the circumstances of this case,
the grievance process was "unavailable" to him, within the
meaning of Ross. (See 6/8/2018 Ltr. of Pl.'s Counsel, Dkt. No.
79).

I conducted the requested evidentiary exhaustion hearing on
June 27, 2018, during which plaintiff and several DOCCS
witnesses testified. (6/27/19 Transcript ("Tr."), Dkt. No. 88).
Inmate Donnell Jefferson was designated as a witness for
plaintiff, and was expected to testify that he placed plaintiff's
first grievance in the facility mail box, at the request of
plaintiff, who was then confined to his cell on "keeplock"
status. However, inmate Jefferson did not testify at the
hearing because he refused to come out of his cell pursuant
to the writ issued by this court to secure his appearance,
apparently because he was not clear on where he was going
to be transported or why. (Tr. at 2, 5-6, 202-03; 6/26/18 &
7/13/2018 Text Minute Entries). For the first time, during
the exhaustion hearing, defense counsel suggested that this
action should be dismissed because plaintiff first filed the
action before his opportunity to exhaust his administrative
remedies was extinguished. (Tr. at 100-03, 192-94, 202). See
Neal v. Goord, 267 F.3d 116, 122 (2d Cir. 2001) (subsequent

2018 WL 4732778

exhaustion after suit is filed is insufficient), *overruled on other grounds, Porter v. Nussle,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002).

**\*2** The court subsequently ordered that the parties depose inmate Jefferson with respect to, inter alia, any information relevant to exhaustion issues. (7/13/2018 Text Minute Entry). The deposition was not conducted until September 14, 2018. At the court's direction, the parties submitted post-hearing briefing, the last of which was submitted on October 1 st, after the Jefferson deposition. (Dkt. Nos. 87, 95, 96).

Based upon the evidence adduced at that hearing and thereafter, and the law outlined below and in my prior Report-Recommendation (Dkt. No. 53), I conclude that plaintiff presented credible evidence that the grievance process was unavailable to him in connection with his complaint of excessive force. Because the grievance process was "unavailable" to plaintiff by the time he filed this action, I reject defendant's argument that this lawsuit should be dismissed because it was filed prematurely. I find, further, that defendant has failed to sustain his burden to prove, by a preponderance of the evidence, the affirmative defense that plaintiff failed to exhaust his administrative remedies. Accordingly, this case must proceed to trial on plaintiff's surviving cause of action for excessive force.

**I. Exhaustion of Administrative Remedies**

**A. General Legal Standards**

The Prison Litigation Reform Act, ("PLRA"), 42 U.S.C. § 1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action. The exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim. *See Giano v. Goord,* 380 F.3d 670, 675-76 (2d Cir. 2004) (citing *Porter v. Nussle,* 534 U.S. 516, 532 (2002) ). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675.

The failure to exhaust is an affirmative defense that must be raised by the defendants. *Jones v. Bock,* 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007); *Johnson v. Testman,* 380 F.3d 691, 695 (2d Cir. 2004). As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements. *See, e.g., Key v. Toussaint,* 660 F.Supp.2d 518, 523 (S.D.N.Y. 2009) (citations omitted).

The Supreme Court has held that in order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules. *Jones,* 549 U.S. at 218-19, 127 S.Ct. 910 (citing *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006) ). In *Woodford,* the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. 548 U.S. at 90-103, 126 S.Ct. 2378.

The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee ("IGRC"). N.Y. Comp. Codes R. & Regs., tit. 7 §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. *Id.* § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee ("CORC"). *Id.* § 701.5(d). The court also notes that the regulations governing the Inmate Grievance Program ("IGP") encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." *Id.* § 701.3(a) (Inmate's Responsibility). There is also an expedited procedure for complaints raising bona fide issues of harassment by staff, which bypasses the IGRC, and initially refers the grievance to the facility superintendent or his designee for prompt review, investigation, and decision. *Id.* § 701.8.

**\*3** Until recently, the Second Circuit utilized a three-part inquiry to determine whether an inmate had properly exhausted his administrative remedies. *See Hemphill v. State of New York,* 380 F.3d 680, 686 (2d Cir. 2004). The *Hemphill* inquiry asked (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.*

However, the Supreme Court has now made clear that courts may not excuse a prisoner's failure to exhaust because of "special circumstances." *Ross v. Blake,* 136 S.Ct. at 1857. " '[M]andatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion.' " *Riles v. Buchanan,* 656 Fed.Appx. 577, 580 (2d

Coleman v. Nolan, Not Reported in Fed. Supp. (2018)

2018 WL 4732778

Cir. 2016) (quoting *Ross*, ––– U.S. ––––, 136 S.Ct. at 1857). Although *Ross* did away with the "special circumstances" exception, the other two factors in *Hemphill*–availability and estoppel–are still valid. The court in *Ross* referred to "availability" as a "textual exception" to mandatory exhaustion, and "estoppel" has become one of the three factors in determining availability. *Ross*, ––– U.S. ––––, 136 S.Ct. at 1858. Courts evaluating whether an inmate has exhausted his or her administrative remedies must focus on whether those remedies were "available" to the inmate. *Id.; see also Riles*, 656 Fed.Appx. at 580. An administrative procedure is "unavailable" when

> (1) "it operates a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates; (2) it is "so opaque that is [sic] becomes, practically speaking, incapable of use"; or (3) "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."

*Riles, supra* (quoting *Ross*, ––– U.S. ––––, 136 S.Ct. at 1859-60).

In *Ross*, the Supreme Court gave examples of the circumstances under which each of the above would apply. *Ross*, ––– U.S. ––––, 136 S.Ct. at 1859-60. The first circumstance listed above involves a case in which the relevant "administrative procedure" lacks the authority to provide "any" relief. *Id.* at 1859. The second example is when the administrative procedure "exists," but is so complicated or "opaque" that no ordinary prisoner could "discern or navigate it." *Id.* Finally, administrative remedies are not available if prison administrators prevent inmates from taking advantage of the grievance process by misleading or threatening them, preventing their use of the administrative procedure. *Id.* at 1860.

In *Williams v. Priatno*, 829 F.3d 118, 123-27 (2d Cir. 2016), the Second Circuit considered whether administrative remedies had been "actually available" to the plaintiff under *Ross*, after the district court granted the defendants' motion to dismiss for failure to exhaust. The plaintiff alleged that, while housed in the special housing unit ("SHU"), he drafted a grievance that he delivered to a correction officer to forward to the grievance office on his behalf. *Id.* at 120-121. Approximately two weeks later, the plaintiff was transferred to a different facility. *Id.* at 121. He never received a response to his grievance and alleged that it was never filed by the

officer to whom he had given it. It was undisputed that plaintiff never appealed the grievance. *Id.*

**\*4** The defendants in *Williams* argued that even if the grievance was never filed, the plaintiff was required to appeal it and complete the grievance process. *Id.* at 124. The defendants relied on a DOCCS regulation that provided that "an inmate may appeal a grievance 'to the next step' if he does not receive a timely response." *Id.* (quoting N.Y. Comp. Codes R. & Regs. tit. 7, § 701.6(g)(2) ). The Second Circuit rejected this argument and held that, for an inmate in the plaintiff's situation, the regulatory scheme was so "opaque" and "confusing" as to be practically unavailable. *Id.* The Second Circuit found that DOCCS regulations "only contemplate appeals of grievances that [have been] actually filed ... [and] give no guidance whatsoever to an inmate whose grievance was never filed." *Id.* Thus, *Williams* holds that "the process to appeal an unfiled and unanswered grievance is prohibitively opaque, such that no inmate could actually make use of it." *Id.* at 126.[1] *See also Medina v. Napoli*, 725 F. App'x 51, 53-54 (2d Cir. 2018) (following *Williams* in the context of a summary judgment motion).

[1]  My summary of *Williams* tracks that of Magistrate Judge Stewart in *Berman v. Durkin*, No. 9:13-CV-136 (LEK/DJS), 2017 WL 1215814, at \*8 (N.D.N.Y. Mar. 10, 2017), (Rep't-Rec.), *adopted*, 2017 WL 1207834 (N.D.N.Y. Mar. 31, 2017).

### B. Exhaustion Hearings

The Second Circuit has ruled that a plaintiff in a lawsuit governed by PLRA is not entitled to a jury trial relating to his exhaustion of administrative remedies. *Messa v. Goord*, 652 F.3d at 308-10. Rather, PLRA exhaustion is a matter of judicial administration, and the court, not a jury, determines factual disputes regarding an inmate's alleged failure to exhaust. *Id.* at 308-08.

As noted above, the defendant bears the burden of proving that the administrative remedies available to the plaintiff were not exhausted prior to the initiation of a civil action. *See, e.g., Howard v. Goord*, No. 98-CV-7471, 1999 WL 1288679, at \*3 (E.D.N.Y. Dec. 28, 1999). However, once a defendant has produced reliable evidence that such remedies were generally available, and the plaintiff nevertheless failed to exhaust those remedies, the plaintiff must then counter the defendant's proof by showing that, as to him or her, the remedy was unavailable. *Smith v. Kelly*, 985 F.Supp.2d 275, 284 (N.D.N.Y. 2013) (Suddaby, J.). "As a result, practically speaking, while the

Case 9:19-cv-00427-DNH-TWD   Document 62   Filed 12/17/21   Page 65 of 193

Coleman v. Nolan, Not Reported in Fed. Supp. (2018)

2018 WL 4732778

burden on this affirmative defense remains at all times on the defendant, the plaintiff may sometimes have to adduce evidence in order to defeat it." *Id.* While there is some ambiguity in the district court cases in the Second Circuit on this point, I agree with Magistrate Judge Peebles's cogent analysis that, while "the burden of production" may shift to a plaintiff when a court considers whether the grievance process was unavailable, "the ultimate burden of proof with respect to the exhaustion defense remains, at all times, with the defendant." *See, e.g., Bailey v. Fortier*, No. 9:09-CV-0742 (GLS/DEP), 2012 WL 6935254, at *5-6 (N.D.N.Y. Oct. 4, 2012) (Rep't-Rec.), *adopted*, 2013 WL 310306 (N.D.N.Y. Jan. 25, 2013); *Nelson v. Plumley*, No. 9:12-CV-422 (TJM/ DEP), 2015 WL 4326762, at *7-8 (N.D.N.Y. July 14, 2015) (Rep't-Rec.), *adopted*, 2013 WL 1305338 (N.D.N.Y. Mar. 18, 2013). [2]

[2]     *Smith v. Kelly, Bailey*, and *Nelson* were all decided before *Ross*, and applied the *Hemphill* factors. However, given that "unavailability" is a common and critical element of the legals standards stated in both in the *Hemphill* line of cases and in *Ross*, the reasoning of the earlier cases with respect to the burden of production and the ultimate burden of proof remain sound after *Ross*.

## II. Facts

### A. Undisputed Facts

As noted, plaintiff stipulated that a grievance process was in place at DOCCS and at Clinton during the relevant time period, and that neither had a record of plaintiff filing a grievance or grievance appeal relating to the alleged December 4, 2014 assault. (Tr. at 12). Plaintiff acknowledged this during his hearing testimony (Tr. at 51-52), and the defendant briefly offered proof supporting the stipulation at the exhaustion hearing (Tr. at 111-113, 125-30). The parties also stipulated to the admission of Defendant's Exhibits 1 through 25 and Plaintiff's Exhibits A through I (subject to relevance objections), although Plaintiff's Exhibit D was admitted for a limited purpose. (Tr. 9-11, 17, 18, 45, 122, 191).

### B. Plaintiff's Version of Disputed Facts

 **\*5**  Plaintiff testified during the exhaustion hearing, referencing various defense exhibits and offering several additional plaintiff's exhibits. He stated that, during the evening of December 4, 2014, he wrote a grievance complaining of defendant Nolan's use of excessive force on plaintiff earlier that afternoon. (Tr. at 19, 74). Plaintiff made and retained a carbon copy of the grievance, a photocopy of which he identified, and which was admitted as Defendant's Exhibit 11. (Tr. at 73). The grievance alleged that plaintiff was asleep in his cell when he felt a sharp pain in his lower right leg, and then awoke to see a correction officer, who he later learned was defendant Nolan, putting away his baton. (Def.'s Ex. 11). When plaintiff stated that he was going to report the incident, defendant Nolan stated, *inter alia*, "write whatever the fuck you want, you see what writing just got you." (*Id.*; Tr. at 46, 74-75).

Defendant Nolan issued plaintiff a misbehavior report as a result of their interaction on December 4th, alleging that plaintiff interfered with Officer Nolan's inmate count and disobeyed a direct order. (Tr. at 46-48; Pl.'s Ex. G). Starting on the morning of December 5th, plaintiff was confined in his cell on "keeplock" status pending resolution of the disciplinary charges against him. (Tr. at 47). Plaintiff had placed the grievance in an envelope, which was addressed to the grievance unit and which had plaintiff's name on it. (Tr. at 19-20). Because he was restricted to his cell, plaintiff passed the envelope containing the grievance to an inmate in an adjacent cell, named Jefferson, to put in the facility mailbox that morning. [3] (Tr. at 19, 20-21, 76). In response to cross-examination by defense counsel, plaintiff testified that inmate Jefferson later confirmed that he placed the grievance in the facility mailbox on their cell block. (Tr. 76-77). Plaintiff procured a contemporaneous declaration from inmate Jefferson regarding what he heard during the alleged assault of plaintiff, which corroborated that Jefferson occupied the cell next to plaintiff in December 2012. (Tr. at 77). [4] During his recent deposition, inmate Jefferson stated that he had no specific recollection of placing something in the facility mailbox for plaintiff in December 2014, when he was confined in the cell next to plaintiff. However, inmate Jefferson testified that, if plaintiff had asked him to mail something while plaintiff was confined on keeplock, Jefferson would have done so. [5]

[3]     Plaintiff, while on keeplock status, was entitled to be released from his cell for one hour per day for recreation, during which time he would have had access to the facility mailbox. However, he testified that he did not request to be released for recreation while on keeplock status. (Tr. at 72-73, 76). Plaintiff would have been allowed to shower while on keeplock status, but a defense

Case 9:19-cv-00427-DNH-TWD    Document 62    Filed 12/17/21    Page 66 of 193

Coleman v. Nolan, Not Reported in Fed. Supp. (2018)

2018 WL 4732778

witness, Sgt. LaValley, testified that plaintiff may not have had an opportunity to place mail in the facility mailbox while being escorted to or from his keeplock cell for the purpose of showering. (Tr. at 160, 165-66).

4    A discussed below, inmate Jefferson's declaration did not mention any involvement in mailing plaintiff's first grievance. (Tr. 77).

5    Pending completion of the deposition transcript, plaintiff's counsel summarized inmate Jefferson's testimony on this point in his recent letter brief. (Dkt. No. 95). Defense counsel belatedly filed a supplemental submission, which stressed Jefferson's lack of recollection, but did not contradict plaintiff's counsel's summary of the deposition testimony. (Dkt. No. 96; 8/10/2018 Text Minute Entry).

A hearing officer dismissed the misbehavior report against plaintiff on or about December 9, 2014, and he was taken off "keeplock" status. (Tr. 72-73, 83). Plaintiff thereafter had regular access to the facility mailbox. (Tr. at 83-84). The hearing officer reported plaintiff's allegation, during the disciplinary hearing, of an assault by defendant Nolan.[6] (Tr. at 97). Lt. Brooks interviewed plaintiff and Officer Nolan about the alleged incident on December 15, 2014. (Tr. at 97-98; Pl.'s Exs. A-C).[7]

6    As a result, plaintiff was seen by a DOCCS nurse on December 11th, who reported that plaintiff had a swollen right ankle. (Def.'s Ex. 25 (Am. Compl.), Dkt. No. 19 at 9 & Ex. S-1 to Am. Compl., Dkt. No. 19-22 at 55).

7    The court incorrectly referred to Exhibits A through C as defense exhibits during the hearing, but they were plaintiff's exhibits.

*6 Because plaintiff did not receive the expected written confirmation that his grievance had been filed with the IGP Supervisor (Tr. at 25), he made a request to DOCCS under the Freedom of Information Law ("FOIL"), on or about December 15, 2014 to determine whether his grievance had been received and filed. (Tr. at 27-29). Plaintiff received a response from the facility FOIL unit, on or about December 26th, that the facility did not have a record of his December 4th grievance. (Def.'s Ex. 12; Tr. at 29-32).[8]

8    There are three dates on the DOCCS FOIL form. It appears plaintiff filed his FOIL request on December 15th, was advised on December 23rd that his request was being reviewed, and notified on December 26th that no record of his grievance existed. (Def.'s Ex. 12; Tr. at 33-34).

Plaintiff alleges that on December 30, 2014, he "resubmitted" a copy of his grievance, again retaining a copy. (Def.'s Ex. 13; Tr. at 32, 35). Plaintiff testified that he personally placed this grievance in the facility mailbox on his cell block in an envelope addressed to the grievance unit, with his name on it. (Tr. at 35-36). The "resubmitted" grievance contained a cover-letter, addressed to the IGRC, stating that plaintiff had been informed, through his FOIL request, that the IGRC never received his December 4th grievance, and advising that plaintiff was "re-submitting [his] initial grievance regarding retaliatory treatment/assault" by defendant Nolan. (Def.'s Ex. 13). Because plaintiff's re-submitted grievance was allegedly mailed more than 21 days after the alleged assault, it was untimely under DOCCS rules; however, it was mailed within the 45-day period during which an inmate could be granted an extension of the filing deadline. (Tr. at 3, 138-39; Def.'s Ex. 20, DOCCS Directive # 4040, §§ 701.5(a)(1), 701.6(g) ).

After again not receiving the expected written confirmation of his December 30th grievance, plaintiff made another FOIL request to determine whether it had been received by the Inmate Grievance Supervisor.[9] (Tr. at 38-39). Plaintiff was advised on January 22, 2015, that his request was being reviewed and, on January 23rd, that the inmate grievance unit had no record of his December 30th grievance. (Def.'s Ex. 15).

9    It is not clear from the DOCCS response when in January plaintiff filed this FOIL request. As discussed further below, plaintiff's original complaint in this action, dated January 7, 2015, was filed with the court on January 14th. (Def.'s Ex. 14).

On January 23rd, plaintiff wrote a letter to the facility superintendent complaining about the alleged assault by defendant Nolan on December 4th, and the fact that plaintiff had submitted two grievances that were never filed by the inmate grievance unit. (Tr. at 39, 41; Def.'s Ex. 16). Defendant received a response on January 28th, advising him that his

2018 WL 4732778

complaint had been referred to the Deputy Superintendent for Security for review and appropriate action. (Tr. at 42; Def.'s Ex. 16). Plaintiff testified that he never received any further communications from facility staff with respect to this complaint. (Tr. at 42). Plaintiff also wrote a similar complaint to the New York Attorney General's Office in March 2015, although he placed the name of another inmate on the envelope to ensure that it was mailed from the facility. (Tr. at 49-51; Def.'s Ex. 17).

### C. The Defense Version of Disputed Facts

Defense counsel extensively cross-examined plaintiff during the exhaustion hearing, and called three witnesses–CORC Assistant Director Rachel Sequin; Clinton's IGP Supervisor, Christine Gregory; and Clinton Sgt. Chad LaValley. Defendant Nolan was not called to testify by either side. (Tr. at 205).

**\*7** Defense counsel contended that the credible evidence does not support plaintiff's claim that he attempted to submit grievances with respect to the December 4, 2014 incident with defendant Nolan. (Tr. at 195-98). Counsel also suggested, for the first time during the exhaustion hearing, that plaintiff's action should be dismissed because he filed his initial complaint prematurely, while he was still attempting to pursue the grievance process with respect to the incident. (Tr. at 100-03, 192-94, 202).

During the hearing, plaintiff acknowledged that he was aware of the DOCCS grievance procedures and knew that if he did not complete all of the steps of the grievance process with respect to a complaint, he might not be able to pursue a lawsuit. (Tr. at 26-27, 51-52, 84). Plaintiff eventually confirmed that he felt that the grievance process at Clinton was "a joke," and that he failed to fully exhaust some other prior grievances when the alleged staff misconduct did not directly threaten his well-being. (Tr. at 55-57, 58).

During cross-examination of plaintiff, defense counsel established that, before, during, and after December 2014, various internal communications and other grievances that plaintiff placed in the facility mailbox with his name on the envelope were received by the facility officials to whom they were directed. (*See, e.g.*, Tr. at 61-64, 65-67, 68-72 86-87, 90-93; Def.'s Exs. 1-3, 7, 8, 10, 12, 15, 16). Plaintiff also acknowledged that an April, 2015 grievance against defendant Nolan for alleged harassment was received by the grievance unit and address by the facility superintendent and CORC. (Tr. at 93-94; Def.'s Exs. 19, 21).

Defense counsel documented, during cross-examination, that neither plaintiff, nor inmate Jefferson had alleged, in various documents, that Jefferson placed plaintiff's December 4, 2014 grievance in the facility mailbox, until plaintiff made that assertion during his deposition. (Tr. at 77, 79-80, 81-83). Plaintiff admitted that he did not see inmate Jefferson place the December 4th grievance in the facility mailbox, nor had he seen anyone tampering with his two grievances, or his mail generally. (Tr. at 76-77, 94).

Plaintiff was questioned by defense counsel as to why he did not do more to follow up with the IGP Supervisor who had apparently not received the two December 2014 grievances, of which plaintiff had kept carbon copies. (Tr. at 85-86, 87-90, 99-100). Plaintiff testified that he made two attempts to submit his grievance to the IGP and never obtained any confirmation that his grievances had been received and filed. Viewing further efforts to communicate with the IGP as futile, and not knowing how to proceed otherwise, he complained to the facility superintendent.[10] (Tr. at 42, 85-86, 87-90, 99-100).

[10]     Plaintiff also stated that he did not attempt to communicate directly with CORC about the fact that his grievances had not been filed, because prior efforts to communicate with CORC about other grievance issues resulted in direction to raise his issues at the facility level first. (Tr. at 42). Rachel Sequin, the CORC Assistant Director, confirmed that an inmate who made an inquiry or complaint to CORC that was not made in the context of an appeal of a grievance **filed** at the facility, would be directed to first raise the issue with staff at the facility. (Tr. at 118).

IGP Supervisor Christine Gregory testified that she never threw away any inmate grievance received by her unit at Clinton. (Tr. at 132, 134). She stated that the IGP typically provided an inmate with written confirmation that a grievance alleging staff misconduct had been received and filed, with an assigned grievance number. (Tr. at 146-47). Ms. Gregory did not recall being aware of plaintiff's two FOIL requests looking for confirmation that his December 2014 grievances had been received by the IGP, but her unit would have been asked by the FOIL clerk at Clinton to determine whether they had those documents. (Tr. at 149-51). She admitted that her unit would not have followed up on a FOIL request which revealed that the IGP did not have any record of a grievance that an inmate

2018 WL 4732778

claimed to have filed. (Tr. at 144-45, 150). Ms. Gregory stated that the security staff at the facility, not the IGP, would have been responsible for investigating complaints that grievances placed in facility mailboxes were not being received. (Tr. at 144-45). She stated that grievances about staff assaults were referred directly to the facility superintendent for investigation and action, and that the IGP would typically not address inmate questions regarding such a grievance. (Tr. at 133, 142).

**\*8** Sgt. LaValley testified about procedures at the Clinton facility, including those relating to inmate mail. He stated that there was a secure facility mailbox in each cell block at Clinton into which inmates could deposit internal or external mail as they left the cell block, *e.g.*, on the way to "chow" (meals). (Tr. at 155-57). The mailbox was in the lobby of plaintiff's cell block in 2014, and could not be viewed by any inmate when he was in his cell. (Tr. at 157, 172-73). While technically not allowed, an inmate could ask another inmate to place a piece of mail in the facility mailbox. (Tr. at 160-61). If an inmate was on keeplock status, he could, in theory, have access to the facility mailbox during the one hour he could be released from his cell for recreation or showers, but would likely be frisked by officers as he was leaving the cell. The correction officer would likely inspect any mail the keeplocked inmate was trying to put in the box, and decide whether or not the inmate could mail it. (Tr. at 160).

Mail was picked up from each cell block every week day by the Visiting Room Officer (or his relief officer if he was not at work) while in the company of an inmate member of the Inmate Liaison Committee ("ILC"). (Tr. at 157-59, 161-63). This process, with an inmate monitoring the mail collection, was implemented more than ten years before because of inmate complaints about their mail going missing. (Tr. at 162, 164-65, 171). Mail was usually picked up when most of the inmates were getting chow and were not present on the cell block. (Tr. at 161-62, 172-73). There were only two rings of keys that would open the mailboxes and the officer collecting mail had to log the key in and out of the room where the keys were stored. (Tr. at 157-58). After the mail was collected from each cell block, the Visiting Room Officer and ILC inmate would deliver the mail to the correspondence room, which Sgt. LaValley believed was staffed by DOCCS civilian employees. (Tr. at 163-64). The Visiting Room Officer and ILC inmate did not observe the mail being sorted or delivered. (Tr. at 179-80).

Sgt. LaValley acknowledged that inmate complaints that grievances at Clinton had not been delivered to the IGP were common, and have been repeatedly raised during periodic meetings between the ILC and facility management. (*See* Pl.'s Ex. D at p. 2; Tr. at 170-71). Sgt. LaValley estimated that, on a typical day, several hundred pieces of mail are picked up at Clinton, including 40 to 50 grievances. (Tr. at 183).

Plaintiff acknowledged that he dated his original federal complaint January 7, 2015. (Tr. at 101). As of that time, plaintiff had not received a response to his second FOIL request about his "re-submitted" December 30, 2014 grievance, and had not yet written his letter of complaint to the facility superintendent. (Tr. at 100-103).

### III. Findings and Conclusions

The court viewed plaintiff's testimony during the hearing, and has reviewed the corroborating and contrary evidence submitted. The court finds that the plaintiff credibly met his burden of production, documenting that he twice attempted to file a grievance with respect to the alleged assault by defendant, pursuant to the mail and grievance procedures in place at Clinton. While defense counsel pointed out some minor inconsistencies between plaintiff's hearing testimony, his June 2016 deposition testimony, and various pleadings filed between early 2015 and late 2016, plaintiff's version of events has been substantially consistent. Given the passage of time since the relevant events of late 2014 and early 2015 and the significant volume of relevant documents, some factual inconsistencies would be expected.

During his recent deposition, inmate Jefferson had no specific recollection of depositing plaintiff's first grievance into the facility mailbox on December 5, 2014–almost four years earlier. However, plaintiff testified, in response to cross-examination by defense counsel, that inmate Jefferson told plaintiff, after the fact, that he had actually placed the grievance in the mail box. Moreover, plaintiff's subsequent steps–submitting a FOIL request to try to confirm that the IGP had received his grievance, and then re-submitting the grievance–provides strong corroboration of plaintiff's testimony. If plaintiff had not submitted the original grievance the day after the incident, he could have just filed a grievance on or about December 15th, when he filed the FOIL request, because the grievance would have still been timely, in that it would have been submitted less than 21 days after the incident. (*See* Def.'s Exhibit 20, DOCCS Directive # 4040, § 701.5(a)(1); Tr. at 119). [11]

Case 9:19-cv-00427-DNH-TWD Document 62 Filed 12/17/21 Page 69 of 193

Coleman v. Nolan, Not Reported in Fed. Supp. (2018)

2018 WL 4732778

11    Plaintiff's omission, in early pleadings, of inmate Jefferson's role in mailing the December 4, 2015 grievance could reflect plaintiff's reluctance to implicate his neighbor in arguably circumventing the keeplock restrictions on plaintiff. But, for the reasons stated above, the court finds that plaintiff's arguably belated disclosure of inmate Jefferson's role does not undermine the credibility of plaintiff's explanation as to how the first grievance was submitted.

**\*9** The defense countered plaintiff's claims that his two attempts to submit grievances about the alleged assault were thwarted by pointing out that plaintiff had successfully filed grievances before and after December 2014. However, plaintiff pointed to documentation of an earlier example when a grievance he submitted was apparently not delivered to the IGP. [12] (*See* Def.'s Exs. 5-7; Tr. at 37-38, 64-67, 68). And, as plaintiff's counsel pointed out (Tr. at 188), plaintiff's first grievance apparently was diverted the morning after plaintiff told defendant Nolan he would report his conduct. Defendant Nolan allegedly told plaintiff, in substance, that grieving his conduct would not get plaintiff anywhere. On December 15, defendant Nolan received notice that plaintiff was still complaining about the alleged assault, because Officer Nolan was interviewed by Lt. Brooks about the incident, based on plaintiff's prior complaints at his disciplinary hearing. Plaintiff's testimony indicates that defendant Nolan had notice of the likelihood that plaintiff would attempt to file grievances with respect to the alleged assault.

12    The plaintiff identified a copy of an initial, unrelated grievance that he submitted, but that was not received by the IGP. (Def.'s Ex. 5). Plaintiff successfully resubmitted that grievance, after being advised, in response to an inquiry to the IGP Supervisor, that the IGP did not have the first grievance. (Def.'s Exs. 6-7).

Plaintiff was able to file a subsequent grievance complaining about defendant Nolan's alleged verbal harassment in April of 2015. However, the court notes that this grievance was filed after plaintiff complained to the facility superintendent and the Attorney General's Office about the disappearance of his December 2014 grievances. It seems probable that the investigation of plaintiff's complaint to the superintendent would deter any further efforts to divert his grievances.

Defense counsel suggested that the procedure for gathering mail at Clinton prevented any tampering or diversion of grievances by staff, and that plaintiff offered no specific evidence as to how his grievance could have been diverted. However, there is no way plaintiff could know how his grievances disappeared, because inmates at Clinton were not in a position to monitor what happened during mail pick-up, sorting, or delivery. As Sgt. LaValley stated, there have been continuing complaints at ILC meetings about grievances not being delivered to the IGP, and one of the inmates on the ILC was supposedly the monitor who ensured that the corrections staff did not divert mail when it was being picked up from the facility mailboxes. [13] While IGP Supervisor Gregory specifically denied ever tampering with an inmate grievance, the defense offered no such representations from defendant Nolan, or from the Visiting Room Officer(s) or the ILC representative(s) who collected the mail, the custodian(s) of the mailbox keys, or the correspondence room staff who sorted and delivered the internal mail at Clinton. [14] Sgt. LaValley acknowledged that most of the correction officers and civilian staff working at Clinton live in the surrounding area. (Tr. 180). Plaintiff's counsel plausibly suggested that the corrections and civilian staff at Clinton may have loyalties to each other that could result in tampering with respect to the internal mail at Clinton. (Tr. at 22-23, 163-64, 179-80, 190-91).

13    Sgt. LaValley also testified that grievances were perceived by DOCCS officials as an important outlet for inmates, and suggested that there was no motivation for DOCCS employees to attempt to interfere with inmate access to grievances. (Tr. at 183). However, officials at Clinton demonstrated little interest in following up on plaintiff's FOIL requests or complaints that his grievances had gone missing. Ms. Gregory testified that the IGP would not have taken any further action with respect to plaintiff's two FOIL requests, which indicated that he attempted to file two grievances that were never received. And, plaintiff testified that there was no apparent follow-up by the Deputy Superintendent for Security, to whom the Superintendent delegated the responsibility to investigate plaintiff's January 23, 2015 complaint.

14    The court recognizes the burden of eliciting such proof from witnesses, other than defendant Nolan, many years after the events at issue. The court also acknowledges that few such witnesses would have

Case 9:19-cv-00427-DNH-TWD   Document 62   Filed 12/17/21   Page 70 of 193

Coleman v. Nolan, Not Reported in Fed. Supp. (2018)

2018 WL 4732778

current recollections of relevant events. However, when a plaintiff credibly meets his burden of production with respect to the unavailability of the grievance process in the particular circumstances he faced, the defendants may not be able to meet their ultimate burden of proof with respect to the affirmative defense of failure to exhaust with general evidence about what procedures were on the books with respect to grievances and mail. *See, e.g., Nelson v. Plumley*, 2015 WL 4326762, at *8-9.

**\*10** As noted earlier, plaintiff credibly met his burden of production by documenting two efforts to file grievances with respect to the alleged assault, pursuant to the appropriate DOCCS and facility-specific procedures. The defense bears the ultimate burden of establishing the failure to exhaust by a preponderance of the evidence, and the general evidence about mail and grievance procedures at Clinton were not sufficient to overcome plaintiff's evidence, notwithstanding his lack of knowledge as to how his grievances might have been diverted. *See, e.g., Nelson v. Plumley*, 2015 WL 4326762, at *8-9. In *Nelson v. Plumley*, Magistrate Judge Peebles found, in similar circumstances, that civil right defendants asserting the affirmative defense of failure to exhaust, did not sustain their burden of proof, once plaintiff met his burden of production that he unsuccessfully attempted to file a grievance:

> Here, plaintiff credibly testified that on January 12, 2012, he attempted to mail the January grievances concerning defendants' alleged assault by having a corrections officer pick them up while he was confined in the SHU at Clinton.... While Clinton IGP Supervisor Gregory testified that she never received those grievances, there is no record evidence that explains or suggests why they were not processed or what happened to them after they were retrieved by the unidentified DOCCS corrections officer.... Defendants have offered no reason why plaintiff would fabricate the grievances post hoc, nor do they provide any reason for why plaintiff would be reluctant to prepare and forward a grievance for processing. At the time he

> claims to have mailed the grievances, plaintiff sent several letters to various DOCCS officials complaining of the assault, demonstrating that he did not fear retribution for complaining concerning the incident.... Moreover, by his own admission, plaintiff is no stranger to the grievance process and does not appear to have hesitated in lodging complaints concerning this and other matters, both utilizing the IGP and through other avenues....

*Id.* at 8 (citations to record omitted). [15]

[15] Plaintiff in *Nelson v. Plumley* was confined in the SHU, which meant he could only submit a grievance by handing it to a correction officer. As noted above, the plaintiff in this case was on keeplock status, and was able to give his grievance to an inmate in the neighboring cell to place in the facility mail box. *Nelson v. Plumley* is arguably distinguishable from this case because Nelson's SHU confinement created a more obvious mechanism for correction officers to prevent the filing of a grievance. However, given that plaintiff in this case documented that he made two unsuccessful efforts to file a grievance through the facility mail box (whereas Nelson only made one attempt from his SHU cell), this court still finds *Nelson v. Plumley* instructive authority supporting my finding that defendant did not meet his burden of proof in this case.

Defense counsel repeated an argument made in support of defendant's summary judgment motion, that plaintiff made only a "general claim that his grievance was lost or destroyed[, which] does not excuse the exhaustion requirement." (Def.'s' Mem. of Law at 10-11, Dkt. No. 50-2) (citing, *inter alia, Rosado v. Fessetto*, No. 9:09-CV-67 (DNH/ATB), 2010 WL 3808813, at *7, 2010 U.S. Dist. LEXIS 108238 (N.D.N.Y. Aug. 4, 2010) (Rep't-Rec.), *adopted,* 2010 WL 3809991, 2010 U.S. Dist. LEXIS 99073 (N.D.N.Y. Sept. 20, 2010) ). As noted in my opinion recommending denial of the summary judgment motion (at 10-11, Dkt. No. 53), *Rosado* correctly stated the law, at the time it was decided. However, *Ross* has changed the law with respect to exhaustion, and requires a court to focus on whether the

Case 9:19-cv-00427-DNH-TWD    Document 62    Filed 12/17/21    Page 71 of 193

Coleman v. Nolan, Not Reported in Fed. Supp. (2018)
2018 WL 4732778

administrative remedies were "available" to the inmate. 136 S.Ct. at 1859-60. In any event, plaintiff did not make a "general claim" that his grievance was lost or destroyed. He submitted a great deal of documentary evidence to corroborate his testimony that he was prevented from filing a grievance, despite reasonable, good faith efforts to do so. [16]

16        In *Moreau v. Peterson*, 672 F. App'x 119 (2d Cir. 2017), the Second Circuit affirmed a dismissal of civil rights claims for failure to exhaust, even though the plaintiff claimed that he was prevented from doing so, because his argument was "inconsistent with the fact that he filed grievances for other claims in the same time period, and those grievances were processed fully." *Id.* at 3 n.1. A review of the District Court's opinion in *Moreau* shows that plaintiff provided "no evidence" of filing grievances related to the claims in question, all of which occurred after the last grievance that was attached to the complaint. *Moreau v. Peterson*, No. 7:14-CV-201, 2015 WL 4272024, at *7 (S.D.N.Y. July 13, 2015). As discussed in my prior Report-Recommendation (at 11-12), this case is distinguishable from *Moreau* because of the corroborating documentation submitted by plaintiff.

*11  This court has found that plaintiff credibly testified that, despite two attempts, plaintiff's grievances with respect to defendant Nolan's alleged assault were never filed with the IGP. Based on that finding, the Second Circuit's *Williams* case, discussed above, establishes that the grievance process was "unavailable" to plaintiff under the Supreme Court's standards in *Ross*. *See Medina v. Napoli*, 2018 WL 1081211, at *1, 725 Fed.Appx. 51 (noting, in the context of a defense summary judgment motion based on plaintiff's alleged failure to exhaust: "The *Williams* decision makes clear that the prison grievance regulations 'plainly do not describe a mechanism for appealing a grievance that was never filed' by reason of inaction or obstruction by prison officials, resulting in a situation where 'the process to appeal an unfiled and unanswered grievance is prohibitively opaque, such that no inmate could actually make use of it.' ") [17]

17        Magistrate Judge Peebles, in *Nelson v. Plumley*, anticipated the Second Circuit's decision in *Williams*. 2015 WL 4326762, at *9 ("In the absence of any evidence that would explain what happened to plaintiffs January grievances, and in light of

plaintiff's credible testimony, I find that the IGP was effectively rendered unavailable to plaintiff when his grievances were lost after a corrections officer picked them up from his SHU cell.").

The case law in this Circuit is relatively clear that *Williams* should be applied only when an inmate's grievance is never filed, as opposed to when a grievance is filed, but not responded to on a timely basis by prison officials. *See, e.g., Cicio v. Wenderlich*, No. 13-CV-195S, 2017 WL 1437206, at *5-6 (W.D.N.Y. Apr. 24, 2017) (granting summary judgment against plaintiff for failure to exhaust when he failed to appeal a grievance **for which he received a receipt confirming that it was filed**, but for which he never received a response on the merits of his grievance), *aff'd*, 714 F. App'x 96, 97 (2d Cir. 2018) (affirming grant of summary judgment, and distinguishing *Williams* which found the DOCCS grievance process "unavailable" when an inmate's grievance was never filed). However, some district court cases also suggest that *Williams* should be limited to its particular facts, *e.g.*, by not applying its holding to plaintiffs who are not confined in a SHU, and who do not need to rely on correction officers to submit their grievances. [18] *See, e.g., Shaw v. Ortiz*, No. 15-CV-8964, 2016 WL 7410722, at *6 (S.D.N.Y. Dec. 21, 2016) ("the factual scenario here is different from that in *Williams* where the Second Circuit found that part of the IGP's regulatory scheme was 'so opaque and so confusing that ... no reasonable prisoner c[ould] use' it.") (citing, *Mena v. City of New York*, No. 13-CV-2430, 2016 WL 3948100, at *5 (S.D.N.Y. July 19, 2016) (finding that the Second Circuit's decision in Williams "hinged on the 'extraordinary circumstances' specific to the case before it") ); *Rodriguez v. Cross*, No. 15-CV-1079 (GTS/CFH), 2017 WL 2791063, at *7 (N.D.N.Y. May 9, 2017) ("Courts have denied a defendant's motion for summary judgment when faced with an unanswered and unfiled grievance drafted in SHU.... This is distinguishable from plaintiff's alleged July 19, 2014 grievance drafted in keeplock.") [19] (Rep't-Rec.), *adopted*, 2017 WL 2790530 (N.D.N.Y. June 27, 2017). [20]

18        In *Medina v. Napoli*, 725 F. App'x at 53-54, the Second Circuit followed *Williams* in a case involving a SHU inmate, but absent the additional circumstance of a transfer to a different facility, which might have further complicated the inmate's ability to file a grievance.

19        As noted above, Sgt. LaValley testified that, while an inmate on keeplock status at Clinton would

Case 9:19-cv-00427-DNH-TWD   Document 62   Filed 12/17/21   Page 72 of 193

**Coleman v. Nolan, Not Reported in Fed. Supp. (2018)**

2018 WL 4732778

have limited access to the facility mailbox, officers would likely "frisk" the inmate and could decide whether or not to allow the plaintiff to place an item in the facility mailbox. (Tr. at 160). Thus, as least in the Clinton facility, officer control over a keeplocked inmate's ability to mail a grievance is not dramatically different than for a SHU inmate.

[20] Defendants' post-hearing submission cites other cases that would limit *Williams* to its particular facts. (Dkt. No. 87, at 3-6). Many of those cases are inapposite to this case because, unlike plaintiff Coleman, the inmate plaintiffs in the cited cases had offered no documentary corroboration of prior efforts to file a grievance, or admitted that they never actually submitted an initial grievance. *See, e.g., Engles v. Dougherty*, No. 9:14-CV-1185 (TJM/ATB), 2017 WL 6466309, at *5 (N.D.N.Y. Aug. 22, 2017) (Rep't-Rec.), *adopted sub nom. Engles v. Souza*, 2017 WL 6463074 (N.D.N.Y. Dec. 18, 2017); *Johnson v. Fraizer*, No. 16-CV-6096, 2016 WL 7012961, at *4 n.5 (W.D.N.Y. Dec. 1, 2016); *White v. Velie*, 709 F. App'x 35, 36-38 (2d Cir. 2017); *Scott v. Kastner-Smith*, 298 F.Supp.3d 545, 554-55 (W.D.N.Y. 2018); *Pridgen v. Beatie*, No. 9:16-CV-535 (DNH/CFH), 2018 WL 1402049, at *7-8 (N.D.N.Y. Jan. 17, 2018) (Rep't-Rec.), *adopted*, 2018 WL 1394146 (N.D.N.Y. Mar. 19, 2018). Other cases cited by defense counsel do not support the application of *Williams* to this case because the plaintiffs in those cases actually filed initial grievances and defaulted on subsequent steps in the exhaustion process. *See, e.g., Rawls v. Rosenfield*, No. 9:16-CV-582 (LEK/CFH), 2017 WL 7050648, at *7-9 (N.D.N.Y. Nov. 28, 2017), (Rep't-Rec.), *adopted*, 2018 WL 542249 (N.D.N.Y. Jan. 23, 2018); *Anderson v. Pedalty*, No. 14-CV-192, 2016 WL 8116154, at *5 (W.D.N.Y. Dec. 6, 2016) (Rep't-Rec.), *adopted*, 2017 WL 387085 (W.D.N.Y. Jan. 27, 2017).

**\*12** As discussed above, the fact that an inmate was in SHU, where an inmate depends on correction officers to forward a grievance, may suggest the most likely explanation for how a grievance could have been diverted. However, this court concludes, despite some district court opinions suggesting otherwise, that the reasoning of *Williams*, which found that DOCCS procedures provided no clear guidance on how any inmate should proceed if a grievance is never filed, would apply even when the inmate is not confined in SHU.

*See Berman v. Durkin*, No. 9:13-CV-136 (LEK/DJS), 2017 WL 1215814, at *7-8 (N.D.N.Y. Mar. 10, 2017) (applying *Williams*, in denying a defense summary judgment motion alleging failure to exhaust by an Clinton inmate, apparently housed in general population, who alleged that his grievance was not filed or answered) (Rep't-Rec.), *adopted*, 2017 WL 1207834 (N.D.N.Y. Mar. 31, 2017). [21]

[21] The defendants in *Berman* ultimately withdrew their affirmative defense of failure to exhaust prior to an exhaustion hearing. See N.D.N.Y. Civil Action No. 9:13-CV-136, (Dkt. No. 208).

As noted earlier, defense counsel argued, for the first time at the close of the exhaustion hearing, that plaintiff's action should be dismissed because he filed his original complaint (dated January 7, 2015) on January 14, 2015, before he completed his efforts to pursue a grievance with respect to the alleged assault. *See, e.g., Casey v. Brockley*, No. 9:13-CV-1271, 2015 WL 8008728, at *5 (N.D.N.Y. Nov. 9, 2015) (if the entire grievance appeal process is not completed prior to filing a complaint, it must be dismissed without prejudice) (citing *Neal v. Goord*, 267 F.3d at 122). However, by the time plaintiff filed his initial federal complaint, he had attempted to file his first grievance (on December 5, 2014) and to re-submit his grievance (on December 30th), and had not received the customary acknowledgment that either had been received by the inmate grievance unit. By the time the complaint was filed, it was established, under *Williams*, that the grievance process was not available to plaintiff. Thereafter, the plaintiff took other steps with respect to his complaint about the alleged assault–the filing of another FOIL request and letters of complaint to the Superintendent and the New York Attorney General. However, such steps were not part of the official grievance process established by DOCCS. *See, e.g., Berman v. Durkin*, 2017 WL 1215814, at *7 (" 'the law is well-settled that informal means of communicating and pursuing a grievance, even with senior prison officials, are not sufficient under the PLRA.' ") (quoting *Timmons v. Schriro*, 2015 WL 3901637, at *3 (S.D.N.Y. June 23, 2015) ). [22] Under these circumstances, *Neal v. Goord* and its progeny would not require the complaint to be dismissed as prematurely filed. [23]

[22] A letter to the facility Superintendent would not have been the appropriate mechanism for plaintiff to appeal his grievance, which fell under the rules for harassment grievances, which are supposed to

2018 WL 4732778

be addressed by the Superintendent in the first instance.

23    It might have been clearer that this action was not prematurely filed if plaintiff had waited at least 45 days after the alleged assault to submit his complaint. By that time, according to Rachel Sequin, the CORC Assistant Director who testified at the hearing, plaintiff would have been foreclosed from filing a grievance or a requesting leave to file an untimely grievance. (*See* Tr. at 120-21; Defendant's Exhibit 20, DOCCS Directive # 4040, § 701.6(g) ). However, given the holding in *Williams* that DOCCS procedures do not establish an intelligible mechanism for appealing a grievance that is not filed by the facility, plaintiff had no meaningful guidance as to how he should proceed once his two efforts to file his grievance were unsuccessful. In the absence of clear guidance in the DOCCS procedures that plaintiff might have been able to pursue other meaningful relief with respect to a grievance for up to 45 days after the alleged assault, his complaint should not be dismissed for filing the complaint when he did.

*13    The court also notes that the defense counsel's delay in arguing that plaintiff's action should be dismissed as prematurely filed might well provide an independent basis for rejecting that argument. Defense counsel filed a summary judgment motion based on plaintiff's alleged failure to exhaust in September 2016 (Dkt. No. 50), which was denied in June 2017 (Dkt. No. 57). Defense counsel did not argue that this action was prematurely filed in connection with the summary judgment motion, but waited to make that argument at the exhaustion hearing in June 2018. By that time, the three-year statute of limitations would likely have run on plaintiff's claim regarding the incident in December 2014. Defense counsel's delay in arguing that plaintiff's complaint should be dismissed because it was filed prematurely, while perhaps not motivated by an intentional effort to prevent plaintiff from re-filing his action, may well have that effect. While not necessary to support this court's rejection of the argument that this action was prematurely filed, defense counsel's delay in raising the issue further supports precluding the defendant's reliance on this argument.

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that because the exhaustion remedies under the DOCCS Inmate Grievance Program were rendered unavailable to plaintiff with regard to grievances complaining of an alleged assault by defendant Nolan on December 4, 2014, his remaining claim in this action is not barred by the Prison Litigation Reform Act based upon a failure to exhaust administrative remedies. And it is further

**ORDERED**, that this matter be set down for trial on plaintiff's remaining claim of excessive force against defendant Nolan.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 4732778

---

**End of Document**                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 2227829
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Thomas OZZBORN, Plaintiff,
v.
Matthew CORNELL,
Correctional officer, Defendant.

9:17-CV-1039 (MAD/ATB)
|
Signed 06/02/2021

**Attorneys and Law Firms**

OF COUNSEL: SCOTT E. RYNECKI, ESQ.,
RUBENSTEIN & RYNECKI, 16 Court Street, Suite 1717,
Brooklyn, New York 11241, Attorneys for Plaintiff.

OF COUNSEL: AIMEE M. COWAN, AAG, OFFICE OF
THE NEW YORK STATE ATTORNEY GENERAL, 300
South State Street, Suite 300, Syracuse, New York 13202,
Attorneys for Defendants.

**MEMORANDUM-DECISION AND ORDER**

Mae A. D'Agostino, U.S. District Judge:

**I. INTRODUCTION**

 *1  On September 19, 2017, Plaintiff Thomas Ozzborn
("Plaintiff"), a former inmate housed at the Auburn
Correctional Facility ("Auburn CF"), filed a complaint in
the Northern District of New York, pursuant to 42 U.S.C. §
1983 and 28 U.S.C. § 1367, against Defendants Corrections
Officer Matthew Cornell, the New York State Department
of Corrections and Community Supervision ("DOCCS"), and
the State of New York (collectively, "Defendants"). See Dkt.
No. 1. On June 22, 2018, the Court issued a Memorandum-
Decision and Order dismissing all claims against the State
Defendants, and the state law assault and battery and all
claims against Defendant Cornell in his official capacity. Dkt.
No. 20. As a result of the Court's decision, Defendant Cornell
is the sole remaining defendant in this action.

On August 21, 2020, Defendant filed a motion for summary
judgment on Plaintiff's remaining claims of false arrest, false
imprisonment, and denial of a right to a fair trial. Dkt. No.
58. On October 21, 2020, Plaintiff filed an opposition to
Defendant's motion. Dkt. No. 62. Defendant filed a reply
on October 28, 2020. Dkt. No. 63. As set forth below,
Defendant's motion is granted in part and denied in part.

**II. BACKGROUND**

On May 9, 2015, Defendant singled out Plaintiff for a
"random" pat frisk. Dkt. No. 58-2 at ¶ 7. Plaintiff alleges
that days prior to this, Plaintiff had a dispute with Defendant
and afterwards, Defendant threatened Plaintiff, stating "I'm
going to see you later." See Dkt. No. 62-1 at 13. Defendant
asserts that he recovered a three- and one-half-inch sharpened
tweezer prong in Plaintiff's right shoe. Dkt. No. 58-2 at ¶
9. Plaintiff alleges that Defendant planted the weapon in his
shoe. Dkt. No. 62-1 at 2.

DOCCS held a disciplinary hearing on May 14, 2015, and
May 28, 2015. See Dkt. No. 58-2 at ¶ 19. Although Plaintiff
maintained his innocence throughout the hearing, he was
found guilty based on Defendant's allegations and transferred
to the Cayuga County Correctional Facility Special Housing
Unit ("SHU") where he spent seven months in solitary
confinement. See Dkt. No. 62-1 at 14.

Faced with a possible sentence of fifteen years to life, Plaintiff
eventually pled guilty to promoting prison contraband in the
first degree, a class D Felony, and agreed to a two to four-
year prison sentence for that charge. Dkt. No. 58-2 at ¶ 44.
On August 12, 2016, Plaintiff appealed his conviction and it
was affirmed. See id. at ¶ 21.

In December 2016, the Inspector General for DOCCS raided
Auburn CF and uncovered multiple items of contraband in the
possession of prison guards. Dkt. No. 62-1 at 12. Defendant
allegedly admitted to the Cayuga County District Attorney
that he had planted at least one weapon on an inmate. See
id. at 13. The District Attorney provided this information
to Plaintiff's counsel and the judge presiding over Plaintiff's
appeal, stating that he had "recently learned of an infirmity
regarding the credibility" of Defendant and that "his office
would not oppose any motion ... to vacate the previously
entered plea and sentence." Dkt. No. 58-15.

 *2  After receiving this letter, Plaintiff filed a motion to
dismiss his conviction and indictment. Dkt. No. 62-1 at 11. On
January 19, 2017, Justice Thomas G. Leone vacated Plaintiff's

2021 WL 2227829

conviction. *See id.* Plaintiff was released from DOCCS's custody on February 9, 2017. *Id.* at 14.

On September 19, 2017, Plaintiff filed a complaint asserting seven causes of action for violations of state law and constitutional rights: (1) false arrest and false imprisonment pursuant to 42 U.S.C. § 1983 against Defendant Cornell, Dkt. No. 1 at ¶¶ 33-48; (2) false arrest and false imprisonment under New York State law against all Defendants, *see id.* at ¶¶ 48-54; (3) denial of the right to a fair trial pursuant 42 U.S.C. § 1983 against Defendant Cornell, *see id.* at ¶¶ 55-60; (4) common law assault against all Defendants, *see id.* at ¶¶ 61-64; (5) common law battery against all Defendants, *see id.* at ¶¶ 65-69; (6) municipal liability against the State Defendants, *see id.* at ¶¶ 70-74; and (7) negligent hiring, retention, training, and supervision against the State Defendants, *see id.* at ¶¶ 75-79. On June 22, 2018, the Court issued a Memorandum-Decision and Order dismissing all claims against the State Defendants, the state law assault and battery against Defendant Cornell and all claims against him in his official capacity. Dkt. No. 20.

On August 21, 2020, Defendant filed a motion for summary judgment on Plaintiff's remaining claims, false arrest, false imprisonment, and denial of a right to a fair trial. Dkt. No. 58. On October 21, 2020, Plaintiff filed an opposition to Defendant's motion. Dkt. No. 62. Defendant filed a reply on October 28, 2020. Dkt. No. 63. Defendant's motion is denied-in-part and granted-in-part.

## III. DISCUSSION

### A. Standard of Review

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted). When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36–37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleadings. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56 (c), (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of New York*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

**\*3** " 'Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment.' " *Jeffreys v. City of New York*, 426 F.3d 549, 553–54 (2d Cir. 2005) (quotation omitted). "However, '[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." *Id.* at 554 (quoting *Anderson*, 477 U.S. at 252) (emphasis in original). "To defeat summary judgment, therefore, nonmoving parties 'must do more than simply show that there is some metaphysical doubt as to the material facts,' ... and they 'may not rely on conclusory allegations or unsubstantiated speculation.' " *Id.* (quotations omitted).

### B. Exhaustion

Defendant asserts that Plaintiff's claims are barred because he failed to exhaust his administrative remedies. Dkt. No. 58-1 at 6-17. Plaintiff argues that he repeatedly attempted to exhaust his administrative remedies, but they were unavailable to him. Dkt. No. 62-2 at 15-17. The Court agrees that Plaintiff failed to exhaust his administrative remedies in part.

The Prison Litigation Reform Act ("PLRA") states that "[no] action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). This exhaustion requirement applies to all suits brought by inmates regarding aspects of prison life. *See Porter v. Nussle*, 534 U.S. 516, 532 (2002). Inmates must exhaust all available administrative

2021 WL 2227829

remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *See Giano v. Goord*, 380 F.3d 670, 675 (2d Cir. 2004), *abrogated on other grounds by Ross v. Blake*, 136 S. Ct. 1850 (2016). The failure to exhaust is an affirmative defense that must be raised by the defendants and, as such, it is the defendants' burden to establish that the plaintiff failed to meet the exhaustion requirements. *See Jones v. Bock*, 549 U.S. 199, 216 (2007); *Key v. Toussaint*, 660 F. Supp. 2d 518, 523 (S.D.N.Y. 2009) (citations omitted).

The Supreme Court has held that in order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules. *See Jones*, 549 U.S. at 218–19 (citing *Woodford v. Ngo*, 548 U.S. 81 (2006)). In *Woodford*, the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. *See Woodford*, 548 U.S. at 90–103.

New York State has a three-step administrative review process, commonly referred to as the Inmate Grievance Program ("IGP"). First, a grievance is submitted to the Inmate Grievance Resolution Committee ("IGRC"), which reviews and investigates the formal complaint before issuing a written determination. *See* 7 N.Y.C.R.R. § 701.5(b). Second, an adverse decision by the IGRC may be appealed to the Superintendent of the Facility. *See id.* § 701.5(c). Third, an adverse decision by the Superintendent may be appealed to the Central Office Review Committee ("CORC"). *See id.* § 701.5(d). If all three levels of review are exhausted, then the prisoner may seek relief in a federal court pursuant to section 1983. *See Bridgeforth v. DSP Bartlett*, 686 F. Supp. 2d 238, 239 (W.D.N.Y. 2010) (citing *Porter*, 534 U.S. at 524).

To the extent a civil rights claim must be exhausted by the grievance process, completion of the three-tiered process, through and including a final decision by the CORC, must be completed before an action asserting that claim may be filed in federal court. *See, e.g., Casey v. Brockley*, No. 9:13-CV-1271, 2015 WL 8008728, *5 (N.D.N.Y. Nov. 9, 2015) ("Receiving a decision from CORC after commencing litigation does not satisfy PLRA's requirement that administrative remedies be exhausted *before* filing suit, and any claim not exhausted prior to commencement of the suit must be dismissed without prejudice") (citing *Neal v. Goord*, 267 F.3d 116, 122–23 (2d Cir. 2001), *overruled on other grounds by Porter*, 534 U.S.

516) (emphasis in original); *Rodriguez v. Rosner*, No. 12-CV-958, 2012 WL 7160117, *8 (N.D.N.Y. Dec. 5, 2012). "[A] post-exhaustion amendment of the complaint cannot cure an exhaustion defect existing at the time the action was commenced." *Guillory v. Haywood*, No. 9:13-CV-1564, 2015 WL 268933, *11 (N.D.N.Y. Jan. 21, 2015) (citing *Neal*, 267 F.3d at 122) (other citation omitted).

**\*4** Plaintiff asserts that after the incident he was placed in SHU and began writing a series of grievances but none of them were actually filed because his mail was not going out. Dkt. No. 62-2 at 15-16. Plaintiff contends that among his unsent mail were his grievances and letters to his mother and the catholic priest; none of which were ever delivered. *Id.* Plaintiff claims that he demanded that he be able to file a grievance but that he was ignored. *Id.* Plaintiff asserts that the grievance process was further unavailable to him because —eight months later—he transferred correctional facilities a number of times. *Id.* at 16.

In support of his position, Plaintiff relies on *Williams v. Correction Officer Priatno*, 829 F.3d 118 (2d Cir. 2016). In *Williams*, the defendant, a corrections officer, searched through the plaintiff's cell and went through his legal paperwork pertaining to a court case regarding a prior assault he suffered from prison officials. *Id.* at 120. The defendant then assaulted the plaintiff in a room with no cameras and told him, " 'this is what running your mouth gets you.' " *Id.* About two weeks later, the plaintiff drafted a grievance and gave it to a corrections officer to submit on his behalf. *Id.* at 121. One week later, the plaintiff saw the superintendent and asked about his grievance. *Id.* The superintendent said he was unaware of the grievance and said to follow up, but the plaintiff was transferred to another facility just one week later. *Id.*

The plaintiff never received a response and claimed that the officer never filed it on his behalf. *Id.* The Second Circuit accepted this allegation as true. *Id.* at 124. While the court agreed that the plaintiff technically could have filed a new grievance at his new facility, the court held that "the regulatory scheme providing for that appeal is 'so opaque' and 'so confusing that ... no reasonable prisoner [could] use [it].' " *Id.* (quoting *Ross*, 136 S. Ct. at 1859). Specifically, the regulations did not detail how a prisoner was to appeal or exhaust an administrative remedy where an officer failed to file the grievance. *Id.* "The regulations simply do not contemplate the situation in which [the plaintiff] found himself, making it practically impossible for him to

ascertain whether and how he could pursue his grievance." *Id.* The plaintiff's transfer only further complicated a confusing situation. *Id.* at 126.

Plaintiff's reliance on *Williams* is misplaced. Unlike *Williams*, Plaintiff does not claim that the grievance process was so opaque that neither he, nor any other reasonable prisoner, could use it. Rather, Plaintiff claims that he knew how to file a grievance was but prevented from doing so. While the overview of the alleged facts in *Williams* have some overlap to those of the present case, the legal arguments and the particular supporting facts are entirely distinct.

For instance, Plaintiff claims that, like *Williams*, his transfer to another correctional facility prevented him from grieving the incident. However, the plaintiff in *Williams* submitted a grievance, contacted the superintendent to follow up on the status of that grievance, and then was transferred to another correctional facility one week later. *Williams*, 829 F.3d at 120-21. The plaintiff supported this allegation by providing the court with the date he filed the grievance, the procedure for how he filed it, and the timeline for roughly when the subsequent follow-up conversations occurred. *Id.* at 121. Here, Plaintiff provides no specifics regarding the grievances he allegedly filed and did not request an extension to file a new one. *See* Dkt. No. 62-2 at 15-17.

**\*5** Plaintiff's case is more similar to *Rodriguez v. Cross*, No. 15-CV-1079, 2017 WL 2791063, \*6 (N.D.N.Y. May 9, 2017). In *Rodriguez*, the plaintiff complained that he submitted a grievance via mail, the correction officers failed to mail it, and thus, he never received a response. *Id.* The court stated that the plaintiff's bald accusations were insufficient to demonstrate that administrative remedies were unavailable to him. *Id.* at \*6-7. The court also noted that although the plaintiff never followed up regarding his grievance, he successfully filed another grievance. *Id.* at \*7.

Here, Plaintiff testified at his deposition that he filed a grievance by leaving a plain envelope addressed to the grievance committee for the mail personnel to collect. Dkt. No. 58-9 at 74-75. Plaintiff stated that his grievances were collected but, because he never received a response, he presumed that they were never submitted. *Id.* at 75. Like *Rodriquez*, Plaintiff does not assert that he ever followed up on his grievance or offer any explanation as to why he failed to. *See* Dkt. No. 62-2 at 15-17. Additionally, Plaintiff has successfully filed numerous grievances in the past, including one just two weeks before the incident. *See* Dkt. No. 58-1

at 3; Dkt. No. 58-3 at ¶ 8. As in *Rodriguez*, Plaintiff has failed to demonstrate that his administrative remedies were unavailable to him. Accordingly, the Court grants Defendant's motion for summary judgment as to Plaintiff's false arrest and imprisonment claim. [1]

[1]   In the alternative, the Court finds that Plaintiff's false arrest/imprisonment claim fails on the merits. The law is clear that " '[a] plaintiff does not have a claim for false arrest ... under [§] 1983 if, at the time of his arrest ..., he is already in custody or incarcerated on other charges, because there is no deprivation of liberty interests.' " *Wong v. LaPierre*, No. 8:07-cv-1110, 2011 WL 13248503, \*8 (N.D.N.Y. Mar. 23, 2011) (quotation and other citations omitted); *Holmes v. Grant*, No. 03 Civ. 3426, 2006 WL 851753, \*14 (S.D.N.Y. Mar. 31, 2006) ("As plaintiff was already incarcerated at the time of the assault proceeding, he suffered no new seizure"); *Goncalves v. Reynolds*, 189 F. Supp. 2d 278, 283 (W.D.N.Y. 2001) (holding that the plaintiff cannot maintain a claim for false arrest where he was already being detained pursuant to earlier charges and based upon his prior convictions); *Perez v. Hewitt*, No. 04 Civ. 10112, 2008 WL 780628, \*2 (S.D.N.Y. Mar. 24, 2008) (noting that "inmates retain only a 'limited right to bodily privacy' under the Fourth Amendment" and dismissing the plaintiff's false arrest/imprisonment claim because, as an inmate, the plaintiff did "not have a reasonable expectation of privacy in his person"). Although Plaintiff may have been able to bring a malicious prosecution claim against Defendant based on Defendant's alleged fabrication of evidence that was forwarded to the Cayuga County District Attorney's Office that resulted in Plaintiff remaining in state custody beyond the expiration of his original criminal sentence, Plaintiff, who is represented by counsel, did not bring a malicious prosecution claim. *See Parker v. City of New York*, No. 05 Civ. 1803, 2008 WL 110904, \*9 (S.D.N.Y. Jan. 7, 2008) (noting that a malicious prosecution claim may exist where "the prisoner's period of incarceration was lengthened as a result of new charges brought against him while he was in custody").

As to Plaintiff's due process claim, however, the Court finds that Plaintiff was not required to exhaust administrative

remedies to pursue that claim. Generally, an inmate bringing a due process claim arising from a prison disciplinary hearing must complete the disciplinary administrative appeal process, not the IGP procedures, to exhaust administrative remedies. *See, e.g., Johnson v. Fraizer*, No. 16-cv-6096, 2016 WL 7012961, *3 (W.D.N.Y. Dec. 1, 2016) (citation omitted). Here, however, Plaintiff's due process claim alleges that Defendant violated his right to a fair trial by providing fabricated evidence to the Cayuga County District Attorney, which led to criminal charges being brought against Plaintiff. *See* Dkt. No. 1 at ¶¶ 54-59. Nothing in this claim relates to the Tier III disciplinary hearing or Plaintiff's time spent in SHU as a result thereof. Rather, this claim relates solely to the criminal case brought against Plaintiff, which is unrelated to "prison conditions" as contemplated by the PLRA. *See* 42 U.S.C. § 1997e(a); *see also Cheatham v. Saturne*, No. 1:18-cv-3154, 2019 WL 10631254, *1 (N.D. Ga. Mar. 1, 2019) (discussing cases not subject to the PLRA's exhaustion requirement) (citations omitted).

 **\*6**  This result is further supported by the fact that Plaintiff would not have been able to pursue this claim until after his conviction was overturned on appeal or otherwise terminated in his favor. Had Plaintiff proceeded with this claim prior to having his conviction vacated, the case would have been dismissed pursuant to *Heck v. Humphrey*, 512 U.S. 477 (1994), because a judgment in Plaintiff's favor on his right to a fair trial/fabricated evidence claim would necessarily imply that his prior conviction was invalid. *See McDonough v. Smith*, 139 S. Ct. 2149, 2157 (2019) (discussing the favorable termination requirement set forth in *Heck*). As such, the Court finds that Plaintiff was not required to exhaust his administrative remedies under the PLRA before pursuing his right to a fair trial claim relating to the new criminal charges.

Accordingly, the Court grants Defendant's motion for summary judgment as to Plaintiff's false arrest and imprisonment claim but denies the motion as to Plaintiff's due process fair trial claim.

## C. Right to a Fair Trial

In his third cause of action, Plaintiff alleges that Defendant, in creating and forwarding false evidence, violated his "right to a fair trial under the Due Process Clause of the Fifth, Sixth and Fourteenth Amendments of the United States Constitution." Dkt. No. 1 at ¶ 59. Defendant contends that this claim must be dismissed insofar as it seeks relief under the Fifth and Sixth Amendments because the Fifth Amendment is only applicable to the federal government and the Sixth

Amendment is inapplicable to civil actions. *See* Dkt. No. 58-1 at 22-24. With respect to Plaintiff's claim under the Fourteenth Amendment, Defendant contends that it must be dismissed because Plaintiff has presented only conclusory statements and speculation in support of his position that Defendant fabricated evidence. *See id.* at 24-26. The Court disagrees.

"The Due Process Clause guarantees a criminal defendant's 'right to a fair trial.' " *Frost v. N.Y.C. Police Dep't*, 980 F.3d 231, 244 (2d Cir. 2020) (quoting *Ramchair v. Conway*, 601 F.3d 66, 73 (2d Cir. 2010)). "This right is violated '[w]hen a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors.' " *Id.* (quoting *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997)). "Such violations are 'redressable in an action for damages under 42 U.S.C. § 1983.' " *Id.* (quotation omitted). "And unlike a malicious prosecution claim, 'a Section 1983 claim for the denial of a right to a fair trial based on an officer's provision of false information to prosecutors can stand even if the officer had probable cause to arrest the Section 1983 plaintiff.' " *Id.* (quoting *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 277–78 (2d Cir. 2016)).

To set forth a claim of the denial of the right to a fair trial, the plaintiff must establish that an "(1) investigating official (2) fabricates evidence (3) that is likely to influence a jury's decision, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of liberty as a result." *Jovanovic v. City of New York*, 486 Fed. Appx. 149, 152 (2d Cir. 2012). The inquiry as to causation is "whether the liberty deprivations that occurred are legally traceable back even further to [the] earlier investigatory act of fabrication." *Zahrey*, 221 F.3d at 352. In a recent decision, however, the Second Circuit made clear that the right to a fair trial can be violated even if the fabricated evidence that was supplied to the prosecutor was not ultimately used at trial. *See Frost*, 980 F.3d at 250. Moreover, it is important to note that, although the officer need not directly provide the fabricated evidence to the prosecutor, no causation for this claim would exist if such evidence was never brought to the prosecutor's attention. In other words, the claim only accrues "when fabricated information is forwarded to a prosecutor and results in the deprivation of a defendant's liberty." *Soomro v. City of New York*, 174 F. Supp. 3d 806, 815 (S.D.N.Y. 2016) (citation omitted).

 **\*7**  Initially, the Court finds that it is unnecessary to determine the precise constitutional amendment underpinning Plaintiff's due process right to a fair trial claim.

The Second Circuit has noted that its own decisions have been " 'inconsistent as to whether' fabrication of evidence claims 'arise[ ] under the Sixth Amendment right to a fair and speedy trial, or under the due process clauses of the Fifth and Fourteenth Amendments.' " *Morse v. Fusto*, 804 F.3d 538, 547 n.7 (2d Cir. 2015) (quotation and other citations omitted). Despite these inconsistencies, the Second Circuit has specifically declined to clarify the issue, noting that regardless of which amendment the right is rooted it, it is undisputed that the "constitutional harm resulting from the falsified information at issue is ... redressable in an action for damages under 42 U.S.C. § 1983." *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 276 n.6 (2d Cir. 2016) (citing *Morse v. Fusto*, 804 F.3d 538, 547 n.7 (2d Cir. 2015)). In line with this authority, the Court declines to determine whether the right to a fair trial is rooted in the Sixth Amendment or Fifth and Fourteenth Amendments, or both.

Next, the Court finds that, contrary to Defendant's position, Plaintiff has supported his claim with more than mere speculation and conclusory statements. Defendant relies on a number of cases where the courts dismissed the plaintiffs' right to a fair trial claim because the claims were supported by nothing more than the plaintiffs' speculation that the officers had falsified evidence. *See* Dkt. No. 58-12 at 24-25 (citing cases). Here, however, Plaintiff's claim is supported by considerably more than mere speculation.

For example, in the Investigative Report prepared by the Office of Special Investigations, it was noted that there was sufficient evidence to corroborate the allegation that Defendant made a verbal admission to Cayuga County Assistant District Attorney ("ADA") Brian Leeds wherein Defendant admitted to planting weapons on inmates at Auburn C.F. *See* Dkt. No. 58-17 at 1-2. Further, the investigator searched Defendant's personal locker and vehicle and found various contraband items and "potential inmate style weapons." *Id.* at 6-7. Moreover, based on Defendant's admission that he had planted weapons on inmates to ADA Leeds and the various contraband items found in Defendant's possession, the Office of Special Investigations reviewed all facility Unusual Incident's and Inmate Misbehavior Reports issued by Defendant since 2014. *See id.* at 7. Of the thirty-eight (38) inmates issued a Misbehavior Report by Defendant for a weapon, twenty-two (22) of the inmates alleged that they had been set up with the weapon by Defendant and fifteen (15) of the inmates admitted that the weapon found by Defendant was theirs. *See id.* [2] As a result of the investigation, on July 30, 2017, Defendant was issued a Notice of Discipline for

his failure to properly secure contraband or report contraband found and for his failure "to comport himself in a lawful manner by planting evidence on an inmate and for issuing false/misleading Misbehavior Reports and statements during an official questioning conducted by OSI." *Id.* at 8. On February 27, 2018, Defendant resigned from his position as a Corrections Officer with DOCCS. *Id.*

[2]    One inmate refused to be interviewed.

Defendant also relies on a report written by Sgt. Ederer dated May 9, 2015, as well as his deposition testimony. In his report, Sgt. Ederer indicates that Defendant performed a pat frisk of Plaintiff. *See* Dkt. No. 58-12 at 13. Sgt. Ederer stated that Plaintiff admitted to possessing a weapon when questioned by Defendant. *Id.* Sgt. Ederer noted that Defendant recovered a "cutting type weapon sharpened to a point." *Id.* During his deposition on January 7, 2020, Sgt. Ederer verified the authenticity of his May 9, 2015 report. *See* Dkt. No. 58-11 at 32-33. Notably, however, during his deposition Sgt. Ederer stated that he did not observe the pat frisk or Defendant obtaining the weapon from Plaintiff. *See id.* at 31-32. Sgt. Ederer clarified that his report was based on Defendant's statements to him after the fact, although he claims that Plaintiff admitted to him directly that the weapon was his. *See id.* at 34.

**\*8**    Finally, the Court notes that Defendant asserts that Plaintiff confessed multiple times to possessing the weapon. Dkt. No. 58-1 at 21. However, the Court does not find these "admissions" very persuasive. First, Defendant asserts that Plaintiff admitted in an email that the weapon was his. In the email, Plaintiff states, "I KNOW ITS MY FAULT I GOT MORE TIME...." Dkt. No. 58-19 at 2. This statement, which is not placed in the context of the entire email chain, is ambiguous. *Id.* at 1-2.

The conversation begins on February 10, 2016 and the quoted text occurred on March 25, 2016. *Id.* at 1. In between those two emails from Plaintiff, there are two other emails, one from Plaintiff and one from Venessa. *Id.* at 1-2. Following Plaintiff's first email on February 10, he sent a second email the next day that appears to reference an entirely different conversation than the first. *See id.* While the first email appears to reference Plaintiff's legal proceedings for the alleged possession of the weapon, the second email refers only to the relationship between Plaintiff and Venessa, Venessa's relationship with another person, and comments made in another conversation. Further, the pages listed on the document jump from one to thirty-four. *Id.* Thus, the email

chain does not provide context as a whole to the conversation and the quoted portion is not particularly damning to Plaintiff by itself.

The phone call the parties reference from May 11, 2016 is also less than clear. During the call, Plaintiff references the weapon and states that he was unwilling to accept a large sentence for having a weapon. Dkt. No. 63. While Plaintiff never states that the weapon was planted on him, he also never states that the weapon was his. *Id.* Rather, Plaintiff continually states that he is fighting the charge and also affirms that he never used the weapon. *Id.* He even states that the judge and district attorney are working against him. *Id.* However, Plaintiff states that he is tired of fighting and is "tapping out." *Id.* Contrary to Defendant's assertions, this call does not arise to the level of an admission of guilt.

Contrary to Defendant's assertions, Plaintiff's right to a fair trial claim is supported by more than mere speculation and conclusory statements. As such, the Court finds that questions of fact preclude granting Defendant's motion for summary judgment as to this claim. [3]

[3]  In his motion, Defendant argues that he is entitled to qualified immunity as to Plaintiff's false arrest/ imprisonment claim based on the existence of "arguable probable cause," but fails to raise the qualified immunity defense as to Plaintiff's right to a fair trial claim. *See* Dkt. No. 58-1 at 28-29. Even assuming Defendant had raised this affirmative defense to Plaintiff's right to a fair trial claim, it would necessarily be denied. " 'When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983.' " *Garnett,* 838 F.3d at 275 (quotation omitted). Here, questions of fact would preclude granting summary judgment based on qualified immunity for the alleged violation of this clearly established right. *See Ricciuti,* 124 F.3d at 130.

### D. Damages

Defendant argues that because Plaintiff did not suffer a "physical injury" as required by the PLRA, he cannot seek compensatory damages. *See* Dkt. No. 58-1 at 27-28. The Court disagrees.

**\*9**  Section 1997e(e) of the PLRA states that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury," and "applies to claims in which a plaintiff alleges constitutional violations." 42 U.S.C. § 1997e(e); *see also Thompson v. Carter,* 284 F.3d 411, 416-17 (2d Cir. 2002). While the PLRA limits recovery of damages for mental and emotional injury with no showing of physical injury, the Second Circuit has made clear that "it does not restrict a plaintiff's ability to recover compensatory damages for actual injury, nominal or punitive damages, or injunctive and declaratory relief." *Thompson,* 284 F.3d at 416.

Here, contrary to Defendant's assertion, Plaintiff is still entitled to recover compensatory damages if he prevails on his right to a fair trial claim based on his loss of a "constitutional liberty interest." *Rodriguez v. Touchette,* No. 5:19-cv-143, 2020 WL 2322615, \*6 (D. Vt. May 11, 2020) (citations omitted); *Holland v. City of New York,* 197 F. Supp. 3d 529, 537 (S.D.N.Y. 2016) (collecting cases). Compensatory damages for intangible deprivations of a plaintiff's liberty and personal rights – as distinct from pain and suffering, mental anguish, and mental trauma – are not barred by the PLRA. *See Rosado v. Herard,* No. 12 Civ. 8943, 2014 WL 1303513, \*13 (S.D.N.Y. Mar. 25, 2014); *see also Malik v. City of New York,* No. 11 Civ. 6062, 2012 WL 3345317, \*16 (S.D.N.Y. Aug. 15, 2012).

Accordingly, the Court denies Defendant's motion for summary judgment insofar as he seeks dismissal of Plaintiff's claim for compensatory damages.

### IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendant's motion for summary judgment (Dkt. No. 58) is **GRANTED in part and DENIED in part**; [4] and the Court further

[4]  As a result of this Memorandum-Decision and Order, Plaintiff's only remaining claim is his due process right to a fair trial claim.

**Ozzborn v. Corriell, Slip Copy (2021)**

2021 WL 2227829

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2021 WL 2227829

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 1966721
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Michael T. HUDSON, Plaintiff,

v.

C. KIRKEY, et al., Defendants.

9:20-CV-0581 (LEK/DJS)
|
Signed 05/17/2021

**Attorneys and Law Firms**

Michael T. Hudson, Attica, NY, Pro Se.

David C. White, Office of Attorney General, Albany, NY, for
Defendant Correction Officer C. Kirkey.

## MEMORANDUM-DECISION AND ORDER

Lawrence E. Kahn, U.S. District Judge

## I. INTRODUCTION

**\*1** Pro se plaintiff Michael T. Hudson filed a 42 U.S.C. §
1983 action against Correction Officer C. Kirkey, Sergeant
John Doe, Correction Officers John Does 1–7, Nurse Jane
Doe, and Doctor John Doe, alleging violations of his
constitutional rights. Dkt. No. 1 ("Complaint"). On January
26, 2021, the Honorable Daniel J. Stewart, United States
Magistrate Judge, recommended that Kirkey's motion for
summary judgment, Dkt. No. 17 ("Motion"), be granted due
to Plaintiff's failure to exhaust his claims, and Plaintiff's
claims against John Does 1–7, Nurse Jane Doe, and Doctor
John Doe be dismissed sua sponte for the same reason. Dkt.
No. 25 ("Report-Recommendation"). For the reasons that
follow, the Court rejects the Report-Recommendation.

## II. BACKGROUND

### A. Factual Background

The facts are detailed in the Report-Recommendation,
familiarity with which is assumed. See R. & R. at 2–3.

### B. The Motion

Kirkey moves for summary judgment on exhaustion grounds.
See generally Mot. Kirkey argues that Plaintiff failed to file

or appeal any grievance pertaining to the events giving rise to
his claims. See Mot. at 8–9.

### C. Response

In his response, Plaintiff argues that the factual contentions
that he submitted his grievance are consistent with Kirkey's
contentions that there is no record of the grievance having
been filed. See Dkt. No. 23 ("Response")[1] at 1. Plaintiff
asks the Court to infer that prison officials somehow thwarted
the filing of his grievance after Plaintiff attempted to submit
it. Id.; Dkt. No. 21 ("Plaintiff's Supplemental Letter")[2] at
1. On this basis, Plaintiff argues that he should be excused
from the exhaustion requirement, as the grievance process
was unavailable. See id.; see also Riles v. Buchanan, 656
Fed. App'x 577, 580 (2d Cir. 2016) ("An administrative
procedure is unavailable when ... 'prison administrators
thwart inmates from taking advantage of a grievance process
through machination, misrepresentation, or intimidation.' ")
(quoting Ross v. Blake, 136 S.Ct. 1850, 1859–60 (2016)).

[1]    Because Plaintiff has sworn to the allegations in his
       Response under penalty of perjury, the Court treats
       his factual allegations as the legal equivalent of an
       affidavit, for evidentiary purposes. See McLean v.
       LaClair, No. 19-CV-1227, 2021 WL 671650, at \*9
       n.2 (N.D.N.Y. Feb. 22, 2021) (Kahn, J.) (finding
       that plaintiff's complaint was a sworn statement
       since it was affirmed under penalty of perjury).

[2]    Plaintiff submitted his Supplemental Letter and
       Response following the filing of Kirkey's Motion.
       The Supplemental Letter elaborates on Plaintiff's
       attempt to file his grievance and was referred to
       in the Report-Recommendation and in Plaintiff's
       objections to the Report-Recommendation. See
       Dkt. No. 26 ("Objections").

Plaintiff presents the following evidence supporting his
factual assertion that he submitted his grievance: (1) his sworn
Response, in which he attests he did so, see Resp. at 1;
(2) his Supplemental Letter in which he attests he did so,
that a correction officer threw away his grievance, and that
he filed an similar grievance through the Office of Special
Investigation ("OSI"), Pl.'s Supplemental Letter at 1.

### D. Report-Recommendation

**\*2** The magistrate judge recommended granting summary
judgment on exhaustion grounds. In doing so, the magistrate

judge relied on a string of district court cases in this Circuit doing the same when a plaintiff offered only "conclusory" assertions that he submitted a grievance that was never filed. See R. & R. at 7–9.

### E. Objections
In his Objections, Plaintiff reiterates an argument from his Response and Supplemental Letter regarding exhaustion. See Objs. Namely, he clarifies that, while he does not dispute that his grievance was never filed with the Inmate Grievance Resolution Committee ("IGRC"), he filed a similar grievance with OSI around the same time and submitted a request under the New York State Freedom of Information Law for a copy of that grievance. Id. at 1–2.

## III. STANDARDS OF REVIEW

### A. Report-Recommendation
Within fourteen days after a party has been served with a copy of a magistrate judge's report-recommendation, the party "may serve and file specific, written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b); L.R. 72.1(c). If objections are timely filed, a court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b). However, if no objections are made, or if an objection is general, conclusory, perfunctory, or a mere reiteration of an argument made to the magistrate judge, a district court need review that aspect of a report-recommendation only for clear error. Barnes v. Prack, No. 11-CV-857, 2013 WL 1121353, at *1 (N.D.N.Y. Mar. 18, 2013); Farid v. Bouey, 554 F. Supp. 2d 301, 306–07 (N.D.N.Y. 2008), abrogated on other grounds by Widomski v. State Univ. of N.Y. at Orange, 748 F.3d 471 (2d Cir. 2014). "A [district] judge ... may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." § 636(b).

### B. Summary Judgment
Pursuant to Federal Rule of Civil Procedure 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. F.D.I.C. v.

Giammettei, 34 F.3d 51, 54 (2d Cir. 1994) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)) (alteration in original).

To defeat a motion of summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. Fed. R. Civ. P. 56(a). Sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion." Scott v. Coughlin, 344 F.3d 282, 289 (2d Cir. 2003). The credibility of such statements is better left to a trier of fact. Id.

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. Nora Beverages, Inc. v. Perrier Group of Am., Inc., 164 F.3d 736, 742 (2d Cir. 1998). Furthermore, when a party is proceeding pro se, the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994). Summary judgment is only appropriate "where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

### C. Exhaustion
*3 The Prison Litigation Reform Act ("PLRA") governs federal civil rights litigation by incarcerated individuals. Under the PLRA, "[n]o action shall be brought with respect to prison conditions under § 1983 of this title, or any other Federal law, by an incarcerated individual confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[T]he PLRA's exhaustion requirement applies to all incarcerated individual suits about prison life, whether they involve general circumstances or particular episodes." Porter v. Nussle, 534 U.S. 516, 532 (2002). "Exhaustion is mandatory—unexhausted claims may not be pursued in federal court." Amador v. Andrews, 655 F.3d 89, 96 (2d Cir. 2011) (citations omitted).

To exhaust administrative remedies, an incarcerated individual must complete all of the administrative review procedures according to the rules applicable to the institution in which he or she is confined. See Jones v. Bock, 549

U.S. 199, 218 (2007). Therefore, "untimely or otherwise procedurally defective attempts to secure administrative remedies do not satisfy the PLRA's exhaustion requirement." Ruggiero v. County of Orange, 467 F.3d 170, 176 (2d Cir. 2006).

The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the IGRC. N.Y. Comp. Codes R. & Regs., tit. 7 §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the superintendent of the facility. Id. § 701.5(c). Adverse decisions at the superintendent's level may be appealed to the Central Office Review Committee ("CORC"). Id. § 701.5(d).

**IV. DISCUSSION**

As Plaintiff's Objections reiterate arguments he has already presented, the Court reviews the Report-Recommendation for clear error. Having done so, the Court concludes that the magistrate judge committed clear error in his exhaustion analysis, by straying from well-established summary judgment principles.

The magistrate judge placed a greater evidentiary burden on Plaintiff than is required to survive summary judgment. With respect to the parties' factual disagreement over whether Plaintiff submitted his initial grievance, the Court notes that this dispute essentially boils down to a clash of sworn statements. Plaintiff attested that he gave his grievance to a correction officer, Objs. at 1, and Kirkey submitted sworn statements from inmate grievance program supervisors indicating that a review of their records revealed that no grievance was filed, Dkt. Nos. 17-4 ("Cieslak Declaration") at 6, 17-8 ("Pickett Declaration") at 5. To the extent that these statements are in contradiction, the Court cannot resolve this contradiction at the summary judgment stage, because the Court is prohibited from making credibility determinations. See McLean, 2021 WL 671650, at *6.

The magistrate judge cites a number of cases in which courts granted summary judgment when a plaintiff offered only "bare" or "unsupported" assertions that he submitted a grievance that was never filed. See R. & R. at 7–9. However, Plaintiff's factual contention that he gave his grievance to a correction officer is supported—by a sworn statement based on personal knowledge. This is sufficient in itself to enable Plaintiff to survive summary judgment. See McLean, 2021 WL 671650, at *7.

The magistrate judge may have implicitly applied a burden-shifting framework that courts in this District generally employ in adjudicating PLRA exhaustion at the summary judgment stage. As Chief Judge Suddaby explained:

> [T]he defendant bears the burden of proving that the administrative remedies available to the plaintiff were not exhausted prior to the initiation of a civil action. See, e.g., Howard v. Goord, No. 96-CV-7471, 1999 WL 1288679, at *3 (E.D.N.Y. Dec. 28, 1999). However, once a defendant has produced reliable evidence that such remedies were generally available, and the plaintiff nevertheless failed to exhaust those remedies, the plaintiff must then counter the defendant's proof by showing that, as to him or her, the remedy was unavailable. Smith v. Kelly, 985 F. Supp. 2d 275, 284 (N.D.N.Y. 2013). "As a result, practically speaking, while the burden on this affirmative defense remains at all times on the defendant, the plaintiff may sometimes have to adduce evidence in order to defeat it." Id. ... [W]hile the burden of production may shift to a plaintiff when a court considers whether the grievance process was unavailable, the ultimate burden of proof with respect to the exhaustion defense remains, at all times, with the defendant.

*4 Coleman v. Nolan, No. 15-CV-40, 2018 WL 4732778, at *4 (N.D.N.Y. Oct. 2, 2018) (other internal quotation marks and citations omitted).

This burden-shifting framework does not ultimately mandate a greater evidentiary showing from Plaintiff than would otherwise be required during summary judgment. See McLean, 2021 WL 671650, at *7. A presumption is not a form of "super-evidence" that heightens the opposing party's evidentiary burden in rebuttal. Id. Indeed, a presumption is not evidence at all. See id.; see also Emhart Industries, Inc. v. Universal Instruments Corp., No. 89-CV-6, 1992 WL 442248, at *10 (N.D.N.Y. June 22, 1992) ("[A] presumption is not evidence."). A presumption's only effect is to require the party contesting it to produce enough evidence substantiating the presumed fact's absence to withstand a motion for summary judgment. See McLean, 2021 WL 671650, at *7.

Put differently, once Kirkey introduced evidence that there was a functional grievance system, see, e.g., Cieslak Decl., Plaintiff could not have survived summary judgment by simply pointing to Kirkey's failure to introduce evidence that this process was specifically available to Plaintiff. Rather, in order to make the presumption of availability "vanish," Plaintiff had to produce competent evidence supporting

2021 WL 1966721

unavailability. See McLean, 2021 WL 671650, at *8. But once he did so, by submitting a sworn statement that he gave his grievance to a correction officer, he was not then required to produce a greater amount of evidence than normally required of a non-movant at the summary judgment stage. Id. Since a sworn statement based upon personal knowledge is sufficient when opposed only by a movant's conflicting sworn statement, Plaintiff's evidence is sufficient here. Id.

Moreover, all of the Court's foregoing analysis rests on an assumption that there is a conflict between Plaintiff's sworn statement that he gave his grievance to a correction officer and Kirkey's sworn statement that the grievance was never filed. In reality, the sworn statements from each side are not necessarily inconsistent. Since the Court is required to draw reasonable inferences in Plaintiff's favor, the Court must infer that the grievance was never filed because prison authorities did not file it, not because Plaintiff did not attempt to submit it. See id. at *7; see also Zulu v. Barnhart, No. 16-CV-1408, 2019 WL 2997226, at *13 (N.D.N.Y. Apr. 22, 2019) ("Defendants' evidence is largely consistent with plaintiff's claim that ... the timely grievances that he attempted to submit while confined to the SHU at Marcy were not filed. The absence of any official records of plaintiff's initial attempts to give the incident comports with plaintiff's assertion that once he handed a grievance through the feed-up hatch in the SHU, it was out of his possession and it was not filed."), report and recommendation adopted, No. 16-CV-1408, 2019 WL 2150628 (N.D.N.Y. May 17, 2019). Kirkey has thus failed to meet his burden to demonstrate the absence of a material factual dispute.

Accordingly, Kirkey has failed to demonstrate the absence of a material factual dispute as to whether the grievance process was "unavailable" due to the machinations or misrepresentations of prison officials who inhibited the filing of Plaintiff's submissions. See McLean, 2021 WL 671650, at *9. In order to determine whether Plaintiff properly exhausted administrative remedies, the Court must hold a hearing, at which a fact-finder can assess the credibility of witnesses and the relative weight of the evidence the parties present. See id. at *7.

 **5**  For these same reasons, the Court finds clear error in the magistrate judge's recommendation of sua sponte dismissal for Plaintiff's claims against the unnamed John Doe and Jane Doe defendants due to Plaintiff's failure to exhaust.

# V. CONCLUSION
Accordingly, it is hereby:

**ORDERED**, that the Report-Recommendation (Dkt. No. 25) is **REJECTED**. Kirkey's motion for summary judgment (Dkt. No. 17) is **DENIED**; and it is further

**ORDERED** that the Clerk shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2021 WL 1966721

---

End of Document

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 671650
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Jermell MCLEAN, Plaintiff,
v.
Darwin LACLAIR, et al., Defendants.

9:19-CV-1227 (LEK/ATB)
|
Signed 02/22/2021

**Attorneys and Law Firms**

Jermell McLean, Malone, NY, pro se.

Lauren Rose Eversley, New York State Attorney General, Albany, NY, for Defendants.

**MEMORANDUM-DECISION AND ORDER**

Lawrence E. Kahn, Senior U.S. District Judge

**I. INTRODUCTION**

 **\*1** Pro se plaintiff Jermell McLean brings this action against several state officials at Franklin Correctional Facility ("Franklin C.F."), asserting Eighth Amendment claims related to the alleged denial of his medical needs while he was incarcerated there. Dkt. No. 9 ("First Amended Complaint" or "FAC").[1] Defendants filed a combined motion for summary judgment and motion to dismiss. Dkt. Nos. 17 ("Motion"); 17-3 ("Tavernier Declaration"); 17-4 ("Seguin Declaration"); 20 ("Response"); 21 ("Reply"). In a Report-Recommendation issued on August 5, 2020, the Honorable Andrew T. Baxter, United States Magistrate Judge, granted Defendants' motion for summary judgment on exhaustion grounds, while also reaching the substance of Plaintiff's claim against Defendant Darwin LaClair, dismissing it for failure to state a claim. Dkt. No. 22 ("Report-Recommendation"). Plaintiff filed objections. Dkt. No. 23 ("Objections"). For the reasons that follow, the Court rejects the Report-Recommendation with respect to exhaustion, while adopting its conclusion regarding Plaintiff's claim against LaClair.

[1]    Plaintiff refers to this document as his "First Amended Complaint"; thus, the court will do the same.

**II. BACKGROUND**

**A. Factual Background**

*1. Medical Transport Incident*

The facts are detailed in the Report-Recommendation, familiarity with which is assumed. For convenience, the Court summarizes facts relevant to this Memorandum-Decision and Order, while noting factual disputes.

On July 29, 2019, Plaintiff was transported by Correction Officers Theodore Harris and Todd Raymond to Alice Hyde Hospital for a surgical procedure to repair the torn anterior cruciate ligament in his left knee. FAC ¶ 10.[2] Harris and Raymond remained with Plaintiff "the entire time, during pre-operative preparation, surgery, recovery, and post-operative discharge examination and instructions." Id. ¶ 11. "Both Harris and Raymond were present when the hospital staff gave [P]laintiff specific instructions to not bear any weight on [his left] leg, to allow the surgical adhesive time to cure and to allow the ligament to knit back together." Id. ¶ 12.

[2]    Because Plaintiff has sworn to the allegations in his First Amended Complaint on penalty of perjury, the Court treats the First Amended Complaint as the legal equivalent of an affidavit, for evidentiary purposes. See Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit for summary judgment purposes, and therefore will be considered in determining whether material issues of fact exist, provided that it meets the other requirements for an affidavit under Rule 56(e)."). The Court does so even though the First Amended Complaint is not notarized. See, e.g., Franco v. Kelly, 854 F.2d 584, 587 (2d Cir. 1988) (noting that documents sworn under penalty of perjury may suffice for summary judgment purposes even if they do not meet all of the formal requirements of a notarized affidavit) (citing Pfeil v. Rogers, 757 F.2d 850, 859, 859 n.15 (7th Cir. 1985)); Tolbert v. Koenigsmann, No. 13-CV-1577, 2018 U.S. Dist. LEXIS 36451, at *6 n.8, 2018 WL 1605573 (N.D.N.Y. Mar. 2, 2018) ("Although plaintiff's amended complaint is not notarized, in light of his pro se status, I have considered it as the legal equivalent of an affidavit for purposes of the pending summary

judgment motion."); BMS Entm't/Heat Music LLC v. Bridges, No. 04-CV-2584, 2005 WL 2482493, at *2 n.1 (S.D.N.Y. Oct. 7, 2005) (accepting as a declaration under 28 U.S.C. § 1746 an affidavit that was not notarized but "certified" that "each of the statements contained herein is true to the best of my information and belief" and contained a "penalty of perjury" clause).

**\*2** Following the surgery, hospital staff attempted to provide Plaintiff with metal crutches. See id. ¶ 13. However, one of the correction officers, citing a policy of Superintendent Darwin LaClair, told the hospital staff that Plaintiff "could not have metal crutches, and ... would be given a pair of [permitted] crutches ... when he arrived at the facility." See id. Plaintiff left the hospital at approximately 3:35 p.m. Id. ¶ 14.

For "reasons unknown to [Plaintiff]," his transport van, upon arriving back at Franklin C. F., was unable to enter the prison complex through the "Truck-Trap, which is the way prisoners are commonly transported and returned." Id. ¶ 22. Had the van been able to proceed through this entrance, it could have dropped Plaintiff off at the medical unit. See id. ¶ 23. Upon realizing that he would not receive pay for waiting until the Truck-Trap accepted the van, Raymond remarked, "We have to get [Plaintiff] to medical fast so we can get the hell out of here." Id. ¶ 17. Harris replied, "[Y]eah, I'm not staying here any longer if I am not getting paid for it." Id. Harris and Raymond then parked the van in Franklin C. F.'s front parking lot and told Plaintiff he had to walk to the prison. See id. ¶ 24.

Before exiting the van, Plaintiff "protest[ed] about being made to walk on [his] recently repaired leg in direct contradiction of the discharge instructions." Id. ¶ 25. In response to Plaintiff's concerns, Raymond stated, " 'Come on, you can make it with my help,' and Harris added that Raymond "was giving [Plaintiff] a 'direct order[.]' " Id.

As Plaintiff exited the van, Raymond "did not brace the plaintiff to prevent him from bearing weight on the leg," because the handcuffs on Plaintiff's wrists, which were affixed to a "[b]lack [b]ox" and a "[b]elly [c]hain," prevented Raymond from physically supporting Plaintiff's arm. See id. ¶¶ 26–27 (internal quotation marks omitted). Instead, Raymond "merely 'guided' plaintiff's arm" as Plaintiff stepped down from the van. See id. ¶ 26. Harris and Raymond then "forced the plaintiff to walk on his left leg, without the aid of any crutches, cane or a wheelchair, through the Administration Building, to a holding area, a distance of between 500-1000 feet." Id. ¶ 24 (emphasis in original).

As Plaintiff entered the prison, he "felt something snap, and immediately felt an intense heightened pain, and burning in the surgery area ... shooting up into his hip and down to his foot." Id. ¶ 30. Once Plaintiff reached a metal bench on the other side of the Administration Building, a non-party correction officer arrived at the scene and "call[ed] medical [to] have them bring a wheelchair for the rest of plaintiff's journey to the medical unit[.]" See id. at ¶ 28.

Since his return from the hospital, Plaintiff "has suffered and continues to suffer constant pain and burning sensations in [his] knee, trouble sleeping, w[a]lking, standing, and performing every day tasks." Id. ¶ 32. Plaintiff has also "developed a mold-like rash covering the skin on his left hip, which was not there prior to the surgery." Id. ¶ 33.

Plaintiff avers that he might not have been harmed had LaClair: (1) instituted a policy that allowed Plaintiff to bring metal crutches into Franklin C. F.; (2) "properly trained" Harris and Raymond on how to handle inmates in Plaintiff's condition; and (3) instituted a policy that paid Harris and Raymond for waiting with Plaintiff until the Truck-Trap accepted the van. See id. at p. 2, [3] ¶¶ 21, 46.

[3]   While the First Amended Complaint is largely organized in numbered paragraphs, some allegations appear in an introductory section prior to the first numbered paragraph.

**\*3** Plaintiff brings medical indifference claims against Harris, Raymond, and LaClair. See Dkt. No. 11 ("April 2020 Order") at 7.

## 2. Grievance Process

The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee ("IGRC"). N.Y. Comp. Codes R. & Regs., tit. 7 §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. Id. § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee ("CORC"). Id. § 701.5(d).

As the magistrate judge notes, in the First Amended Complaint and Response, Plaintiff provides a detailed account of his attempts to file grievances and appeals

regarding the incident in question. See R. & R. at 9. As summarized in the Report-Recommendation:

> Plaintiff states that on July 29, 2019, the same day of the incident in question, and while he was in the infirmary, he wrote a grievance on plain paper because he did not have a grievance form. (FAC ¶ 35). Plaintiff states that he placed the grievance in an envelope, addressed it to the IGP Supervisor, sealed the envelope, and gave it to a corrections officer to place in the mail because there is no mail box or "grievance box" in the infirmary. (Id.) Plaintiff states that he wrote the grievance "quickly" because he did not know how many days he would be in the infirmary. (Id.) In the FAC, he states that he kept a copy of the grievance, and he has submitted it as an exhibit to his opposition papers. (FAC ¶ 36 & Dkt. No. 20, Ex. A).

> Plaintiff states that he received no response to this grievance. (FAC ¶ 36). Plaintiff states that, on August 14, 2019, he mailed a letter to the IGP Supervisor, along with a copy of the grievance, explaining that he had not received a response, and he was "construing the failure or refusal to respond as a denial and appealing to the Superintendent." (FAC ¶ 37). Plaintiff has attached a copy of this letter to his opposition papers. ([Resp.], Ex. B).

> Plaintiff claims that he received no response to his August 14, 2019 letter. (FAC ¶ 38). As a result, plaintiff states that he wrote another letter to the IGP Supervisor at Franklin, dated September 3, 2019. (FAC ¶ 38). Plaintiff states that he attached another copy of the July 29, 2019 grievance to the September 3rd letter. (Id.) Plaintiff claims that in the September 3rd letter, he "explain[ed] that he was construing the subsequent failure or refusal to answer the appeal letter as a denial of same, and appealing to the CORC by said letter." (Id.) Plaintiff has not included a copy of this letter in his opposition papers.

> Plaintiff then states that he did not receive a response to the September 3rd letter. (FAC ¶ 39). He claims that on September 27, 2019, he had one of his family members contact the CORC in Albany. (Id.) Plaintiff states that his "family member" spoke to "a Ms. Mary Furcinetti (phonetic)," who was "very nice," and who "looked in the computer," and verified that no grievance, written by plaintiff, had been filed "by the IGP Supervisor," nor was it ever forwarded to the CORC. (FAC ¶ 40).

*4    R. & R. at 9–11.

**B. The Motion, Response, Report-Recommendation, and Objections**

*1. Motion*

Defendants move for summary judgment on exhaustion grounds and move to dismiss Plaintiff's claim against LaClair. Regarding exhaustion, they argue that Plaintiff failed to file or appeal any grievance pertaining to the events giving rise to his claims. See Mot. at 6–10. In support of this contention, Defendants offer the following evidence. Inmate Grievance Program ("IGP") Coordinator Judy Tavernier attests that upon a review of all grievances filed at Franklin C.F. between January 1, 2016 the date she signed her declaration, June 10, 2020, she uncovered no grievances filed by Plaintiff. See Tavernier Decl. ¶¶ 10, 15. IGP Assistant Director Rachel Seguin attests that upon a review of all grievance appeals for the current year and the four previous calendar years, she did not uncover any grievance appeal filed by Plaintiff. See Seguin Decl.¶¶ 8, 12. Attached as an exhibit to her declaration is a computer print-out from the CORC database, dated June 4, 2020, which shows no appeals filed by Plaintiff. See id., Ex. A.

Defendants also argue that LaClair lacks personal involvement in the alleged constitutional violations. See id. at 10–12. Defendants do not address the merits of Plaintiff's claims against Harris or Raymond. See generally id.

*2. Response*

In his Response, Plaintiff argues that the factual contentions that he submitted his grievance and that he submitted his appeals are consistent with Defendants' contentions that they have no record of the grievance or appeals having been filed. See Resp. at 2. Plaintiff asks the Court to infer that prison officials somehow thwarted the filing of his grievance and appeals after Plaintiff attempted to submit them. See id. at 3. On this basis, Plaintiff argues that he should be excused from the exhaustion requirement, as the grievance process was "unavailable." See id. at 2–3; see also Riles v. Buchanan, 656 F. App'x 577, 580 (2d Cir. 2016) ("An administrative procedure is unavailable when ... 'prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.' ") (quoting Ross v. Blake, ––– U.S. ––––, 136 S.Ct. 1850, 1859– 60, 195 L.Ed.2d 117 (2016)).

Plaintiff presents the following evidence supporting his factual claim that he submitted his grievance and appeals: (1) his sworn complaint, in which he attests that he did so, *see* FAC ¶¶ 35–40; (2) a copy of his grievance, Resp. Ex. A; and (3) a copy of his August 14, 2019 letter to the IGP Supervisor appealing his grievance to the Superintendent, Resp. Ex. B.

Plaintiff does not address Defendants' arguments regarding the merits of Plaintiff's claims against LaClair. See generally Resp.

### 3. Report-Recommendation

The magistrate judge recommended granting summary judgment on exhaustion grounds. In doing so, the magistrate judge relied on a string of lower court cases in this Circuit doing the same when a plaintiff offered only "bare" or "unsupported" assertions that he submitted a grievance but that it was never filed. See R. & R. at 12–15 (citing Davis v. Grant, No. 15-CV-5359, 2019 WL 498277, at *10 (S.D.N.Y. Feb. 8, 2019) ("Plaintiff's bare assertions that he submitted his grievances but never received a response fall squarely into the category of assertions that courts in the Second Circuit have found do not excuse the exhaustion requirement."); Engles v. Jones, No. 13-CV-6461, 2018 WL 6832085, at *10 (W.D.N.Y. Dec. 28, 2018) ("Plaintiff's unsupported assertion that he filed a grievance but that it was somehow lost or destroyed is insufficient to establish a genuine issue of material fact."); Scott v. Kastner Smith, 298 F. Supp. 3d 545, 555 (W.D.N.Y. 2018) ("[C]ourts have consistently held ... that an inmate's general claim that his grievance was lost or destroyed does not excuse the exhaustion requirement.") (internal quotation marks omitted); Mims v. Yehl, No. 13-CV-6405, 2014 WL 4715883, at *4 (W.D.N.Y. Sept. 22, 2014) (inmate's "unsupported statement" that he has submitted a grievance is "insufficient at the summary judgment stage"); Veloz v. New York, 339 F. Supp. 2d 505, 516 (S.D.N.Y. 2004) ("[An] inmate's unsupported claims that his grievances were lost at the Grievance Committee Office or destroyed by officers ... fails to excuse [the] inmate from fully grieving remedies[.]") (internal citation omitted)).

**\*5** Regarding the merits of Plaintiff's claim against LaClair, the magistrate judge determined that Plaintiff's allegations were too vague and conclusory to establish supervisory liability under any of the routes recognized in Colon v. Coughlin, 58 F.3d 865 (2d Cir. 1995). See id. at 16–19.

### 4. Objections

In his Objections, Plaintiff reiterates an argument from his Response regarding exhaustion. Namely, he clarifies that, while he does not dispute that his grievance was never filed, he, in fact, gave the grievance to the officer on duty at the infirmary and asked him to submit it: "I gave my grievance to the officer that was working that day. I don't know why it was never filed and why it's not in their system. But I know I put one in." Objs. at 1.

Regarding his claim against LaClair, Plaintiff restates his allegation that in denying Plaintiff metal crutches, Harris and Raymond were following a facility policy instituted by LaClair. Id. at 1–2. [4]

[4]    Plaintiff also offers arguments relevant to Harris and Raymond's liability. See id. The Court disregards these arguments, because Defendants did not move for dismissal or summary judgment on grounds related to the merits of those claims.

### III. STANDARDS OF REVIEW

#### A. Report-Recommendation

Within fourteen days after a party has been served with a copy of a magistrate judge's report-recommendation, the party "may serve and file specific, written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b); L.R. 72.1(c). If objections are timely filed, a court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b). However, if no objections are made, or if an objection is general, conclusory, perfunctory, or a mere reiteration of an argument made to the magistrate judge, a district court need review that aspect of a report-recommendation only for clear error. Barnes v. Prack, No. 11-CV-857, 2013 WL 1121353, at *1 (N.D.N.Y. Mar. 18, 2013); Farid v. Bouey, 554 F. Supp. 2d 301, 306–07 (N.D.N.Y. 2008), abrogated on other grounds by Widomski v. State Univ. of N.Y. at Orange, 748 F.3d 471 (2d Cir. 2014). "A [district] judge ... may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." § 636(b).

#### B. Summary Judgment

Federal Rule of Civil Procedure 56 instructs courts to grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute is " 'genuine' ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Thus, while "[f]actual disputes that are irrelevant or unnecessary" will not preclude summary judgment, "summary judgment will not lie if ... the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.; see also Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991) ("Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted.").

**\*6** The party seeking summary judgment bears the burden of informing the court of the basis for the motion and identifying those portions of the record that the moving party claims will demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Similarly, a party is entitled to summary judgment when the nonmoving party has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322, 106 S.Ct. 2548.

In attempting to repel a motion for summary judgment after the moving party has met its initial burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). At the same time, a court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Hence, "a court's duty in reviewing a motion for summary judgment is 'carefully limited' to finding genuine disputes of fact, 'not to deciding them.' " Macera v. Vill. Bd. of Ilion, No. 16-CV-668, 2019 U.S. Dist. LEXIS 169632, at \*26, 2019 WL 4805354, at \*8 (N.D.N.Y. Sept. 30, 2019) (Kahn, J.) (quoting Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994)).

## IV. DISCUSSION

As Plaintiff's Objections reiterate arguments he has already presented, the Court reviews the Report-Recommendation

for clear error.[5] Having done so, the Court concludes that the magistrate judge committed clear error in his exhaustion analysis, by straying from well-established summary judgment principles.

[5]     Since Plaintiff did not respond to Defendants' motion to dismiss Plaintiff's claims against LaClair, Plaintiff's arguments with respect to that claim could be construed, alternatively, as "new" arguments improperly introduced in objections. See Ross v. Koenigsmann, No. 14-CV-1321, 2016 WL 5408163, at \*2 (N.D.N.Y. Sept. 28, 2016) ("[A] district court will ordinarily refuse to consider an argument that could have been, but was not, presented to the magistrate judge in the first instance."). Either way, the Court would review this aspect of the Report-Recommendation for clear error. See Barnes, 2013 WL 1121353, at \*1.

The magistrate judge placed a greater evidentiary burden on Plaintiff than he is required to meet to survive summary judgment. With respect to the parties' factual disagreement over whether Plaintiff submitted his initial grievance, the Court notes that this dispute essentially boils down to a clash of sworn statements. Plaintiff attests that he gave his grievance to the correction officer on duty at the infirmary on July 29, 2019, FAC ¶ 35, and Defendants submit a sworn statement indicating that a review of their records revealed that no grievance was filed, see Tavernier Decl. ¶¶ 10, 15. To the extent that these statements are in contradiction, the Court cannot resolve this contradiction at the summary judgment stage, because the Court is prohibited from making credibility determinations. See, e.g., Gen. Elec. Capital Corp. v. NET Transportation, Inc., No. 04-CV-316, 2006 WL 8447262, at \*3 (D. Conn. May 4, 2006) ("In ruling on summary judgment, the Court cannot credit averments made in plaintiff's affidavit over that of the defendants."); Lupyan v. Corinthian Colleges, Inc., 761 F.3d 314, 320-321 (3d Cir. 2014) ("[A] single, non-conclusory affidavit or witness's testimony, when based on personal knowledge and directed at a material issue, is sufficient to defeat summary judgment. This remains true even if the affidavit is 'self-serving.' ") (internal citations omitted); Curry v. City of Syracuse, 316 F.3d 324, 333 (2d Cir. 2003) (noting that "credibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment").

2021 WL 671650

**\*7** The magistrate judge cites a number of cases in which courts granted summary judgment when a plaintiff offered only "bare" or "unsupported" assertions that he submitted a grievance but that it was never filed. See R. & R. at 12–15. But Plaintiff's factual contention is that he gave his grievance to a correction officer *is* supported—by a sworn statement based on personal knowledge. See *supra* note 2; Fed. R. Civ. P. 56(c)(4). This is sufficient in itself to enable Plaintiff to survive summary judgment. The Court notes, however, that Plaintiff's factual contention is also supported by a dated, handwritten copy of his grievance. See Resp., Ex. A. The magistrate judge apparently determined that this piece of evidence should be discounted in determining whether Plaintiff meets his burden on summary judgment, citing one other case in this District for support. See R. & R. at 13 (citing Means v. Olmstead, No. 17-CV-746, 2019 WL 4395289, at \*7 (N.D.N.Y. June 3, 2019), report and recommendation adopted, 2019 WL 3451127, at \*2 (N.D.N.Y. July 31, 2019)). But Means offers no reasoning or legal authorities to support this legal conclusion, see id., which appears to entail the improper weighing of evidence and assessment of credibility, see Curry, 316 F.3d at 333. Especially given that Defendants in this case have not even addressed the authenticity of Plaintiff's copy of his grievance, it is improper for the Court to discount Plaintiff's claim that this is a genuine, contemporaneous copy.

The magistrate judge appears to have applied a burden-shifting framework that courts in this District generally employ in adjudicating PLRA exhaustion at the summary judgment stage. As Judge Suddaby has explained:

> [T]he defendant bears the burden of proving that the administrative remedies available to the plaintiff were not exhausted prior to the initiation of a civil action. See, e.g., Howard v. Goord, No. 98-CV-7471, 1999 WL 1288679, at \*3 (E.D.N.Y. Dec. 28, 1999). However, once a defendant has produced reliable evidence that such remedies were generally available, and the plaintiff nevertheless failed to exhaust those remedies, the plaintiff must then counter the defendant's proof by showing that, as to him or her, the remedy was unavailable. Smith v. Kelly, 985 F.Supp.2d 275, 284 (N.D.N.Y. 2013). "As a result, practically speaking, while the burden on this affirmative defense remains at all times on the defendant, the plaintiff may sometimes have to adduce evidence in order to defeat it." Id. ... [W]hile the burden of production may shift to a plaintiff when a court considers whether the grievance process was unavailable, the ultimate burden of proof with

respect to the exhaustion defense remains, at all times, with the defendant. [6]

Coleman v. Nolan, No. 15-CV-40, 2018 WL 4732778, at \*4 (N.D.N.Y. Oct. 2, 2018) (other internal quotation marks omitted).

> [6] Citing Bailey v. Fortier, No. 09-CV-0742, 2012 WL 6935254, at \*5-6 (N.D.N.Y. Oct. 4, 2012), report and recommendation adopted, 2013 WL 310306 (N.D.N.Y. Jan. 25, 2013); Nelson v. Plumley, No. 12-CV-422, 2015 WL 4326762, at \*7-8 (N.D.N.Y. July 14, 2015), report and recommendation adopted, 2013 WL 1305338 (N.D.N.Y. Mar. 18, 2013).

This burden-shifting framework does not ultimately mandate a greater evidentiary showing from Plaintiff than would otherwise be required at summary judgment. A presumption is not a form of super-evidence that heightens the opposing party's evidentiary burden in rebuttal. Indeed, a presumption is not evidence at all, but rather merely "an assumption of fact resulting from a rule of law which requires such fact to be assumed from another fact or group of facts found or otherwise established in the action." 21B Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure § 5124 (2d ed. 2005); see also Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 n.10, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (describing presumption as "legally mandatory inference"); Emhart Industries, Inc. v. Universal Instruments Corp., No. 89-CV-6, 1992 U.S. Dist. LEXIS 13458, at \*10, 1992 WL 442248 (N.D.N.Y. June 22, 1992) ("[A] presumption is not evidence.") (quoting A.C. Aukerman Co. v. R.L. Chaides Construction Co., 960 F.2d 1020, 1037–38 (1992)). A presumption's "only effect is to require the party contesting it to produce enough evidence substantiating the presumed fact's absence to withstand a motion for summary judgment[.]" Lupyan, 761 F.3d at 320; see also ITC Ltd. v. Punchgini, Inc., 482 F.3d 135, 149 (2d Cir. 2007) ("Courts and commentators are in general agreement that proffered evidence is sufficient to rebut a presumption as long as the evidence could support a reasonable jury finding of the nonexistence of the presumed fact.") (collecting authorities) (internal quotation marks omitted). "[A] presumption vanishes upon the introduction of evidence sufficient to support a finding of the nonexistence of the presumed fact." Punchgini, Inc., 482 F.3d at 148 (internal quotation marks omitted).

**\*8** In other words, once Defendants introduced evidence that they generally operated a functioning grievance system, see Seguin Decl. ¶¶ 5–6, Plaintiff could not have survived summary judgment simply by pointing to Defendants' failure to introduce evidence that this process was available to him specifically. Rather, in order to make the presumption of availability "vanish," Plaintiff had to produce competent evidence supporting unavailability. But once he did so, by submitting a sworn statement that he gave his grievance to a correction officer, he was not then required to produce a greater quantum of evidence than normally required of a non-movant at the summary judgment stage. Since a sworn statement based on personal knowledge is generally sufficient when opposed only by a movant's conflicting sworn statement, Plaintiff's evidence is sufficient here.

Moreover, all of the Court's foregoing analysis rests on an assumption that is unjustifiably charitable to Defendants— namely, that there is a conflict between Plaintiff's sworn statement that he gave his grievance to a correction officer for submission and Defendants' statement that the grievance was never filed. As Plaintiff correctly argues, these competing sworn statements are not necessarily inconsistent. See Resp. at 2–3; Objs. at 1. Since the Court is required to draw reasonable inferences in Plaintiff's favor, the Court must infer that the grievance was never filed because prison authorities did not file it, not because Plaintiff did not attempt to submit it. See Zulu v. Barnhart, No. 16-CV-1408, 2019 WL 2997226, at *13 (N.D.N.Y. Apr. 22, 2019) ("Defendants' evidence is largely consistent with plaintiff's claim that, for whatever reason, the timely grievances that he attempted to submit while confined to the SHU at Marcy were not filed. The absence of any official records of plaintiff's initial attempts to grieve the incident comports with plaintiff's assertion that once he handed a grievance through the feed-up hatch in the SHU, it was out of his possession and it was not filed."), report and recommendation adopted, No. 16-CV-1408, 2019 WL 2150628 (N.D.N.Y. May 17, 2019). Defendants have, thus, failed to demonstrate the absence of a material factual dispute.

The Court reaches the same conclusion with respect to Plaintiff's appeals. Plaintiff attests that, on August 14, 2019, he mailed a letter to the IGP supervisor, along with a copy of his grievance, explaining that he had not received a response and that he was "construing the failure or refusal to respond as a denial and appealing to the Superintendent." FAC ¶ 37. Plaintiff has submitted a copy of this letter. Resp., Ex. B. Plaintiff additionally attests that he wrote another letter to the IGP Supervisor on September 3, 2019, explaining "that he

was construing the subsequent failure or refusal to answer the appeal letter as a denial of same, and appealing to the CORC by said letter." Id. ¶ 38. Plaintiff has not submitted a copy of the September 3, 2019 letter. Seguin attests that upon a review of all grievance appeals for the current year and the four previous calendar years, she did not uncover any grievance appeals filed by Plaintiff. See Seguin Decl. ¶¶ 8, 12. Attached as an exhibit to her declaration is a computer print-out from the CORC database, dated June 4, 2020, which shows no appeals to the CORC filed by Plaintiff. See id., Ex. A.

Here, there is again a clash of sworn statements: Plaintiff attests that he attempted to submit the appeals, and Defendants attest that they were never filed. As discussed, the Court cannot credit Defendants' sworn statements over Plaintiff's. See Joshi v. Ashcroft, 389 F.3d 732, 735 (7th Cir. 2004) ("Most letters are delivered, but some aren't, and so if there is a sworn denial of receipt the trier of fact has to weigh the credibility of the denial in light of the fact that the vast majority of letters are delivered and that the intended recipient has a strong incentive to lie."). [7] Defendants additionally present documentary evidence that Plaintiff's appeals were not filed, namely the CORC print-out. See Seguin Decl., Ex. A. Importantly, while Defendants state in conclusory fashion that they infallibly maintain records of all grievances and appeals, they do not specifically represent that the CORC print-out is a log of all incoming mail, or describe Defendants' mail-processing practices in a manner that would support an inference that the absence of a record of Plaintiff's appeals being filed reliably indicates non-receipt of his letters. See Seguin Decl. ¶ 8 ("[T]he CORC computer database contains records of appeals of grievances received from facility Inmate Grievance Program offices[.]"); Tavernier Decl. ¶ 10 ("All documents ... related to a particular grievance ... are stored in the Franklin grievance office in the regular course of that office's activities as they are created or received."); cf. Lupyan, 761 F.3d at 322 ("When the intended recipient is a commercial or legal entity, it may be routine business practice to log incoming mail. In such cases, the absence of an entry in a mail log near the time that mail would likely have arrived, can be used to establish that mail was not received."); Guerra v. CONRAIL, 936 F.3d 124, 137 (3d Cir. 2019) ("OSHA's denial of receipt is strengthened by its practice of tracking correspondence and its unavailing search for a trace of Guerra's letter."). As before, there is no necessary inconsistency between Plaintiff's claim that he mailed the appeals and Defendants' claim that they were never filed; and the Court must grant Plaintiff the favorable inference that his

grievance was sent and received, but not filed, for reasons out of his control. [8]

[7]    In a variety of legal contexts, Courts adjudicate disputes over whether a letter was sent or received by employing the "mailbox rule," according to which "[a] rebuttable presumption of receipt [arises] on evidence that a properly addressed piece of mail is placed in the care of the postal service." Witt v. Roadway Express, 136 F.3d 1424, 1429–30 (10th Cir. 1998); see also Godfrey v. United States, 997 F.2d 335, 338 (7th Cir. 1993); Anderson v. United States, 966 F.2d 487, 491 (9th Cir. 1992). Plaintiff's sworn statement that he mailed the letters would establish his entitlement to this presumption, which Defendants would have the burden to rebut. See, e.g., United States v. Ekong, 518 F.3d 285, 287 (5th Cir. 2006) ("A sworn statement is credible evidence of mailing for the purposes of the mailbox rule."); Schikore v. BankAmerica Supplemental Ret. Plan, 269 F.3d 956, 964 (9th Cir. 2001) (same); Witt, 136 F.3d at 1430 ("Because the presumption is rebuttable ... evidence denying receipt creates a credibility issue that must be resolved by the trier of fact.") (citing Rosenthal v. Walker, 111 U.S. 185, 193–94, 4 S.Ct. 382, 28 L.Ed. 395 (1884); Anderson, 966 F.2d at 491–92; 9 Wigmore, Evidence § 2519).

[8]    Defendants also argued that, even assuming arguendo that Plaintiff had properly filed his grievance and appeals, his claims should be denied for failure to exhaust, because he did not file his complaint in this action after waiting thirty days from his final appeal. See Reply at 2–3. In addition to being improperly raised for the first time in a reply, this argument is meritless, because the complaint was filed on October 4, 2019, Docket, which is more than thirty days after September 3, 2019, the date on which Plaintiff attests he filed his final appeal, FAC ¶ 38.

**\*9** Accordingly, Defendants have failed to demonstrate the absence of a material factual dispute as to whether the grievance process at Franklin C.F. was "unavailable" due to the machinations or misrepresentations of prison officials who inhibited the filing of Plaintiff's submissions. See Riles, 656 F. App'x at 580; see also Gill v. Frawley, No. 02-CV-1380, 2006 U.S. Dist. LEXIS 101694, at *44, 2006 WL 1742738 (N.D.N.Y. May 9, 2006) (noting that "[s]ome courts

have suggested that an inmate has exercised a reasonable effort to exhaust his administrative remedies when he has tried to properly file a grievance and that grievance has been lost or destroyed by a prison official," and collecting cases); Fann v. Graham, No. 15-CV-1339, 2018 WL 1399331, at *6 (N.D.N.Y. Jan. 11, 2018) ("Viewing the facts in the light most favorable to plaintiff, the record suggests that plaintiff's grievances were submitted, but were unfiled and unanswered, creating an issue of fact as to whether the grievance process was available and whether plaintiff attempted to exhaust his administrative remedies[.]"), report and recommendation adopted, No. 15-CV-1339, 2018 WL 1399340 (N.D.N.Y. Mar. 19, 2018); Thaxton v. Simmons, No. 10-CV-1318, 2013 WL 4806457, at *4 (N.D.N.Y. Sept. 9, 2013) ("[A] question of fact exists as to whether [p]laintiff never filed his initial grievance on April 29, as [d]efendants claim, or that, as [p]laintiff claims, he filed a timely grievance that was lost or tampered with by [d]efendants. Such credibility assessments are to be resolved by a trier of fact.").

In order to determine whether Plaintiff properly exhausted administrative remedies, the Court must hold a hearing, at which a fact-finder can assess the credibility of witnesses and the relative weight of the evidence the parties present. See, e.g., Woodward v. Lytle, No. 16-CV-1174, 2019 WL 2527342, at *8 (N.D.N.Y. May 24, 2019), report and recommendation adopted, No. 16-CV-1174, 2019 WL 2524756 (N.D.N.Y. June 19, 2019) (issuing a decision on exhaustion subsequent to a hearing); see also Messa v. Goord, 652 F.3d 305, 310 (2d Cir. 2011) (affirming the constitutionality of adjudicating PLRA exhaustion issues by bench trial).

With respect to the magistrate judge's conclusion that the claim against LaClair should be dismissed due to his lack of personal involvement, the Court concurs and finds no clear error.

## V. CONCLUSION
Accordingly, it is hereby:

**ORDERED**, that the Report-Recommendation (Dkt. No. 22) is **REJECTED in part and ADOPTED in part**. Defendant's Motion (Dkt. No. 17) is denied as to exhaustion and granted as to Plaintiff's Eighth Amendment claim against LaClair; and it is further

**ORDERED**, that the Clerk **TERMINATE** LaClair from the docket; and it is further

McLean v. LaClair, Slip Copy (2021)

2021 WL 671650

**ORDERED**, that the Clerk serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2021 WL 671650

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 5233308
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

K'var TILLMAN, Plaintiff,
v.
Trevor PHILLIPS, et al., Defendants.

No. 9:19-CV-1597 (LEK/CFH)
|
Signed 11/10/2021

**Attorneys and Law Firms**

K'VAR TILLMAN, 37 N. Brandywine Ave., Schenectady, New York 12307, Plaintiff pro se.

OF COUNSEL: DAVID C. WHITE, ESQ., Assistant Attorney General, Attorney General for the State of New York, The Capitol, Albany, New York 12224, Attorneys for defendant(s).

**REPORT-RECOMMENDATION AND ORDER** [1]

[1]  This matter was referred to the undersigned for Report-Recommendation and Order pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

CHRISTIAN F. HUMMEL, UNITED STATES MAGISTRATE JUDGE

 *1  Plaintiff pro se K'var Tillman ("plaintiff"), who was at all relevant times in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983, alleging that defendants Sergeant ("Sgt.") Trevor Phillips ("Phillips"), Sgt. Timothy Clark ("T. Clark"), Sgt. Michael Clark ("M. Clark"), Correction Officer ("C.O.") J. Sorensen ("Sorensen"), C.O. Danny Putnam [2] ("D. Putnam"), and C.O. John Putnam [3] ("J. Putnam") (collectively, "defendants") violated his constitutional rights under the Eighth Amendment; and that defendant Phillips violated his constitutional rights under the Fourteenth Amendment. See Dkt. No. 1 ("Compl."). Presently before the Court is defendants' Motion for Summary Judgment brought pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 56. See Dkt. No. 26-1. Plaintiff filed a response. See Dkt.

No. 28. Defendants filed a reply. See Dkt. No. 29. For the following reasons, it is recommended that defendants' motion be denied.

[2]  The docket reflects defendant's last name as "Putman." However, the parties' use the spelling "Putnam." See Dkt. No. 1 ("Compl.") at 3; Dkt. No. 26-1 at 3. The clerk of court is directed to update the docket to reflect the appropriate spelling of defendant Putnam's last name.

[3]  In plaintiff's complaint, he refers to defendant as "John Putman" and "D.J. Putman." See Compl. at 3, 5. Defendants, however, consistently refer to defendant as "Jonathan Putnam." See Dkt. 26-1 at 3; Dkt. No. 26-2 at 1. As such, the Court will use defendants' spelling, and the clerk of court is directed to update the docket.

**I. Background**

On review of defendants' Motion for Summary Judgment, the facts will be related herein in the light most favorable to plaintiff as the nonmoving party. See Rattner v. Netburn, 930 F.2d 204, 209 (2d Cir. 1991) ("In assessing the record ... to determine whether there is a genuine issue as to any material fact, the court is required to resolve all ambiguities and draw all factual inferences in favor of the party against whom summary judgment is sought.").

**A. Plaintiff's Factual Assertions** [4]

[4]  To the extent that plaintiff's exhibits are relevant to the causes of action at issue on the present motion, the Court will consider them as part of the complaint. See Sira v. Morton, 380 F.3d 57, 67 (2d Cir. 2004) ("A complaint is deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are integral to the complaint.") (internal quotation marks and citations omitted).

On January 31, 2019, while plaintiff was housed at Watertown Correctional Facility ("Watertown"), he was assaulted by an unknown assailant. See Dkt. No. 1-1 at 1. Thereafter, D. Putnam ordered plaintiff to place his hands on the wall to

frisk and check plaintiff for weapons. See id. at 2; Compl. at 6. Unprovoked, D. Putnam then punched plaintiff in his right ear, and plaintiff immediately fell to the ground. See Dkt. No. 1-1 at 2. While plaintiff was on the ground, defendants repeatedly pepper sprayed, punched, kicked, and choked him. See Compl. at 5. Phillips pulled out plaintiff's dread locks and yelled racial slurs. See id. The assault lasted for approximately fifteen to twenty minutes. See Dkt. No. 1-1 at 2.

 **\*2** Following the incident on January 31, 2019, plaintiff was placed in the special housing unit ("SHU") [5] for 270 days and was under contraband watch for twenty-one days. See Compl. at 2, 6; Dkt. No. 1-1 at 3. On March 14, 2019, plaintiff was transferred from Watertown to Downstate Correctional Facility ("Downstate"). See Dkt. No. 26-9 at 9. The same day, plaintiff was in transit from Downstate to Fishkill Correctional Facility ("Fishkill"). See id. On March 15, 2019, plaintiff was transferred from Fishkill to Upstate Correctional Facility ("Upstate"), where he remained until November 2019. See id.

[5]    SHUs exist in all maximum and certain medium security facilities. The units "consist of single- or double-occupancy cells grouped so as to provide separation from the general population...." N.Y. COMP. CODES R. & REGS. ("7 N.Y.C.R.R.") § 300.2(b). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reason, or in other circumstances as required. See id. at pt. 301.

In a letter dated March 20, 2019, addressed "To: Grievance[,]" plaintiff states that he "filed a grievance at Watertown Corr. Facility, on approximately 2/19/19, in which [he] ha[s] not received a response or a notice that the grievance was ever received." Dkt. No. 1-1 at 4. [6]

[6]    Plaintiff does not provide the Court with copies of other grievances or letters beyond the March 20, 2019, letter.

## II. Legal Standards [7]

[7]    All unpublished decisions cited in this Report-Recommendation and Order, unless otherwise noted, have been provided to plaintiff.

### A. Summary Judgment Standard

Under Fed. R. Civ. P. 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). The moving party has the burden of showing the absence of a genuine dispute of material fact by providing the Court with portions of "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which support the motion. Celotex, 477 U.S. at 322; see FED. R. CIV. P. 56(c). A fact is material if it "might affect the outcome of the suit," as determined by the governing substantive law; a "dispute about a material fact is 'genuine' ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

If the moving party meets this burden, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 248, 250; see Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986) (citing Quarles v. Gen. Motors Corp. (Motors Holding Div.), 758 F.2d 839, 840 (2d Cir. 1985) (per curiam)). Furthermore, "mere conclusory allegations or denials ... cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (brackets omitted) (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)).

 **\*3** Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. See Treistman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit stated,

[t]here are many cases in which we have said that a pro se litigant is entitled to special solicitude, that a *pro se* litigant's submissions must be construed liberally, and that such submissions must be read to raise the strongest arguments that they suggest. At the same time, our cases have also indicated that we cannot read into *pro se* submissions claims that are not consistent with the *pro se* litigant's allegations, or arguments that the submissions themselves do not suggest, that we should not excuse frivolous or vexatious filings by *pro se* litigants, and that *pro se* status does not exempt a party from compliance with relevant rules of procedural and substantive law....

*Id.* (internal quotation marks, citations, and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district courts that when [a] plaintiff proceeds *pro se,* ... a court is obligated to construe his pleadings liberally.") (internal quotation marks and citations omitted).

### A. Exhaustion

The Prison Litigation Reform Act ("PLRA") requires that a prisoner exhaust any administrative remedies available to him or her before bringing an action for claims arising out of his or her incarceration. See 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."). The exhaustion requirement applies "to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532 (2002). Exhaustion is required even where the prisoner seeks relief not available in the administrative grievance process, such as money damages. See id. at 524. "To exhaust administrative remedies, the inmate must complete the full administrative

review process set forth in the rules applicable to the correctional facility in which he or she is incarcerated." Cuadrado v. Brueault, No. 9:14-CV-1293 (DNH/CFH), 2015 WL 1606178, at *3 (N.D.N.Y. Apr. 8, 2015); see Jones v. Bock, 549 U.S. 199, 218 (2007). "Courts in [ ] this Circuit have long recognized [DOCCS'] three-step procedure as an 'available' remedy for purposes of the PLRA." [8] Hall v. Cnty. of Saratoga, No. 10-CV-1120 (NAM/CFH), 2013 WL 838284, at *1-2 (N.D.N.Y. Mar. 6, 2013).

[8]    DOCCS has a well-established administrative review process. See N.Y.C.R.R. § 701.1(a). First, an inmate must file a complaint with the Inmate Grievance Resolution Committee ("IGRC") within twenty-one calendar days of the alleged incident. See id. § 701.5(a). Second, an inmate may appeal IGRC's decision to the facility's Superintendent. See id. § 701.5(c)(1). Third, an inmate may appeal the Superintendent's decision to the Central Office Review Committee ("CORC"). See id. § 701.5(d)(1)(i). "There is also an expedited procedure for complaints raising bona fide issues of harassment or other misconduct by DOCCS staff, which bypasses the IGRC, and initially refers the grievance to the facility superintendent or his designee for prompt review, investigation, and decision." Ferguson v. Mason, No. 9:19-CV-927 (GLS/ATB), 2021 WL 862070, at *2 (N.D.N.Y. Jan. 7, 2021), report and recommendation adopted, 2021 WL 531968 (N.D.N.Y. Feb. 12, 2021) (citing 7 N.Y.C.R.R. § 701.8).

**\*4** "Generally, if a plaintiff ... fails to follow each of the required steps prior to commencing an action, he has failed to exhaust his administrative remedies as required under the PLRA." Sanders v. St. Mary, No. 9:19-CV-1314 (BKS/TWD), 2021 WL 1575944, at *4 (N.D.N.Y. Apr. 22, 2021), report and recommendation adopted, 2021 WL 1999781 (N.D.N.Y. May 19, 2021); see also Ruggiero v. Cnty. of Orange, 467 F.3d 170, 176 (2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).") (quotation marks and citations omitted).

Although the Supreme Court of the United States has deemed exhaustion mandatory, the Second Circuit recognizes certain caveats. See Ruggiero, 467 F.3d at 175 (2d Cir. 2006). In 2016, the Supreme Court made clear that "[c]ourts may

2021 WL 5233308

not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement." Ross v. Blake, 578 U.S. 632, 648 (2016). The Supreme Court determined that the PLRA's "exhaustion requirement hinges on the 'availab[ility]' of administrative remedies[.]" Id. at 642. " '[A]vailability' means 'an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of.' " Santos v. Schroeder, No. 9:19-CV-1610 (LEK/TWD), 2021 WL 931959, at *5 (N.D.N.Y. Feb. 1, 2021), report and recommendation adopted, 2021 WL 930709 (N.D.N.Y. Mar. 11, 2021) (quoting Ross, 578 U.S. at 642) (quotations and internal citations omitted).

There are "three circumstances where administrative remedies may be unavailable to a prisoner." Wilson v. Snyder, No. 9:19-CV-420 (DNH/CFH), 2019 WL 8192227, at *4 (N.D.N.Y. Dec. 5, 2019), report and recommendation adopted, 2020 WL 1140666 (N.D.N.Y. Mar. 9, 2020). First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." Ross, 578 U.S. at 643 (citing Booth v. Churner, 532 U.S. 731, 736 (2001)). "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." Id. Lastly, administrative remedies are unavailable where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id. at 644.

### III. Arguments

#### A. Defendants' Arguments

Defendants contend that plaintiff's complaint should be dismissed in its entirety for failure to exhaust administrative remedies because he did not file a grievance, despite the availability of the grievance procedure. See Dkt. No. 26-1.

Defendants submit declarations from the Inmate Grievance Program ("IGP") supervisors at Watertown, Downstate, Fishkill, and Upstate, who all contend that plaintiff did not file any grievances or submit any written requests for an extension of time to file a grievance concerning the alleged January 31, 2019, incident. See Dkt. No. 26-4 at 4, ¶ 14; Dkt. No. 26-6 at 3, ¶¶12-13; Dkt. No. 26-7 at 3, ¶¶12-13; Dkt. No. 26-8 at 3, ¶¶12-13; Dkt. No. 26-9 at 5, ¶¶19-20. Johnson, the IGP

Supervisor at Watertown, declares that the grievance office never received any letters from plaintiff related to the alleged assault. See Dkt. No. 26-9 at 5, ¶ 23. A search of the Central Office Review Committee ("CORC") records revealed no appeals related to the January 31, 2019, incident. See Dkt. No. 26-5 at 4.

#### B. Plaintiff's Arguments

 *5  In response to defendants' motion for summary judgment, plaintiff states, "I admit that I have exhausted my remedies as far as the process goes." Dkt. No. 28 at 1. Plaintiff does not contend that he filed a request for an extension of time to file a grievance at Watertown. See generally Compl.; Dkt. No. 28. Plaintiff testified that he appealed to the CORC "[a]bout the grievance that [he] filed in February pertaining to the incident that happened in Watertown" and was "still waiting right now for a response to that." Dkt. No. 26-2 at 95, 99. However, plaintiff does not allege in his complaint or response that he filed an appeal, nor provide any details as to how, when, or at what facility he wrote to the CORC. See generally Compl.; Dkt. No. 28. Rather, plaintiff explains why he was unable to use the grievance process. See Dkt. 1-1 at 3-4; Dkt. No. 28 at 1-2. Plaintiff contends that: (1) he was prohibited from having any writing utensils while under the twenty-one day contraband watch at Watertown; (2) the day he was released from contraband watch, he submitted a grievance, but the officer he gave it to did not file it; (3) he was not permitted access to "writing utensils" while in transit from Watertown to Upstate because "no one is allowed access to the grievance program during transit to S.H.U."; and (4) he wrote "To: Grievance" at Upstate inquiring about the lack of response from Watertown immediately upon his arrival at Upstate. Dkt. No. 28 at 1-2; Dkt. No. 1-1 at 4. Therefore, it appears that plaintiff's current argument is that administrative remedies were unavailable.

### IV. Discussion

#### A. Availability of Administrative Remedies

Whether a plaintiff exhausted his administrative remedies is a legal question that requires a defendant to produce reliable evidence of availability. See Coleman v. Nolan, No. 9:15-CV-40 (ATB), 2018 WL 4732778, at *4 (N.D.N.Y. Oct. 2, 2018). "[O]nce a defendant has produced reliable evidence

2021 WL 5233308

that such remedies were generally available, and the plaintiff nevertheless failed to exhaust those remedies, the plaintiff must then counter the defendant's proof by showing that, as to him or her, the remedy was unavailable." Id. (citing Smith v. Kelly, 985 F. Supp. 2d 275, 284 (N.D.N.Y. 2013)). As such, " 'the burden of production' may shift to a plaintiff when a court considers whether the grievance process was unavailable[.]" Id. (citations omitted).

Williams v. Correction Officer Priatno provides that administrative remedies are unavailable to a plaintiff where a grievance is "unfiled and unanswered" because "the process to appeal ... is prohibitively opaque, such that no inmate could actually make use of it." 829 F.3d 118, 126 (2d Cir. 2016). In Williams, the plaintiff was housed in the SHU and "gave [his] grievance to a correction officer to forward to the grievance office on his behalf, in accordance with DOCCS grievance procedures that apply to inmates in the SHU." [9] Id. at 120-21. The Court found that "in giving his grievance to the correction officer, Williams exhausted all administrative remedies that were available to him." Id. at 126. "That Williams was decided on a motion to dismiss and not on a summary judgment motion does not change the analysis." Medina v. Napoli, 725 F. App'x 51, 54 (2d Cir. 2018) (summary order) (reversing grant of summary judgment and remanding to the district court to apply Williams).

<hr/>

[9] 7 N.Y.C.R.R. 701.7(b) requires that SHU inmates "use centrally located IGP deposit boxes to send grievance forms" and that IGP staff shall collect the contents from these boxes "at least two times per week." 7 N.Y.C.R.R. 701.7(c)(1) further requires that "[a]n IGRC staff member (sergeant, officer) or grievance supervisor shall make rounds of all special housing areas at a reasonable time at least once a week to allow inmates direct access to the program." Plaintiff testified that because he was locked in his cell, an officer collected his grievance and placed it in the necessary box. See Dkt. No. 26-2 at 91; see also Rodriguez v. Cross, No. 9:15-CV-1079 (GTS/CFH), 2017 WL 2791063, at *7 (N.D.N.Y. May 9, 2017), report and recommendation adopted, 2017 WL 2790530 (N.D.N.Y. June 27, 2017) (acknowledging that inmates in the SHU are in a different position than other inmates regarding availability of administrative remedies).

In Williams, "[t]he plaintiff supported [his] allegation [of unavailability] by providing the court with the date he filed the grievance, the procedure for how he filed it, and the timeline for roughly when [ ] subsequent follow-up conversations occurred." Ozzborn v. Cornell, No. 9:17-CV-1039 (MAD/ATB), 2021 WL 2227829, at *4 (N.D.N.Y. June 2, 2021) (citing Williams, 829 F.3d at 121). In applying Williams, this Court has held that it is sufficient for a plaintiff to "submit[ ] a sworn statement that he gave his grievance to a correction officer," and the plaintiff is "not then required to produce a greater amount of evidence than normally required of a non-movant at the summary judgment stage." Hudson v. Kirkey, No. 9:20-CV-0581 (LEK/DJS), 2021 WL 1966721, at *4 (N.D.N.Y. May 17, 2021) (citing McLean v. LaClair, No. 9:19-CV-1227, (LEK/ATB) 2021 WL 671650, at *8 (N.D.N.Y. Feb. 22, 2021)).

*6 This Court has also denied summary judgment where a plaintiff "does not have a copy of the grievance, was not confined in the SHU, and has not submitted any contemporaneous correspondence inquiring about the status of his grievance," but submitted a sworn response and testified under oath that he submitted a handwritten grievance and that he verbally followed up with the grievance office. Maldonado v. Mandalaywala, No. 9:17-CV-1303 (BKS/TWD), 2020 WL 1159426, at *17 (N.D.N.Y. Feb. 12, 2020), report and recommendation adopted, 2020 WL 1157643 (N.D.N.Y. Mar. 10, 2020); see also Martinaj v. Uhler, No. 9:18-CV-00257 (BKS/DJS), 2021 WL 3793769, at *12 (N.D.N.Y. Aug. 26, 2021) (denying summary judgment where the plaintiff wrote a follow-up letter inquiring about his grievance and submitted a copy of the letter to the Court, corroborating his sworn declaration).

Further, this Court has denied summary judgment where the plaintiff testified that he wrote two grievances, handed one to a grievance officer while housed in the general population, and another to a prison guard while housed in the SHU, but "he made no attempt to follow up or otherwise appeal to the superintendent." Britt v. Carberry, No. 9:17-CV-0234 (MAD/DEP), 2019 WL 3365766, at *10 (N.D.N.Y. Mar. 22, 2019), report and recommendation adopted, 2019 WL 2437912 (N.D.N.Y. June 11, 2019); see also Braxton v. Bruen, No. 9:17-CV-1346 (BKS/ML), 2020 WL 5752333, at *7 (N.D.N.Y. Aug. 24, 2020), report and recommendation adopted, 2020 WL 5751172 (N.D.N.Y. Sept. 25, 2020) (denying summary judgment where the plaintiff "provided extensive deposition testimony regarding his efforts to file

grievances and appeals and proffered copies of his grievances, appeals, and letters.").

By contrast, this Court has granted a defendant's motion for summary judgment where the plaintiff testified during a "deposition that he filed a grievance by leaving a plain envelope addressed to the grievance committee for the mail personnel to collect," but did not submit documentary evidence to support the contention and did not verbally follow up with anyone at the prison about the grievance. Ozzborn, 2021 WL 2227829, at *4-5. In addition, this Court has found a plaintiff's exhaustion claim insufficient where the plaintiff "provided no evidence that he actually did write grievances; when they were written; the content of the grievances ... the officers named in the grievance(s) ...; the specific steps taken by Plaintiff to provide them to an officer to send to the grievance office; and any specific follow up with the grievance office[.]" Sankara v. Montgomery, No. 9:16-CV-00885 (FJS/TWD), 2018 WL 4610686, at *8 (N.D.N.Y. June 25, 2018), report and recommendation adopted, 2018 WL 3408135 (N.D.N.Y. July 13, 2018). This Court has noted that "[i]nmates not housed in the SHU are in a different position to SHU inmates when determining if grievance procedures are 'essentially unknowable' or unavailable." Rodriguez v. Cross, No. 9:15-CV-1079 (GTS/CFH), 2017 WL 2791063, at *7 (N.D.N.Y. May 9, 2017), report and recommendation adopted, 2017 WL 2790530 (N.D.N.Y. June 27, 2017) (citation omitted) (granting summary judgment to a plaintiff housed in the general population who did not follow up on his grievance and filed a different grievance at the facility a week later); see also Coleman, 2018 WL 4732778, at *12 ("[A]n inmate depends on correction officers to forward a grievance" while housed in the SHU).

In determining the availability of administrative remedies, courts have also looked to whether and when a plaintiff was transferred from the correctional facility where the grievance at issue was allegedly unfiled. In Williams, the plaintiff was transferred two weeks after attempting to file his grievance. See 829 F.3d at 121. The Second Circuit explained that such a transfer compounded the issue of availability where "[t]he regulations plainly do not provide guidance on how a transferred inmate can appeal his grievance with the original facility without having received a response." Id. at 126; compare Ozzborn, 2021 WL 2227829, at *4-5 (explaining that the plaintiff was transferred eight months after attempting to file his grievance and that during those eight months, he did "not assert that he ever followed up on his grievance or offer any explanation as to why he failed to.").

## B. Availability as to Plaintiff

**\*7** Here, plaintiff has produced sufficient evidence to raise a question of fact as to whether administrative remedies were available to him. As plaintiff was housed in the SHU at all relevant times, he had to rely on corrections officers to submit his grievance. See Dkt. No. 1-1 at 3; see, e.g., Williams, 829 F.3d at 120-21. Plaintiff testified that after being released from contraband watch, he "put [the grievance] in an envelope, [ ] sealed it, addressed it to I.D.R.C., [sic] and being that [he was] locked in [his] cell, they have to collect [the] mail and put in in a box." Dkt. No. 26-2 at 91; compare Sankara, 2018 WL 4610686, at *8 (finding that the plaintiff provided no specifics related to his grievance). Plaintiff further testified that a few days after attempting to file his grievance, he asked nonparty C.O. Richardson what was going to happen with his grievance, and C.O. Richardson responded, "it's not going to make it." Id. at 92-93; see Maldonado, 2020 WL 1159426, at *17 (finding an issue of fact as to availability where the plaintiff testified that he "verbally followed up with the Upstate grievance office" but provided no documentary evidence of the conversation). Although plaintiff did not testify about who he handed his grievance to, he explained the procedure he followed, and roughly set forth the timeline for when he filed the grievance and held a follow-up conversation, which creates a genuine issue of material fact as to the availability of administrative remedies. See Ozzborn, 2021 WL 2227829, at *4 (citing Williams, 829 F.3d at 121).

Moreover, plaintiff transferred facilities three weeks after attempting to file a grievance and follow up on its status, contributing to the potential unavailability as "[t]he regulations plainly do not provide guidance on how a transferred inmate can appeal his grievance with the original facility without having received a response." Williams, 829 F.3d 118 at 126; Ozzborn, 2021 WL 22272829, at *4

Plaintiff testified that after arriving at Upstate, he wrote a letter to Upstate seeking a response to the grievance he filed at Watertown. See Dkt. No. 26-2 at 90. Plaintiff has supported this testimony by submitting a sworn response and a copy of the letter he wrote to Upstate. See Dkt. No. 28; Dkt. No. 1-1 at 4; see Martinaj, 2021 WL 3793769, at *12 (finding that the plaintiff's "sworn declaration, which is corroborated by his follow-up letter to the IGP Supervisor at Upstate, raises a material issue of fact as to whether

2021 WL 5233308

he submitted a grievance while confined at Upstate."). Considering this Court's responsibility to draw reasonable inferences in plaintiff's favor, along with plaintiff's deposition testimony, sworn response, and corroborating document— the letter written to Upstate—plaintiff has raised a genuine issue of material fact as to the availability of administrative remedies. See, e.g., Hudson, 2021 WL 1966721, at *4.

### C. Plaintiff's Access to Writing Materials and Timing of Filing

In reply, defendants argue that plaintiff's unavailability argument should be disregarded because plaintiff's deposition testimony contradicts his response. See Dkt. No. 29 at 5-6. Specifically, defendants argue that plaintiff never testified about lacking access to writing utensils. See id. at 6. Further, defendants contend that "plaintiff testified that he filed a grievance on February 19, 2019," but because he was on contraband watch until February 21, 2019, he would have been unable to write the grievance on February 19 if he were denied writing materials. Id. (citing Dkt. No. 26-2 at 86-88; [10] Dkt. No. 1-1 at 4). IGP Supervisor Johnson declares that an inmate housed in the SHU at Watertown "ha[s] access to grievance forms, paper, and writing utensils." Dkt. No. 26-9 at 3, ¶ 9. Further, the IGP Supervisors for Fishkill and Downstate declare that "[p]laintiff had full access to the [ ] grievance office ... during the time that he was incarcerated[.]" Dkt. No. 26-7 at 3, ¶ 10; Dkt. No. 26-8 at 3, ¶ 10. Citing Louis-Charles v. Barker, defendants also argue that plaintiff had forty-two days between the January 31, 2019, incident and his March 14, 2019, transfer to Watertown to file a grievance, an extension request, or write to Watertown, and "any argument of unavailability due to transfer should be disregarded as without merit." Dkt. No. 29 at 8; see No. 9:16-cv-1417 (MAD/CFH), 2018 WL 4299982, a *2 (N.D.N.Y. Sept. 10, 2018).

[10]    Plaintiff did not testify that he filed a grievance on February 19, 2019, in the portion of the deposition transcript that defendants cite. See Dkt. No. 26-2 at 86-88. Defendants' counsel asked plaintiff if he "had sent a grievance on February 19th, 2019[,]" to which plaintiff initially responded, "Yes." Id. at 89. Plaintiff later clarified, "[s]o, when I got off of watch and on the 21st of February '19, I wrote the letter and sent it out the next day." Id.

**\*8** To the extent defendants argue that plaintiff could have filed his grievance or a request for an extension after being

released from contraband watch and prior to his transfer, Williams squarely addressed this issue. The Court explained,

> the window to request an extension between 21 and 45 days of the incident will occur only where the inmate took less than the allowed 21 days to submit his original complaint. If the inmate took full advantage of the time the regulations give him to act and then had to wait 25 days for a response, 46 days will have passed before he learns with certainty that the superintendent failed to respond.

Williams, 829 F.3d at 125. As noted, plaintiff was under contraband watch for twenty-one days. See Dkt. No. 28 at 1. [11] Assuming for the sake of argument that plaintiff wrote his grievance the same day he was taken off of contraband watch, i.e., at the end of the twenty-first day, and waited twenty-five days for the Superintendent's response, [12] he would have missed the window to seek an extension. See Williams, 829 F.3d at 125; see also 7 N.Y.C.R.R. §§ 701.5(a) (1), 701.8(g). Further, even where 7 N.Y.C.R.R. § 701.8(g) allows for an inmate to appeal if "the superintendent fails to respond within the required 25 calendar day time limit[,]" this assumes that the grievance was filed. Williams, 829 F.3d at 124 ("[I]f the grievance had never been filed, the superintendent would never have received it and the timeline for [the superintendent] to provide a response ... would never have been triggered.... In turn, the textual provision allowing a grievant to appeal to the CORC would never have come into effect.") (citing 7 N.Y.C.R.R. § 701.8(f), (g)). Therefore, because the regulations do not provide "a mechanism for appealing a grievance that was never filed," plaintiff could not have "actually ma[d]e use of" the grievance process. Id. at 126.

[11]    Defendants do not address the length of plaintiff's contraband watch. Rather, they state that he was placed on contraband watch on January 31, 2019, and reference the twenty-one days only when reiterating plaintiff's contentions. See Dkt. No. 29 at 5, n.1, 7.

12    "Grievances claiming employee harassment, including claims of excessive force, are of particular concern to the administration of [DOCCS] facilities, and subject to an expedited procedure whereby the grievance goes directly to the facility superintendent." Miller v. Ott, No. 9:20-CV-00666 (DNH/CFH), 2021 WL 3812621, at *4 (N.D.N.Y. Aug. 5, 2021), report and recommendation adopted, 2021 WL 3793051 (N.D.N.Y. Aug. 26, 2021) (quotation marks and citations omitted). "Within 25 calendar days of receipt of the grievance, the superintendent will render a decision on the grievance and transmit said decision, with reasons stated to the grievant[.]" 7 N.Y.C.R.R. § 701.8(f)

As to the availability of writing materials while plaintiff was on contraband watch and during his transfers, "[w]hen a plaintiff[ ] asserts that a defendant[ ] withheld pens, courts have granted summary judgment against a plaintiff when the record does not show that [p]laintiff indicated to prison officials that he needed a pen [to] file a grievance or that prison officials refused to provide [one] for this purpose." Rodriguez, 2017 WL 2791063, at *5 (citation and internal quotation marks omitted). Courts also examine "whether the inmate was drafting other documents during the same time period, or whether they were able to access materials from other sources." Id. Here, plaintiff does not explain whether, when, or from whom he requested writing materials. See generally Dkt. No. 28. Instead, plaintiff summarily states that, while on contraband watch, he "was prohibited from obtaining any kind of clothes, mat[t]resss, or writing uten[s]ils" and during transport, he was "not permitted any kind of writing utensils." Dkt. No. 28 at 1-2. However, the record does not show that plaintiff filed any grievances, wrote any letters, or had access to writing materials from another source while under contraband watch or during his transport to other facilities. C.f. Rodriguez, 2017 WL 2791063, at *5 (granting summary judgment where the plaintiff filed numerous other grievances in the same year and only asserted a denial of paper and pen on one occasion); Mena v. City of New York, No. 12-CV-6838 (GBD/AJP), 2013 WL 1352081, at *8 (S.D.N.Y. Apr. 4, 2013), report and recommendation adopted, 2013 WL 3580057 (S.D.N.Y. July 10, 2013) (finding the plaintiff's contention that the defendants "totally deprived [him] of a writing implement[,]" "implausible[,]" because he wrote other documents and grievances during the relevant time period).

*9    Additionally, defendants' reliance on Louis-Charles is misplaced. There, the plaintiff claimed that he was denied access to writing materials but submitted a written grievance and drafted letters during the same time frame. See Louis-Charles, 2018 WL 4299982, at *2. As such, the Court "found Plaintiff's allegation did not establish a genuine dispute of material fact because the testimony was both internally inconsistent and not supported by any evidence." Id. The plaintiff also did not reach out to shift supervisors to inquire about his grievance. See id. The Court found that "[p]laintiff's decision to abandon alternative available avenues for relief was not the result of Defendants thwarting his access to the grievance process[.]" Id. Conversely, here, plaintiff contacted a corrections officer to inquire about his grievance and later wrote to Upstate asking about the status of the grievance. See Dkt. No. 26-2 at 92; Dkt. No. 1-1 at 4.

As to internal inconsistencies, the precise date plaintiff allegedly attempted to file his grievance is unclear. In the letter plaintiff wrote to Upstate, he explained that he wrote his Watertown grievance "on approximately 2/19/19[.]" Dkt. No. 1-1 at 4. In his deposition, plaintiff testified, "I filed it February 22nd.... So, when I got off of watch and on the 21st of February '19, I wrote the letter and sent it out the next day." Dkt. No. 26-2 at 89. In his response, plaintiff wrote that "[f]rom 2/21/19 [to] 3/14/19, I did not receive a response to my grievance[,]" implying that he attempted to file it on February 21, 2019, or sooner. Dkt. No. 28 at 2. Finally, in his complaint, plaintiff stated that he was taken off of contraband watch on "2/23/19 ... and [he] immediately filed a grievance[.]" Compl. at 2. Therefore, even though plaintiff is inconsistent with the date he was released from contraband watch, plaintiff's contention that he wrote the grievance immediately after being released is not. See Compl. at 2; Dkt. No. 26-2 at 89.

Where a defendant correctly notes that a plaintiff's versions of events are not completely consistent, "this Court, at the summary judgment stage, will not weigh in on the factual dispute or make credibility determinations regarding Plaintiff's sometimes conflicting testimony." Thompson v. Booth, No. 16-CV-03477 (PMH), 2021 WL 918708, at *9 (S.D.N.Y. Mar. 10, 2021). Therefore, as "the exhaustion determination hinges on the question of plaintiff's credibility ... summary judgment is not warranted on the issue of exhaustion." Bishop v. Presser, No. 9:16-CV-1329 (MAD/ATB), 2018 WL 7917915, at *5 (N.D.N.Y. Dec. 28, 2018), report and recommendation adopted, 2019 WL 442154 (N.D.N.Y. Feb. 5, 2019) (finding that the exhaustion

issue hinged on the plaintiff's credibility where the "plaintiff [ ] consistently alleged that he filed a grievance[,]" [he] "provided documentary evidence to support that claim[,]" he was required to rely on SHU officers, and he was "subsequent[ly] transfer[red] to another facility[.]").

The record, when viewed in the light most favorable to plaintiff, suggests that his grievance may have been unfiled and unanswered. As such, it is recommended that the Court deny defendants' Motion for Summary Judgment and "hold a hearing, at which a fact-finder can assess the credibility of witnesses and the relative weight of the evidence the parties present" to determine whether plaintiff exhausted his administrative remedies or if the administrative remedies were unavailable. Hudson, 2021 WL 1966721, at *4.

### V. Conclusion

**WHEREFORE**, for the reasons set forth above, it is hereby:

**RECOMMENDED**, that defendants' Motion for Summary Judgment (Dkt. No. 26) be **DENIED**; and it is further

**RECOMMENDED**, that the Court hold an exhaustion hearing; and it is

**ORDERED**, that the Clerk of Court update the docket to reflect the appropriate spelling of defendants' names: Danny Putnam and Jonathan Putnam; and it is further

**\*10  ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order on all parties in accordance with Local Rules.

**IT IS SO ORDERED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); FED R. CIV. P. 6(a), 6(e), 72. [13]

[13]      If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Report-Recommendation & Order was mailed to you to serve and file objections. See FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. See id. § 6(a)(1)(C).

**All Citations**

Slip Copy, 2021 WL 5233308

---

**End of Document**                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.   9

2021 WL 5768393
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

K'var TILLMAN, Plaintiff,
v.
Trevor PHILLIPS, et al., Defendants.

9:19-CV-1597 (LEK/CFH)
|
Signed 12/06/2021

**Attorneys and Law Firms**

K'var Tillman, Schenectady, NY, Pro Se.

David C. White, Office of Attorney General, Albany, NY, for Defendants Trevor Phillips, Timothy Clark, Michael Clark, J. Sorensen, Danny Putman, John Putman.

### DECISION AND ORDER

Lawrence E. Kahn, United States District Judge

### I. INTRODUCTION

 **\*1** Plaintiff K'var Tillman brings this pro se action against Sergeant ("Sgt.") Trevor Phillips, Sgt. Timothy Clark, Sgt. Michael Clark, Correction Officer ("C.O.") J. Sorensen, C.O. Danny Putnam, and C.O. John Putnam (collectively, "Defendants"). Plaintiff commenced this action on December 23, 2019. Dkt. No. 1 ("Complaint"). On January 2, 2020, the Court ordered administrative closure for failure to properly comply with the Filing Fee Requirement. Dkt. No. 4. On January 10, 2020, Plaintiff filed a motion for leave to proceed in forma pauperis ("IFP") and the case was reopened. Dkt. Nos. 5, 6.

On April 4, 2020, the Court issued a Decision and Order. Dkt. No. 7. In that Decision and Order, the Court granted Plaintiff's motion to proceed IFP, and allowed the following claims to survive sua sponte review: (1) Plaintiff's Eighth Amendment excessive-force and failure-to-intervene claims against D. Putnam, J. Putnam, Sorensen, Phillips, Clark, and Clarke for their January 31, 2019 assault of Plaintiff; and (2) Plaintiff's equal-protection claim against Phillips.

Following discovery, on April 1, 2021, Defendants filed a motion for summary judgement, Dkt. No. 26 ("Motion"),

arguing that Plaintiff had failed to exhaust administrative remedies as required by law. Dkt. No. 26-1. at 2. On November 10, 2021, Magistrate Judge Christian Hummel recommended that summary judgement be denied and an exhaustion hearing be scheduled. Dkt. No. 33 ("Report-Recommendation") at 2. No objections to the Report-Recommendation have been filed in this case. See Docket.

For the reasons discussed below, the Court adopts the Report-Recommendation in its entirety.

### II. BACKGROUND

Plaintiff's factual allegations are detailed in Judge Hummel's Report-Recommendation, familiarity with which is assumed. See R. & R. at 2–4.

### III. LEGAL STANDARD

Within fourteen days after a party has been served with a copy of a magistrate judge's report-recommendation, the party "may serve and file specific, written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b); see also L.R. 72.1(c). A court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). However, if no objections are made, or if an objection is general, conclusory, perfunctory, or a mere reiteration of an argument made to the magistrate judge, a district court need review that aspect of a report-recommendation only for clear error. See Barnes v. Prack, No. 11-CV-857, 2013 WL 1121353, at \*1 (N.D.N.Y. Mar. 18, 2013); see also Demuth v. Cutting, No. 18-CV-789, 2020 WL 950229, at \*2 (N.D.N.Y. Feb. 27, 2020) (Kahn, J.). "[I]t is established law that a district judge will not consider new arguments raised in objections to a magistrate judge's report and recommendation that could have been raised before the magistrate but were not." Zhao v. State Univ. of N.Y., 04-CV-0210, 2011 WL 3610717, at \*1 (E.D.N.Y. Aug. 15, 2011) (internal quotation marks and citation omitted); see also Hubbard v. Kelley, 752 F. Supp. 2d 311, 312–13 (W.D.N.Y. 2009) ("In this circuit, it is established law that a district judge will not consider new arguments raised in objections to a magistrate judge's report and recommendation that could have been raised before the magistrate but were not.") (internal quotation marks omitted). "A [district] judge ... may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." § 636(b).

## IV. DISCUSSION

 **\*2** Here, no objections have been raised in the allotted time with respect to Magistrate Judge Hummel's Report-Recommendation. Consequently, the Court reviews the Report-Recommendation for clear error and finds none. Therefore, the Court adopts the Report-Recommendation in its entirety.

## V. CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that the Report-Recommendation (Dkt. No. 33) is **APPROVED and ADOPTED** in its entirety; and it is further

**ORDERED**, that Defendant's Motion for Summary Judgement is **DENIED**; and it is further

**ORDERED**, that the matter is referred to the Magistrate to schedule an exhaustion hearing; and it is further

**ORDERED**, that the Clerk of the Court shall serve a copy of this Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2021 WL 5768393

---

**End of Document**                              © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 1159426
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Shain MALDONADO, Plaintiff,

v.

Vijaykumar S. MANDALAYWALA,
et al., Defendants.

9:17-CV-1303 (BKS/TWD)
|
Signed 02/12/2020

**Attorneys and Law Firms**

Shain Maldonado, 15-B-2138, Wende Correctional Facility,
P.O. Box 1187, Alden, NY 14004, Plaintiff, pro se.

David A. Rosenberg, Esq., Hon. Letitia James, Office of
New York State Attorney General, The Capitol, Albany, NY
12224, Attorneys for Defendants.

## ORDER AND REPORT-RECOMMENDATION

THÉRÈSE WILEY DANCKS, United States Magistrate
Judge

## I. INTRODUCTION

 **\*1** This matter has been referred to the undersigned for a
report-recommendation pursuant to 28 U.S.C. § 636(b) and
Local Rule 72.3. On November 29, 2017, *pro se* Plaintiff
Shain Maldonado, an inmate in custody of the New York
State Department of Corrections and Community Supervision
("DOCCS"), commenced this action pursuant to 42 U.S.C.
§ 1983, asserting claims arising out of his incarceration at
Upstate Correctional Facility ("Upstate") and Great Meadow
Correctional Facility ("Great Meadow"). (Dkt. No. 1.)

On May 29, 2018, the Honorable Brenda K. Sannes,
United States District Judge, granted Plaintiff leave to file
a second amended complaint. (Dkt. No. 15.) Defendants
and claims remaining following *sua sponte* review of the
second amended complaint and subsequent motion practice
are: (1) Eighth Amendment medical indifference claims
against Dr. Vijaykumar S. Mandalaywala, a physician at
Upstate; (2) Eighth Amendment medical indifference and
conditions of confinement claims against Great Meadow
Offender Rehabilitation Coordinators Jane Doe #1 and Jane

Doe #2; and (3) Eighth Amendment excessive force claims
against Great Meadow Corrections Officers D. Bennett and
John Doe #1. (Dkt. Nos. 17, 41.) By Decision and Order
filed July 31, 2018, the "Superintendent of Great Meadow
Correctional Facility" was added as a defendant for purposes
of service and discovery only. (Dkt. No. 26. [1] ) To date,
Plaintiff has not moved to substitute an identified individual
as a defendant in place of any Doe Defendant. (*See* Docket
Report.)

[1]     On initial review of the second amended complaint
        under 28 U.S.C. §§ 1915(e)(2)(B) & 1915A(b),
        Plaintiff's claims against Christopher Miller, the
        Superintendent of Great Meadow, were *sua sponte*
        dismissed without prejudice for failure to state a
        claim. (Dkt. No. 17.)

Defendants Dr. Mandalaywala, Bennett, and Superintendent
Miller (together, "Defendants"), now move for summary
judgment pursuant to Rule 56 of the Federal Rules of Civil
Procedure. (Dkt. No. 46.) Plaintiff responded in opposition to
the motion, and Defendants filed a reply. (Dkt. Nos. 53, 54.)
Plaintiff also filed a sur-reply, which this Court has considered
in its review. (Dkt. Nos. 55, 56.)

For the reasons set forth below, the Court recommends
Defendants' motion be granted in part and denied in part.

## II. CONTENTIONS

### A. Dr. Mandalaywala

Plaintiff claims Dr. Mandalaywala failed to prescribe Plaintiff
speech and physical therapies at Upstate as recommended
by the medical professionals at Albany Medical Center
Hospital ("Albany Medical"), the hospital where Plaintiff
was treated for a stroke in October 2016. (Dkt. No. 15 at
5, 9-10. [2] ) Plaintiff also claims Dr. Mandalaywala delayed
issuing Plaintiff a "flats" permit at Upstate. (*Id.* at 9-10.)

[2]     Page references to documents identified by docket
        number are to the numbers assigned by the
        CM/ECF docketing system maintained by the
        Clerk's Office. Paragraph numbers are used
        where documents identified by the CM/ECF
        docket number contain consecutively numbered
        paragraphs. Unless noted, excerpts from the record
        are reproduced exactly as they appear in the

original and errors in spelling, punctuation, and grammar have not been corrected.

**\*2** Plaintiff alleges he experienced pain throughout his "whole right side" following his stroke, which has caused him complications with walking. (*Id.* at 9.) He also claims Dr. Mandalaywala was aware of Plaintiff's need for physical and speech therapies—which Plaintiff requested on "several occasions"—based on documents provided to him from Albany Medical. (*Id.* at 5, 9.) In addition, Plaintiff alleges Dr. Mandalaywala could have "sign[ed] off on" a "flats" permit in "minutes[,]" but Plaintiff had to wait "several weeks" after requesting the permit to receive it, during which time his "physical pain" intensified. (*Id.* at 9-10.) Plaintiff was issued a flats permit on January 10, 2017. (*Id.* at 9.)

Defendants contend Dr. Mandalaywala is entitled to summary judgment because (1) Plaintiff cannot establish Dr. Mandalaywala was deliberately indifferent to his serious medical needs; (2) Dr. Mandalaywala not personally involved in the treatment at issue in this case; and (3) Plaintiff failed to exhaust his administrative remedies (Dkt. No. 46-2 at 8-20.)

### B. Bennett

On December 26, 2016, while temporarily housed at Great Meadow on a medical trip, Plaintiff claims he was subjected to excessive force by Bennett. (Dkt. No. 15 at 7-8.) Plaintiff "returned to Upstate that day." (*Id.* at 9.) "On December 27, 2016, [a]t Upstate, [Plaintiff] submitted a grievance for the ... the physical abuse that [he] received at Great Meadow." He never received a response. (*Id.*)

Defendants argue Bennett is entitled to summary judgment because Plaintiff failed to exhaust his administrative remedies. (Dkt. No. 46-2 at 16-21.)

### C. Superintendent Miller

As noted above, Plaintiff's claims against Superintendent Miller were *sua sponte* dismissed without prejudice on initial review for failure to state a claim. (Dkt. No. 17.) However, Plaintiff's Eighth Amendment medical indifference and conditions of confinement claims against Jane Doe #1 and Jane Doe #2 and Eighth Amendment excessive force claim against John Doe #1, all of whom are claimed to be Great Meadow employees, survived *sua sponte* review. (*Id.*)

Because of the pendency of Plaintiff's claims against the Doe Defendants, the District Court ordered the Superintendent of Great Meadow be added as a defendant solely for service and discovery purposes, to allow Plaintiff an opportunity to seek the identities of the Doe Defendants through discovery. (Dkt. No. 26 at 3.) "By doing so, the Court d[id] not suggest in any way that the Superintendent of Great Meadow Correctional Facility was personally involved in the Eighth Amendment claims asserted against the Doe Defendants." (*Id.* at 4.)

On October 15, 2018, Superintendent Miller answered the second amended complaint as directed by the District Court. (Dkt. No. 35.) Following the joinder of issue, a mandatory pretrial discovery and scheduling order was issued. (Dkt. No. 36.) All discovery was to be completed by April 22, 2019. (*Id.*) Mandatory disclosures were exchanged in December 2018 and Plaintiff was deposed on March 21, 2019. (Dkt. Nos. 39, 40, 46-5.)

Defendants contend "Plaintiff having been afforded an opportunity to seek discovery related to the Doe Defendants, and discovery having since concluded, the Superintendent of Great Meadow (Supt. Miller), should now be dismissed from this action with prejudice." (Dkt. No. 46-2 at 15-16.)

### III. LEGAL STANDARD FOR SUMMARY JUDGMENT

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, no genuine issue of material fact exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248.

**\*3** Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating genuine issues of material fact exist. *Salahuddin*, 467 F.3d at 273 (citations omitted). The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). "Conclusory allegations, conjecture and speculation ... are

2020 WL 1159426

insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

The Second Circuit has reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005). To defeat summary judgment, nonmoving parties "may not rely on conclusory allegations or unsubstantiated speculation." *Id.* (citation and internal quotation marks omitted). Rather, "[a]t the summary judgment stage, a nonmoving party must offer some hard evidence showing that [his] version of the events is not wholly fanciful." *Id.* (citation and internal quotation marks omitted). Accordingly, statements "that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obligated to "read [the *pro se* party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991).

## IV. DISCUSSION

### A. Plaintiff's Failure to File a Response to Defendants' Local Rule 7.1 Statement

Pursuant to this District's Local Rules, "[t]he Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." N.D.N.Y. L.R. 7.1(a)(3). Where a party has failed to respond to the movant's statement of material facts as required by Local Rule 7.1(a)(3), the facts in the movant's statement will be accepted as true to the extent they are (1) supported by evidence in the record, and (2) the nonmovant, if proceeding *pro se*, has been specifically advised of the possible consequences of failing to respond to the motion. *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).

As required by the Local Rules, Defendants advised Plaintiff of the consequences of failing to file a response to Defendants' Rule 7.1 Statement of Material Facts, as did the Court. (Dkt. Nos. 46, 48.) While Plaintiff opposes Defendants' motion, he failed to do so in the manner required under Local Rule 7.1(a)(3). [3] (*See generally* Dkt. Nos. 53, 55; *see also* Dkt. No. 54 at 3-5.) "Although a *pro se* litigant is entitled to a liberal construction of his filings, *see Sykes v. Bank of America*, 723 F.3d 399, 403 (2d Cir. 2013), his *pro se* status does not relieve him of his obligation to comply with the relevant procedural rules." *Marino v. Watts*, No. 9:12-CV-801 (NAM/DJS), 2018 WL 3121612, at *1 (N.D.N.Y. Mar. 7, 2018), *report-recommendation adopted sub nom. Marino v. Schult*, 2018 WL 1578163 (N.D.N.Y. Mar. 30, 2018), *aff'd*, 764 F. App'x 73 (2d Cir. 2019) (summary order).

[3]    Local Rule 7.1(a)(3) requires the opposing party to file a response to the movant's statement of material facts. Under the rule, the response "shall mirror the movant's statement of material facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises." *Id.*

*4    Although this Circuit adheres to the view that nothing in Rule 56 imposes an obligation on a court to conduct a search and independent review of the record to find proof of a factual dispute where a non-movant willfully fails to respond to a properly filed summary judgment motion, *Amnesty Am. v. Town of West Hartford*, 288 F.3d 467, 470 (2d Cir. 2002), the Second Circuit has ruled that "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules," including local rules relating to requirements regarding the submission of and response to statements of material facts on summary judgment motions, and whether to "conduct an assiduous review of the record." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (citation and quotation marks omitted).

In deference to Plaintiff's *pro se* status, the Court has opted to review the entire summary judgment record. Accordingly, the Court treats the verified second amended complaint as an affidavit for purpose of this motion, along with Plaintiff's sworn responses and sur-reply, and considers the factual allegations therein to the extent they are not conclusory and supported by the record. *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) ("[I]n determining whether the moving party has met his burden of

showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts in the moving party's [Statement of Material Facts]. It must be satisfied that the citation to evidence in the record supports the assertion.") (citations omitted).

As to any facts not contained in Defendants' Local Rule 7.1(a)(3) Statement, in light of the procedural posture of this case, the Court is "required to resolve all ambiguities and draw all permissible factual inferences" in favor of Plaintiff. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

**B. Plaintiff's Deliberate Indifference Claim Against Dr. Mandalaywala**

As noted above, Plaintiff contends Dr. Mandalaywala was deliberately indifferent to his serious medical needs by failing to make arrangements for Plaintiff to have speech and physical therapies at Upstate after he was discharged from Albany Medical Hospital Center ("Albany Medical") following a stroke in October 2016, and by delaying Plaintiff's "flats" permit. Defendants argue insufficient evidence exists in the record to support Plaintiff's medical indifference claim against Dr. Mandalaywala.

**1. Legal Standards**

The Eighth Amendment forbids the infliction of "cruel and unusual punishments" on those convicted of crimes, "which includes punishments that involve the unnecessary and wanton infliction of pain." U.S. Const. amend. VIII; *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994) (citing *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). "In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.' " *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). This standard contains objective and subjective components. *Hathaway*, 37 F.3d at 66. The objective component requires the plaintiff to demonstrate that his alleged medical need is "sufficiently serious." *Id.* The subjective component requires a showing that the defendant has acted with a "sufficiently culpable state of mind." *Id.*

To satisfy the objective element, the alleged deprivation must be "sufficiently serious." *Salahuddin*, 467 F.3d at 279 (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). Determining

whether a deprivation is sufficiently serious also involves two inquiries. *Id.* Initially, the court must determine whether the inmate was actually denied adequate care. *Id.* "Prison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations under the Eighth Amendment when the care provided is reasonable." *Jones v. Westchester Cty. Dep't of Corr.*, 557 F. Supp. 2d 408, 413 (S.D.N.Y. 2008) (citations and quotation mark omitted).

**\*5** Second, if the care provided was unreasonable, courts must inquire as to whether that inadequacy was "sufficiently serious." *Salahuddin*, 467 F.3d at 280. Courts must examine how the care was inadequate and what harm the inadequacy caused or will likely cause the plaintiff. *Id.* (citing *Helling v. McKinney*, 509 U.S. 25, 32-33 (1993)). If the "unreasonable care" consists of a failure to provide *any* treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Id.* (citing *Smith*, 316 F.3d at 185-86). Factors informing this inquiry include "whether a reasonable doctor or patient would find it important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain." *Id.* (quotation marks and alterations omitted).

However, where the inadequacy is in the medical treatment that was actually afforded to the inmate, the inquiry is narrower. *Id.* "For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone." *Salahuddin*, 467 F.3d at 280. Thus, although courts "sometimes speak of a serious medical condition as the basis for an Eighth Amendment claim, such a condition is only one factor in determining whether a deprivation of medical care is sufficiently grave to establish constitutional liability." *Id.*

As to the subjective component, a prison official acts with a sufficiently culpable state of mind when "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. "Deliberate indifference is a mental state equivalent to subjective recklessness" which "requires that the charged official act or fail to act while actually aware of a substantial

risk that serious inmate harm will result." *Salahuddin, 467 F.3d at 280* (quotation marks omitted). A defendant "may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was 'insubstantial or non-existent.' " *Wright v. Genovese, 694 F. Supp. 2d 137, 154 (N.D.N.Y. 2010)* (citing *Farmer, 511 U.S. at 844*). Therefore, "the defendant's belief that his conduct posed no risk of serious harm need not be sound so long as it is sincere, and even if objectively unreasonable, a defendant's mental state may be nonculpable." *Id.* at 154-55 (quoting *Salahuddin, 467 F.3d at 281*) (internal quotation marks omitted).

Further, "[i]t is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment claim." *Chance, 143 F.3d at 703*. Therefore, any "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists or the timing of intervention, are not adequate grounds for a Section 1983 claim." *Randle v. Alexander, 960 F. Supp. 2d 457, 481 (S.D.N.Y. 2013)* (citation and internal quotation marks omitted).

Additionally, "[p]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [Section] 1983." *Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994)* (quoting *Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991)*). As the Supreme Court has noted, a defendant may only be held accountable for his own actions under Section 1983. *See Iqbal, 556 U.S. at 683*. Thus, to prevail on a Section 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson, 790 F.2d 260, 263 (2d Cir. 1986)*. With respect to individuals sued based on their supervisory capacities, "vicarious liability is inapplicable to ... [Section] 1983 suits." *Iqbal, 556 U.S. at 676*.

**\*6** In this circuit, a supervisory official is personally involved in a constitutional violation if he or she: (1) directly participated in the violation; (2) failed to remedy that violation after learning of it through a report or appeal; (3) created, or allowed to continue, a policy or custom under which the violation occurred; (4) was grossly negligent in managing subordinates who caused the violation; or (5) exhibited deliberate indifference to the rights of inmates by failing to

act on information indicating that the violation was occurring. *Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995)*. [4]

4    "*Iqbal* has ... engendered conflict ... about the continuing vitality of the supervisory liability test set forth in *Colon*," *Reynolds v. Barrett, 685 F.3d 193, 205 n.14 (2d Cir. 2012)*, and the Second Circuit has not resolved the conflict. *See, e.g., Hogan v. Fischer, 738 F.3d 509, 519 n.3 (2d Cir. 2013)* ("We express no view on the extent to which the Supreme Court's decision in *Ashcroft v. Iqbal* ... 'may have heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations.' ") (citation omitted). Nevertheless, district courts in this Circuit have consistently held that "[w]here the constitutional claim ... relies on the ... deliberate indifference standard[ ] of the ... Eighth Amendment[ ]," *Colon* still applies. *Sash v. United States, 674 F. Supp. 2d 531, 544 (S.D.N.Y. 2009)*; *see also Williams v. Adams, No. 9:18-CV-1041 (BKS/TWD), 2019 WL 350215, at \*7 (N.D.N.Y. Jan. 29, 2019)* (collecting cases).

### 2. Analysis

The record evidence demonstrates Plaintiff was not provided with speech, occupational, and physical therapies as part of his post-stroke care at Upstate and he was not assigned to the "flats" until January 10, 2017. [5] However, the Court finds Plaintiff has failed to provide evidence from which a fact-finder could reasonably conclude Dr. Mandalaywala was deliberately indifferent to his serious medical needs. *See Salahuddin, 467 F.3d at 279*. Here, there is no indication in the record that Plaintiff was provided with inadequate medical care; in fact, the record establishes the opposite.

5    Plaintiff also testified he did not receive occupational therapy at Upstate, despite Albany Medical indicating the need for same. (Dkt. No. 46-5 at 62, 65.)

### a. Record Evidence

Dr. Mandalaywala is the Facility Health Services Director ("FHSD") at Upstate. (Dkt. No. 46-8 at ¶¶ 1, 6.) As FHSD, Dr. Mandalaywala oversees the medical program at Upstate and

is primarily engaged in administrative duties. (*Id.* at ¶ 5.) The medical staff is responsible for primary day-to-day patient care. (*Id.*) However, as he also is a Clinical Physician II, he occasionally sees patients for medical treatment as needed, depending on staffing levels, and when specifically requested by a provider. (*Id.* at ¶ 6.)

On October 1, 2016, Plaintiff presented to the infirmary at Upstate with apparent symptoms of a stroke and was transported to Albany Medical for emergency treatment where he remained for approximately three weeks. (Dkt. No. 46-1 at ¶ 9.) On October 20, 2016, Plaintiff was discharged from Albany Medical and returned to Upstate. (*Id.* at ¶ 10.) Among the medical records provided by Albany Medical to Upstate was a Physical Therapy Plan of Care form, indicating Plaintiff could move, transfer, and ambulate independently. (*Id.* at ¶ 13.) A copy of Plaintiff's Transfer Discharge Summary faxed to Upstate included a handwritten notation that Plaintiff's physical and occupational therapies were discontinued on October 20, 2016. (*Id.* at ¶¶ 11, 12.)

 **\*7** On October 21, 2016, at approximately 3:00 am, Plaintiff was admitted to the infirmary at Upstate for observation, as per protocol. (*Id.* at ¶¶ 10, 15.) Plaintiff remained in the infirmary for approximately three days. (*Id.* at ¶ 16.) Over the course of the weekend, medical staff observed Plaintiff could walk independently without difficulty, had clear speech, voiced no medical complaints, and expressed eagerness to return to his cell block and job in the law library. (*Id.* at ¶ 17.[6]) In particular, the following observations were recorded in Plaintiff's Progress Notes:

> October 21, 2016 – Kelly Rabideau, RN: "Returned from [Albany Medical] [at] 3 AM. Ambulated to infirmary [without] difficulty.... Denies any medical complaint [at] present. Some [right] sided weakness observed. Speech was clear – expresses some difficulty [with] communication at times, particularly if he attempts to talk too fast. Provider to evaluate in the AM."

> October 21, 2016 – Mary Kowalchuk, PA: "Lying on bed. He was able to get out of bed [without] difficulty. Normal gait, has great strength to the hands. States he does not need speech therapy, OT or PT as the evaluation done at Albany showed no need for it. Able to speak very well – able to understand everything he says. We'll keep in infirmary over [the] weekend - Dr. Kumar will probably discharge to block. He works in the law library ... wants to go back to work."

> October 21, 2016 – Denise Reome, RN: "Ambulates and transfers independently [without] difficulty. Speaks clearly but in short one or two word sentences. Can answer yes/no questions.... Out to phone to call family. Speaks fluently in native tongue and rapidly. No medical complaints voiced."

> October 22, 2016 – Denise Reome, RN: "Speech clear. Gives simple answers. Ambulates and transfers independently. Tolerates soft diet well. No medical complaints voiced. Eager to return to cadre cell block."

> October 22, 2016 – Christy Conklin, RN: "No medical concerns voiced at this time."

> October 23, 2016 – Marla Travers, RN: "Ambulates [with] steady gait. Speech clear. Offers no complaints. Appears in [no acute distress]. Tolerating diet well. Will continue to monitor."

> October 23, 2016 – Christy Conklin, RN: "Claims he's anxious to return to his cell."

> October 24, 2016 – Brenda Holcombe, RN: "Speaks clearly. Gait steady ... [no complaints of] medical needs voiced or noted ... [s]till requesting to return to his cadre job in law library."

> October 24, 2016 – Elizabeth Ahern, PA: "[Patient] seen this AM ... No weakness noted ... No difficulty swallowing. Will advance to regular diet. Discharge to block. Speech improving."

(Dkt. No. 47-7 at 2-3.)

[6]     While not material to the pending motion, Plaintiff denies asking to return to his law library job and merely stated he worked in the law library. (Dkt. No. 46-5 at 30.)

On October 24, 2016, on the order of PA Ahern, Plaintiff was released from the infirmary to his housing block at Upstate.

(Dkt. No. 46-1 at ¶ 18;[7] *see also* Dkt. No. 47-1 at 2.)

[7]     Plaintiff argues he was "discharged to his housing unit by Dr. Mandalaywala as he was in the presence of staff members of his medical department and CO's. Just because the defendant did not sign any of the documentation approving the return of the Plaintiff to his housing unit, does not mean he did not approve or know about any of the conditions the

Plaintiff was in. (Please see Plaintiff's response to motion to dismiss.)." (Dkt. No. 53-1 at 36.) Plaintiff also directs the Court's attention to PA Kowalchuk's October 21, 2016, entry, highlighting "Dr. Kumar will probably discharge to block." (*Id.*)

**\*8** On November 18, 2016, Dr. Glenn Schroyer, a physician at Upstate, referred Plaintiff for a follow-up consultation with a neurologist. (Dkt. No. 46-1 at ¶ 23.) Plaintiff was placed on a temporary medical trip to Great Meadow from December 13, 2016, through December 27, 2016. (*Id.* at ¶ 31.) Plaintiff was seen by a neurologist for follow-up on or about December 14, 2016. (Dkt. Nos. 15 at 7, 47-14 at 14.)

Plaintiff's Ambulatory Health Record ("AHR") Progress Notes reflect that on January 10, 2017, during a sick call appointment, Plaintiff asked RN Sturgen for a "flats" permit. (Dkt. No. 47-12 at 9. [8] ) A medical permit, signed by RN Sturgen was issued on January 10, 2017, indicating "flats permit—downstairs only! Permanent." (Dkt. No. 47-10 at 2.) Plaintiff testified he was moved to the lower level of the facility the same day. (Dkt. No. 46-5 at 36.)

[8]    Plaintiff testified, however, that he asked for the flats permit on many prior occasions. (Dkt. Nos. 46-5 at 36 ("I was asking and asking and asking and they was like, ... we'll see to it. [ ] I followed the chain of command. I spoke to the C.O.s first, then to the nurse and nothing.").)

Plaintiff's periodic medical appointments at Upstate in the months following his return from Albany Medical were with Dr. Glenn Schroyer or Dr. Jonathan Beach. (Dkt. No. 47-12 at 1-9.) In January 2017, Dr. Shroyer noted "no residual muscular problems. [Patient] to continue to active lifestyle." (*Id.* at 9.) In March 2017, Dr. Shroyer noted "good speech pattern, good strength, ambulates well, central nerve intact." (*Id.* at 8.) During sick call visits in May and June 2017, Plaintiff was issued Tylenol to address complaints of joint pain and stiffness. (*Id.* at 7, 8.) In July 2017, Dr. Shroyer noted "no complaints, ambulates [easily], speech normal, central nerve intact." (*Id.* at 7.) In November 2017, Dr. Shroyer continued Plaintiff's medication. (*Id.*)

In March 2018, Dr. Jonathan Beach noted Plaintiff complained of joint pain and stiffness and requested an eye examination. (Dkt. No. 47-12 at 6.) Plaintiff was prescribed Tylenol and referred for an eye examination. (*Id.*) In April 2018, Dr. Beach noted "no complaints, doing well, good hand ... neuro intact." (*Id.* at 5.)

In May 2018, Plaintiff filed the second amended complaint. (Dkt. No. 15.) Plaintiff was subsequently transferred to Wende Correctional Facility ("Wende") on or about January 18, 2019. (Dkt. No. 42.)

**b. Objective Prong**

As to the first inquiry of the objective prong, the Court finds no reasonable jury could find Plaintiff was "actually deprived of adequate medical care" at Upstate following his discharge from Albany Medical in October 2016. *Salahuddin,* 467 F.3d at 276. As discussed above, the word "adequate" reflects the reality that "[p]rison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations under the Eighth Amendment when the care provided is 'reasonable.' " *Jones,* 557 F. Supp. 2d at 413 (quoting *Salahuddin,* 467 F.3d at 280).

The record evidence demonstrates Plaintiff's medical needs were reasonably treated and monitored at Upstate following his discharge from Albany Medical. While Plaintiff contends that he needed physical, occupational, and speech therapies at Upstate following his October 2016 stroke, and believes he should have been issued a "flats" permit prior to January 10, 2017, such assertions amount to nothing more than a mere disagreement with Plaintiff's post-stroke medical care, which is not actionable under the Eighth Amendment. *See Randle,* 960 F. Supp. 2d at 481 (quoting *Alston v. Bendheim,* 672 F. Supp. 2d 378, 385 (S.D.N.Y. 2009)) ("Indeed, '[a]n inmate's disagreement with his treatment or a difference of opinion over the type or course of treatment [does] not support a claim of cruel and unusual punishment.' ").

**\*9** Accordingly, Plaintiff has failed to establish Dr. Mandalaywala deprived him of adequate medical care under the objective prong of the deliberate indifference analysis and the Court finds summary judgment is warranted on this ground. *See, e.g., Gray v. Kang Lee,* No. 9:13-cv-258 (GLS/DEP), 2015 WL 1724573, at \*3 (N.D.N.Y. Apr. 15, 2015) (finding inmate could not satisfy objective requirement where he was frequently treated, prescribed pain medication, tested with an X-ray and MRI, and referred to an orthopedic specialist); *Nowinski v. Rao,* No. 6:14-CV-06559 (MAT), 2018 WL 2303780, at \*5-6 (W.D.N.Y. May 21, 2018) (finding plaintiff was not deprived of adequate care where, *inter alia,* the inmate was provided with extensive care for his knee problems, medications, and accommodations).

#### c. Subjective Prong and Personal Involvement

Even assuming, *arguendo*, Plaintiff could satisfy the objective component of the Eighth Amendment, Plaintiff fails to establish Dr. Mandalaywala knew of and disregarded an "excessive risk" to his health under the subjective prong. Simply put, despite Plaintiff's contrary allegations, the record evidence demonstrates Dr. Mandalaywala was not personally involved in Plaintiff's medical care at Upstate following his discharge from Albany Medical.

For example, although Plaintiff claims his "quarterly" medical appointments were "always" with Dr. Mandalaywala, (*see, e.g.*, Dkt. No. 46-5 at 36-37), as discussed above, Plaintiff's periodic medical appointments in the months following his return from Albany Medical were with Drs. Schroyer and Beach; none were with Dr. Mandalaywala. (Dkt. No. 47-12 at 1-9.) Further, Dr. Mandalaywala states that he "did not evaluate [P]laintiff and was not personally involved in any decisions as to provision of physical, occupational, or speech therapy." (*Id.* at 12. [9])

[9] Plaintiff's medical records reflect Dr. Mandalaywala saw Plaintiff once for a medical appointment on April 18, 2016, months before his October 1, 2016, stroke, and reviewed Plaintiff's medications on two occasions in 2018. (Dkt. No. 46-8 at ¶ 21.) Dr. Mandalaywala explains this is routine when a patient has medication to be renewed and does not involve a visit with the patient. (*Id.* at ¶ 23.)

To the extent Plaintiff claims he also submitted written requests via sick call slips for speech, occupational, and physical therapies, along with a flats permit, Dr. Mandalaywala explains "sick call requests from inmates are addressed and handled directly by the medical staff; they do not cross my desk as a matter of course. Regardless, I was never made aware of any such request by Plaintiff." (Dkt. No. 46-8 at ¶ 19.) Additionally, "the medical records that [Dr. Mandalaywala] reviewed in preparation for this motion show that [P]laintiff did not require such therapies at Upstate." (*Id.* at ¶ 12.) Inmates do not have a constitutional right to the treatment of their choice. *See Wright*, 694 F. Supp. 2d at 155 (citing *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986)) ("[That the plaintiff] preferred an alternative treatment or believes that he did not get the medical attention he desired

does not rise to the level of a constitutional violation."). As such, disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of medical intervention implicate medical judgment and do not rise to the level of a constitutional violation. *Sonds*, 151 F. Supp. 2d at 312 (citing *Estelle*, 429 U.S. at 107); *Randle*, 960 F. Supp. 2d at 481 ("[A] difference of opinion over the type or course of treatment [does] not support a claim of cruel and unusual punishment.") (internal citations and quotation marks omitted); *see, e.g.*, *Santiago v. Johnson*, No. 9:11-CV-635 (LEK/TWD), 2015 WL 9854844, at *15 (N.D.N.Y. Nov. 16, 2015) ("Not ordering physical therapy likewise implicated [the doctor's] medical judgment."), *report-recommendation adopted by* 2016 WL 225695 (N.D.N.Y. Jan. 19, 2016).

**\*10** As to the flats permit, contrary to Plaintiff's claim, Dr. Mandalaywala explains "[a]ny member of the medical staff, physician assistant or nurse, can write a medical permit if medically necessary. It does not require FHSD's input or approval." (Dkt. No. 46-9 at ¶ 18.) Dr. Mandalaywala further states, "[a]t no time did I have a conversation with [P]laintiff regarding a medical permit for a lower level cell." (*Id.* at ¶ 19.)

Further, to the extent Plaintiff's medical care at Upstate differed from that of other medical facilities, including Albany Medical and/or Wende, (*see* Dkt. Nos. 53 at ¶ 6, 53-2 at 5, 7-10), this assertion does not amount to a constitutional violation. "Physicians can and do differ as to their determination of the appropriate treatment for a particular patient; that difference in opinion does not satisfy the requirements for a constitutional claim of deliberate indifference." *Cole v. Goord*, No. 04 CIV. 8906 (GEL), 2009 WL 1181295, at *8 n.9 (S.D.N.Y. Apr. 30, 2009), *aff'd*, 379 F. App'x 28 (2d Cir. 2010); *see also Chance*, 143 F.3d at 703 ("[M]ere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment claim.") (internal citation omitted).

Even if Dr. Mandalaywala caused Plaintiff unintended harm, negligence is not actionable under Section 1983. *See Burroughs v. Petrone*, 138 F. Supp. 3d 182, 211 (N.D.N.Y. 2015) ("Deliberate indifference requires more than negligence but less than conduct undertaken for the very purpose of causing harm.") (internal quotation marks and citation omitted); *see also Daniels v. Williams*, 474 U.S. 327, 328 (1986) (holding negligence is not a cognizable claim under Section 1983); *Kucharczyk v. Westchester Cty.*, 95 F.

Supp. 3d 529, 537 (S.D.N.Y. 2015) ("[M]ere negligence is not enough to state a claim for deliberate indifference."); *Smith*, 316 F.3d at 184 ("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation.").

Lastly, to the extent Plaintiff aruges Dr. Mandalaywala's "high position of authority over the medical staff" at Upstate establishes his "knowledge" and "deliberate indifference," (*see, e.g.*, Dkt. No. 53-1 at 42), "liability ... cannot rest on *respondeat superior.*" *Richardson*, 347 F.3d at 435; *Wright*, 21 F.3d at 501. Moreover, Plaintiff's conclusory assertion that Dr. Mandalaywala, as FHSD was "fully aware" of Plaintiff's serious medical needs, including the need for speech, occupational, and physical therapies, and that he was "grossly negligent in supervising any other medical providers who have been deliberately indifferent to Plaintiff's serious medical needs" is without merit. (Dkt. No. 53-1 at 42.) As discussed above, Plaintiff was provided with reasonable medical care.

Based on the foregoing, there is no evidence in the record that Dr. Mandalaywala acted with the mental state necessary for a deliberate indifference claim and summary judgment is also warranted on this ground.

Therefore, for the reasons stated, the Court finds no reasonable factfinder could conclude Dr. Mandalaywala was deliberately indifferent to Plaintiff's serious medical needs and recommends granting summary judgment to Dr. Mandalaywala.

**\*11** Because the Court finds Plaintiff's Eighth Amendment deliberate indifference claim against Dr. Mandalaywala fails on the merits, the Court does not reach Defendants' exhaustion argument.

## C. Excessive Force Claim Against Bennett
Plaintiff alleges he was assaulted by Bennett on December 26, 2016, at Great Meadow in violation of his Eighth Amendment rights. (Dkt. No. 15 at 7-9.) Defendants seek summary judgment on the ground Plaintiff failed to exhaust his available administrative remedies before commencing this action. (Dkt. Nos. 46-2 at 16-21, 54 at 8-11.) Plaintiff counters his administrative remedies were unavailable and, alternatively, requests an exhaustion hearing. (Dkt. Nos. 53-1 at 46-51, 55 at 1, 8-13.)

### 1. Exhaustion of Administrative Remedies

Under the Prison Litigation Reform Act of 1995 ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 of this title or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion is required for "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

The failure to exhaust is an affirmative defense that must be raised by the defendants. *Jones v. Bock*, 549 U.S. 199, 218 (2007); *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004). As an affirmative defense, it is the defendants' burden to establish the plaintiff failed to meet the exhaustion requirements. *See, e.g.*, *Key v. Toussaint*, 660 F. Supp. 2d 518, 523 (S.D.N.Y. 2009) (citations omitted).

To properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular institution to which they are confined. *Jones*, 549 U.S. at 218 (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)); *see also Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (exhaustion necessitates "using all steps that the [government] agency holds out, and doing so properly").

In New York, DOCCS has a well-established three-step Inmate Grievance Program ("IGP"). 7 N.Y.C.R.R. § 701.5. First, an inmate must submit a complaint with the facility IGP clerk within twenty-one days of the alleged occurrence. *Id.* § 701.5(b). "The complaint may only be filed at the facility where the inmate is housed even if it pertains to another facility." *Id.* A representative of the facility's Inmate Grievance Resolution Committee ("IGRC") has sixteen calendar days from receipt of the grievance to informally resolve the issue. *Id.* § 701.5(b)(1). If there is no such informal resolution, the full IGRC conducts a hearing within sixteen calendar days of receipt of the grievance and issues a written decision within two working days of the conclusion of the hearing. *Id.* §§ 701.5(b)(2), (3).

Second, a grievant may appeal the IGRC's decision to the facility superintendent within seven days of receipt of the IGRC's written decision. *Id.* § 701.5(c)(1). If the grievance

involves an institutional issue (as opposed to a DOCCS-wide policy issue), the superintendent must issue a written decision within twenty calendar days of receipt of the grievant's appeal. *Id.* § 701.5(c)(3)(ii). Grievances regarding DOCCS-wide policy issues are forwarded directly to the Central Officer Review Committee ("CORC") for a decision under the process applicable to the third step. *Id.* § 701.5(c)(3)(i).

**\*12** Third, a grievant may appeal to CORC within seven working days of receipt of the superintendent's written decision. *Id.* § 701.5(d)(1)(i). CORC is to render a written decision within thirty calendar days of receipt of the appeal. *Id.* § 701.5(d)(3)(ii).

Where an inmate's grievance complains of employee harassment or other misconduct, the grievance is forwarded directly to the superintendent, bypassing the IGRC review. *Id.* §§ 701.8(b), (c). The superintendent has twenty-five days from the date of its receipt to render a decision. *Id.* § 701.8(g). An inmate may appeal the superintendent's decision to CORC within seven days of its receipt. *Id.* § 701.8(h).

As set forth above, at each step of the IGP, a decision must be rendered within a specified time period. "Where the IGRC and/or superintendent do not timely respond, an inmate must appeal to 'to the next step,' " assuming there is another step in the IGP. *Eleby v. Smith*, No. 9:15-CV-0281 (TJM/DEP), 2017 WL 986123, at \*4 (N.D.N.Y. Jan. 9, 2017) (quoting 7 N.Y.C.R.R. § 701.6(g)(2)); *see, e.g.*, *Smith v. Kelly*, 985 F. Supp. 2d 275, 281 (N.D.N.Y. 2013) ("[A]ny failure by the IGRC or the superintendent to timely respond to a grievance ... can—and must—be appealed to the next level ... to complete the grievance process.").

Generally, if a plaintiff fails to follow each of the required steps of the IGP, including receipt of a decision from CORC, prior to commencing litigation, he has failed to exhaust his administrative remedies as required under the PLRA. *See Ruggerio v. Cty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits).").

While the PLRA mandates exhaustion of administrative remedies, it also "contains its own, textual exception to mandatory exhaustion." *Ross v. Blake*, 136 S. Ct. 1850, 1857 (2016). More specifically, Section 1997e(a) provides that only those administrative remedies that "are available" must first be exhausted. 42 U.S.C. § 1997e(a); *see also Ross*, 136 S. Ct. at 1858 ("[T]he exhaustion requirement hinges on the availability of administrative remedies[.]" (quotation marks and citations omitted)). In the PLRA context, the Supreme Court has determined "availability" means "an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." *Ross*, 136 S. Ct. at 1859 (quotation marks and citations omitted).

In *Ross*, the Supreme Court identified "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." *Id.* at 1859-60. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end — with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 1859. "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* In other words, "some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id.* Third, an administrative remedy is not "available" when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860. Thus, if a plaintiff fails to exhaust his administrative remedies, the court must consider whether those remedies were, in fact, "available" to him.

### 2. Analysis

**\*13** Plaintiffs has sworn to and testified under oath that on December 27, 2016, while housed at Upstate, he submitted a grievance regarding, *inter alia*, the alleged December 26, 2016, assault at Great Meadow. (Dkt. Nos. 15 at 9, 46-5 at 106-08, 53-1 at 50-51.) Although he personally placed the grievance in the "grievance box" outside the Upstate grievance office, he never received a response. (Dkt. Nos. 15 at 9, 46-5 at 106-08, 53-1 at 50-51.) Plaintiff testified:

Q: [W]hat ... did you write in the grievance? What was your complaint that you put in there?

A: I filed in the complaint that I went [to Great Meadow] for a medical trip and the whole time I was there, I did not receive any medication, nor my diet trays, and on the date I was placed on transfer -- transit, the [correctional officers] beat me up.... And they actually physically beat me up and I ... mentioned this to C.O. Bennett and several, you know,

like the other C.O. that's John Doe and then Jane Doe and I never got a response."

(Dkt. No. 46-5 at 111.) There is no indication in the facility records that he filed a grievance or that he appealed the denial of any grievance to CORC. (*See generally* Dkt. Nos. 46-9, 46-11, 46-13.)

In support of their motion, Defendants have submitted the declarations of Sherri Debyah, the IGP Supervisor at Upstate, Alexandria Mead, the IGP Supervisor at Great Meadow, and Rachel Seguin, the Assistant Director of IGP for DOCCS. (*See* Dkt. Nos. 46-9 at ¶¶ 1-3, 46-11 at ¶¶ 1-3, 46-13 at ¶¶ 1-3.) Supervisors Debyah and Mead explain that "[t]o start the grievance process, the inmate sends a written complaint to the grievance office at [the facility]. A complaint may be written on a grievance form that is made available to inmates [at the facility] or on regular paper. Grievance complaints may be filed in the facility at which the inmate is housed even if the complaint pertains to another facility." (Dkt. Nos. 46-9 at ¶ 5, 46-11 at ¶ 5.)

They further state:

"Once the complaint is determined to be a timely grievance, it is logged, coded, and titled. An investigative request is sent in order to investigate the inmate's claims. After the investigative report is returned, a grievance hearing is conducted by the IGRC. ...

An expedited procedure is used when an inmate files a grievance alleging harassment or assault by staff. ... [T]he Superintendent will arrange for an appropriate investigation and render a decision on that investigation. Upon issuance of the Superintendent's response, an inmate who is not satisfied can appeal to [CORC], the third and final step under DOCCS' [IGP].

(Dkt. Nos. 46-9 at ¶ 5, 46-11 at ¶ 5.) According to Supervisor Debyah:

The grievance process is available to inmates to grieve incidents involving DOCCS staff, whether the incident took place at the inmate's facility or at any outside location. When an inmate housed at Upstate complains of an incident involving DOCCS staff that took place while at an outside

location, such as at a different DOCCS facility, the Upstate grievance office will accept the grievance, process it as usual, and maintain all records related to the grievance.

(*Id.* at ¶ 13.) She states that all documents related to a particular grievance, including the grievance itself, the investigations, and appeals, are stored in the Upstate grievance office as they are created or received. (Dkt. No. 46-9 at ¶ 9. [10])

[10] "The Upstate grievance office keeps all documents for grievances filed in the current year and in the previous four (4) calendar years – thus, our office has on file all grievances filed in Upstate from January 1, 2015 to the present. (Dkt. No. 46-9 at ¶ 9.) The same is true for Great Meadow. (*See* Dkt. No. 46-11 at ¶ 9.)

**\*14** Plaintiff was incarcerated at Upstate from March 7, 2016, until January 17, 2019. (*Id.* at ¶ 11.) Supervisor Debyah states that if Plaintiff filed a grievance at Upstate, there would be a record of the grievance in the files, maintained in the grievance office. (*Id.* at ¶ 10.) Based on her search, there is no record of any grievance filed by Plaintiff with respect to the alleged December 26, 2016, assault at Great Meadow and conditions of his confinement. (Dkt. No. 46-9 at ¶¶ 1, 14, 15. [11])

[11] While not relevant to Plaintiff's excessive force claim against Bennett, on November 14, 2016, Plaintiff filed Grievance UST-59609-16, entitled "Denied Medical Treatment" which he appealed to CORC on February 1, 2017. (Dkt. Nos. 46-10 at 2, 46-15 at 3.) The parties dispute whether Grievance UST-59609-16 exhausted Plaintiff's medical indifference claim against Dr. Mandalaywala. (Dkt. Nos. 46-2 at 16-21, 53-1 at 46-51, 54 at 8-10, 55 at 8-12.) Inasmuch as the Court finds Dr. Mandalaywala was not deliberately indifferent, the Court did not reach Defendants' exhaustion argument. Plaintiff also filed two unrelated grievances at Upstate, Grievance UST-58085-16 entitled "Property Destroyed" on April 27, 2016, and Grievance UST-60681-17

entitled "Not Receiving All Items on Menu" on March 28, 2017. (Dkt. No. 46-10 at 2.)

Similarly, Supervisor Mead states that all documents related to a particular grievance, including the grievance itself, the investigations, and appeals, are stored in the Great Meadow grievance office as they are created or received. (Dkt. No. 46-11 at ¶ 9.) Plaintiff was temporarily incarcerated at Great Meadow from December 13, 2016, until December 27, 2016. (*Id.* at ¶ 10.) Supervisor Mead states that if Plaintiff filed a grievance while incarcerated at Great Meadow, there would be a record of this in the files maintained at the Great Meadow grievance office. (*Id.* at ¶ 11.) According to Supervisor Mead:

> if an inmate housed at a different facility complains of an incident that had taken place at Great Meadow, the grievance office at his facility at the time of filing will accept the grievance and process it as usual.

(*Id.* at ¶ 12.) Thus, if Plaintiff filed a grievance at Upstate concerning the alleged December 26, 2016, assault at Great Meadow, "there would be a record of it in the files maintained at the Upstate grievance office. The records would not be on file at the Great Meadow grievance office." (*Id.* at ¶¶ 13-14.) Nevertheless, Supervisor Mead searched the records and states Plaintiff has not filed any grievances at Great Meadow. (*Id.* at ¶ 15.)

Assistant Director Seguin states both Upstate and Great Meadow have fully functioning IGPs available to inmates and that inmates have full access to CORC by which to appeal from a facility-level grievance determination. (Dkt. No. 46-13 at ¶¶ 11-12.) She explains that when an inmate appeals to CORC, it is DOCCS policy to maintain records of these appeals for at least four years, and in accordance with that policy, the CORC database contains records of appeals of IGP grievances, including those reviewed under the expedited procedure described above. (*Id.* at ¶ 8.) Assistant Director Seguin conducted a search of the database and found Plaintiff appealed two grievances to CORC, neither of which relate to the alleged December 26, 2016, incident at Great Meadow. (*Id.* at ¶¶ 13-14.) As noted above, Grievance UST-58085-16 entitled "Property Destroyed" was received by CORC on June 28, 2016, and Grievance UST-59609-16 entitled "Denied Medical Treatment" was received by CORC on February 1, 2017. (Dkt. No. 46-15 at 3.)

**\*15** Based on the foregoing, the Court finds Defendants have satisfied their burden of showing Plaintiff failed to exhaust his administrative remedies with respect to the alleged assault. "[O]nce a defendant has adduced reliable evidence that administrative remedies were available to the plaintiff and that the plaintiff nevertheless failed to exhaust those administrative remedies, the plaintiff must then 'counter' the defendant's assertion by persuading the Court of either exhaustion or unavailability." *Adams v. O'Hara*, No. 16-CV-527 (GTS/ATB), 2019 WL 652409, at \*4 (N.D.N.Y. Feb. 15, 2019). Plaintiff advances several arguments for finding unavailability and, alternatively, requests an exhaustion hearing. (Dkt. Nos. 15 at 9, 53-1 at 1, 46-48, 55 at 1, 8-13.)

Here, while it is undisputed Plaintiff never appealed the grievance "to the next step," whether his administrative remedies were available requires closer examination. In *Williams v. Priatno*, 829 F.3d 118, 123-27 (2d Cir. 2016), the Second Circuit considered whether administrative remedies had been "actually available" to an inmate-plaintiff under *Ross*, after the district court granted the defendants' motion to dismiss for failure to exhaust. There, the plaintiff alleged that, while housed in the special housing unit ("SHU"), he drafted a grievance that he delivered to a corrections officer to forward to the grievance office on his behalf. *Id.* at 120-21. Approximately two weeks later, the plaintiff was transferred to a different facility. *Id.* at 121. He never received a response to his grievance and alleged that it was never filed by the officer to whom he had given it. It was undisputed the plaintiff never appealed the grievance. *Id.*

The defendants in *Williams* argued that even if the grievance was never filed, the plaintiff was required to appeal it "to the next step" and complete the grievance process. *Id.* at 124 (quoting 7 N.Y.C.R.R. § 701.6(g)(2)). The Second Circuit rejected this argument and held that, for an inmate in the plaintiff's situation, the regulatory scheme was so "opaque" and "confusing" as to be practically unavailable. *Id.* The Second Circuit found that DOCCS regulations "only contemplate appeals of grievances that [have been] actually filed ... [and] give no guidance whatsoever to an inmate whose grievance was never filed." *Id.* [12]

[12]    This summary of *Williams* tracks that of Magistrate Judge Baxter in *Means v. Olmstead*, No. 9:17-CV-746 (BKS/ATB), 2019 WL 4395289, at \*4 (N.D.N.Y. June 3, 2019), *report-recommendation*

*adopted by* 2019 WL 3451127 (N.D.N.Y. July 31, 2019), which in turns tracks that of Magistrate Judge Stewart in *Berman v. Durkin*, No. 9:13-CV-136 (LEK/DJS), 2017 WL 1215814, at *8 (N.D.N.Y. Mar. 10, 2017), *report-recommendation adopted by* 2017 WL 1207834 (N.D.N.Y. Mar. 31, 2017).

Following the Second Circuit's decision in *Williams*, several courts—including this Court—have concluded that where a grievance is both *unfiled* and *unanswered*, the "process to appeal ... is prohibitively opaque, such that no inmate could actually make use of it." *Williams*, 829 F.3d at 126; *see Britt v. Carberry*, No. 17-CV-0234 (MAD/DEP), 2019 WL 3365766, at *8 (N.D.N.Y. Mar. 22, 2019) (collecting cases), *report-recommendation adopted by* 2019 WL 2437912 (N.D.N.Y. June 11, 2019); *see, e.g., Hurst v. Mollnow*, No. 16-CV-1062 (DNH/TWD), 2018 WL 4178226, at *10 (N.D.N.Y. July 20, 2018) ("Therefore, '[a]s long as [the plaintiff's] grievances were not actually filed, then [the plaintiff's] current situation falls squarely within the Second Circuit's decision in *Williams*[.]' ") (quoting *Juarbe v. Carnegie*, No. 9:15-CV-1485 (MAD/DEP), 2016 WL 8732798, at *6 (N.D.N.Y. Oct. 7, 2016)), *report-recommendation adopted by* 2018 WL 4153926 (N.D.N.Y. Aug. 30, 2018); *Berman v. Drunkin*, 2017 WL 1215814, at *8 ("*Williams* holds that 'the process to appeal an unfiled and unanswered grievance is prohibitively opaque, such that no inmate could actually make use of it.' "), *report-recommendation adopted by* 2017 WL 1207834 (N.D.N.Y. Mar. 31, 2017); *Juarbe v. Carnegie*, 2016 WL 8732798, at *6 (explaining that *Williams* appears to draw a distinction between an "unfiled and unanswered" grievance and a simply "unanswered grievance," insofar as the regulations provide that an inmate may appeal an unanswered grievance), *report-recommendation adopted by* 2016 WL 6901277 (N.D.N.Y. Nov. 23, 2016); *cf. Cicio v. Wenderlich*, No. 13-CV-195S, 2017 WL 1437206, at *5-6 (W.D.N.Y. Apr. 24, 2017) (granting summary judgment against plaintiff for failure to exhaust when he failed to appeal a grievance for which he received a receipt confirming the grievance was it was filed, but for which he never received a response), *aff'd*, 714 F. App'x 96, 97 (2d Cir. 2018) (affirming grant of summary judgment, and distinguishing *Williams*, which found the DOCCS grievance process "unavailable" when an inmate's grievance was never filed); *see also Coleman v. Racette*, No. 9:15-CV-40 (TJM/ATB), 2017 WL 2579084, at *5 (N.D.N.Y. Jan. 17, 2017) ("The court notes, however, that if a grievance is lost or destroyed before it is received by the IGRC and assigned a number, it would be difficult to 'appeal' a grievance 'to the next step.' "), *report-*

*recommendation adopted by* 2017 WL 2589366 (N.D.N.Y. June 14, 2017).

**\*16** However, *Williams* has also been distinguished in cases in which the plaintiff claimed to have filed a grievance where, *inter alia*, the inmate was not segregated from the population and had access to the grievance office. *See, e.g., Means v. Olmstead*, 2019 WL 4395289, at *6 (finding remedies available despite the inmate's contention that he filed a grievance where, *inter alia*, the plaintiff was not hampered by confinement in the SHU, nor was he transferred shortly after the incident, and testified that he dropped the grievance in the "box" himself) (citing *Davis v. Grant*, No. 9:15-CV-5359, 2019 WL 498277, at *10 (S.D.N.Y. Feb. 8, 2019)); *Blake v. Porlier*, No. 9:18-CV-1008 (DNH/CFH), 2019 WL 7484052, at *7 (N.D.N.Y. Oct. 4, 2019) ("Because plaintiff successfully utilized the grievance system for unrelated issues, makes no allegation that he was in restrictive housing at the time he attempted to file the alleged grievance, and makes no indication that he attempted to follow up with his alleged grievance, ... administrative remedies were available to the plaintiff."), *report-recommendation adopted by* 2020 WL 58613 (N.D.N.Y. Jan. 6, 2020).

For example, "[i]n *Davis*, the court found that '[p]laintiff's bare assertions that he submitted grievances but never received a response fall squarely into the category of assertions that courts in the Second Circuit have found do not excuse the exhaustion requirement.' " *Means*, 2019 WL 4395289, at *7. Thus, an "unsupported assertion" the plaintiff "filed a grievance but that it was somehow lost or destroyed is insufficient to establish a genuine issue of fact." *Id.* (collecting cases),[13] *see, e.g., Blake*, 2019 WL 7484052, at *5 ("Courts within the Second Circuit have continuously held that 'mere contentions or speculation of grievances being misplaced by officers do not create a genuine issue of material fact when there is no evidence to support the allegations.' ") (quoting *Rodriguez v. Cross*, No. 9:15-CV-1079 (GTS/CFH), 2019 WL 7484082, at *5 (N.D.N.Y. May 9, 2017) (citing *Khudan v. Lee*, No. 12-CV-8147(RJS), 2016 WL 4735364, at *6 (S.D.N.Y. Sept. 8, 2016)) (citations omitted) (holding under *Ross* mere standalone contentions of mail tampering without support and particularity cannot deem administrative remedies unavailable); *Veloz v. New York*, 339 F. Supp. 2d 505, 516 (S.D.N.Y. 2004) (finding remedies available where the plaintiff claimed officers misplaced his grievances, but offered no evidence to support his claim)); *see also Artis v. Dishaw*, No. 9:14-CV-1116 (MAD/ATB), 2016 WL 11266599, at *7 n.13 (N.D.N.Y. Sept. 12, 2016) (finding

the plaintiff's failure to exhaust was not excusable, in part, because while the plaintiff "state[d] that some grievances were destroyed ... he ha[d] not submitted any copies of these grievances, nor d[id] he specify when he attempted to file them"), *report-recommendation adopted by* 2017 WL 1076343 (N.D.N.Y. Mar. 22, 2019); *see also Engles v. Jones*, No. 6:13-CV-6461 (EAW), 2018 WL 6832085, at *10 (W.D.N.Y. Dec. 28, 2018) ("Plaintiff's unsupported assertion that he filed a grievance but that it was somehow lost or destroyed is insufficient to establish a genuine issue of material fact.") (citing *Scott v. Kastner Smith*, 298 F. Supp. 3d 545, 555 (W.D.N.Y. 2018)).

13    In adopting the report-recommendation in *Means, supra*, and finding administrative remedies available, the District Court found the plaintiff's conclusory assertions, raised for the first time in his objections to the report-recommendation, that (1) prison officials "thwarted" his attempt to exhaust his grievance "through machination, misrepresentation and intimidation"; (2) he "was told that there was no record" of his grievance when he inquired about it; and (3) when he "attempted to re-submit his Grievance he was told that his time had run out" were based on factual assertions nowhere in the record, including the plaintiff's deposition, opposition to the motion to dismiss, and opposition to the motion for summary judgment. *Means*, 2019 WL 3451127, at *1.

*17    Returning to the case at hand, the Court finds the record, viewed in the light most favorable to Plaintiff, suggests Plaintiff's grievance was *unfiled* and *unanswered*, creating an issue of fact as to the availability of administrative remedies under *Williams*. In so finding, the Court has considered Defendants' arguments and, although Plaintiff does not have a copy of the grievance, was not confined in the SHU, and has not submitted any contemporaneous correspondence inquiring about the status of his grievance, 14 Plaintiff testified that he submitted a handwritten grievance on personal plain paper (because Upstate is "very very strict of not giving you the grievance forms" and he had "no carbon paper, no copy machine") by personally placing the grievance in the "grievance box" on the wall in front of the Upstate grievance office on December 27, 2016. (Dkt. No. 46-5 at 106-07.) Plaintiff submits he verbally followed up with the Upstate grievance office and the IGRC representatives "informed" Plaintiff that it was "[o]ut of our hands[,] explaining that the grievance was sent to

Great Meadow." (Dkt. No. 53-1 at 51.) Similarly, Plaintiff testified, in sum and substance, that when he "approached" the grievance office and asked them "what's been going on with the grievance to Great Meadow, Plaintiff was told by Supervisor Debyah that it had been "mail[ed] directly" to Great Meadow because it pertained to that facility. (Dkt. No. 46-5 at 109-10.) In particular, Plaintiff testified as follows:

> Q: [Supervisor Debyah] told you, as well as the inmate, that when you file a grievance at Upstate related to something at another facility –
>
> A: They mail –
>
> Q: -- they told you they send it directly to them?
>
> A: -- they mail it direct to them.
>
> Q: Okay. Did they acknowledge receipt of your grievance, though? Did they tell you hey, we received your grievance and we sent it on?
>
> A: Yes. She told me that they – they received it and they sent it immediately to Great Meadow Correctional Facility.

(*Id.* at 110.) For her part, Supervisor Debyah flatly denies having had a conversation with Plaintiff wherein she told him his grievance was mailed to Great Meadow. (Dkt. No. 46-9 at ¶ 15.) She states, under oath, "I never told [P]laintiff that his grievance was mailed to Great Meadow, as that would not have been the procedure." (*Id.* at ¶ 16.) According to Supervisor Debyah:

> "If [P]laintiff had filed such a grievance, it would have been entered and processed at Upstate, in accordance with the procedure outlined above, and all records would be available at Upstate. The grievance would not be mailed to Great Meadow for processing. There is no record that [P]laintiff ever filed such a grievance.
>
> In any event, I did not have any conversation with [P]laintiff regarding his claimed grievance. Plaintiff would not have been in a position to speak to me, as he now claims.

(*Id.* at ¶¶ 15, 17.) In his sur-reply, Plaintiff explains that because he worked in the law library at Upstate, he was in a unique position to interact with the grievance office, including Supervisor Debyah. (Dkt. No. 56 at 9.) "So [Supervisor] Debyah saw the Plaintiff on several occasions and spoke to Plaintiff. Every time the Plaintiff would ask her or any member of the [IGRC] any information pursuant the

grievance at Great Meadow, the Plaintiff would just be given the 'run around.' " (*Id.*) Moreover, Plaintiff testified "he never got a grievance number or anything" and argues "[t]here is no way to send in a grievance to the CORC without any prior decision on that grievance." (Dkt. Nos. 46-5 at 123; 53-1 at 51.)

14      As Defendants correctly point out, the only documentation submitted by Plaintiff on this issue are letters and a FOIL request from September and December 2018, nearly two years after he claims to have filed the grievance, and written only *after* Defendants made a motion to dismiss on the ground of failure to exhaust administrative remedies in this action. (Dkt. No. 54 at 8; *see* Dkt. No. 53-1 at 20-23.)

In light of the foregoing, the Court finds Plaintiff has raised a material issue of fact as to the availability regarding his purported *unfiled* and *unanswered* grievance under *Ross* and *Williams*. *See, e.g.*, *Adams v. O'Hara*, 2019 WL 652409, at *3 ("It is important to note that, where an inmate does not know that an unprocessed grievance (i.e., a grievance that has not been assigned a grievance number) may technically be appealed, he need not appeal that unprocessed grievance, because the regulatory scheme advising him of that right is too opaque.") (citing *Williams*, 829 F.3d at 126 ("Even if Williams technically could have appealed his [unprocessed] grievance, we conclude that the regulatory scheme providing for that appeal is 'so opaque' and 'so confusing that ... no reasonable prisoner can use' [it pursuant to *Ross*]")).

 *18   However, to the extent Plaintiff raises general complaints about how the IGP process "is truly flawed" and that inmates "are thwarted, misrepresented and lied to" and subjected to "intimidation," (Dkt. Nos. 53-1 at 1, 55 at 1), such bare assertions do not excuse exhaustion requirements. *Rodriguez v. Cross*, 2017 WL 2791063, at *7-9. Further, to the extent Plaintiff argues "special circumstances" should be taken into consideration, particularly his stroke, (*see* Dkt. No. 55 at 9-10), "that avenue has been foreclosed." *Riles v. Buchanan*, 656 F. App'x 577, 581 (2d Cir. 2016) (summary order). In *Ross*, the Supreme Court held "[c]ourts may not engraft an unwritten 'special circumstances exception' onto the PLRA's exhaustion requirement." *Ross*, 136 S. Ct. at 1862; *accord Williams*, 829 F.3d at 123.

Therefore, for the reasons stated above, the Court recommends denying Defendants' motion for summary judgment on this ground without prejudice and that an

exhaustion hearing be held prior to the trial on Plaintiff's Eighth Amendment excessive force claim against Bennett.

### D. Superintendent of Great Meadow

Defendants contend the Superintendent of Great Meadow is no longer a proper party to this action. (Dkt. No. 46-2 at 15-16.) The Court agrees.

As set forth above, on initial review, the District Court concluded the second amended complaint failed to establish Miller's personal involvement. (Dkt. No. 17.) In an effort to assist Plaintiff in identifying the Doe Defendants, the District Court subsequently issued an Order adding the Superintendent of Great Meadow as a named defendant "**for service and discovery purposes only**." (Dkt. No. 26 at 3 (emphasis in original).) The District Court indicated the Superintendent of Great Meadow would remain as a defendant "until plaintiff has been afforded an opportunity to conduct discovery related to the identity of the Doe defendants." (*Id.* at 4 n.2.)

Miller, the Superintendent of Great Meadow, filed an answer denying any wrong and noted that he was named as a party solely for purposes of service and discovery. (Dkt. No. 35.) The Court then issued an Order setting case management deadlines, including a February 22, 2019, deadline for amendment of pleadings and an April 22, 2019, deadline for completion of discovery. (Dkt. No. 36.) Defendants provided mandatory initial disclosures to Plaintiff on December 18, 2018. (Dkt. No. 40.)

In his response, Plaintiff acknowledges Defendants provided him with the relevant log-book entry for the alleged December 26, 2016, incident. (Dkt. No. 53-1 at 44.) However, Plaintiff raised no issues concerning discovery in this case and never filed a motion to compel discovery. (*See generally* Docket Report; *see also* Dkt. No. 54-2.) Plaintiff admits he has not identified the Doe Defendants and never filed a motion to amend. (Dkt. No. 53-1 at 44.) In sum, all pretrial deadlines have expired without any of the Doe Defendants having been identified by Plaintiff. Therefore, the Court finds the Superintendent of Great Meadow's presence in this lawsuit for discovery purposes is no longer needed. *See, e.g.*, *Reed v. Doe*, No. 9:11-CV-250 (TJM/DEP), 2015 WL 902795, at *5 (N.D.N.Y. Mar. 3, 2015) (granting the defendants' motion for summary judgment and dismissing the Superintendent of Eastern Correctional Facility, who was added as a party solely for discovery purposes, following plaintiff's failure to identify the Doe defendants).

Although Plaintiff had a lengthy period of time during which discovery was available to assist him in identifying the Doe Defendants, only now, in opposition to Defendants' motion, and well after the discovery deadline expired, does Plaintiff request the Great Meadow "log-book" entries for December 12 through December 25, 2016. (*See* Dkt. No. 53-2 at 44.) As Defendants point out, if Plaintiff wanted copies of Great Meadow's log-book entries for thirteen additional days, as he now claims, he had four months to request same, but he failed to serve Defendants with *any* discovery requests. (Dkt. No. 54 at 7.) Thus, the Court finds Plaintiff has in fact, "been afforded an opportunity to conduct discovery related to the identity of the Doe defendants." (Dkt. No. 26 at 4 n.2; *see, e.g.*, Dkt. Nos. 23, 35, 36, 39, 40, 46-5, 54-2.)

*19  Lastly, Plaintiff's contention that the Superintendent of Great Meadow should not be terminated as a Defendant because he is the "overseer" of the facility, which, among other things "establishes" his personal "involvement" in this action, (*see* Dkt. No. 53-1 at 45), is without merit. (*See* Dkt. No. 17 at 9-1.) If the defendant is a supervisory official, like the Superintendent of Great Meadow, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of respondeat superior) is insufficient to show his or her personal involvement in that unlawful conduct. *See Polk Cty. v. Dodson*, 454 U.S. 312, 325 (1981); *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003). In other words, supervisory officials may not be held liable merely because they held a position of authority. *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996). In this case, the District Court took pains to emphasize the Superintendent of Great Meadow was "named as a defendant **for service and discovery purposes only**. By doing so, the Court does not suggest in any way that the Superintendent of Great Meadow Correctional Facility was personally involved in the Eighth Amendment claims asserted against the Doe defendants." (Dkt. No. 26 at 4 (emphasis in original); *see also* Dkt. No. 17 at 9-11.)

Accordingly, for these reasons, the Court recommends granting Defendants' motion as to the Superintendent of Great Meadow.

## V. CONCLUSION

For the reasons stated above, the Court recommends that Defendants' motion for summary judgment (Dkt. No. 46) be granted in part and denied in part without prejudice. If the above recommendations are accepted, only Plaintiff's Eighth Amendment excessive force claim against Bennett remains for trial. However, the Court recommends that an exhaustion hearing be held prior to the trial.

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Defendant's motion for summary judgment (Dkt. No. 46) be **GRANTED** as to Dr. Mandalaywala and the Superintendent of Great Meadow; and **DENIED without prejudice** as to Bennett; and it is further

**RECOMMENDED** that an exhaustion hearing be held prior to the trial on Plaintiff's Eighth Amendment excessive force claim against Bennet; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2008) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. [15] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) (per curiam)); 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).

[15]  If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

**All Citations**

Slip Copy, 2020 WL 1159426

**Maldonado v. Mandalaywala, Slip Copy (2020)**
2020 WL 1159426

End of Document                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 1157643
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Shain MALDONADO, Plaintiff,
v.
Vijaykumar S. MANDALAYWALA,
et al., Defendants.

9:17-cv-1303 (BKS/TWD)
|
Signed 03/10/2020

**Attorneys and Law Firms**

Plaintiff, pro se: Shain Maldonado, 15-B-2138, Wende
Correctional Facility, P.O. Box 1187, Alden, NY 14004.

For Defendants: Letitia James, Attorney General of the State
of New York, Keith J. Starlin, Assistant Attorney General, of
Counsel, The Capitol, Albany, NY 12224.

**MEMORANDUM-DECISION AND ORDER**

Hon. Brenda K. Sannes, United States District Judge:

 **\*1** Plaintiff Shain Maldonado, a New York State inmate,
commenced this civil rights action asserting claims under
42 U.S.C. § 1983 arising out of his incarceration. (Dkt.
No. 15). On July 11, 2019, Defendants filed a motion
for summary judgment. (Dkt. No. 46). The motion was
fully briefed, with a response filed by Plaintiff and a
reply filed by Defendants. (Dkt. Nos. 53, 54). This matter
was referred to United States Magistrate Judge Thérèse
Wiley Dancks who, on February 12, 2020, issued a Report-
Recommendation recommending that Defendants' motion
for summary judgment be granted as to Dr. Vijaykumar
Mandalaywala and the Superintendent of Great Meadow
and denied, without prejudice, as to D. Bennett. (Dkt. No.
58). With respect to D. Bennett, Magistrate Judge Dancks
recommended denying the motion for summary judgment
based on a failure to exhaust administrative remedies because
Plaintiff raised a material issue of fact as to the availability

of administrative remedies under *Williams v. Priatno*, 829
F.3d 118 (2d Cir. 2015). Magistrate Judge Dancks advised the
parties that under 28 U.S.C. § 636(b)(1), they had fourteen
days within which to file written objections to the report, and
that the failure to object to the report within fourteen days
would preclude appellate review. (Dkt. No. 58, at 39).

No objections to the Report-Recommendation have been
filed. As the time for filing objections has expired, the
Court reviews the Report-Recommendation for clear error.
*See Petersen v. Astrue*, 2 F. Supp. 3d 223, 228–29 (N.D.N.Y.
2012); Fed. R. Civ. P. 72(b) advisory committee's note to 1983
amendment. Having reviewed the Report-Recommendation
for clear error and found none, the Court adopts the Report-
Recommendation in its entirety.

For these reasons, it is

**ORDERED** that the Report-Recommendation (Dkt. No. 58)
is **ADOPTED** in its entirety; and it is further

**ORDERED** that Defendants' motion for summary judgment
(Dkt. No. 46) is **GRANTED IN PART** and **DENIED IN
PART**; and it is further

**ORDERED** that Defendants' motion for summary judgment
is **GRANTED** as to Defendants Mandalaywala and the
Superintendent of Great Meadow, and they are **DISMISSED**
from this action; and it is further

**ORDERED** that Defendants' motion for summary judgment
is **DENIED without prejudice** as to D. Bennett, and an
exhaustion hearing will be scheduled on Plaintiff's Eighth
Amendment excessive force claim against D. Bennett; and it
is further

**ORDERED** that the Clerk serve a copy of this Order upon
the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2020 WL 1157643

---

**End of Document**                         © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Britt v. Carberry, Not Reported in Fed. Supp. (2019)

2019 WL 3365766

2019 WL 3365766
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Troy BRITT, Plaintiff,

v.

Anne CARBERRY, et al., Defendants.

Civil Action No. 9:17-CV-0234 (MAD/DEP)
|
Signed 03/22/2019

**Attorneys and Law Firms**

FOR PLAINTIFF: TROY BRITT, Pro Se, 781 E. 135th Street, Bronx, NY 10454.

FOR DEFENDANTS: HON. LETITIA JAMES, New York State Attorney General, OF COUNSEL: KYLE W. STURGESS, ESQ., Assistant Attorney General, The Capitol, Albany, NY 12224.

REPORT AND RECOMMENDATION

DAVID E. PEEBLES, CHIEF U.S. MAGISTRATE JUDGE

**\*1** This is a civil rights action brought by *pro se* plaintiff Troy Britt, a former New York State prison inmate, against several individuals employed by the New York State Department of Corrections and Community Supervision ("DOCCS"), pursuant to 42 U.S.C. § 1983. As narrowed by a series of decisions of this court, plaintiff's claims include his assertion that certain medical personnel were deliberately indifferent to his serious medical needs, in violation of his Eighth Amendment rights, while other corrections personnel violated his due process rights under the Fourteenth Amendment in connection with a disciplinary hearing held in July of 2016.

Now that discovery is complete, defendants have moved for the entry of summary judgment dismissing plaintiff's remaining causes of action, both on the merits and, in connection with his medical indifference claims, based upon his alleged failure to exhaust available remedies before commencing suit. For the reasons set forth below, I recommend that defendants' motion be granted.

I. BACKGROUND [1]

[1] Defendants' motion papers properly included a statement of undisputed material facts, as required under Local 7.1(a)(3) of this court. Dkt. No. 73-1. In his opposition papers, plaintiff failed to respond to defendants' statement.

By its terms, Local Rule 7.1 provides, in part, that "[t]he Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." N.D.N.Y. L.R. 7.1(a)(3) (emphasis in original). Courts in this district have routinely enforced this rule in cases involving a non-moving party's failure to properly respond to a Local Rule 7.1(a)(3) Statement. *See, e.g., Elgamil v. Syracuse Univ.*, No. 99-CV-0611, 2000 WL 1264122, at \*1 (N.D.N.Y. Aug. 22, 2010) (McCurn, J.) (listing cases).

*Pro se* litigants are undeniably entitled to some measure of deference when defending against summary judgment motions. *Jemzura v. Public Serv. Comm'n*, 961 F. Supp. 406, 415 (N.D.N.Y. 1997) (McAvoy, J.). That deference, however, does not extend to relieving *pro se* plaintiffs of the ramifications associated with the failure to comply with the court's local rules. *Robinson v. Delgado*, No. 96-CV-0169, 1998 WL 278264, at \*2 (N.D.N.Y. May 22, 1998) (Pooler, J., *adopting report and recommendation by* Hurd, M.J.). Stated differently, "a pro se litigant is not relieved of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Latouche v. Tompkins*, No. 09-CV-0308, 2011 WL 1103045, at \*1 (N.D.N.Y. Mar. 23, 2011) (Mordue, J.).

Plaintiff was expressly warned twice regarding the consequences of a failure to properly respond to defendants' Local Rule 7.1(a)(3) Statement. Dkt. No. 73 at 3; Dkt. No. 76 at 1. Based upon plaintiff's response in opposition to defendants' motion— which either consents to defendants' Local Rule 7.1(a)(3) Statement or simply fails to respond to it—I will deem the facts contained in defendants' Local Rule 7.1(a)(3) Statement as having been admitted to the extent they are supported by accurate record citations. *See, e.g., Latouche v. Tompkins*, No. 09-CV-0308, 2011 WL 1103045, at \*1 (N.D.N.Y. Mar. 23, 2011) (Mordue, J.); *see also Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).

Case 9:19-cv-00427-DNH-TWD    Document 62    Filed 12/17/21    Page 125 of 193

Britt v. Carberry, Not Reported in Fed. Supp. (2019)

2019 WL 3365766

As to any facts not contained in defendants' Local Rule 7.1(a)(3) Statement, in light of the procedural posture of this case, the court is "required to resolve all ambiguities and draw all permissible factual inferences" in favor of plaintiff. *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir. 2003).

**\*2** Prior to December 2016, plaintiff was held in the custody of the DOCCS. *See generally* Dkt. No. 73-2 at 145-49. Although he was confined to several different facilities during his incarceration, at the times relevant to his claims, plaintiff was housed at the Ogdensburg Correctional Facility ("Ogdensburg"), located in Ogdensburg, New York, the Riverview Correctional Facility ("Riverview"), also located in Ogdensburg, New York, or Upstate Correctional Facility ("Upstate"), located in Malone, New York. *Id.* at 148-49.

A. Plaintiff's Medical Treatment

On February 20, 2015, plaintiff was transferred to Ogdensburg. Dkt. No. 73-2 at 57, 148. Upon his intake at that facility, plaintiff was evaluated by medical staff who documented his medical history, including a history of chronically low blood platelets requiring periodic blood work, and his vital signs. Dkt. No. 74-1 at 33. At that time, plaintiff was not experiencing any symptoms consistent with cellulitis. [2] Dkt. No. 73-2 at 136.

[2]    "Cellulitis is 'an acute, diffuse, spreading edematous, suppurative inflammation of the deep subcutaneous tissues, and sometimes muscle, sometimes with abscess formation.' " *Nelson v. Dougherty,* No. 10-CV-1568, 2012 WL 4026682, at \*1 (N.D.N.Y. Aug. 13, 2012) (quoting DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 330 (31st ed. 2007)).

On July 30, 2015, plaintiff requested that he be seen at emergency sick call due to redness and itchiness in his lower right leg. Dkt. No. 73-2 at 131-32; Dkt. No. 74 at 2; Dkt. No. 74-1 at 30. Plaintiff was examined by defendant Dr. Mark Chalom ("Dr. Chalom"), a physician at Ogdensburg, who believed that his complaints were likely due to cellulitis. Dkt. No. 73-2 at 132; Dkt. No. 74 at 2-3; Dkt. No. 74-1 at 30. Dr. Chalom prescribed plaintiff a ten-day course of Bactrim, noted that he had easy access to hydrocortisone cream, and directed him to follow up in two weeks for a reassessment. Dkt. No. 74 at 3; *see also* Dkt. No. 74-1 at 30; *see also* Dkt. No. 50 at 10.

Plaintiff, however, did not follow up again until January 26, 2016, when he presented to sick call complaining of pain, warmth, and redness in his right leg. Dkt. No. 74 at 3; Dkt. No. 74-1 at 28. At that time, plaintiff did not appear to be in significant distress, and his vital signs were noted to be within normal ranges. Dkt. No. 74 at 3; Dkt. No. 74-1 at 28. On this occasion, Dr. Chalom prescribed plaintiff a course of doxycycline. Dkt. No. 74 at 3; Dkt. No. 74-1 at 28.

In a declaration submitted in support of defendants' motion, Dr. Chalom states that he did not provide any further medical treatment to plaintiff; a claim that is supported by plaintiff's ambulatory health records ("AHR"). Dkt. No. 74 at 3-4; *see generally* Dkt. No. 74-1. At various times during this action, plaintiff has suggested that Dr. Chalom provided additional treatment to him in July of 2016. *See, e.g.,* Dkt. No. 73-2 at 86; Dkt. No. 77 at 4 ("Dr. Chalom ... failed to still treat the [c]ellulitis-like infection."). During his deposition, however, plaintiff clarified that Dr. Chalom did not provide any further medical treatment following the January 26, 2016 sick call, but instead testified that Dr. Chalom visited him at Riverview in July of 2016 to discuss his cellulitis. *Compare* Dkt. No. 73-2 at 86 ("[Dr. Chalom] visited me at Riverview in the isolation room."), 137 *with* Dkt. No. 74 at 4 (observing that plaintiff received treated from Dr. Seidman upon intake at Riverview). Accordingly, Dr. Chalom's treatment of plaintiff's complaints is limited to the July 30, 2015 and January 26, 2016 sick calls.

B. The June 29, 2016 Incident

**\*3** On June 29, 2016, plaintiff requested emergency sick call through his dormitory officer, and he was taken to the infirmary. Dkt. No. 73-2 at 74. Plaintiff claimed that he went to "use the bathroom and felt light headed and passed out," slumping against a nearby wall for approximately thirty seconds. Dkt. No. 73-7 at 18; *see also* Dkt. No. 73-2 at 73-76. Plaintiff was examined by defendant Terri Penn ("Nurse Penn"), a registered nurse employed by the DOCCS and stationed at Ogdensburg, who documented plaintiff's injuries, including a right eyebrow laceration, scratched elbow, and a patch of inflamed, warm red skin on his lower right leg, the latter of which she believed to be consistent with cellulitis. Dkt. No. 73-7 at 18, 20-25; *see* Dkt. No. 73-9 at 3.

Plaintiff was then interviewed by Sergeant Costello ("Sgt. Costello"), who concluded that plaintiff's injuries, as well as the evasive answers he provided under questioning, were consistent with his having been involved in an altercation. Dkt. No. 73-7 at 3, 13-14; Dkt. No. 73-2 at 79. As a result,

Britt v. Carberry, Not Reported in Fed. Supp. (2019)

2019 WL 3365766

Sgt. Costello issued plaintiff an inmate misbehavior report ("MBR"), charging him with fighting, violent conduct, and lying. Dkt. No. 73-7 at 9; *see also* Dkt. No. 73-2 at 65; *see generally* 7 N.Y.C.R.R. § 270.2. According to the MBR,

> [u]pon closer inspection of [plaintiff's] injuries[,] it was clear that they were consistent with being involved in a fight. [Plaintiff] denied being involved in any type of altercation and continued to state that he fell while in the bathroom. [Plaintiff] was uncooperative and refused to answer questions about who was in the area at the time of the incident, refusing to identify other inmates. [Plaintiff] appeared very nervous and was inconsistent with his answers when I questioned him about w[h]ere he fell and how he landed.

Dkt. No. 73-7 at 9.

Upon learning that plaintiff would be transferred to an isolation room at Riverview as a result of the MBR, Nurse Penn contacted medical staff regarding plaintiff's history of cellulitis. Dkt. No. 73-9 at 3. When plaintiff was examined upon his intake at Riverview, medical staff at that facility documented "recurrent cellulitis" on his right lower leg. Dkt. No. 74-1 at 25-26. Plaintiff was ultimately prescribed a course of Augmentin, an antibiotic, which resolved the issue. Dkt. No. 73-2 at 137-38; Dkt. No. 74-1 at 37.

### C. The July 2016 Tier III Disciplinary Hearing

On June 30, 2016, after plaintiff was served with the charges stemming from the MBR, plaintiff selected defendant Sergeant Thomas McKinley ("Sgt. McKinley"), as an employee assistant to help him in marshaling materials for his defense. Dkt. No. 73-2 at 156, 158; *see generally* Dkt. No. 73-8. According to an assistance form executed by plaintiff and Sgt. McKinley, plaintiff requested testimony from Inmates Drepaul and Green, as well as his medical records. Dkt. No. 73-8 at 6; *see also* Dkt. No. 73-2 at 94-96; Dkt. No. 73-8 at 3. Plaintiff alleges, however, that he also requested a copy of the dormitory logbook, a copy of DOCCS Directive 4932, [3] "and any other documentary evidence," but

that those items were not noted by Sgt. McKinley on the executed assistance form. Dkt. No. 73-2 at 97-98, 107.

[3]     DOCCS Directive 4932 refers to the procedures for implementing standards of inmate behavior, *see* 7 N.Y.C.R.R. § 250 *et seq.*, including the requirements for an MBR. *See* 7 N.Y.C.R.R. § 251-3.1.

Sgt. McKinley relayed the requests reflected on the assistance form to Ogdensburg's tier hearing office. Dkt. No. 73-8 at 3; *see also* Dkt. No. 73-8 at 6. Sgt. McKinley was "informed that the [p]laintiff would be shown relevant medical documents at the hearing[,]" but plaintiff claims, however, that he was not provided with those records at the hearing. *Compare* Dkt. No. 73-8 at 3; Dkt. No. 73-7 at 4-5, *with* Dkt. No. 73-2 at 106-07. Plaintiff concedes that he did not object to any purported lack of medical records during the hearing. Dkt. No. 73-2 at 106-07.

 **\*4** When Inmate Drepaul was approached to testify, he refused and indicated, "I didn't see anything. I don't want to testify." Dkt. No. 73-7 at 16. Despite a clear expression that he did not wish to testify, plaintiff alleges that efforts should have been made to inquire further regarding Inmate Drepaul's refusal. Dkt. No. 73-2 at 103-04.

On July 1, 2016, a Tier III disciplinary hearing was commenced before defendant Anne Carberry, superintendent of administration at Riverview. [4]  Dkt. No. 73-7 at 1-2. Although Inmate Green was called to testify at the hearing, he refused, stating that "he wanted no involvement" in the disciplinary proceeding because "he was in the yard at the time." Dkt. No. 73-2 at 102-03.

[4]     The DOCCS conducts three types of inmate disciplinary hearings. *See* 7 N.Y.C.R.R. § 270.3; *see also* *Hynes v. Squillace*, 143 F.3d 653, 655 n.1 (2d Cir. 1998). Tier I hearings address the least serious infractions and can result in minor punishments such as the loss of recreation privileges. *Hynes*, 143 F.3d at 655 n.1. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the SHU. *Id.* Tier III hearings address the most serious violations and can result in unlimited SHU confinement and the loss of "good time" credits. *Id.*

Britt v. Carberry, Not Reported in Fed. Supp. (2019)

2019 WL 3365766

In addition to Inmate Green, defendant Carberry heard testimony from plaintiff, Sgt. Costello, and Nurse Penn. Dkt. No. 73-2 at 101-02, 105; Dkt. No. 73-7 at 11, 28. At the conclusion of the hearing, defendant Carberry determined that plaintiff was guilty as charged. Dkt. No. 73-7 at 2. Plaintiff was sentenced to ninety days of disciplinary confinement in a special housing unit ("SHU"), coupled with a corresponding loss of commissary, telephone, and package privileges. Dkt. No. 73-7 at 28-29. Plaintiff served the first sixteen days of his disciplinary sentence at Riverview, before serving the remainder of the disciplinary sentence at Upstate. Dkt. No. 73-2 at 56, 121-22, 148-49

In November of 2016, plaintiff brought a proceeding in Supreme Court, Albany County, pursuant to Article 78 of the New York Civil Practice Law and Rules, challenging the disciplinary determination. Dkt. No. 73-2 at 162-178. During that proceeding, personnel from the DOCCS learned that the tape from the hearing was "profoundly distorted," precluding the production of a reliable hearing transcript. Dkt. No. 73-6 at 3. In the face of an incomplete hearing record, on January 23, 2017, the determination of guilt was administratively reversed and expunged from plaintiff's disciplinary record. Dkt. No. 73-6 at 5. Thereafter, on April 3, 2017, Denise A. Hartman, Acting Supreme Court Justice, dismissed the petition. Dkt. No. 73-2 at 181-82.

### D. Plaintiff's Grievance Efforts

According to plaintiff, when he entered Ogdensburg, he underwent an orientation, which included information regarding the DOCCS inmate grievance procedure. Dkt. No. 73-2 at 58-59. During his deposition, plaintiff expressed a general understanding of how the DOCCS grievance procedure operated, including that most grievances must be filed within twenty-one calendar days of an alleged occurrence. Dkt. No. 73-2 at 59.

According to plaintiff, he filed three grievances with respect to the medical treatment provided to him. The first grievance was filed in October 2015, while he was confined at Ogdensburg. Dkt. No. 73-2 at 60-63. When plaintiff did not receive a response to that grievance, he followed up by sending a letter to the DOCCS Deputy Chief Medical Officer, Carl J. Koenigsmann. Dkt. No. 73-2 at 60-63. Plaintiff maintains that a second grievance, also submitted while he was confined to Ogdensburg, was filed in January of 2016. Dkt. No. 73-2 at 63. Plaintiff did not receive a response, and he did not follow up. Dkt. No. 73-2 at 64. In contrast to plaintiff's allegation, however, Courtney

Armstrong, the Inmate Grievance Program Supervisor for Ogdensburg, indicates that a search of her records failed to uncover any medical grievances filed by plaintiff from 2015 through mid-2016. Dkt. No. 73-3 at 3.

**\*5** Plaintiff claims that while he was confined to the SHU at Riverview he filed a third grievance on July 7, 2016 by handing the grievance to officers in the SHU to mail on his behalf. Dkt. No. 73-2 at 64; *see also* Dkt. No. 50 at 3. Once again, plaintiff did not receive a response, and he did not appeal. Dkt. No. 73-2 at 64. Similarly, in contrast to plaintiff's allegation, Cassie Bayne, the Inmate Grievance Program Supervisor for Riverview, indicates that a search of her records failed to uncover any medical grievances filed by plaintiff in June or July of 2016. Dkt. No. 73-4 at 2.

## II. PROCEDURAL HISTORY

Plaintiff commenced this action on or about March 1, 2017. Dkt. No. 1. On March 3, 2017, District Judge Mae A. D'Agostino issued an order, directing that the action be administratively closed and denying plaintiff's application to proceed *in forma pauperis* ("IFP") as incomplete. Dkt. No. 4. On March 13, 2017, plaintiff filed a second, completed application for IFP status, together with an inmate authorization form. Dkt. Nos. 6, 7. As a result, on April 12, 2017, Judge D'Agostino reopened the action and issued a decision and order granting plaintiff's IFP application. Dkt. Nos. 8, 9. In that same decision and order, in accordance with 28 U.S.C. §§ 1915(e) and 1915A, Judge D'Agostino directed defendant Carberry to respond to plaintiff's Fourteenth Amendment due process claims, concluded that plaintiff's Fourteenth Amendment claims against the John Doe defendant survived *sua sponte* review, and dismissed certain claims and defendants without prejudice for the failure to state a claim upon which relief could be granted. *See generally* Dkt. No. 9.

After two prior motions by plaintiff for leave to amend his complaint were denied, on June 15, 2017, plaintiff filed a third motion for leave to amend the complaint. Dkt. Nos. 11, 16, 17, 20, 21. Over defendant Carberry's opposition, *see* Dkt. No. 22, plaintiff's motion was granted only with respect to Eighth Amendment deliberate indifference claims against Dr. Chalom and Nurse Penn. Dkt. No. 24.

Following the filing of defendants' answer, *see* Dkt. No. 35, plaintiff filed a fourth motion for leave to file an amended complaint. Dkt. No. 41. Over defendants' opposition, *see* Dkt. No. 42, plaintiff's motion was granted in part and denied in

Britt v. Carberry, Not Reported in Fed. Supp. (2019)

2019 WL 3365766

Case 9:19-cv-00427-DNH-TWD    Document 62    Filed 12/17/21    Page 128 of 193

part. Dkt. No. 49. Judge D'Agostino undertook a review of plaintiff's second amended complaint ("SAC") pursuant to sections 1915(e) and 1915A, and concluded that pleading be accepted only to the extent that it asserts claims against defendants Carberry, McKinley, Dr. Chalom, and Nurse Penn, Dkt. Nos. 49, 50. Plaintiff's fifth motion for leave to file an amended complaint, which defendants opposed, was denied by the court on June 25, 2018. Dkt. Nos. 64, 65, 68.

Discovery now closed, defendants now move seeking the entry of summary judgment, dismissing plaintiff's claims. Dkt. Nos. 73, 74, 75. On October 19, 2018, plaintiff responded in opposition to defendants' motion, Dkt. No. 77, and defendants have since filed a reply in further support of their motion, Dkt. No. 78. Defendants' motion, which is now ripe for a determination, has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). See Fed. R. Civ. P. 72(b).

## III. DISCUSSION

### A. Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

**\*6** A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex,* 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Emp'rs' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson*, 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

### B. Exhaustion of Available Administrative Remedies

In support of their motion for summary judgment, defendants argue that plaintiff's medical indifference claim should be dismissed because he failed to fully exhaust his administrative remedies prior to commencing this action. Dkt. No. 73-11 at 11-14. Plaintiff does not specifically address this contention in his opposition papers. *See generally* Dkt. No. 77.

#### 1. Legal Standard

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016). Section 1997e(a)'s exhaustion provision is mandatory and applies to all inmate lawsuits regarding the conditions of their confinement. *Ross*, 136 S. Ct. at 1856; *Woodford v. Ngo*, 548 U.S. 81, 84 (2006); *Porter v. Nussle*, 534 U.S. 516, 524, 532 (2002); *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 122 (2d Cir. 2016). In the event a defendant establishes that the inmate-plaintiff failed to fully comply with the administrative process prior to commencing an action in federal court, the plaintiff's complaint is subject to dismissal. *See Woodford*, 548 U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."); *see also Wilson v. McKenna*, 661 F. App'x 750, 752 (2d Cir. 2016). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." *Woodford*, 548 U.S. at 95; *accord, Macias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007). [5]

Case 9:19-cv-00427-DNH-TWD   Document 62   Filed 12/17/21   Page 129 of 193

Britt v. Carberry, Not Reported in Fed. Supp. (2019)

2019 WL 3365766

5  While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion " 'in a substantive sense,' " an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias*, 495 F.3d at 43 (quoting *Johnson v. Testman*, 380 F.3d 691, 697-98 (2d Cir. 2004) (emphasis omitted)).

**\*7** In New York, the DOCCS has instituted a grievance procedure, designated as the Inmate Grievance Program ("IGP"), for use by prison inmates to lodge complaints regarding the conditions of their confinement. *Williams*, 829 F.3d at 119. The IGP is comprised of three steps that inmates must satisfy when they have a grievance regarding prison conditions. 7 N.Y.C.R.R. §§ 701.1, 701.5; *Williams*, 829 F.3d at 119. The IGP requires that an inmate first file a grievance with "the clerk" within twenty-one days of the alleged occurrence giving rise to his complaint. 7 N.Y.C.R.R. § 701.5(a)(1). "The complaint may only be filed at the facility where the inmate is housed even if it pertains to another facility." *Id.* Representatives of the inmate grievance resolution committee ("IGRC")[6] have up to sixteen days after the grievance is filed to informally resolve the issue. 7 N.Y.C.R.R. § 701.5(b)(1). If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen days after receipt of the grievance. 7 N.Y.C.R.R. § 701.5(b)(2).

6  The IGRC is comprised of "two voting inmates, two voting staff members, and a non-voting chairperson." 7 N.Y.C.R.R. § 701.4(a).

A grievant may then appeal the IGRC's decision to the facility's superintendent within seven days after receipt of the IGRC's written decision. 7 N.Y.C.R.R. § 701.5(c). The superintendent must issue a written decision within a certain number of days after receipt of the grievant's appeal.[7] 7 N.Y.C.R.R. § 701.5(c)(3)(i), (ii).

7  Depending on the type of matter complained of by the inmate, the superintendent has either seven or twenty days after receipt of the appeal to issue a decision. 7 N.Y.C.R.R. § 701.5(c)(3)(i), (ii).

The third and final step of the IGP involves an appeal to the CORC, which must be taken within seven days after an inmate receives the superintendent's written decision. 7

N.Y.C.R.R. § 701.5(d)(1)(i). The CORC is required to render a written decision within thirty days of receipt of the appeal. 7 N.Y.C.R.R. § 701.5(d)(2)(i), (ii).

Where an inmate's grievance complains of employee harassment, the grievance is forwarded directly to the superintendent, bypassing the IGRC review. 7 N.Y.C.R.R. § 701.8(b), (c). The superintendent then has twenty-five days from the date of its receipt to render a decision. 7 N.Y.C.R.R. § 701.8(f). An inmate may appeal the superintendent's decision to the CORC within seven days of its receipt. 7 N.Y.C.R.R. § 701.8(h).

As can be seen, at each step of the IGP process, a decision must be rendered within a specified time period. 7 N.Y.C.R.R. § 701.5. Where the IGRC and/or superintendent do not timely respond, an inmate is permitted to appeal "to the next step." 7 N.Y.C.R.R. § 701.6(g)(2). Generally, if a plaintiff fails to follow each of the required three steps of the above-described IGP prior to commencing litigation, he has failed to exhaust his administrative remedies as required under the PLRA. *See Ruggerio v. Cty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." (internal quotation marks omitted)).

While the PLRA mandates exhaustion of available administrative remedies, it also "contains its own, textual exception to mandatory exhaustion." *Ross*, 136 S. Ct. at 1858. More specifically, section 1997e(a) provides that only those administrative remedies that "are available" must first be exhausted. 42 U.S.C. § 1997e(a); *see also Ross*, 136 S. Ct. at 1858 ("[T]he exhaustion requirement hinges on the availab[ility] of administrative remedies." (alteration in original) (internal quotation marks omitted)). In the PLRA context, the Supreme Court has determined that "availability" means that "an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." *Ross*, 136 S. Ct. at 1859 (quoting *Booth v. Churner*, 532 U.S. 731, 738 (2001)) (internal quotation marks omitted).

**\*8** In *Ross*, the Supreme Court identified three circumstances in which a court could find that internal administrative remedies are not available to prisoners under the PLRA.[8] *Ross*, 136 S. Ct. at 1859-60. Under the first, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates

2019 WL 3365766

as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 1859. In addition, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* The Court explained that "[i]n this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id.* The third scenario in which administrative remedies are deemed unavailable to prisoners is when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

8    According to the Second Circuit, "the three circumstances discussed in *Ross* do not appear to be exhaustive[.]" *Williams*, 829 F.3d at 123 n.2.

## 2. Analysis

Plaintiff, who has been in and out of DOCCS custody since 1995, is not unfamiliar with the IGP. Dkt. No. 73-2 at 146-49. During his deposition, he expressed a general understanding of how the grievance process operates, including that in most cases, a grievance must be filed within twenty-one days of the alleged occurrence giving rise to a complaint. Dkt. No. 73-2 at 58-60; *see generally* 7 N.Y.C.R.R. § 701.5(a)(1). Moreover, since 2005, plaintiff fully exhausted six unrelated grievances, evincing his understanding and familiarity with the IGP Dkt. No. 73-5 at 6-7.

Plaintiff contends that he submitted three grievances in connection with the medical treatment he received from Dr. Chalom and Nurse Penn. Dkt. No. 73-2 at 59-60. Plaintiff asserts that he filed his first medical grievance in October 2015 by presenting it to the grievance office at Ogdensburg. Dkt. No. 73-2 at 60-61. That grievance, which was filed more than two months following the medical treatment he received on July 30, 2015, Dkt. No. 74-1 at 30, was untimely, and therefore insufficient to exhaust his administrative remedies. 7 N.Y.C.R.R. § 701.5(a)(1); *see, e.g., Adams v. O'Hara*, No. 16-CV-0527, 2019 WL 652409, at *7 (N.D.N.Y. Feb. 15, 2019) (Suddaby, C.J.) ("Filing an untimely grievance without subsequently obtaining a finding of mitigating circumstances is insufficient to exhaust one's available administrative remedies."); *Girard v. Cuttle*, No. 15-CV-0187, 2018 WL 4190140, at *5 (Aug. 10, 2018) (Stewart, M.J.) ("An untimely grievance does not satisfy the exhaustion requirement."), *report and recommendation adopted by* 2018 WL 4190140 (N.D.N.Y. Aug. 31, 2018) (Mordue, J.). 9

Although plaintiff wrote a letter to Carl J. Koenigsmann, Dkt. No. 73-2 at 61-62, a prison official outside of the grievance chain of command, this too was insufficient to properly exhaust his administrative remedies. *See Louis-Charles v. Barker*, No. 16-CV-1417, 2018 WL 4299982, at *2 (N.D.N.Y. Sept. 10, 2018) (D'Agostino, J. *adopting report and recommendation of* Hummel, M.J.) (citing *Geer v. Chapman*, No. 15-CV-952, 2016 WL 6091699, *5 (Sept. 26, 2016) (Baxter, M.J.), *report and recommendation adopted by* 2016 WL 6090874 (N.D.N.Y. Oct. 18, 2016) (Sharpe, J.)); *see also Macias*, 495 F.3d at 44-45.

9    All unpublished opinions are appended for the convenience of the *pro se* plaintiff. [Editor's Note: Appended decisions have been deleted for online purposes.]

Plaintiff asserts that he submitted a second grievance to the grievance office at Ogdensburg at an unspecified point in January 2016. Dkt. No. 73-2 at 63. While this is not necessarily clear from the record, it appears that this second grievance followed plaintiff's sick call on January 26, 2016. Dkt. No. 74-1 at 28, 30. Although this grievance was undoubtedly timely, during his deposition, plaintiff claimed that he did not receive a response, and has conceded that he did not follow up or file an appeal. Dkt. No. 73-2 at 63-64.

 *9  In addition, plaintiff claims that on July 7, 2016, he filed a third grievance concerning his medical treatment by handing the grievance to officers while he was confined in the SHU at Riverview. Dkt. No. 73-2 at 64. Much like the second grievance, however, plaintiff claims that he did not receive a response, did not follow up, and did not appeal. 10 Dkt. No. 73-2 at 64.

10    Plaintiff alleges in his SAC that he "filed a timely administrative appeal" to the CORC on July 17, 2016. *See, e.g.*, Dkt. No. 50 at 3. Upon questioning at his deposition, however, plaintiff conceded that he was referring to an appeal regarding his disciplinary hearing. Dkt. No. 73-2 at 68-69; *see* Dkt. No. 73-2 160 ("Appeal Form to Commissioner"). Nonetheless, if plaintiff filed a grievance on July 7, 2016, and then an appeal to the CORC a mere ten days later, plaintiff would have effectively bypassed several steps of the IGP, negating any contention that he properly exhausted the remedies available under the program.

2019 WL 3365766

Although there is no disputed issue of material fact that plaintiff failed to exhaust his administrative remedies with respect to the three grievances, whether those remedies remained available to him—in particular with respect to the timely second and third grievances—requires closer examination. Following the Second Circuit's decision in *Williams*, several courts—including this court—have concluded that where a grievance is both *unfiled* and *unanswered*, "the process to appeal ... is prohibitively opaque, such that no inmate could actually make use of it." *Williams*, 829 F.3d at 126; *see also id.* ("In sum, the regulations plainly do not describe a mechanism for appealing a grievance that was never filed."); *see, e.g., Hurst v. Mollnow,* No. 16-CV-1062, 2018 WL 4178226, at *10 (Jul. 20, 2018) (Dancks, M.J.) ("Therefore, '[a]s long as [the plaintiff's] grievances were not actually filed, then [the plaintiff's] current situation falls squarely within the Second Circuit's decision in *Williams*[.]' "), *report and recommendation adopted by* 2018 WL 4153926 (N.D.N.Y. Aug. 30, 2018) (Hurd, J.); *Berman v. Drunkin*, No. 13-CV-0136, 2017 WL 1215814, at *8 (Mar. 10, 2017) (Stewart, M.J.) ("*Williams* holds that 'the process to appeal an *unfiled* and unanswered grievance is prohibitively opaque, such that no inmate could actually make use of it.' "), *report and recommendation adopted by* 2017 WL 1207834 (N.D.N.Y. Mar. 31, 2017) (Kahn, J.); *Coleman v. Racette*, No. 15-CV-40, 2017 WL 2579084, at *5 (Jan. 17, 2017) (Baxter, M.J.) ("The court notes, however, that if a grievance is lost or destroyed before it is received by the IGRC and assigned a number, it would be difficult to 'appeal' a grievance 'to the next step.' "), *report and recommendation adopted by* 2017 WL 2589366 (N.D.N.Y. Jun. 14, 2017) (McAvoy, J.); *Juarbe v. Carnegie*, No. 15-CV-1485, 2016 WL 8732798 (Oct. 7, 2016) (Peebles, M.J), *report and recommendation adopted by* 2016 WL 8732798 (N.D.N.Y. Nov. 25, 2016) (D'Agostino, J.).

Complicating matters, however, is a recent summary order from the Second Circuit in *Cicio v. Wenderlich*, 714 F. App'x 96 (2d Cir. 2018). In summarizing the evidence contained in the record in that case, the Second Circuit observed:

> [Plaintiff] claims that ... he filed a written grievance to the Inmate Grievance Resolution Committee ("IGRC") .... However, an IGRC supervisor filed a declaration in the [d]istrict [c]ourt stating that he could find no record of [the plaintiff's]

grievance. In any event, the parties agree that [the plaintiff] never received a response to his grievance.

**\*10** *Id.* at 97. The Second Circuit concluded that the plaintiff's situation was not so opaque that it became "incapable of use" because "[w]hen a prisoner has filed a grievance, but receives no response, the regulations provide a right of appeal." *Id.* at 97-98 (citing, *inter alia,* 7 N.Y.C.R.R. § 701.6(g)) ("[M]atters not decided within the time limits may be appealed to the next step.").

In so holding, the Second Circuit compared and distinguished the plaintiff's situation from that of the plaintiff in *Williams*. In particular, the inmate in *Cicio* alleged that he filed a grievance directly with IGRC, whereas the inmate in *Williams* provided his grievance to a prison guard to file on his behalf. *Compare Cicio*, 714 F. App'x at 97-98 ("The parties agree that Cicio received no response to the grievance he purportedly filed."), *with Williams*, 829 F.3d at 126 (finding that appellate process was too opaque in circumstances where inmate alleged that a prison guard did not file his grievance and the inmate had since been transferred); *see, e.g., Pizarro v. Ponte*, No. 17-CV-4412, 2019 WL 568875, at *5 (S.D.N.Y. Feb. 11, 2019) ("Failing to pursue a grievance for which no response is received is not excused."); *Ramos v. New York*, No. 17-CV-0259, 2018 WL 7133696, at *4 (Dec. 27, 2018) (Hummel, M.J.) (collecting cases), *report and recommendation adopted by* 2019 WL 330869 (N.D.N.Y. Jan. 25, 2019) (Sannes, J.).

On the spectrum between *Cicio* and *Williams*, plaintiff's situation regarding the filing of his second and third grievances falls somewhere in the middle. Plaintiff alleges that he handed the second grievance to the grievance office, and the third grievance to a prison guard, yet he failed to provide a copy of either grievance for the court's consideration. *Cf. Ramos*, 2018 WL 7133696, at *4 ("Plaintiff proffers a copy of the alleged grievance[.]"). Nonetheless, plaintiff claims that he did not receive a response to either grievance, and simultaneously concedes that he made no attempt to follow up or otherwise appeal to the superintendent. At the same time, there is no allegation that the staff at either facility discarded or otherwise interfered with plaintiff's grievances. Nonetheless, the IGP supervisors at both Ogdensburg and Riverview submitted declarations stating they could find no record of plaintiff's grievances in their respective offices. Dkt. Nos. 73-3, 73-4. Plaintiff's third

Britt v. Carberry, Not Reported in Fed. Supp. (2019)

2019 WL 3365766

Case 9:19-cv-00427-DNH-TWD    Document 62    Filed 12/17/21    Page 132 of 193

grievance, arising out of his medical treatment at Ogdensburg on June 29, 2016, is complicated by his immediate transfer to Riverview and further transfer to Upstate. Dkt. No. 73-2 at 147-49.

Although I am able to easily conclude that plaintiff's first, untimely grievance was insufficient to exhaust his administrative remedies, I cannot reach the same conclusion with respect to the second and third grievances, although I acknowledge that it is a somewhat nebulous issue in light of the decisions in *Cicio* and *Williams*, as well as the specific facts of this case. Accordingly, I recommend that defendants' motion for summary judgment based upon an alleged failure to exhaust available administrative remedies be granted with respect to only the medical treatment rendered by Dr. Chalom on July 30, 2015, but that the motion otherwise be denied on this procedural basis.

### C. Deliberate Indifference Claim

Defendants argue plaintiff's medical indifference claims must still be dismissed because there is no genuine issue of material fact to be resolved and, based upon the uncontested facts, plaintiff cannot establish either prong of the medical-indifference inquiry. Dkt. No. 73-11 at 14-17; Dkt. No. 78 at 6-8. In opposition, plaintiff argues that Dr. Chalom and Nurse Penn provided him with inadequate medical treatment. *See generally* Dkt. No. 77.

### 1. Standard

**\*11** The Eighth Amendment prohibits punishment that is "incompatible with the evolving standards of decency that mark the progress of a maturing society[,] or which involve the unnecessary and wanton infliction of pain[.]" *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976) (internal quotation marks and citations omitted). While the Eighth Amendment "does not mandate comfortable prisons, ... neither does it permit inhumane ones[.]" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (internal quotation marks and citation omitted). "These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration." *Estelle*, 429 U.S. at 103. Failure to provide inmates with medical care, "[i]n the worst cases, ... may actually produce physical torture or lingering death, [and] ... [i]n less serious cases, ... may result in pain and suffering which no one suggests would serve any penological purpose." *Id.* (internal quotation marks and citations omitted).

A claim alleging that prison officials have violated an inmate's Eighth Amendment rights by inflicting cruel and unusual punishment must satisfy both objective and subjective requirements. *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009); *Price v. Reilly*, 697 F. Supp. 2d 344, 356 (E.D.N.Y. 2010). To meet the objective requirement, the alleged deprivation must be "sufficiently serious." *Farmer*, 511 U.S. at 844; *see also Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006) ("[T]he objective test asks whether the inadequacy in medical care is sufficiently serious."). Factors informing this inquiry include "whether a reasonable doctor or patient would find it important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain." *Salahuddin*, 467 F.3d at 280 (internal quotation marks and alterations omitted). Determining whether a deprivation is sufficiently serious requires a court to examine the seriousness of the deprivation, and whether the deprivation represents "a condition of urgency, one that may produce death, degeneration, or extreme pain[.]" *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (internal quotation marks omitted). Importantly, it is "the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes." *Smith v. Carpenter*, 316 F.3d 178, 186 (2d Cir. 2003).

To satisfy the subjective requirement, a plaintiff must demonstrate that the defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness.' " *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999). "In medical-treatment cases ..., the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Salahuddin*, 467 F.3d at 280. "Deliberate indifference," in a constitutional sense, "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id.*; *see also Farmer*, 511 U.S. at 837 ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."). "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin*, 467 F.3d at 280 (citing *Farmer*, 511 U.S. at 839-40).

Case 9:19-cv-00427-DNH-TWD    Document 62    Filed 12/17/21    Page 133 of 193

Britt v. Carberry, Not Reported in Fed. Supp. (2019)
2019 WL 3365766

### 2. Analysis

In this case, while plaintiff occasionally frames his allegations as a complete deprivation of medical treatment, it is clear that his claims arise out of a disagreement over the medical treatment that he received while he was confined. *See generally* Dkts. No. 50, 77. Plaintiff's disagreement, without more, "does not create a constitutional claim." *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998); *accord, Fuller v. Lantz*, 549 F. App'x 18, 21 (2d Cir. 2013); see also *Estelle*, 429 U.S. at 107 (concluding that a medical professional's decision regarding which diagnostic techniques or forms of treatment are indicated "is a classic example of a matter for medical judgment" and does not give rise to a constitutional claim). At times, however, plaintiff's claims fall closer to an allegation that he was denied adequate medical care, which requires a narrower inquiry into seriousness. *See Salahuddin*, 467 F.3d at 279.

**\*12** Addressing first the objective element of the governing test, I note that the record evidence demonstrates plaintiff was provided with treatment on each of the three occasions that he complained regarding his lower right leg. Dkt. No. 74-1 at 25-26, 28, 30. Although plaintiff's filings make frequent reference to suffering from "serious bacteria," methicillin-resistant Staphylococcus aureus ("MRSA"), and/or a "deadly infection," *see* Dkt. No. 50 at 3; Dkt. No. 77 at 8, plaintiff's medical records reflect that while he suffered from recurring cellulitis, that condition did not cause him any acute distress and merely manifested itself in redness and itchiness in plaintiff's lower right leg. Dkt. No. 74-1 at 25-26, 28, 30. Plaintiff's medical records simply do not support any claim that the pain he suffered as a result of the cellulitis, even if chronic, was severe. Based upon these circumstances, it is doubtful that a reasonable fact finder could conclude that plaintiff's cellulitis was sufficiently severe as to support the objective requirement of the controlling test.

I note, moreover, that to the extent that a reasonable fact finder could conclude that plaintiff's condition was sufficiently severe as to support the objective requirement of the controlling test—for example, by causing him to pass out in the bathroom on June 29, 2016, as he claimed—I nonetheless find that no reasonable fact finder could conclude that defendants' treatment was inadequate or, to the extent it could be construed as inadequate, the inadequacy that was sufficiently serious. In *Dean v. Coughlin*, 804 F.2d 207 (2d Cir. 1986), the Second Circuit observed that a "correctional

facility is not a health spa, but a prison in which convicted felons are incarcerated." *Id.* at 215; *see also Clay v. D'Silva*, No. 09-CV-1245, 2011 WL 1135937, *3 (N.D.N.Y. Mar. 25, 2011)* (Suddaby, C.J.). Accordingly, the Eighth Amendment does not afford prisoners a right to medical treatment of their choosing. The question of what treatment should be administered to an inmate is a "classic example of a matter for medical judgment," and, accordingly, prison medical personnel are vested with broad discretion to determine what method of care and treatment to provide to their patients. *Estelle*, 429 U.S. at 107; *see also Chance*, 143 F.3d at 703; *Rosales v. Coughlin*, 10 F. Supp. 2d 261, 264 (W.D.N.Y. 1998).

Plaintiff's claims against Dr. Chalom are based upon, *inter alia*, his desire to be referred to a specialist, prescribed physical therapy, and sent for diagnostic testing. Dkt. No. 77 at 10; *see also* Dkt. No. 50 at 10. Following Dr. Chalom's first examination, the physician prescribed plaintiff a ten-day course of Bactrim, noted that he had easy access to hydrocortisone cream, and directed him to follow up in two weeks for a reassessment.[11] Dkt. No. 74 at 3; *see also* Dkt. No. 74-1 at 30; *see also* Dkt. No. 50 at 10. When plaintiff presented nearly six months later complaining of similar symptoms, Dr. Chalom prescribed a course of doxycycline. Dkt. No. 74 at 3; Dkt. No. 74-1 at 28. There is nothing in the record now before the court to suggest that Dr. Chalom's decision to prescribe certain medications was anything other than an appropriate exercise of his discretion to determine the method of care and treatment to provide to plaintiff. *See Estelle*, 429 U.S. at 107.

11    Any claims against Dr. Chalom based upon this examination are procedurally barred. *See ante*, at 21-27.

Plaintiff's claims against Nurse Penn are based upon her purported failure to treat him for cellulitis.[12] Dkt. No. 73-2 at 76; *see also* Dkt. No. 50 at 9. Plaintiff concedes, however, that when Nurse Penn examined him on June 29, 2016, she cleaned his lacerations with alcohol, and observed that he required further medical attention from a doctor. Dkt. No. 73-7 at 18; *see generally* Dkt. No. 73-9. Upon plaintiff's transfer to Riverview a mere two hours later, Nurse Penn contacted medical staff at the facility to explain that plaintiff had a history of cellulitis. Dkt. No. 73-9 at 3; Dkt. No. 74-1 at 26 ("Also reported is ... 'recurrent cellulitis[.]' "). Plaintiff concedes that he was examined by a doctor at Riverview that same day, and that he received a prescription for Augmentin,

Case 9:19-cv-00427-DNH-TWD    Document 62    Filed 12/17/21    Page 134 of 193

Britt v. Carberry, Not Reported in Fed. Supp. (2019)

2019 WL 3365766

which completely resolved his complaints. Dkt. No. 73-2 at 137-38; *see also* Dkt. No. 74-1 at 25-26. The record before the court indicates that Nurse Penn appropriately exercised her judgement to determine the method of care and treatment to be provided to plaintiff, within the scope of her authority as a registered nurse. *See Estelle*, 429 U.S. at 107.

12    As a registered nurse, Nurse Penn is not authorized to "make definitive diagnoses, write prescriptions (beyond dispensing over-the-counter drugs such as anti-inflammatories or aspirin), or make ultimate determinations about the need for medical devices (such as hearing aids or orthopedic inserts), or consultation with medical specialists." Dkt. No. 73-9 at 2; *see generally* N.Y. Education Law § 6902(1). Such determinations are made by the DOCCS doctors or outside specialists. Dkt. No. 73-9 at 2.

**\*13** Even assuming that plaintiff could satisfy the objective prong, I conclude that no reasonable fact finder could conclude that Dr. Chalom or Nurse Penn acted with the requisite deliberate indifference. The record reflects that on every occasion that plaintiff was seen, his concerns were addressed, albeit apparently not to his liking. Nothing in the record now before the court suggests that defendants turned a blind eye to plaintiff's condition or failed to act while aware of a substantial risk of harm to plaintiff's health or safety.

Based on the evidence of record, I conclude that no reasonable fact finder could find, objectively, that defendants deprived plaintiff of adequate medical care or that, subjectively, any of them exhibited deliberate indifference to plaintiff's serious medical needs. Accordingly, I recommend that plaintiff's Eighth Amendment deliberate medical indifference claims be dismissed in their entirety.

### D. Plaintiff's Procedural Due Process Claim

In support of their motion for summary judgment, defendants argue that there is no genuine issue of material fact that plaintiff's ninety-day disciplinary confinement did not constitute an atypical and significant hardship. Dkt. No. 73-11 at 18-19; Dkt. No. 78 at 10-11. Defendants further argue that even if he was deprived of a cognizable liberty interest, plaintiff was afforded sufficient process. Dkt. No. 73-11 at 19-24; Dkt. No. 78 at 9-10. In his opposition to defendants' motion, plaintiff fails to address defendants' liberty interest argument, but contends that he was deprived of procedural due process in connection with the Tier III disciplinary

hearing held at Riverview in July of 2016. *See generally* Dkt. No. 77.

As a general matter, to prevail on a section 1983 due process claim arising out of a disciplinary hearing, a plaintiff must show that he both (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient process. *Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000); *Hynes*, 143 F.3d at 658; *Bedoya v. Coughlin*, 91 F.3d 349, 351-52 (2d Cir. 1996).

### 1. Liberty Interest

In *Sandin v. Conner*, 515 U.S. 472 (1995), the Supreme Court determined that, to establish a liberty interest deprivation in the context of a prison disciplinary proceeding resulting in removal of an inmate from the general prison population, a plaintiff must demonstrate that (1) the state actually created a protected liberty interest in being free from segregation and (2) the segregation would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 483-84; *Tellier*, 280 F.3d at 79-80; *Hynes*, 143 F.3d at 658. The prevailing view in this circuit is that, by its regulatory scheme, the State of New York has created a liberty interest in remaining free from disciplinary confinement, thus satisfying the first *Sandin* factor. *See, e.g., LaBounty v. Coombe*, No. 95-CV-2617, 2001 WL 1658245, at \*6 (S.D.N.Y. Dec. 26, 2001); *Alvarez v. Coughlin*, No. 94-CV-0985, 2001 WL 118598, at \*6 (N.D.N.Y. Feb. 6, 2001) (Kahn, J.). Accordingly, I must first determine whether the conditions of plaintiff's ninety-day SHU confinement rise to the level of an atypical and significant hardship under *Sandin*.

Atypicality in a *Sandin* inquiry is normally a question of law. [13] *Colon v. Howard*, 215 F.3d 227, 230-31 (2d Cir. 2000); *Sealey v. Giltner*, 197 F.3d 578, 585 (2d Cir. 1999). "[W]hether the conditions of a segregation amount to an 'atypical and significant hardship' turns on the duration of the segregation and a comparison with the conditions in the general population and in other categories of segregation." *Arce v. Walker*, 139 F.3d 329, 336 (2d Cir. 1998) (citing *Brooks v. DiFasi*, 112 F.3d 46, 48-49 (2d Cir. 1997)). In cases involving shorter periods of segregated confinement where the plaintiff has not alleged any unusual conditions, however, a court may not need to undergo a detailed analysis of these considerations. *Arce*, 139 F.3d at 336; *Hynes*, 143 F.3d at 658.

13　In cases where there is factual dispute concerning the conditions or duration of confinement, however, it may nonetheless be appropriate to submit those disputes to a jury for resolution. *Colon v. Howard*, 215 F.3d 227, 230-31 (2d Cir. 2000); *Sealey*, 197 F.3d at 585.

**\*14** In cases such as this involving a period of restrictive confinement of less than 101 days, and where the confinement occurs under ordinary conditions found in a typical SHU setting, the disciplinary punishment does not rise to the level of an atypical and significant hardship. [14] *Davis v. Barrett*, 576 F.3d 129, 133 (2d Cir. 2009). Accordingly, when the duration of restrictive confinement is less than 101 days, proof of "conditions more onerous than usual" is required. *Id.* (citing *Colon*, 215 F.3d at 232-33 n.5). The court must examine "the [actual] conditions of [the plaintiff's] confinement 'in comparison to the hardships endured by prisoners in general population, as well as prisoners in administrative and protective confinement, assuming such confinements are imposed in the ordinary course of prison administration.' " *Davis*, 576 F.3d at 134 (quoting *Welch v. Bartlett*, 196 F.3d 389, 392-93 (2d Cir. 1999)).

14　On the other hand, the Second Circuit has suggested that disciplinary segregation under ordinary conditions of more than 305 days rises to the level of atypicality. *See Colon*, 215 F.3d at 231 ("Confinement in normal SHU conditions for 305 days is in our judgment a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin*.").

For example, in *Palmer v. Richards*, 364 F.3d 60 (2d Cir. 2004), the Second Circuit denied the prison officials' motion for summary judgment because even though the inmate's SHU confinement was only seventy-seven days, he was deprived of his personal effects, and was kept completely "out of communication from his family." *Id.* at 66. The Second Circuit agreed that "at least based on the record as it stands now, [the inmate] should have the opportunity to demonstrate that the conditions of his confinement vis-a-vis both the conditions in administrative confinement and in the general prison population were sufficiently harsh' to violate a liberty interest despite the 'comparative shortness' of his confinement." *Id.* at 66 (quoting *Palmer v. Goss*, No. 02-CV-5804, 2003 WL 22327110 (S.D.N.Y. Oct. 10, 2003),); *see also Davis*, 576 F.3d at 134 (holding that a more detailed factual record was required to determine whether unsanitary

conditions of forty-one-day administrative confinement, in which plaintiff was denied books, commissary privileges, and his one hour of exercise per day, entitled plaintiff to due process).

Here, plaintiff was held in disciplinary SHU confinement for ninety days, the first sixteen days of which were served at Riverview, with the remainder being served at Upstate. Dkt. No. 73-2 at 147-49. According to plaintiff, during the sixteen-day period at Riverview, he was subjected to a light in his cell that was illuminated from 6:00 a.m. until 11:00 p.m.; showers that were dirty with mildew on the walls and floors; and rats and roaches running freely through his cell. Dkt. No. 50 at 18; Dkt. No. 73-2 at 121-25. Although plaintiff did not have issues with the illumination of his cell and dirty showers for the remainder of his SHU confinement at Upstate, there continued to be rodent issues at that facility. Dkt. No. 73-2 at 121-25. Plaintiff alleged that as a result of these conditions, he lost weight, was unable to sleep and developed "severe migraines, dizziness ... extreme fatigue[,] and hallucinations[.]" Dkt. No. 50 at 18; *see also* Dkt. No. 73-2 at 126.

Although plaintiff testified regarding the actual conditions of his confinement, "the record lacks any evidence of the conditions for other inmates in administrative confinement, or in the general prison population." *Davis*, 576 F.3d at 135. A detailed factual record containing information as to the actual conditions in both administrative segregation and for the general population is necessary for the court to make the type of comparison required by the Second Circuit. Because this evidence is lacking in the current record, the court cannot undertake the type of specific fact-finding required to determine, on a motion for summary judgment, whether plaintiff suffered an atypical and significant hardship during his ninety-day disciplinary SHU confinement. *See Davis*, 576 F.3d at 135. For this reason, I have assumed, for purposes of this report, that plaintiff was deprived of a constitutionally-significant liberty interest during the course of his ninety-day SHU confinement, and will proceed to analyze whether defendants provided plaintiff with constitutionally adequate safeguards in connection with his disciplinary hearings.

### 2. Procedural Safeguards

**\*15** The procedural safeguards to which a prison inmate is entitled before being deprived of a constitutionally cognizable liberty interest are well established under *Wolff v. McDonnell*,

Case 9:19-cv-00427-DNH-TWD   Document 62   Filed 12/17/21   Page 136 of 193

Britt v. Carberry, Not Reported in Fed. Supp. (2019)
2019 WL 3365766

418 U.S. 539 (1974). In its decision in *Wolff*, the Court held that the constitutionally mandated due process requirements include (1) written notice of the charges to the inmate; (2) the opportunity to appear at a disciplinary hearing and a reasonable opportunity to present witnesses and evidence in support of his defense, subject to a prison facility's legitimate safety and penological concerns; (3) a written statement by the hearing officer explaining his decision and the reasons for the action being taken; and (4) in some circumstances, the right to assistance in preparing a defense. *Wolff*, 418 U.S. at 564-69; *see also Luna v. Pico*, 356 F.3d 481, 487 (2d Cir. 2004). To pass muster under the Fourteenth Amendment, a hearing officer's disciplinary determination must also garner the support of at least "some evidence." *Superintendent, Mass. Corr. Inst., Walpole v. Hill*, 472 U.S. 445, 455 (1985); *Luna*, 356 F.3d at 487-88.

### a. Inadequate Notice and Vague MBR

Plaintiff maintains that his due process rights were violated when defendant Carberry provided inadequate notice of the disciplinary hearing and relied upon a vague MBR. *See generally* Dkt. No. 50.

"Due process requires that prison officials give an accused inmate written notice of the charges against him twenty-four hours prior to conducting a disciplinary hearing." *Sira v. Morton*, 380 F.3d 57, 70 (2d Cir. 2004) (citing *Wolff*, 418 U.S. at 564; *Kalwasinski v. Morse*, 201 F.3d 103, 108 (2d Cir. 1999)). Plaintiff acknowledges, however, that he received the challenged MBR within the prescribed time. He was served with the charges against him at 7:40 a.m. on June 30, 2016, *see* Dkt. No. 73-2 at 156, and the disciplinary hearing commenced twenty-seven hours later—at 10:40 a.m. the following day. *See* Dkt No. 73-2 at 100-01; Dkt. No. 73-7 at 11.

To the extent that plaintiff's allegations and submissions can be construed as challenging the MBR as being too general to provide meaningful notice of the misconduct at issue, that claim must fail. Due process does not mandate "notice that painstakingly details all facts relevant to the date, place, and manner of charged inmate misconduct." *Sira*, 380 F.3d at 72. Rather, due process requires notice with "sufficient factual specificity to permit a reasonable person to understand what conduct is at issue so that he may identify relevant evidence and present a defense." *Id.* The MBR at issue satisfies this standard. *See, e.g., Samuels v. Selsky*, 166 F. App'x. 552, 554-55 (2d Cir. 2006). The MBR is neither vague

nor conclusory, and it provides plaintiff with notice of the "specific facts" underlying the accusations against him. Dkt. No. 73-7 at 9. In particular, in the MBR, Sgt. Costello noted that plaintiff was uncooperative, refused to identify inmates in the area, provided inconsistent answers, and appeared to have suffered injuries that were consistent with having been involved in an altercation. *Id.*; *see, e.g., McAllister v. Call*, No. 10-CV-610, 2014 WL 5475293, at *11 (N.D.N.Y. Oct. 24, 2014) (Scullin, J., *adopting report and recommendation of* Hummel, M.J.). Sgt. Costello then concluded in the MBR that "[b]ased on my experience, [plaintiff] sustained several injuries as a result of being involved in a fight[,] and then lied about falling in the bathroom as an attempt to conceal what actually took place and to avoid [an MBR.]" Dkt. No. 73-7 at 9.

Accordingly, I conclude that plaintiff was provided with adequate notice of the disciplinary hearing, as well as notice of the "specific facts" underlying the accusations against him.

### b. Employee Assistance

"Although inmates are not entitled to retained or appointed counsel in prison disciplinary hearings, '[p]rison authorities have a constitutional obligation to provide assistance to an inmate in marshaling evidence and presenting a defense when he is faced with disciplinary charges.' " *Moore v. Peters*, 92 F. Supp. 3d 109, 125-26 (W.D.N.Y. 2015) (quoting *Eng v. Coughlin*, 858 F.2d 889, 897 (2d Cir. 1988)). Because, however, "[a]n inmate's right to assistance with his disciplinary hearing is limited[,]" *Neree v. O'Hara*, No. 09-CV-802, 2011 WL 3841551, at *13 (N.D.N.Y. July 20, 2011) (Baxter, M.J.), "[t]he assistant 'need only perform what the plaintiff would have done but need not go beyond the inmate's instructions.' " *Grant v. Fischer*, No. 14-CV-1382, 2017 WL 1180866, at *2 (N.D.N.Y. Mar. 29, 2017) (D'Agostino, J. *adopting report and recommendation of* Stewart, M.J.), *aff'd*, No. 17-1283-PR, 2019 WL 190512 (2d Cir. Jan. 15, 2019); *see also Lewis v. Johnson*, No. 08-CV-482, 2010 WL 3785771, at *10 (N.D.N.Y. Aug. 5. 2010). "[A]ny violation of this qualified right are reviewed for 'harmless error.' " *Clyde v. Schoellkopf*, 714 F. Supp. 2d 432, 437 (W.D.N.Y. 2010) (quoting *Pilgrim v. Luther*, 571 F.3d 201, 206 (2d Cir. 2009)).

**\*16** Here, because plaintiff was confined to an isolation room while at Riverview, he was entitled to assistance in marshaling evidence and presenting a defense. According

Case 9:19-cv-00427-DNH-TWD    Document 62    Filed 12/17/21    Page 137 of 193

Britt v. Carberry, Not Reported in Fed. Supp. (2019)

2019 WL 3365766

to the assistance form that was executed by plaintiff and Sgt. McKinley, the assigned employee assistant, plaintiff requested testimony from Inmates Drepaul and Green, as well as his medical records. Dkt. No. 73-8 at 6; *see also* Dkt. No. 73-2 at 94-96; Dkt. No. 73-8 at 3. Sgt. McKinley then relayed those requests to the tier hearing office at Ogdensburg. Dkt. No. 73-8 at 3, 6. Sgt. McKinley was informed by prison personnel that plaintiff would be able to review the medical records at the hearing, and efforts were made to secure the testimony of plaintiff's requested witnesses. Sgt. McKinley was not required to undertake additional efforts and "go beyond the inmate's instructions." *Grant*, 2017 WL 1180866, at *2 (quoting *Moore*, 92 F. Supp. 3d at 126).

Plaintiff alleges that he also requested information that was not reflected on the executed assistance form, including a copy of the dormitory logbook, a copy of DOCCS Directive 4932, "and any other documentary evidence[.]" Dkt. No. 73-2 at 97-98, 107. Even assuming that this is true, there is no evidence that the failure to provide plaintiff with this information would have impacted the outcome of the hearing. Thus, viewing the evidence in the light most favorable to the plaintiff, any alleged failure by Sgt. McKinley to perform his duties as an assistant amounts to harmless error not warranting denial of summary judgment. *See, e.g., Young v. Polizzi*, No. 16-CV-0660, 2018 WL 3949967, at *8 (Jul. 11, 2018) (Hummel, M.J.), *report and recommendation adopted by* 2018 WL 3949942 (N.D.N.Y. Aug. 16, 2018) (Scullin, J.); *Hernandez v. Selsky*, 572 F. Supp. 2d 446, 455 (S.D.N.Y. 2008) (concluding that because the plaintiff failed to show how outcome of hearing would have been, any alleged inadequate assistance was harmless error not warranting denial of summary judgment).

### c. Denial of Plaintiff's Witnesses

In his SAC, plaintiff alleged that defendant Carberry refused to call certain witnesses and that in denying those witnesses, "she never stated that the denial was based on institutional safety concerns, or that plaintiff's alibi-witness testimony was irrelevant or redundant." Dkt. No. 50 at 5. To that end, "[d]isciplinary hearing officers ... have the discretion to deny witnesses for valid reasons, including irrelevance, lack of necessity, and other factors particular to each case." *Tafari v. McCarthy*, 714 F. Supp. 2d 317, 377 (N.D.N.Y. 2010) (Hurd, J., *adopting report and recommendation by* Lowe, M.J.) (citing *Wolff*, 418 U.S. at 566-67).

In this case, however, there is nothing in the present record to indicate that defendant Carberry "denied" plaintiff's requested witnesses. Instead, the undisputed record reveals that plaintiff requested testimony from two inmates, Drepaul and Green. Dkt. No. 73-8 at 6. When inmate Drepaul was approached to testify, he refused and indicated "I didn't see anything. I don't want to testify." Dkt. No. 73-7 at 16. Inmate Green, on the other hand appeared for the hearing, but also refused to testify and stated that "he wanted no involvement" in the hearing because "he was in the yard at the time." Dkt. No. 73-2 at 102-03. As a result, plaintiff's claim that defendant Carberry denied his witness is flatly contradicted by the record before the court, and her purported failure to call a witness, who refused to testify, fails to offend procedural due process. *See, e.g., Caimite v. Venettozzi*, No. 17-CV-0919, 2018 WL 6069458, at *5 (Oct. 29, 2018) (Hummel, M.J.), *report and recommendation adopted by* 2018 WL 6068414 (N.D.N.Y. Nov. 20, 2018) (Sharpe, J.); *Abdur-Raheem v. Caffery*, No. 13-CV-6315, 2015 WL 667528, at *6 (S.D.N.Y. Feb. 17, 2015); *Hinton v. Prack*, No. 12-CV-1844, 2014 WL 4627120, at *7 (N.D.N.Y. Sept. 11, 2014) (Kahn, J.) ("The fact that these witnesses refused to testify on [the plaintiff's] behalf does not alter the fact that he was given the opportunity to call witnesses.").

### d. Impartiality of the Hearing Officer

**\*17** Lastly, plaintiff alleges that defendant Carberry was biased. *See, e.g.,* Dkt. No. 50 at 9. The due process clause of the Fourteenth Amendment also guarantees that "[a]n inmate subject to a disciplinary hearing is entitled to ... an impartial hearing officer." *Allen v. Cuomo*, 100 F.3d 253, 259 (2d Cir. 1996). The Second Circuit has explained that its "conception of an impartial decisionmaker is one who, *inter alia*, does not prejudge the evidence and who cannot say ... how he would assess evidence he has not yet seen." *Patterson v. Coughlin*, 905 F.2d 564, 570 (2d Cir. 1990). "The degree of impartiality required of prison officials[, however,] does not rise to the level of that required of judges." *Allen*, 100 F.3d at 259. Indeed, "[i]t is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Id.* (citing *Russell v. Selsky*, 35 F.3d 55, 60 (2d Cir. 1996); *Francis v. Coughlin*, 891 F.2d 43, 46 (2d Cir. 1989)). "A hearing officer may satisfy the standard of impartiality if there is *'some evidence* in the record' to support the findings of the hearing." *Allred v. Knowles*, No. 06-CV-0456, 2010 WL 3911414, at *5 (W.D.N.Y. Oct. 5, 2010) (emphasis in

Case 9:19-cv-00427-DNH-TWD    Document 62    Filed 12/17/21    Page 138 of 193

Britt v. Carberry, Not Reported in Fed. Supp. (2019)

2019 WL 3365766

original) (quoting *Hill,* 472 U.S. at 455); *see also Francis,* 891 F.2d at 45 (responding to the plaintiff's allegations that the hearing officer's bias allowed for "*no* chance to prevail at the [disciplinary] hearing]" by concluding that "it is axiomatic that a prison disciplinary hearing in which the result is arbitrarily and adversely predetermined violates [an inmate's] right [to be free from arbitrary governmental action]" (emphasis in original)).

Here, there is no record evidence from which a reasonable fact finder could conclude that defendant Carberry was biased against plaintiff or that she predetermined the outcome of the disciplinary hearing. Although DOCCS personnel subsequently learned that the hearing tape was profoundly distorted, precluding the production of a transcript of the proceeding, the record as a whole reflects that defendant Carberry heard testimony from plaintiff, Sgt. Costello, Nurse Penn, as well as the inmate witness that plaintiff requested. Dkt. No. 73-7 at 11. In addition, plaintiff was afforded the opportunity to question Sgt. Costello. Dkt. No. 73-2 at 105.

Plaintiff's bare assertions with respect to defendant Carberry's alleged bias are unsupported by the record and, accordingly, are insufficient to give rise to a dispute of material fact. *See Francis,* 891 F.2d at 47 ("[A] plaintiff-inmate armed with nothing more than conclusory allegations of bias and prejudgment should not be able to defeat a well-supported motion for summary judgment[.]"); *Boose v. Schneider,* 14-CV-0518, 2016 WL 8732644 (N.D.N.Y. Feb. 19, 2016) (Peebles, M.J.), *report and recommendation adopted,* 2016 WL 1175224 (N.D.N.Y. Mar. 24, 2016) (D'Agostino, J.).

Accordingly, because no reasonable fact finder could conclude that plaintiff's due process rights were violated, I recommend that defendants' motion be granted.

## IV. SUMMARY AND RECOMMENDATION

The record currently before the court demonstrates that although plaintiff did not receive his preferred course of medical treatment, it is undisputed that plaintiff received timely and appropriate medical treatment that was tailored to address his medical condition. The record similarly indicates that there is no disputed issue of genuine material fact and that plaintiff received due process in connection with his disciplinary hearing. Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 73) be GRANTED and plaintiff's second amended complaint (Dkt. No. 50) be dismissed in its entirety.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. [15] FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

[15]  If you are proceeding *pro se* and are served with this report and recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the report and recommendation/order was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

 **\*18**  It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

### All Citations

Not Reported in Fed. Supp., 2019 WL 3365766

---

**End of Document**                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Britt v. Carberry, Not Reported in Fed. Supp. (2019)

2019 WL 2437912

2019 WL 2437912
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Troy BRITT, Plaintiff,

v.

Anne CARBERRY, et al., Defendants.

9:17-CV-0234 (MAD/DEP)
|
Signed 06/11/2019

**Attorneys and Law Firms**

TROY BRITT, 781 E. 135 th Street, Bronx, New York 10454, Plaintiff, pro se.

OFFICE OF THE NEW YORK STATE ATTORNEY GENERAL, OF COUNSEL: KYLE W. STURGESS, AAG, The Capitol, Albany, New York 12224, Attorneys for Defendants.

### MEMORANDUM-DECISION AND ORDER

Mae A. D'Agostino, U.S. District Judge

### I. INTRODUCTION

*1 *Pro se* plaintiff, Troy Britt ("Plaintiff"), a former New York State prison inmate, commenced this civil rights action against several individuals employed by New York State Department of Corrections and Community Supervision ("DOCCS") pursuant to 42 U.S.C. § 1983. Dkt. No. 1. As narrowed by a series of decisions of this Court, Plaintiff's claims currently at issue include allegations that (1) Defendants T.L. Penn ("Nurse Penn") and Dr. M. Chalom violated Plaintiff's Eight Amendment rights by exhibiting deliberate indifference to Plaintiff's medical needs; and (2) Defendants Anne Carberry and Sergeant Thomas McKinley ("Sgt. McKinley") violated Plaintiff's Fourteenth Amendment due process rights in connection with Plaintiff's Tier III disciplinary hearing. *See* Dkt. Nos. 1, 4, 8, 9, 24, 25, 49, 50. Plaintiff's claims arose from events between July 30, 2015 and about October 7, 2016, while he was in custody of DOCCS as an inmate in Ogdensburg Correctional Facility ("Ogdensburg C.F."), Riverview Correctional Facility ("Riverview C.F."), and

Upstate Correctional Facility ("Upstate C.F."). *See* Dkt. No. 50.

On September 27, 2018, Defendants moved for entry of summary judgment dismissing Plaintiff's remaining claims on the merits. *See* Dkt. No. 73. In a February 1, 2019 Report and Recommendation, Magistrate Judge Peebles recommended Plaintiff's second amended complaint be dismissed in its entirety for failure to prosecute and comply with this Court's orders and local rules of practice and that Defendants' motion for summary judgment be denied as moot. *See* Dkt. No. 81. On February 14, 2019, Plaintiff filed objections to the February 1 Report and Recommendation. *See* Dkt. No. 84. Subsequently, Magistrate Judge Peebles issued the March 22, 2019 Report and Recommendation presently before this Court. *See* Dkt. No. 87.

In the March 22, 2019 Report and Recommendation, Magistrate Judge Peebles recommended that Defendants' motion for summary judgment be granted and Plaintiff's second amended complaint be dismissed in its entirety. *See* Dkt. No. 87. Specifically, Magistrate Judge Peebles found (1) Plaintiff failed to exhaust his administrative remedies with respect to his October 2015 grievance; (2) Plaintiff failed to establish a sufficiently serious deprivation and failed to establish that Defendants Dr. Chalom and Nurse Penn had the requisite state of mind with respect to his deliberate indifference claims and; (3) although Plaintiff had a liberty interest, he was afforded the necessary procedural protections with respect to his disciplinary hearing and due process claims against Defendants Sgt. McKinley and Carberry. *See id.* Neither party objected to the March 22 Report-Recommendation and Order.

A litigant's failure to file objections to a magistrate judge's report and recommendation, even when that litigant is proceeding *pro se*, waives any challenge to the report on appeal. *See Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003) (holding that, "[a]s a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point" (citation omitted)). A *pro se* litigant must be given notice of this rule; notice is sufficient if it informs the litigant that the failure to timely object will result in the waiver of further judicial review and cites pertinent statutory and civil rules authority. *See Frank v. Johnson*, 968 F.2d 298, 299 (2d Cir. 1992); *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989) (holding that a *pro se* party's failure to object to a report and recommendation does not waive his right to appellate

Case 9:19-cv-00427-DNH-TWD   Document 62   Filed 12/17/21   Page 140 of 193

Britt v. Carberry, Not Reported in Fed. Supp. (2019)
2019 WL 2437912

review unless the report explicitly states that failure to object will preclude appellate review and specifically cites 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and former 6(e) of the Federal Rules of Civil Procedure).

## II. DISCUSSION

### A. Standard of Review

*2 A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. See *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted). When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36-37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleadings. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(c) (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. See *Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2502, 2513-14, 91 L. Ed. 2d 202 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather the court must be satisfied that the citations to evidence in the record support the movant's assertions. See *Giannullo v. City of N.Y.*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

"[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2007) (quoting *Haines v. Kerner*, 404 U.S. 519, 520, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972)) (other citations omitted). The Second Circuit has held that the court is obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting legal rights merely because they lack a legal education. *Id.* (quoting *Traguth v.*

*Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)). However, this does not mean that a *pro se* litigant is excused from following the procedural requirements of summary judgment. *Id.* at 295 (citing *Showers v. Eastmont*, 00 CIV. 3725, 2001 WL 527484, *1 (S.D.N.Y. May 16, 2001)). Specifically, "a *pro se* party's 'bald assertion,' completely unsupported by evidence is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin*, 902 F. Supp. 424, 429 (S.D.N.Y. 1995) (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

### B. Exhaustion

The Prison Litigation Reform Act ("PLRA") expressly provides that "no action shall be brought with respect to prison conditions under Section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016). In the event a defendant establishes that an inmate-plaintiff failed to fully comply with the administrative process prior to commencing an action in federal court, the plaintiff's complaint is subject to dismissal. See *Woodford v. Ngo*, 548 U.S. 81, 93 (2006); *see also Wilson v. McKenna*, 661 Fed. Appx. 750, 752 (2d Cir. 2016). "Proper exhaustion requires a plaintiff to procedurally exhaust his claims by compl[ying] with the system's critical procedural rules," and "demands compliance with an agency's deadlines and other critical procedural rules." *Woodford*, 548 U.S. at 90, 95. In the context of a Section 1983 claim, the court must look at the relevant state's prison procedures to determine if the inmate-plaintiff complied with the appropriate procedures. See *Jones v. Bock*, 549 U.S. 199, 218 (2007); *Woodford*, 548 U.S. at 88-90.

*3 New York State has a three-step administrative review process, or Inmate Grievance Program ("IGP"). See N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5. First, a grievance must be submitted to the Inmate Grievance Resolution Committee ("IGRC") within twenty-one days of the alleged occurrence giving right to the complaint. See 7 N.Y.C.R.R. § 701.5(a)(1). After the grievance has been filed, the IGRC reviews and investigates the formal complaint and must informally resolve the issue within sixteen days of the filing or conduct a hearing. See *id.* at § 701.5(b). Second, within seven days after receipt of the IGRC's written decision, the inmate-plaintiff may appeal to the superintendent of the facility, who must then issue a written decision within a certain number of days. [1] See *id.* at § 701.5(c). Third, within seven days after the receipt of the superintendent's decision, the

Case 9:19-cv-00427-DNH-TWD   Document 62   Filed 12/17/21   Page 141 of 193

Britt v. Carberry, Not Reported in Fed. Supp. (2019)
2019 WL 2437912

inmate-plaintiff may appeal it to the Central Office Review Committee ("CORC"), who will issue the final administrative decision. *See id.* at § 701.5(d). When an inmate does not receive a timely response to a filed grievance, the inmate is permitted to appeal "to the next step." *See id.* at § 701.6(g)(2).

1    Depending on the type of matter complained of by the inmate, the superintendent has either seven or twenty days after receipt of the appeal to issue a decision. 7 N.Y.C.R.R. § 701.5(c)(3).

If all three of these levels of review are exhausted, then the inmate may seek relief in federal court pursuant to § 1983. *See Bridgeforth v. Bartlett*, 686 F. Supp. 2d 238, 239 (W.D.N.Y. 2010) (citing *Porter v. Nussle*, 534 U.S. 516, 524 (2002)); *Singh v. Goord*, 520 F. Supp. 2d 487, 495-96 (S.D.N.Y. 2007) (quoting *Hemphill v. N.Y.*, 380 F.3d 680, 686 (2d Cir. 2004)). When a plaintiff presents a claim arising "directly out of a disciplinary or administrative segregation hearing ... (*e.g.*, a claim of denial of procedural due process), he exhausts his administrative remedies by presenting his objections in the administrative appeals process, not by filing a separate grievance instead of or in addition to his ordinary appeal." *Sweet v. Wende Corr. Facility*, 514 F. Supp. 2d 411, 413 (W.D.N.Y. 2007) (internal quotation and citations omitted); *see also Davis v. Barrett*, 576 F.3d 129, 131-32 (2d Cir. 2009). Generally, if a plaintiff fails to follow each of the required three steps of the above-described IGP prior to commencing litigation, the plaintiff has failed to exhaust his administrative remedies as required under the PLRA. *See Ruggerio v. Cty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006).

In the current case, Defendants claim Plaintiff failed to satisfy the exhaustion requirements for all claims contained in the second amended complaint. *See* Dkt. No. 73. During Plaintiff's deposition on July 30, 2018, Plaintiff expressed a general understanding of how the grievance process operates. Dkt. No. 73-2 at 58-59. DOCCS computer printouts show that Plaintiff properly appealed at least six other grievances prior to commencing this action, thereby demonstrating that Plaintiff generally knew how to exhaust his administrative remedies prior to filing suit. Dkt. No. 73-5 at 6.

Although DOCCS records do not show any grievances which were filed and appealed regarding the claims of deliberate indifference against Defendants Dr. Chalom and Nurse Penn, Plaintiff contends he filed three grievances for "medical," or inadequate medical care, in October 2015, January 2016, and on July 7, 2016. Dkt. No. 73-2 at 59-64; *See* Dkt. No. 73-5 at 6. Plaintiff alleges he filed a grievance with the grievance

office at Ogdensburg C.F. in October 2015 in connection with the medical treatment Plaintiff received on July 30, 2015. Dkt. No. 73-2 at 60-61. Even assuming the DOCCS records were incorrect and the grievance was filed, it would have been filed over two months after Plaintiff received the complained of medical treatment and therefore untimely. Dkt. No. 74-1 at 30; *see* 7 N.Y.C.R.R. § 701.5(a)(1). Untimely grievances are insufficient to exhaust administrative remedies. 7 N.Y.C.R.R. § 701.5(a)(1); *see, e.g., Adams v. O'Hara*, No. 16-CV-0527, 2019 WL 652409, *7 (N.D.N.Y. Feb. 15, 2019) ("Filing an untimely grievance without subsequently obtaining a finding of mitigating circumstances is insufficient to exhaust one's available administrative remedies"); *Girard v. Cuttle*, No. 15-CV-0187, 2018 WL 4190140, *5 (N.D.N.Y. Aug. 10, 2018) ("An untimely grievance does not satisfy the exhaustion requirement").

**\*4** Although Plaintiff wrote a follow up letter on the October 2015 grievance to the Ogdensburg C.F. Deputy Chief Medical Officer Carl J. Koenigsmann, this too was insufficient to properly exhaust Plaintiff's administrative remedies because Koenigsmann is a prison official outside of the grievance chain of command. Dkt. No. 73-2 at 60-62; *see Louis-Charles v. Barker*, No. 16-CV-1417, 2018 WL 4299982, *2 (N.D.N.Y. Sept. 10, 2018) (citing *Geer v. Chapman*, No. 15-CV-952, 2016 WL 6091699, *5 (N.D.N.Y. Sept. 26, 2016)); *see also Macias v. Zenk*, 495 F.3d 37, 44-45 (2d Cir. 2007). 2

2    While placing prison officials on notice of a grievance through less formal channels may constitute a claim exhaustion " 'in a substantive sense,' " an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias*, 495 F.3d at 43 (quoting *Johnson v. Testman*, 380 F.3d 691, 697-98 (2d Cir. 2004) (emphasis omitted)).

Plaintiff asserted he submitted a second grievance to the grievance office at Ogdensburg C.F. in January 2016. Dkt. No. 73-2 at 63. Plaintiff also alleges he filed a third grievance on July 7, 2016 by handing the grievance to an officer to mail for him while he was confined in the Riverview C.F. Special Housing Unit ("SHU"). Dkt. No. 73-2 at 63-64. Although these grievances would have been timely with the corresponding medical treatment, Plaintiff did not receive a response and did not follow up or file any appeals. Dkt. No. 73-2 at 63-64. Therefore, Magistrate Judge Peebles correctly

found that Plaintiff failed to properly use the IGP and proceeded to address a possible exception to the exhaustion requirement.

Although the PLRA requires inmates to exhaust all available administrative remedies prior to filing a § 1983 claim, courts have interpreted this Act to contain an important textual exception: an inmate is not required to exhaust administrative remedies if such remedies are not "available." *Ross v. Blake*, 136 S. Ct. 1850, 1855 (2016). There are three circumstances in which the Supreme Court has found administrative remedies are not available. *Id.* at 1855. "First, an administrative remedy may be unavailable when 'it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates.' " *Williams v. Priatno*, 829 F.3d 118, 123 (2d Cir. 2016) (quoting *Ross*, 136 S. Ct. at 1859). "Second, 'an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use.' " *Id.* at 123 (quoting *Ross*, 136 S. Ct. at 1859). "In other words, 'some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it.' " *Id.* at 123-24 (quoting *Ross*, 136 S. Ct. at 1859). "Third, an administrative remedy may be unavailable 'when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.' " *Id.* at 124 (quoting *Ross*, 136 S. Ct. at 1860).

In this case, there is no allegation that the staff at Ogdensburg C.F. or Riverview C.F. discarded or otherwise interfered with Plaintiff's grievances. *See generally* Dkt. No. 50. Therefore, Magistrate Judge Peebles proceeded to address the Second Circuit's treatment of the availability of New York's IGP when the inmate does not receive a response to filed grievances.

**\*5** In *Williams*, an inmate-plaintiff allegedly gave a prison guard a grievance to file on his behalf, but it was never filed and the inmate was subsequently transferred and never received a response. *Williams*, 829 F.3d at 120-21. The Second Circuit addressed whether administrative remedies were "available" to the inmate-plaintiff and concluded that New York regulations do not clearly outline the process to appeal an unfiled and unanswered grievance. *See id.* at 124. As such, the Court held that "the grievance procedures that were technically available to [the plaintiff] are so opaque and confusing that they were, 'practically speaking, incapable of use.' " *Id.* (quoting *Ross*, 136 S. Ct. at 1859).

In contrast, the Second Circuit in *Cicio* found that when an inmate claimed he filed a written grievance with the IGRC, but the IGRC supervisor could not find a record of the grievance and the parties agreed the plaintiff never received a response, the situation was not so opaque that it became "incapable of use." *Cicio v. Wenderlich*, 714 Fed. Appx. 96, 97-98 (2d Cir. 2018). There, the Court found that "[w]hen a prisoner has filed a grievance, but receives no response, the regulations provide a right of appeal." *Id.*

Magistrate Judge Peebles appropriately reasoned that the facts of the present case fall somewhere in between *Williams* and *Cicio*. The IGP supervisors at both Ogdensburg C.F. and Riverview C.F. submitted declarations stating they could find no record of Plaintiff's grievances in their respective offices. Dkt. Nos. 73-3, 73-4. However, Plaintiff alleges that he handed the second grievance to the Ogdensburg C.F. grievance office, and the third grievance to a prison guard while in Riverview C.F. SHU. Dkt. No. 73-2 at 63-64. Plaintiff claims that he did not receive a response to either grievance, and simultaneously concedes that he made no attempt to follow up or otherwise appeal. Dkt. No. 73-2 at 61-64. Plaintiff's third grievance is further complicated by his transfer from Riverview C.F. SHU to Upstate C.F. SHU. Dkt. No. 73-2 at 147-49.

Although Plaintiff's first, untimely grievance was clearly insufficient to exhaust his administrative remedies, the Court is unable to come to the same conclusion with respect to the second and third grievances. The Court agrees with Magistrate Judge Peebles' acknowledgment that whether administrative remedies were available is a somewhat nebulous issue in light of *Cicio* and *Williams*, as well as the specific facts of this case. Therefore the Court finds that Magistrate Judge Peebles' correctly determined Defendants' summary judgment motion cannot be granted with regard to the alleged January 2016 and July 7, 2016 grievances on this procedural basis.

Based on the foregoing, the Court finds that Magistrate Judge Peebles correctly determined that Defendants' Motion for Summary Judgment should be granted with respect only to the grievance allegedly filed in October 2015 regarding the medical treatment rendered by Dr. Chalom on July 30, 2015. As such, Plaintiff's claim as to his first grievance is dismissed for his failure to exhaust.

### C. Deliberate Indifference

Britt v. Carberry, Not Reported in Fed. Supp. (2019)
2019 WL 2437912

Case 9:19-cv-00427-DNH-TWD   Document 62   Filed 12/17/21   Page 143 of 193

For a plaintiff to effectively state an Eighth Amendment claim for denial of adequate medical care, he must demonstrate that the accused prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). The deliberate indifference standard for denial of medical care requires demonstration of (1) a sufficiently serious deprivation, and (2) deliberate indifference with a "sufficiently culpable state of mind." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir. 1994) (citation omitted).

### 1. Sufficiently Serious Deprivation

**\*6** The sufficiently serious deprivation inquiry is the objective prong of the deliberate indifference standard. *See Brock v. Wright,* 315 F.3d 158, 162 (2d Cir. 2003) (citation omitted). Under this prong, relevant considerations include "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) 'the existence of chronic and substantial pain.' " *Id.* (quoting *McGuckin v. Smith,* 974 F.2d 1050, 1059-60 (9th Cir. 1992)) (other citation omitted). Further, the court may examine whether the deprivation represents "a condition of urgency, one that may produce death, degeneration, or extreme pain[.]" *Hill v. Curcione,* 657 F.3d 116, 122 (2d Cir. 2011) (internal quotation marks omitted). As the Second Circuit has stated, the relevant inquiry focuses on "the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition[.]" *Smith v. Carpenter,* 316 F.3d 178, 186 (2d Cir. 2003).

In this case, Plaintiff's deliberate indifference claims generally arise out of a disagreement over the medical treatment Plaintiff received from Dr. Chalom and Nurse Penn while he was an inmate. *See* Dkt. No. 50. Standing alone, Plaintiff's disagreement "does not create a constitutional claim." *Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir. 1998); *accord, Fuller v. Lantz,* 549 Fed. Appx. 18, 21 (2d Cir. 2013); *see also Estelle,* 429 U.S. at 107 (concluding that a medical professional's decision regarding which diagnostic techniques or forms of treatment are indicated "is a classic example of a matter for medical judgment" and does not give rise to a constitutional claim).

Nevertheless, Plaintiff also alleges he was denied adequate medical care. *See generally* Dkt. Nos. 50, 77. Although Plaintiff references suffering from "serious bacteria," "Methicillin-Resistant Staphylococcus Aureus" ("MRSA"),

and a "deadly infection," the record reflects he suffered from recurring cellulitis [3] and received treatment on each occasion that he requested medical assistance. Dkt. No. 50 at ¶¶ 13-15; Dkt. No. 74-1 at 25-26, 28, 30; Dkt. No. 77 at 8.

3   "Cellulitis is 'an acute, diffuse, spreading edematous, suppurative inflammation of the deep subcutaneous tissues, and sometimes muscle, sometimes with abscess formation.' " *Nelson v. Dougherty,* No. 10-CV-1568, 2012 WL 4026682, \*1 (N.D.N.Y. Aug. 13, 2012) (quoting DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 330 (31 st ed. 2007)).

When Plaintiff requested medical attention while in custody in Ogdensburg C.F. on July 30, 2015 and January 26, 2016, Dr. Chalom examined him and prescribed him antibiotics for cellulitis. Dkt. No. 74 at 3; *see also* Dkt. No. 74-1 at 30, 28; *see also* Dkt. No. 50 at 10. Although at varying points in the record Plaintiff contends otherwise, Plaintiff's medical records indicate Dr. Chalom did not provide any further medial treatment to Plaintiff. *See* Dkt. No. 50; Dkt. No. 74 at 3-4; *see generally* Dkt. No. 74-1. There is nothing in the record to suggest Dr. Chalom's decision to prescribe certain medications was anything other than an appropriate exercise of his discretion to determine the method of care and treatment to provide to Plaintiff. *See Estelle,* 429 U.S. at 107.

When Plaintiff requested emergency medical attention on June 29, 2016, Nurse Penn examined Plaintiff at Ogdensburg C.F. and aware of Plaintiff's impending transfer, then contacted medical staff at Riverview C.F. to examine Plaintiff upon his intake. Dkt. No. 73-2 at 74; Dkt. No. 73-7 at 18, 20-25; *see* Dkt. No. 73-9 at 3; Dkt. No. 74-1 at 25-26. Plaintiff concedes he was subsequently examined by a doctor at Riverview C.F. and given a prescription for antibiotics, which resolved his complaints. Dkt. No. 73-2 at 137-38; *see also* Dkt. No. 74-1 at 25-26. The record indicates that Nurse Penn appropriately exercised her judgment to determine the method of care and treatment to be provided to Plaintiff, within the scope of her authority as a registered nurse. Dkt. No. 73-9 at 2; *see Estelle,* 429 U.S. at 107.

**\*7** Therefore, the Court agrees with Magistrate Judge Peebles' assessment that a reasonable fact finder would not conclude that Plaintiff's cellulitis was sufficiently severe as to support the first factor or objective test for deliberate medical indifference. The Court further finds Magistrate Judge Peebles correctly determined that even if a reasonable fact

finder could conclude Plaintiff's condition was sufficiently severe, no reasonable fact finder could conclude that Defendants' care was inadequate, or if in any way inadequate, that it was sufficiently serious. The Eighth Amendment does not afford prisoners a right to medical treatment of their choosing and prison medical personnel have broad discretion to determine what method of care and treatment to provide to their patients. *See Estelle*, 429 U.S. at 107*; see also Dean v. Coughlin*, 804 F.2d 207 (2d Cir. 1986).

### 2. Culpable State of Mind

The second prong of the deliberate indifference standard is a subjective test requiring the plaintiff to show that the defendant acted with the requisite culpable state of mind. *Hathaway*, 37 F.3d at 66. This state of mind is similar to criminal recklessness and requires "something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994).

In this case, the record shows Plaintiff's condition was addressed and Defendants did not turn a blind eye or fail to act while aware of a substantial risk of harm to Plaintiff's health or safety. Dkt. No. 73-2 at 74; Dkt. No. 73-7 at 18, 20-25; *see* Dkt. No. 73-9 at 3; Dkt. No. 74 at 3-4, 25-26; *see generally* Dkt. No. 74-1; *see also* Dkt. No. 50 at 10. Therefore, the Court agrees with Magistrate Judge Peebles' conclusion that even if Plaintiff could satisfy the objective prong, no reasonable fact finder could conclude that Dr. Chalom or Nurse Penn acted with the requisite deliberate indifference.

Based on the foregoing, the Court finds that Magistrate Judge Peebles correctly determined that Defendants' Motion for Summary Judgment should be granted with respect to Plaintiff's deliberate medical indifference claims.

### D. Due Process Claim

Defendants argue there is no genuine issue of material fact as to whether Plaintiff's ninety-day disciplinary confinement constituted an atypical and significant hardship. Dkt. No. 73-11 at 18-19; Dkt. No. 78 at 10-11. Further, Defendants argue even if Plaintiff was deprived of a cognizable liberty interest, Plaintiff was afforded sufficient due process. Dkt. No. 73-11 at 19-24; Dkt. No. 78 at 9-10. Plaintiff has not addressed Defendants' liberty interest argument, but contends he was deprived of procedural due process in connection with his disciplinary hearing held in July of 2016. *See* Dkt. No. 77.

### 1. Liberty Interest

To successfully state a claim under Section 1983 for denial of due process, a plaintiff must establish both the existence of a protected liberty or property interest, and that he was deprived of that interest without being afforded sufficient process. *See Shakur v. Selsky*, 391 F.3d 106, 118 (2d Cir. 2004) (citing *Kentucky Dep't of Corrs. v. Thompson*, 490 U.S. 454, 460 (1989)); *Giano v. Selsky*, 238 F.3d 223, 225 (2d Cir. 2001). "Prison discipline implicates a liberty interest when it 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Ortiz*, 380 F.3d at 654 (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). In *Sandin*, the Supreme Court held that although states may create liberty interests protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, ... nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. 483-84 (internal citations omitted).

**\*8** The prevailing view in the Second Circuit is that, by its regulatory scheme, the State of New York has created a liberty interest in remaining free from disciplinary confinement, thus satisfying the first *Sandin* factor. *See, e.g., LaBounty v. Coombe*, No. 95-CV-2617, 2001 WL 1658245, \*6 (S.D.N.Y. Dec. 26, 2001); *Alvarez v. Coughlin*, No. 94-CV-0985, 2001 WL 118598, \*6 (N.D.N.Y. Feb. 6, 2001). Accordingly, Magistrate Judge Peebles appropriately addressed whether Plaintiff's SHU confinement rose to the level of an atypical and significant hardship under *Sandin*. Dkt. No. 87 at 38-39.

The Second Circuit has not set a bright line rule on when confinement becomes atypical. "In order to determine whether a liberty interest has been affected, district courts are required to examine the circumstances of a confinement ... and to identify with specificity the facts upon which [their] conclusions [are] based." *Wright v. Coughlin*, 132 F.3d 133, 137 (2d Cir. 1998) (citations omitted). While under certain circumstances confinement of less than 101 days could be shown to meet the atypicality standard under *Sandin*, the Second Circuit generally takes the position that confinement in a SHU, without unusual conditions, for a period of 101 days or less will not constitute an atypical hardship, while confinement for a period of more than 305 days has been held to be atypical even if under "normal conditions." *Ortiz*, 380 F.3d at 654; *see Colon v. Howard*, 215 F.3d 227, 231, 232

Britt v. Carberry, Not Reported in Fed. Supp. (2019)

2019 WL 2437912

n.5 (2d Cir. 2000). The "atypicality" inquiry under *Sandin* is normally a question of law. *Colon*, 215 F.3d at 230-31; *Sealey v. Giltner*, 197 F.3d 578, 585 (2d Cir. 1999).

In the present case, at Plaintiff's July 2016 disciplinary hearing, Defendant Carberry found Plaintiff guilty and imposed a ninety-day SHU confinement. Dkt. No. 73-7 at ¶¶ 13, 14. As Plaintiff has alleged unusual conditions, the Court must address whether the record reflects that Plaintiff was subject to "conditions more onerous than usual" during his confinement. *Davis v. Barrett*, 576 F.3d 129, 133 (2d Cir. 2009) (citing *Colon*, 215 F.3d at 232-33 n.5 (2d Cir. 2000)). The Court must examine the conditions of confinement " 'in comparison to the hardships endured by prisoners in general population, as well as prisoners in administrative and protective confinement, assuming such confinements are imposed in the ordinary course of prison administration.' " *Id.* at 134 (quoting *Welch v. Bartlett*, 196 F.3d 389, 392-93 (2d Cir. 1999)).

For the duration of Plaintiff's ninety-day disciplinary confinement, he was confined in Riverview C.F. SHU for the first sixteen days, and then in Upstate C.F. SHU for the remainder of the ninety days. Dkt. No. 73-2 at 147-49. Plaintiff alleges that in Riverview C.F. SHU, the shower walls and floors were dirty with mildew, there was a rodent infestation in his cell, and there was a light in his cell illuminated from 6:00 a.m. to 11:00 p.m. Dkt. No. 50 at 18. Plaintiff further alleged Upstate C.F. SHU had similar rodent issues. Dkt. No. 50 at 8; Dkt. No. 73-2 at 121-25. Plaintiff alleged these conditions resulted in weight loss, an inability to sleep, "severe migraines, dizziness, [and other] ailments, which included extreme fatigue and hallucination[s.]" Dkt. No. 50 at 18.

Although Plaintiff testified to the SHU conditions and alleges they were inferior to conditions "for the general pop[ulation] inmates[,]" "the record lacks any evidence of the conditions for other inmates in administrative confinement or in the general prison population." Dkt. No. 50 at 18; *Davis*, 576 F.3d at 135. Therefore, Magistrate Judge Peebles correctly concluded that without the necessary evidence in the record for the Court to determine if Plaintiff suffered an atypical and significant hardship during his confinement, the Court must assume Plaintiff was deprived of a liberty interest. Dkt. No. 87 at 41. Accordingly, the Court must proceed to analyze whether Defendants provided Plaintiff with constitutionally adequate safeguards in connection with his disciplinary hearing. *Id.*

### 2. Procedural Safeguards

**\*9** The Fourteenth Amendment to the Constitution provides that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. CONST. AMEND. XIV, § 1. "Although prison inmates necessarily have their liberty severely curtailed while incarcerated, they are nevertheless entitled to certain procedural protections when disciplinary actions subject them to further liberty deprivations such as loss of good-time credit or special confinement that imposes an atypical hardship." *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004) (citations omitted).

These due process requirements include procedural protections such as (1) written notice of the charges, (2) the opportunity to appear at a disciplinary hearing with a reasonable opportunity to present witnesses and evidence in support of his defense, subject to a prison facility's legitimate safety and penological concerns, (3) a written statement by the hearing officer explaining the decision and the reason for the action being taken, and (4) in some circumstances, the right to assistance in preparing a defense. *Wolff*, 418 U.S. at 564-69; *see also Luna v. Pico*, 356 F.3d 481, 487 (2d Cir. 2004).

#### a. Written Notice

While Plaintiff acknowledged he received written notice of the charges against him in the form of a misbehavior report ("MBR") within the prescribed time of at least twenty-four hours prior to his disciplinary hearing, Plaintiff challenged the MBR as being too general to provide meaningful notice. Dkt. No. 50 at 6; *see* Dkt. No. 73-2 at 98. In reviewing this claim, Magistrate Judge Peebles correctly articulated that due process does not require "notice that painstakingly details all facts relevant to the date, place, and manner of charged inmate misconduct[,]" but rather only requires "sufficient factual specificity to permit a reasonable person to understand what conduct is at issue[.]" *Sira*, 380 F.3d at 72. As Magistrate Judge Peebles correctly determined, the MBR provided Plaintiff sufficient notice under this standard because it included "specific facts" of his charged misconduct. Dkt. No. 87 at 44 (quoting Dkt. No. 73-7 at 9).

#### b. Opportunity to Present Witnesses

In the second amended complaint, Plaintiff alleged Defendant Carberry, in her role as disciplinary hearing officer, denied

witness testimony that would have provided compelling evidence of his innocence. Dkt. No. 50 ¶ 17. Although a prisoner's right to call witnesses at a disciplinary hearing may be denied "on the basis of irrelevance or lack of necessity," the record indicates Plaintiff's request for inmates Drepaul and Green to testify was not denied. *See* Dkt. No. 73-7 at 6, 16; *Kingsley v. Bureau of Prisons*, 937 F.2d 26, 30 (2d Cir. 1991) (citations omitted). Instead, Drepaul refused to testify, saying "I didn't see anything. I don't want to testify." Dkt. No. 73-7 at 16. Further, Defendant Carberry's hearing report reflected that Green did testify, but also indicated his testimony was not credible and that he stated he was in the yard at the time of the incident. Dkt. No. 73-7 at 27.

Therefore, this Court agrees with Magistrate Judge Peebles' determination that Plaintiff's claim is flatly contradicted by the record and that Defendant Carberry's failure to call Drepaul, a witness who refused to testify, does not violate Plaintiff's procedural due process rights. *See, e.g., Caimite v. Venettozzi*, No. 17-CV-0919, 2018 WL 6069458, *5 (N.D.N.Y. Oct. 29, 2018); *Abdur-Raheem v. Caffery*, No. 13-CV-6315, 2015 WL 667528, *6 (S.D.N.Y. Feb. 17, 2015); *Hinton v. Prack*, No. 12-CV-1844, 2014 WL 4627120, *7 (N.D.N.Y. Sept. 11, 2014) ("The fact that these witnesses refused to testify on [the plaintiff's] behalf does not alter the fact that he was given the opportunity to call witnesses").

### c. Employee Assistant

**\*10** "Although inmates are not entitled to retained or appointed counsel in prison disciplinary hearings, '[p]rison authorities have a constitutional obligation to provide assistance to an inmate in marshaling evidence and presenting a defense when he is faced with disciplinary charges.' " *Moore v. Peters*, 92 F. Supp. 3d 109, 125-26 (W.D.N.Y. 2015) (quoting *Eng v. Coughlin*, 858 F.2d 889, 897 (2d Cir. 1988)). "New York's regulations entitle a prisoner to an employee assistant to help him prepare for a disciplinary hearing." *Id.* at 126 (citing 7 N.Y.C.R.R. §§ 251-4.1, 251-4.2). "The assistant 'need only perform what the plaintiff would have done but need not go beyond the inmate's instructions.' " *Id.* (quotation and other citation omitted). "[A]ny violations of this qualified right are reviewed for 'harmless error.' " *Clyde v. Schoellkopf*, 714 F. Supp. 2d 432, 437 (W.D.N.Y. 2010) (quoting *Pilgrim v. Luther*, 571 F.3d 201, 206 (2d Cir. 2009)).

In the present case, Plaintiff received an employee assistant, Defendant Sgt. McKinley, who relayed Plaintiff's requests

to the hearing office and executed an assistance form with him. Dkt. No. 73-8 at 2, 3, 6. Plaintiff alleged he requested additional information that was not listed on the executed assistance form or requested by Defendant Sgt. McKinley. *Id.*; Dkt. No. 73-2 at 94-98, 107. Upon review of Plaintiff's claim, Magistrate Judge Peebles correctly found, nothing in the record supports the notion that providing Plaintiff with this information would have impacted the outcome of the hearing. *Clyde*, 714 F. Supp. 2d at 437 (quoting *Pilgrim*, 571 F.3d at 206); *see, e.g., Young v. Polizzi*, No. 16-CV-0660, 2018 WL 3949967, *8 (N.D.N.Y. July 11, 2018); *Hernandez v. Selsky*, 572 F. Supp. 2d 446, 455 (S.D.N.Y. 2008) (concluding that because the plaintiff failed to show how outcome of hearing would have been impacted, alleged inadequate assistance was harmless error not warranting denial of summary judgment). Accordingly, Defendants' motion for summary judgment is granted as to this claim.

### d. Impartial Hearing Officer

"An inmate subject to a disciplinary hearing is entitled to an impartial hearing officer." *Allen v. Cuomo*, 100 F.3d 253, 259 (2d Cir. 1996) (citing cases). Nevertheless, "[i]t is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts," and "[t]he degree of impartiality required of prison officials does not rise to the level of that required of judges generally." *Id.* at 259 (citing cases). In addition to the greater flexibility accorded prison disciplinary hearing officers, the due process impartiality standard is satisfied if "some evidence" in the record supports the decision of the prison disciplinary proceeding. *Superintendent, Mass. Corr. Inst. v. Hill*, 472 U.S. 445, 447 (1985). Further, the inmate must demonstrate prejudice in connection with the alleged denial of due process by showing that it affected the outcome of the hearing. *See, e.g., Clark v. Dannheim*, 590 F. Supp. 2d 426, 429 (W.D.N.Y. 2008) (citing *Powell v. Coughlin*, 953 F.2d 744, 750 (2d Cir. 1991)) (other citations omitted).

In the second amended complaint, Plaintiff alleges that Defendant Carberry was not an impartial hearing officer and that she had predetermined the results of the hearing in an "arbitrary and capricious" and "bad-faith manner[.]" Dkt. No. 50 at ¶ 19. As Magistrate Judge Peebles correctly determined, Plaintiff's claim against Defendant Carberry is without merit. Although the hearing tape was so distorted that the Court was unable to review it, the Court was able to review other evidence in the record, including the hearing

Britt v. Carberry, Not Reported in Fed. Supp. (2019)

2019 WL 2437912

record sheet and Defendant Carberry's handwritten hearing report. Dkt. No. 73-7 at 11, 27-29. The Court finds that Magistrate Judge Peebles correctly concluded that Plaintiff's bare assertions with respect to Defendant Carberry's alleged bias are unsupported by these documents and the record as a whole, and as such, are insufficient to give rise to a dispute of material fact. *See generally* Dkt. No. 73-7; *see Francis v. Coughlin*, 891 F.2d 43, 47 (2d Cir. 1989) ("[A] plaintiff-inmate armed with nothing more than conclusory allegations of bias and prejudgment should not be able to defeat a well-supported motion for summary judgment[.]"); *Boose v. Schneider*, No. 14-CV-0518, 2016 WL 8732644 (N.D.N.Y. Feb. 19, 2016).

**\*11**  Accordingly, because no reasonable fact finder could conclude that Plaintiff's due process rights were violated, Defendants' motion for summary judgment is granted as to this claim.

### III. CONCLUSION

After carefully reviewing the entire record in this matter, Magistrate Judge Peebles' March 22, 2019 Report and Recommendation, and the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Magistrate Judge Peebles' March 22, 2019 Report and Recommendation (Dkt. No. 87) is **APPROVED** and **ADOPTED in its entirety** for the reasons stated therein; and the Court further

**ORDERS** that Defendants' Motion for Summary Judgment (Dkt. No. 73) is **GRANTED in its entirety**; and the Court further

**ORDERS** that Plaintiff's amended complaint is **DISMISSED with prejudice**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2019 WL 2437912

---

**End of Document**                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Sankara v. Montgomery, Not Reported in Fed. Supp. (2018)

2018 WL 4610686

2018 WL 4610686
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Ahmadou SANKARA, Plaintiff,

v.

MONTGOMERY, Burgess, Lopez, Defendants.

9:16-CV-00885 (FJS/TWD)
|
Signed 06/25/2018

**Attorneys and Law Firms**

AHMADOU SANKARA, 16-R-0122, Plaintiff pro se, Upstate Correctional Facility, P.O. Box 2001, Malone, New York.

HON. BARBARA D. UNDERWOOD, Attorney General for the State of New York, OF COUNSEL: MATTHEW P. REED, ESQ., The Capitol, Albany, New York 12224, Counsel for Defendants.

**ORDER AND REPORT-RECOMMENDATION**

THÉRÈSE WILEY DANCKS, United States Magistrate Judge

**I. INTRODUCTION**

*1 The sole remaining claim in *pro se* Plaintiff Ahmadou Sankara's amended complaint (Dkt. No. 19) in this civil rights action brought under 42 U.S.C. § 1983 is his Eighth Amendment conditions of confinement claim involving the alleged denial of meals against Defendants Keith Montgomery ("Montgomery"), a Department of Corrections and Community Supervision ("DOCCS") Sergeant at Fishkill Correctional Facility ("Fishkill"); Erik Burgess ("Burgess"), a Corrections Officer ("C.O.") at Fishkill; and Jessica Lopez ("Lopez"), a former C.O. at Fishkill. (Dkt. No. 22 at 22.[1]) Montgomery, Burgess, and Lopez now move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on the grounds that Plaintiff has failed to exhaust his administrative remedies and has failed to assert a constitutional violation. (Dkt. Nos. 81 and 81-1.) Plaintiff has filed papers in opposition to Defendants' motion.[2] (Dkt. No. 84.)

[1] Page references to documents identified by docket number are to the numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office.

[2] Plaintiff has filed a cross-notice of motion for summary judgment seeking denial of Defendants' summary judgment motion. (Dkt. No. 84-2). Because Plaintiff is not cross-moving for summary judgment in his favor, the Court is treating his notice of motion as opposition to Defendants' motion.

For reasons that follow, the Court recommends that Defendants' motion for summary judgment be granted.

**II. FACTUAL BACKGROUND**

Plaintiff, an inmate in the custody of DOCCS, was transferred to Fishkill on August 3, 2016. (Dkt. No. 19 at 11.) In his amended complaint, Plaintiff alleges that his Eighth Amendment conditions of confinement claim is based upon having been deprived of meals by Defendant Burgess on August 3, 2016, and August 4, 2016; by Defendants Lopez and Montgomery on October 10, 2016, and September 24, 2016; and by Montgomery on October 23, 2016, and October 24, 2016. *Id.* At his deposition, Plaintiff testified he was deprived of five meals by the Defendants, which included dinner on August 3 and 4, 2016, and lunch on September 10, 2016, September 23, 2016, and September 24, 2016. (Dkt. No. 81-3 at 19, 21, 26-27.)

**A. Service of Meals in the Fishkill SHU**

Meals are served three times a day in the Special Housing Unit ("SHU") at Fishkill. (Dkt. No. 81-4 at ¶ 7.[3]) Before a meal is served, an announcement is made on the public address system once on each of the two floors notifying inmates of the forthcoming meal, and reminding them to be awake, with their lights on, fully clothed, and with any clothing lines in their cell taken down. *Id.* at ¶¶ 8-9. It is made before meal delivery so that inmates have time to prepare. *Id.* at ¶ 9. The rules for meals are contained in the SHU rulebook given to inmates when they are admitted to the unit. *Id.* at ¶ 10. The rules have a dual purpose: to ensure that food is not contaminated and to meet heightened security concerns in SHU. *Id.* at ¶¶ 11-13. Plaintiff denies having received the rulebook. (Dkt. No. 84 at ¶ 17.)

3     Paragraph numbers are used where documents identified by CM/ECF docket number contain consecutively numbered paragraphs.

**\*2** Anywhere from five to seven officers assist in delivering meals, with Defendant Montgomery either leading or following behind the officers to address any problems when he is on duty. *Id.* at ¶¶ 15-17. Inmates who do not comply with the established procedures do not receive a meal. *Id.* at ¶ 18. Failure to comply with the meal distribution procedures is noted as a refusal of chow and recorded in the SHU logbook. *Id.* at ¶ 14.

### B. August 3 and 4, 2016

Plaintiff claims that on August 3, 2016, the day he arrived at Fishkill, he was deprived of dinner by Defendant Burgess. (Dkt. No. 81-3 at 19, 27.) Plaintiff testified at his deposition that he received something like a box lunch with bread while en route to Fishkill and should have been given dinner at Fishkill but was not. *Id.* at 20. According to Plaintiff, dinner is served at 3:00 or 4:00pm. *Id.* at 22. Plaintiff claims that he and his bunk mate in SHU were denied dinner by Burgess on August 3, 2016, because his bunk mate was not properly dressed. *Id.* at 20-23, 27. Plaintiff was properly dressed and did not say anything, but his bunk mate began arguing with Burgess, which he was not supposed to do, so Burgess also deprived them of dinner the following day, August 4, 2016. *Id.* at 21, 27.

Plaintiff was very hungry and emotionally frustrated the night of August 3, 2016, because he had not made himself breakfast that morning, the lunch he was given was too small, and he did not receive dinner. *Id.* at 26. Plaintiff did receive both breakfast and lunch on August 4, 2016, missing only dinner. *Id.* at 21-22.

While Burgess recalls Plaintiff and his behavior in SHU, he does not recall the specific dates on which Plaintiff claims Burgess deprived him of a meal. (Dkt. No. 81-5 at ¶ 5.) There is an entry for August 3, 2016, in the SHU logbook in indicating that Plaintiff was not admitted to SHU until 6:48 pm, after dinner would have been served. (Dkt. No. 81-3 at 124.) The logbook appears to note two refusals for dinner on August 4, 2016, but does not list the inmates by name. *Id.* at 131.

### C. September 10, 2016

Plaintiff testified at his deposition that on September 10, 2016, he was denied a haircut by a corrections officer because Plaintiff had allegedly called him a Chinese officer, which Plaintiff denies. (Dkt. No. 81-3 at 32-33.) The officer wrote a misbehavior report on Plaintiff, and when the officer and Montgomery came around serving lunch, Plaintiff, who was standing in front of his door, was told he was not properly dressed and did not receive lunch. *Id.* at 34. Plaintiff did receive dinner on September 10, 2016. *Id.* at 36. Although Montgomery recalls Plaintiff, he does not recall his interactions with Plaintiff on the dates Plaintiff claims not to have received his meals. (Dkt. No. 81-4 at ¶ 20.)

### D. September 23, 2016

On September 23, 2016, recreation ("rec") and lunch were called at the same time. (Dkt. No. 81-3 at 39.) According to Plaintiff, a SHU inmate cannot have rec and chow at the same time. *Id.* Plaintiff was at rec with another inmate. *Id.* 39-40. When they came in, Plaintiff told the sergeant he had been at rec and needed his lunch. *Id.* at 39. At that time lunch had not yet passed by Plaintiff's door. *Id.* at 39-40. Plaintiff could see the officers and talked to them when the food was next to him, but Plaintiff was not given any. *Id.* at 40. Plaintiff has identified Montgomery as the one who did not give him lunch. *Id.* at 42.

**\*3** Plaintiff was very hungry so he started to kick the door for them to bring his food. *Id.* They did not want to bring his food so he left it alone. *Id.* Plaintiff did receive dinner on September 23, 2016. *Id.* at 41.

### E. September 24, 2016

Plaintiff testified at his deposition that on September 24, 2016, he stopped the Superintendent at Fishkill and started to speak with him about the food issue going on. (Dkt. No. 81-3 at 42.) Montgomery told Plaintiff to talk fast and Plaintiff said he knew Montgomery's name even though he hid it, and that Montgomery was the one who had denied him food September 10 and 23, 2016. *Id.* After the Superintendent left, Montgomery denied Plaintiff lunch again because he had talked to the Superintendent. *Id.* at 42-43. Defendant Lopez came to speak with Plaintiff when he began kicking his door. Plaintiff was told they had already passed and were not coming back, and they walked away. *Id.* at 43. When Plaintiff started kicking the door because he was really hungry, Lopez wrote a misbehavior report on which she stated he had been sleeping. *Id.* Plaintiff testified that of the Defendants only Montgomery was involved in depriving Plaintiff of lunch on

Case 9:19-cv-00427-DNH-TWD    Document 62    Filed 12/17/21    Page 150 of 193
Sankara v. Montgomery, Not Reported in Fed. Supp. (2018)
2018 WL 4610686

September 23, 2016, and that both Montgomery and Lopez were involved on September 24, 2016. *Id.* at 44.

## III. APPLICABLE SUMMARY JUDGMENT LEGAL STANDARDS

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56; *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin*, 467 F.3d at 272-73. The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "Conclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

A party opposing summary judgment is required to submit admissible evidence. *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] ... may rely only on admissible evidence.") (citation and internal quotation marks omitted). A plaintiff's verified complaint is to be treated as an affidavit. [4] *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit ... and therefore will be considered in determining whether material issues of fact exist....") (citations omitted).

[4]    The Court finds that Plaintiff's amended complaint is properly verified under 28 U.S.C. § 1746. (Dkt. No. 19 at 16.)

**\*4**  In *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005), the Second Circuit reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful." *Id.* (citation and internal quotation marks omitted). "To defeat summary judgment, ... nonmoving parties may not rely on conclusory allegations or unsubstantiated speculation." *Jeffreys*, 426 F.3d at 554 (citation and internal quotation marks omitted). "[T]o satisfy Rule 56(e), affidavits must be based upon 'concrete particulars,' not conclusory allegations." *Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997) (citation omitted). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obliged to "read [the pro se party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, "a pro se party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ. 5981 (WHP) (JCF), 1999 WL 983876 at *3 (S.D.N.Y. Oct. 28, 1999) [5] (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991) ).

[5]    Copies of all unpublished decisions cited herein will be provided to Plaintiff in accordance with *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

## IV. PLAINTIFF'S FAILURE TO COMPLY FULLY WITH N.D.N.Y. L.R. 7.1(a)(3)

While courts are required to give due deference to a plaintiff's *pro se* status, that status "does not relieve [a *pro se*] plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003). In opposing Defendants' summary judgment motion, Plaintiff failed to respond to the statement of material facts filed by Defendants in the manner required under N.D.N.Y. L.R. 7.1(a)(3) by neglecting to set forth a specific citation to the record in a number of instances where

Case 9:19-cv-00427-DNH-TWD    Document 62    Filed 12/17/21    Page 151 of 193

Sankara v. Montgomery, Not Reported in Fed. Supp. (2018)

2018 WL 4610686

he appears to dispute a statement included in the statement of undisputed facts.[6] (See Dkt. Nos. 81-2 and 84.)

[6]    L.R. 7.1(a)(3) requires the opposing party to file a response to the movant's Statement of Material Facts. Under the rule, the response "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises."

Where a party has failed to respond to the movant's statement of material facts in the manner required under N.D.N.Y. L.R. 7.1(a)(3), the facts in the movant's statement to which Plaintiff has not properly responded will be accepted as true (1) to the extent they are supported by evidence in the record,[7] and (2) the nonmovant, if proceeding *pro se*, has been specifically advised of the possible consequences of failing to respond to the motion.[8] *See Champion, v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). However, the Second Circuit, acknowledging a court's broad discretion to determine whether to overlook a failure to comply with local rules, has held that "while a court is not required to consider what the parties fail to point out in their [local rule statements of material facts], it may in its discretion opt to conduct an assiduous review of the entire record even where one of the parties has failed to file such a statement." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (citation and internal quotation marks omitted). In deference to Plaintiff's *pro se* status and the significant degree of effort he has shown in his response to Defendants' material statement of facts (Dkt. No. 84), the Court has opted to review the entire record.

[7]    L.R. 7.1(a)(3) provides that "The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." However, *see Vermont Teddy Bear Co., Inc. v. 1 800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) ("[I]n determining whether the moving party has met his burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts in the moving party's [Statement of Material Facts]. It must be satisfied that the citation to evidence in the record supports the assertion.") (citations omitted).

[8]    Defendants have complied with L.R. 56.2 by providing Plaintiff with the requisite notice of the consequences of his failure to respond to their summary judgment motion. (Dkt. No. 81 at 2.)

## V. EXHAUSTION OF ADMINISTRATIVE REMEDIES

### A. Legal Standard

**\*5**    Montgomery, Burgess, and Lopez seek summary judgment on Plaintiff's Eighth Amendment conditions of confinement claim against them on the ground that Plaintiff failed to exhaust his administrative remedies under the DOCCS Inmate Grievance Procedure ("IGP") with regard to the claim. Under the Prison Litigation Reform Act of 1995 ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Ross v. Blake*, —— U.S. ——, 136 S.Ct. 1850, 1854-55, 195 L.Ed.2d 117 (2016). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007).

The PLRA requires "proper exhaustion," which means using all steps required by the administrative review process applicable to the institution in which an inmate is confined and doing so properly. *Jones*, 549 U.S. at 218, 127 S.Ct. 910 (citing *Woodford v. Ngo*, 548 U.S. 81, 88, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006) ); *see also Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (exhaustion necessitates "using all steps that the [government] agency holds out, and doing so properly") (internal quotations omitted). In New York State prisons, DOCCS has a well-established three-step IGP. *See* N.Y. Comp. Codes R. & Regs. ("N.Y.C.R.R.") tit. 7, § 701.5.

First, an inmate must file a complaint with the facility IGP clerk within twenty-one days of the alleged occurrence. *Id.* § 701.5(a)(1). A representative of the facility's IGRC has sixteen calendar days from receipt of the grievance to informally resolve the issue. *Id.* § 701.5(b)(1). If there is no such informal resolution, the full IGRC conducts a hearing within sixteen calendar days of receipt of the grievance, *id.* §

Case 9:19-cv-00427-DNH-TWD    Document 62    Filed 12/17/21    Page 152 of 193

Sankara v. Montgomery, Not Reported in Fed. Supp. (2018)

2018 WL 4610686

701.5(b)(2), and issues a written decision within two working days of the conclusion of the hearing. *Id.* § 701.5(b)(3).

Second, a grievant may appeal the IGRC's decision to the facility superintendent within seven calendar days of receipt of the IGRC's written decision. *Id.* § 701.5(c)(1). If the grievance involves an institutional issue (as opposed to a DOCCS-wide policy issue), the superintendent must issue a written decision within twenty calendar days of receipt of the grievant's appeal. *Id.* § 701.5(c)(3)(ii). Grievances regarding DOCCS-wide policy issues are forwarded directly to the Central Office Review Committee ("CORC") for a decision under the process applicable to the third step. *Id.* § 701.5(c)(3)(i).

Third, a grievant may appeal to CORC within seven working days of receipt of the superintendent's written decision. *Id.* § 701.5(d)(1)(i). CORC is to render a written decision within thirty calendar days of receipt of the appeal. *Id.* § 701.5(d)(3)(ii).

Special procedures are used when the grievance involves a claim of staff misconduct. *Id.* § 701.8. A grievance alleging staff misconduct, once it is given a number and recorded, must be sent directly to the superintendent, and the superintendent must issue a decision within twenty-five days. *Id.* § 701.8(f). If the grievant wishes to appeal a decision by the Superintendent to CORC, he must file a notice of decision to appeal with the inmate grievance clerk at the bottom of the Superintendent's decision within seven days of receipt of the decision. *Id.* § 701.8(h). CORC is required to render a written decision within thirty calendar days of receipt of the appeal. *Id.* § 701.8(i) (incorporating § 701.5).

As set forth above, at each step of the IGP, a decision must be rendered within a specified time period. "Where the IGRC and/or superintendent do not timely respond, an inmate must appeal 'to the next step,' " assuming there is another step in the IGP. *Eleby v. Smith*, No. 9:15-CV-0281 (TJM/DEP), 2017 WL 986123, at *4 (N.D.N.Y. Jan. 9, 2017) (quoting 7 N.Y.C.R.R. § 701.6(g)(2) ); *see also Smith v. Kelly*, 985 F.Supp.2d 275, 281 (N.D.N.Y. 2013) ("[A]ny failure by the IGRC or the superintendent to timely respond to a grievance ... can and must be appealed to the next level ... to complete the grievance process."). Exhaustion under the DOCCS IGP is not complete until the grievance has been appealed to CORC and CORC has issued a decision. *See Neal v. Goord*, 267 F.3d 116, 123 (2d Cir. 2001), *overruled on other grounds by Porter v. Nussle*, 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); *Singh v. Goord*, 520 F.Supp.2d 487, 495 (S.D.N.Y. 2007) (complete exhaustion to CORC, the highest level, is required).

**\*6** While the PLRA mandates exhaustion of administrative remedies, it also "contains its own, textual exception to mandatory exhaustion." *Ross*, 136 S.Ct. at 1858. More specifically, section 1997e(a) provides that only those administrative remedies that "are available" must first be exhausted. 42 U.S.C. § 1997e(a); *see also Ross*, 136 S.Ct. at 1858 ("[T]he exhaustion requirement hinges on the availability of administrative remedies[.]" (quotations and citations omitted) ). In the PLRA context, the Supreme Court has determined that "availability" means that "an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." *Ross*, 136 S.Ct. at 1859 (quotations and internal citations omitted).

The *Ross* Court identified three circumstances in which a court may find that internal administrative remedies are not available to prisoners under the PLRA. *Id.* at 1859-60. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 1859. "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* Finally, an administrative remedy is not "available" when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

In *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 123 n.2 (2d Cir. 2016), the Second Circuit noted that, "the three circumstances discussed in *Ross* do not appear to be exhaustive[.]" The illustrations of unavailability in *Ross* nonetheless guide the Court's inquiry. *See Mena v. City of New York*, No. 13-CV-2430 (RJS), 2016 WL 3948100, at *4 (S.D.N.Y. July 19, 2016).

Because non-exhaustion is an affirmative defense, defendants bear the burden of showing that a prisoner has failed to satisfy the exhaustion requirements. *See Jones*, 549 U.S. at 216, 127 S.Ct. 910; *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004), *overruled on other grounds, Woodford*, 548 U.S. at 94-95, 126 S.Ct. 2378. Plaintiff must then establish that the DOCCS IGP was unavailable to him. *See Jones*, 549 U.S. at 216, 127 S.Ct. 910.

Sankara v. Montgomery, Not Reported in Fed. Supp. (2018)

2018 WL 4610686

**B. Analysis**

1. Plaintiff's Failure to Exhaust
His Administrative Remedies

Fishkill had a fully functioning inmate grievance procedure during the time Plaintiff was housed at the facility. (Dkt. No. 81-7 at ¶ 12.) Fishkill IGP supervisor, Sally Reams ("Reams"), has submitted a declaration describing the DOCCS IGP procedures followed at Fishkill. (*See generally* Dkt. No. 81-9.) According to Reams, she reviewed the records in the Fishkill grievance office where all documents or copies thereof related to a particular grievance dating back to January 1, 2013, are maintained. *Id.* at ¶¶ 9, 12. Her review revealed that Plaintiff was housed at Fishkill from August 3, 2016, to October 31, 2016, and during that time did not file any grievance related to a denial of six meals at Fishkill between August 3, 2016, and October 24, 2016. [9] *Id.* at ¶ 13.

[9]      The Court notes that Reams does not indicate in her declaration whether Plaintiff filed any grievances regarding one or more individual missed meal, or a grievance regarding a number other than six missed meals. (*See* Dkt. No. 81-9 at ¶ 13.) Moreover, Reams has used the dates in Plaintiff's amended complaint rather than the corrected dates in his deposition testimony for the time span during which the missed meals occurred used by her in her review. *Id.*

Joseph Cieslak ("Cieslak"), IGP supervisor at Mohawk Correctional Facility ("Mohawk"), to which Plaintiff was moved on October 31, 2016, has described the manner in which the DOCCS IGP is followed at Mohawk. (*See generally* Dkt. No. 81-8.) Cieslak reviewed the grievance records in the grievance office at Mohawk and determined that Plaintiff had not filed any formal grievances while at Mohawk. *Id.* at ¶¶ 9-12.

**\*7** Rachael Seguin, Assistant Director of the DOCCS IGP, has also submitted a declaration in support of Defendants' motion. (Dkt. No. 81-7.) Seguin is the custodian of records maintained by CORC. *Id.* at ¶ 2. The CORC database contains files on inmate appeals to CORC for the current year and the previous four calendar years. *Id.* at ¶ 7. Seguin reviewed the CORC database for appeals related to Plaintiff's claim in this

action and determined that he has never appealed a grievance to CORC. *Id.* at ¶¶ 10-11 and pp. 7-8.

The Court finds that the Reams declaration is deficient in showing that Plaintiff failed to file grievances with regard to any of the missed meals since it indicates only that her review of the grievance office records showed that Plaintiff did not file a grievance related to "a denial of meals on six occasions between August 3, 2016 and October 3, 2016." (Dkt. Nos. 81-3 at 38-39; 81-9 at ¶ 13.) However, inasmuch as the Seguin declaration and attached printouts from the CORC database establish that Plaintiff has never filed any appeals with CORC, the Court finds that Defendants have met their burden of establishing that Plaintiff failed to exhaust his administrative remedies with regard to his Eighth Amendment conditions of confinement claim that he was deprived of five meals by Defendants. *See Jones, 549 U.S. at 218, 127 S.Ct. 910* (proper exhaustion under the PLRA means using all steps required by the applicable administrative review process).

2. Plaintiff's Failure to Sustain His Burden on Availability

The Court also finds that Plaintiff has failed to submit nonconlusory evidence of unavailability under *Ross* sufficient to raise a material issue of fact on the question of availability of the DOCCS IGP. In his amended complaint, Plaintiff alleges "... also at Fishkill my SHU appel mail was not go out and my grievance was not go out I was denied food at Fishkill five times in the SHU...." (Dkt. No. 19 at 9.) Plaintiff further alleges "[o]n August 3, 2016 I was transfer from Green facility to Fishkill facility I don't know if Green facility write note to Fishkill facility because same day on June 3, 2016 [August 3, 3016?] I was denied chow the next day I was denie on June 4, 2016 [August 4. 2016?] I write grievance I never receive my grievance respond...." *Id.* at 11.

At his deposition, Plaintiff testified he filed grievances for "any matter that's not procedure" and "for [his] right" and never received a response. (Dkt. No. 81-3 at 60.) According to Plaintiff, he filed grievances regarding missed meals at Fishkill. *Id.* at 73. Plaintiff described the procedure followed in the Fishkill SHU whereby inmates give grievances to the corrections officer who comes around and drops the grievances in a basket and claims that the officers only send out the mail they want to send out. *Id.* at 74. Plaintiff claims to have filed grievances all the time and believes that they

Case 9:19-cv-00427-DNH-TWD    Document 62    Filed 12/17/21    Page 154 of 193
Sankara v. Montgomery, Not Reported in Fed. Supp. (2018)
2018 WL 4610686

probably did not go out because he never received a response. *Id.*

Plaintiff testified he wrote to the superintendent about the food situation because he had not heard back from the I.G.R.C. *Id.* at 75. The superintendent wrote back and told him to appeal his decision. *Id.* at 78. According to Plaintiff, the superintendent told him to appeal to CORC regarding how many times he was denied food in SHU, so he wrote to CORC and retained a copy as was his practice and never received a response. *Id.* at 77-78.

In his declaration in reply to the Reams declaration, Plaintiff states that the Fishkill grievance office failed to respond to his grievance of the Eighth Amendment violation. (Dkt. No. 84-1 at 2.) In his declaration in response to the Cieslak declaration, Plaintiff states that Cieslak never filed or responded to any of Plaintiff's grievances at Mohawk. *Id.* at 4. In his declaration in response to the Seguin declaration, the only grievance referenced is a grievance dated June 21, 2017. *Id.* at 6. Although not admissible evidence, Plaintiff repeats in his response to Defendants' material statement of facts that his grievances regarding being denied meals were taken but not sent to the grievance office. (Dkt. No. 84 at ¶ 54.)

 **\*8** Plaintiff has done nothing more than allege in conclusory fashion that he attempted to file one or more grievances concerning the denial of meals. He has provided no evidence that he actually did write grievances; when they were written; the content of the grievances, including the specific denial of meals involved in the grievance; the officers named in the grievance(s) as involved in the denials; the specific steps taken by Plaintiff to provide them to an officer to send to the grievance office; and any specific follow up with the grievance office at Fishkill regarding the grievances. Plaintiff has submitted no documentary evidence whatsoever that supports his conclusory assertion that he submitted grievances regarding the denial of meals or demonstrates any follow up on his part when he allegedly received no response.

The Court concludes that Plaintiff's conclusory accusations that the DOCCS IGP was unavailable to him because his grievances were not sent to the grievance office by the officers who picked them up and because he did not receive a response from CORC, unsupported by evidence, are insufficient to withstand summary judgment. *See Rodriguez v. Cross*, No. 15-CV-1079 (GTS/CFH), 2017 WL 2791063, at *7 (N.D.N.Y. May 9, 2017) ("Courts in this Circuit have consistently held that mere contentions or speculations

of grievances being misplaced by officers do not create a genuine issue of material fact [on the availability of the DOCCS IGP] when there is no evidence to support the allegations"); *Khudan v. Lee*, No. 12-cv-8147 (RJS), 2016 WL 4735364, at *6 (S.D.N.Y. Sept. 8, 2016) ("Plaintiff's accusations [regarding grievances], which 'stand alone' and are 'unsupported,' are insufficient to withstand summary judgment") (quoting *Bolton v. City of New York*, No. 13-CV-5749 (RJS), 2015 WL 1822008, at *2 (S.D.N.Y. April 20, 2015) ).

Based upon the foregoing, the Court recommends that all three Defendants be granted summary judgment on the ground that Plaintiff failed to exhaust his administrative remedies with regard to his Eighth Amendment claim.

## VI. Eighth Amendment Claim Regarding Missed Meals

The Court is recommending that Defendants be granted summary judgment on exhaustion grounds. However, if the Court were to consider Defendants claim for entitlement to judgment as a matter of law, it would recommend summary judgment as a matter of law on Plaintiff's Eighth Amendment conditions of confinement claim as well.

### A. Legal Standard for Eighth Amendment Conditions of Confinement Claims for Depriving an Inmate of Meals

The Eighth Amendment "imposes the constitutional limitation upon punishments: they cannot be 'cruel and unusual.' " *Rhodes v. Chapman*, 452 U.S. 337, 345, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). The Eighth Amendment prohibits punishments which "involve the unnecessary and wanton infliction of pain." *Id.* at 346, 101 S.Ct. 2392 (quoting *Gregg v. Georgia*, 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) ). "Among 'unnecessary and wanton' inflictions of pain are those that are 'totally without penological justification.' " *Id.* (quoting *Gregg*, 428 U.S. at 183, 96 S.Ct. 2909).

The Second Circuit has held that the Constitution requires that prisoners be fed nutritionally adequate food and "under certain circumstances a substantial deprivation of food may well be recognized as being of constitutional dimension." *Robles v. Coughlin*, 725 F.2d 12, 15 (2d Cir. 1983); *see also Jackson v. Marks*, 722 F. App'x 106, 107 (2d Cir. 2018) (Mem) ("[A] substantial deprivation of food can cause serious physical harm sufficient to find cruel and unusual punishment

Case 9:19-cv-00427-DNH-TWD Document 62 Filed 12/17/21 Page 155 of 193

Sankara v. Montgomery, Not Reported in Fed. Supp. (2018)

2018 WL 4610686

in violation of the Eighth Amendment.") (citation and internal quotation marks omitted).

In order to establish a claim that the denial of food constitutes a Eighth Amendment violation, a prisoner must establish that a "sufficiently serious condition" resulted from not receiving food. *Evans v. Albany County Correctional Facility*, No. 9:05-CV-1400 (GTS), 2009 WL 1401645, at *9 (N.D.N.Y. May 14, 2009) (citation and internal quotation marks omitted). To prove a conditions of confinement claim, a prisoner must also establish that defendant acted with deliberate indifference that defendant "knows of and disregards an excessive risk to inmate health or safety." *Phelps v. Kapnolas*, 308 F.3d 180, 185-86 (2d Cir. 2002) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ). "[T]he [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw that inference." *Id.* at 186 (quoting *Farmer, id.*). The "deliberate indifference" element is equivalent to standard of "recklessness" as used in criminal law. *Id.*

### B. Analysis

**\*9** Plaintiff claims to have missed a total of five meals over a period of fifty-three days as a result of the actions of the Defendants and never to have missed more than one meal on a given day. (Dkt. No. 81-3 at 19, 21, 26-27, 80.) Plaintiff contends Defendant Burgess denied him dinner on August 3 and August 4, 2016; Montgomery denied him lunch on September 10, 23, and 24, 2016; and Lopez with Montgomery denied him lunch on September 24, 2016. (Dkt. No. 81-3 at 19, 21, 27, 32-33, 42, 44, 55-56.) Neither Burgess nor Montgomery has any recollection of interactions with Plaintiff on the days he was allegedly denied meals. (Dkt. Nos. 81-4 at ¶ 20; 81-5 at ¶ 5.)

According to Lopez, she only withheld a meal from Lopez on one occasion because he was lying on his bed under a sheet either asleep or pretending to be asleep. (Dkt. No. 81-6 at ¶¶ 11, 16.) Lopez did not deliver his meal because he was not standing at his door fully dressed as required. *Id.* at ¶ 12. A review of the logbook by Lopez revealed that the denial occurred on September 24, 2016. *Id.* at ¶¶ 14-15. Lopez stated in her declaration that it was not uncommon for Plaintiff to pretend to be asleep during meals so that he could then allege he had been denied the meal and use the allegations to be disrespectful to officers and rile up the inmates. *Id.* at ¶ 13.

The Court finds that denying Plaintiff a single meal, as alleged against Lopez, does not rise to the level of a violation of Plaintiff's rights under the Eighth Amendment. *See Cabassa v. Oshier*, No. 9:11-CV-01237 (MAD/CFH), 2015 WL 5094802, at *5 (N.D.N.Y. Aug. 28, 2015) (denial of a single meal fails to plausibly state an Eighth Amendment claim); *Pagan v. Quiros*, No. 3:11-cv-1134 (DJS), 2014 WL 1057016, at *6 (D. Conn. Mar. 18, 2014) (holding that allegation of denial food and drink at one meal "does not constitute a substantial or sufficiently serious deprivation of a basic human need"); *Hankerson v. Nassau County Correctional Facility*, No. 12-CV-5282 (SJF) (WDW), 2012 WL 6055019, at *4 (E.D.N.Y. Dec. 4, 2012) (holding that denial of a single meal "falls far short of a 'substantial deprivation of food' and does not give rise to the level of a constitutional deprivation.").

The Court likewise concludes that Burgess's alleged denial of Plaintiff's dinner on August 3 and 4, 2016, and Montgomery's alleged denial of Plaintiff's lunch on September 10, 23, and 24, 2016, did not rise to the level of a violation of Plaintiff's rights under the Eighth Amendment. One missed meal a day has been found insufficient to establish an Eighth Amendment claim. *See Benitez v. Locastro*, No. 04-CV-423, 2008 WL 4767439, at *7 (N.D.N.Y. Oct. 29, 2008) (claim of one missed meal a day insufficient to establish an Eighth Amendment claim); *Johnson v. Merriman*, No. 1:13-cv-00087-MP-GRJ, 2015 WL 1409529, at *4 (N.D. Fl., Gainesville Div. March 26, 2015) (where the most each of three defendants could have personally deprived plaintiff of meals was one meal a day for a period of three days, the denial of the meals was not sufficiently severe to rise to the level of a constitutional violation).

Moreover, Plaintiff has failed to submit evidence showing that a "sufficiently serious condition" resulted from not receiving food. *See Evans*, 2009 WL 1401645, at *9. Plaintiff testified at his deposition that he was hungry and emotionally frustrated as a result of not having dinner on August 3, 2016, after having failed to make himself breakfast and traveled all day with only a small lunch en route. (Dkt. No. 81-3 at 26.) Plaintiff was hungry and emotionally frustrated after not receiving lunch on September 10, 2016, as well. *Id.* at 37.

**\*10** In sum, the evidence supports a finding by the Court that the claimed denial of meals by each of the three Defendants falls short of that required to support an Eighth Amendment violation, and the evidence does not support a finding that

Case 9:19-cv-00427-DNH-TWD   Document 62   Filed 12/17/21   Page 156 of 193

Sankara v. Montgomery, Not Reported in Fed. Supp. (2018)

2018 WL 4610686

Plaintiff suffered a sufficiently serious condition from any of the three Defendants' denial of a meal or meals.

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 81) be **GRANTED**; and it hereby

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (*per curiam* ). Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. [10] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health*

*and Human Services*, 892 F.2d 15 (2d Cir. 1989) ); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

[10]     If you are proceeding pro se and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. 6(a)(1)(C).

**All Citations**

Not Reported in Fed. Supp., 2018 WL 4610686

---

     © 2021 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**  © 2021 Thomson Reuters. No claim to original U.S. Government Works.  9

Case 9:19-cv-00427-DNH-TWD    Document 62    Filed 12/17/21    Page 157 of 193

Sankara v. Montgomery, Not Reported in Fed. Supp. (2018)

2018 WL 3408135

2018 WL 3408135
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Ahmadou SANKARA, Plaintiff,

v.

MONTGOMERY, Burgess and Lopez, Defendants.

9:16-CV-885 (FJS/TWD)
|
Signed 07/13/2018

**Attorneys and Law Firms**

AHMADOU SANKARA, 16-R-122, Coxsackie Correctional Facility, P.O. Box 999, Coxsackie, New York 12051, pro se.

OFFICE OF THE NEW YORK, STATE ATTORNEY GENERAL, OF COUNSEL, MATTHEW P. REED, AAG, The Capitol, Albany, New York 12224, Attorneys for Defendants.

**ORDER**

Frederick J. Scullin, Jr., Senior United States District Judge

**\*1** The sole remaining claim in this civil rights action is Plaintiff's Eighth Amendment conditions-of-confinement claim involving the alleged denial of meals against Defendants Keith Montgomery, a Department of Corrections and Community Supervision ("DOCCS") Sergeant at Fishkill Correctional Facility; Erik Burgess, a Corrections Officer at Fishkill Correctional Facility; and Jessica Lopez, a former Corrections Officer at Fishkill Correctional Facility.

Defendants moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on the grounds that Plaintiff had failed to exhaust his administrative remedies and had not asserted a constitutional violation. See Dkt. No. 81. Plaintiff filed papers in opposition to Defendants' motion. See Dkt. No. 84.

In a Order and Report-Recommendation dated June 25, 2018, Magistrate Judge Dancks recommended that this Court grant Defendants' motion for summary judgment. See Dkt. No. 88. Specifically, after thoroughly reviewing the record, she concluded that Plaintiff had failed to exhaust his administrative remedies with regard to his Eighth

Amendment claim. See id. at 9-17. Alternatively, she found that summary judgment was warranted because the evidence fell "short of that required to support an Eighth Amendment violation, and the evidence [did] not support a finding that Plaintiff [had] suffered a sufficiently serious condition [as a result of the] denial of a meal or meals." See id. at 21.

On July 2, 2018, the Court received Plaintiff's objections to Magistrate Judge Danck's recommendations. See Dkt. No. 89.

After reviewing a magistrate judge's recommendations, the district court may accept, reject or modify those recommendations. See 28 U.S.C. § 636(b)(1). The court reviews de novo those portions of the magistrate judge's recommendations to which a party objects. See Pizzaro v. Bartlett, 776 F. Supp. 815, 817 (S.D.N.Y. 1991). " 'If, however, the party "makes only conclusory or general objections, or simply reiterates his original arguments, the Court reviews the Report and Recommendation only for clear error.' " " McAllan v. Von Essen, 517 F. Supp. 2d 672, 679 (S.D.N.Y. 2007) (quotation and other citations omitted).

Plaintiff's objections are, for the most part, general and conclusory. In addition, some of his objections do not refer to his Eighth Amendment claim but, rather, concern claims that this Court has already dismissed. Moreover, to the extent that Plaintiff objects to Magistrate Judge Dancks' recommendations regarding the issue of whether he exhausted his administrative remedies, Plaintiff basically makes the same arguments that he made in opposition to Defendants' motion for summary judgment, which Magistrate Judge Dancks thoroughly reviewed and found no evidence to support Plaintiff's contention that he had filed grievances regarding the denial of meals.

Alternatively, the Court notes that, even if it were to find that Plaintiff had exhausted his administrative remedies with regard to denial of his meals, Defendants would still be entitled to summary judgment on Plaintiff's claim because, as Magistrate Judge Dancks thoroughly explained, the denial of five meals over the course of fifty-three days does not rise to the level of a violation of Plaintiff's Eighth Amendment rights; and, furthermore, the evidence does not support a finding that Plaintiff suffered a sufficiently serious condition as a result of Defendants' denial of those meals.

**\*2** Accordingly, having reviewed the entire file in this matter, Magistrate Judge Dancks' June 25, 2018 Order and

Sankara v. Montgomery, Not Reported in Fed. Supp. (2018)

2018 WL 3408135

Report-Recommendation, and Plaintiff's objections thereto, as well as the applicable law, the Court hereby

**ORDERS** that Magistrate Judge Dancks' June 25, 2018 Order and Report-Recommendation, *see* Dkt. No. 88, is **ACCEPTED in its entirety** for the reasons stated therein; and the Court further

**ORDERS** that Defendants' motion for summary judgment, *see* Dkt. No. 81, is **GRANTED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in favor of Defendants and close this case.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2018 WL 3408135

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 4806457
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Ronnie THAXTON, Plaintiff,

v.

A. SIMMONS, Corrections Officer, Upstate
Correctional Facility, Bush, Corrections Officer,
Upstate Correctional Facility, K. Garneau, Nurse,
Upstate Correctional Facility, John Doe, Corrections
Officer, Upstate Correctional Facility, Defendants.

No. 9:10–CV–1318 (MAD/RFT).
|
Sept. 9, 2013.

**Attorneys and Law Firms**

Ronnie Thaxton, Ossining, NY, pro se.

Office of the New York State Attorney General, Christopher
W. Hall, AAG, of Counsel, Albany, NY, for Defendants.

Hon. Eric T. Schneiderman, Attorney General of the State
of New York, Christopher W. Hall, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

**MEMORANDUM–DECISION AND ORDER**

MAE A. D'AGOSTINO, District Judge.

**I. INTRODUCTION**

**\*1** *Pro se* plaintiff, Ronnie Thaxton, brought this civil
rights action pursuant to 42 U.S.C. § 1983 alleging (1)
Defendant Simmons retaliated against Plaintiff because of
past grievances he filed, (2) Defendants Bush and Doe
deprived Plaintiff of nutritional meals, and (3) Defendant
Garneau violated Plaintiff's First and Eighth Amendment
rights by his deliberate indifference to Plaintiff's serious
medical needs. *See* Dkt. No. 60 at 1. Defendants have moved
for summary judgment on the grounds that (1) Plaintiff failed
to exhaust the available administrative remedies regarding his
claims against Defendants Bush and Garneau, (2) Defendants
Bush and Simmons were not personally involved in the
claimed constitutional violations, and (3) Plaintiff did not
suffer a serious injury to support his medical deliberate

indifference claim against Defendant Garneau. *See* Dkt. No.
50–5. In a May 23, 2013 Report–Recommendation and Order,
Magistrate Judge Treece recommended that Defendants'
motion for summary judgement be granted.

Currently before the Court are Plaintiff's objections to
Magistrate Judge Treece's Report–Recommendation and
Order.

**II. BACKGROUND**

Plaintiff's claims arose from events between January 12,
2009, and April 28, 2009, while he was in the custody
of the New York State Department of Corrections and
Community Supervision ("DOCCS") as an inmate in the
Upstate Correctional Facility ("Upstate C.F."). *See* Dkt. No.
50–1 at ¶ 1.

On January 12, 2009, Plaintiff filed a grievance, which
the parties have agreed implicated Defendant Simmons,
complaining about receiving his meals later than other
prisoners. *See id.* at ¶¶ 2–3. On April 6, Defendant Simmons
delivered Plaintiff's evening meal which contained several
strands of hair. *See id.* Plaintiff complained to Defendant
Simmons about the hair and he promptly gave Plaintiff
another tray of food. *See* Dkt. No. 50–3 at 25. [1] Plaintiff
did not see anyone place the hair in his meal, did not see
Defendant Simmons remove the plastic wrap from the meal,
and Defendant Simmons stated that he had not "played"
with Plaintiff's food. *See id.* at 26, 28. Plaintiff contends that
Defendant Simmons placed the hair in the food as a means of
retaliating against him for the January 12 grievance. *See id.*
at 31.

[1]  To avoid confusion, any time the Court references a
specific page number for a document on the docket,
the Court will cite to the page number assigned by
the Court's electronic filing system.

On April 28, 2009, Defendants Bush and Doe served Plaintiff
his evening meal containing a piece of metal in his sardines.
*See* Dkt. No. 50–1 at ¶¶ 16–17, 25. Defendant Doe did not
touch the food and only delivered Plaintiff his Kool–Aid and
hot water. *See* Dkt. No. 50–3 at 39. Plaintiff did not see
Defendant Bush tamper with the food and discovered the
piece of metal when he bit into his sardine sandwich. *See id.*
at 38. Plaintiff "noticed drops of blood in the food" after the

piece of metal cut his mouth, at which point he called for medical attention. *See id.* at 45.

Defendant Nurse Garneau and Sergeant Lombard came to Plaintiff's cell within twenty minutes of his request for medical attention. *See id.* at 34. Defendant Garneau did not inspect Plaintiff's mouth, but stated that there was not much damage and that Plaintiff should not "be a cry baby." *See id.* at 34. Plaintiff's bleeding completely stopped within an hour and was not "actually a cut anymore" within three or four days. *See id.* at 50. Plaintiff experienced slight difficulty eating and sleeping directly after the incident, but was able to get the "right amount" of food and sleep. *See id.* at 54, 56. Plaintiff requested sick call at the Attica Correctional Facility ("Attica C.F.") about a week after the incident. *See id.* at 54. There, he saw another nurse and a dentist and neither reported any lasting injuries or effects from the incident. *See id.*

 **\*2** In a May 23, 2013 Report–Recommendation and Order, Magistrate Judge Treece recommended that the Court grant Defendants' motion for summary judgment and close this case. *See* Dkt. No. 60. In his objections to the Report–Recommendation and Order, Plaintiff generally just reiterates arguments he made in opposing the motion for summary judgment. *See* Dkt. No. 61. Specifically, Plaintiff presents the following arguments: (1) the metal placed in his sardine sandwich deprived him of the "minimal civilized measures of life's necessities which was nutritionally adequate food that is 'prepared' and 'served' under conditions which do not present imminent danger to health and well being of inmates who consume it;" (2) Defendant Garneau violated his Eighth Amendment rights when she refused to examine or treat his injuries; and (3) that the injury to his mouth lasted approximately thirty days and he was prescribed Tylenol for the injury, which shows that it was more than a *de minimis* injury. *See* Dkt. No. 61 at 2–4.

## III. DISCUSSION

### A. Standard of review

When a party files specific objections to a magistrate judge's report-recommendation, the district court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). However, when a party files "[g]eneral or conclusory objections or objections which merely recite the same arguments [that he presented] to the magistrate judge," the court reviews those recommendations

for clear error. *O'Diah v. Mawhir,* No. 9:08–CV–322, 2011 WL 933846, \*1 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted). After the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendation made by the magistrate judge." 28 U.S.C. § 636(b)(1).

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 36 (2d Cir.1994) (citations omitted). When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36–37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleadings. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)(e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers,* 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2502, 2513–14, 91 L.Ed.2d 202 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.,* 322 F.3d 139, 143 n. 5 (2d Cir.2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

 **\*3** "[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (quoting *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)) (other citations omitted). The Second Circuit has opined that the court is obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting legal rights merely because they lack a legal education. *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (qquoting *Traguth v. Zuck,* 710 F.2d 90,

95 (2d Cir.1983)). "However, this does not mean that a *pro se* litigant is excused from following the procedural requirements of summary judgment. *See id.* at 295 (citing *Showers v. Eastmond,* 00 CIV. 3725, 2001 WL 527484, * 1 (S.D.N.Y. May 16, 2001)). Specifically, "a *pro se* party's 'bald assertion,' completely unsupported by evidence" is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin,* 902 F.Supp. 424, 429 (S.D.N.Y.1995) (citing *Cary v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)).

**B. Exhaustion**

The Prison Litigation Reform Act ("PLRA") states that "no action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U .S.C. § 1997e(a). This exhaustion requirement applies to all suits brought by inmates regarding aspects of prison life. *See Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002).

New York State has a three-step administrative review process. First, a grievance is submitted to the Inmate Grievance Resolution Committee ("IGRC") which reviews and investigates the formal complaint before issuing a written determination. *See* N.Y. COMP.CODES R. & REGS. tit. 7, § 701.5(b). Second, if the IGRC decision is appealed, the superintendent of the facility issues a decision after reviewing the IGRC's determination. *See id.* at § 701.5(c). Third, if the superintendent's decision is appealed, the final administrative decision is made by the Central Office Review Committee ("CORC"). *See id.* at § 701.5(d). If all three of these levels of review are exhausted, then the prisoner may seek relief in federal court pursuant to § 1983. *See Bridgeforth v. Bartlett,* 686 F.Supp.2d 238, 239 (W.D.N.Y.2010) (citing *Porter v. Nussle,* 534 U.S. 516, 524, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002)).

In determining whether a prisoner has failed to exhaust all available administrative remedies, the Second Circuit has instructed the district courts to consider:

> "(1) whether administrative remedies were actually available, (2) whether the defendants forfeited their right to raise the affirmative defense or by their own actions precluded the plaintiff

> from using administrative grievance procedures, and (3) whether special circumstances have been plausibly alleged that justify the prisoner's failure to comply with administrative procedural requirements."

**\*4** *Singh v. Goord,* 520 F.Supp.2d 487, 495–96 (S.D.N.Y.2007) (quoting *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)).

In the current case, Defendants claim that Plaintiff failed to exhaust all available administrative remedies in his claims against Defendants Bush and Garneau for meal tampering and deliberate indifference because he did not file a timely grievance with the IGRC. *See* Dkt. No. 50–5 at 10. Plaintiff contends that he filed a timely grievance and that special circumstances prevented him from complying with the administrative procedural requirements. *See* Dkt. No. 54 at 11–13.

Plaintiff claims that on April 29, 2009, he filed a grievance for both incidents and sent the superintendent a letter describing the events. Plaintiff has provided a copy of both the grievance and the letter to support his claim. *See* Dkt. No. 55 at 4–5, 8–9. On June 1, 2009, Plaintiff followed up his grievance by requesting an update on its status and received notice on June 8 stating "there is no grievance on file" concerning his complaints allegedly filed on April 29, and that "[Plaintiff's] complaint is being returned to [him] to file at [his] present facility." *See id.* at 7. On June 16, 2009, Plaintiff filed another grievance with the IGRC at Lakeview Correctional Facility about the April 28 incidents which was denied because of untimely service. *See id.* at 8, 10. Plaintiff then appealed this decision to the superintendent, who affirmed the IGRC decision. *See id.* at 10. On June 22, Plaintiff made a final appeal to the CORC who affirmed the superintendent's decision. *See id.* at 13.

While an untimely grievance does not properly exhaust available administrative remedies under the PLRA, a question of fact exists as to whether Plaintiff never filed his initial grievance on April 29, as Defendants claim, or that, as Plaintiff claims, he filed a timely grievance that was lost or tampered with by Defendants. Such credibility assessments are to be resolved by a trier of fact. Accordingly, the Court finds that a material issue of fact exists as to whether Plaintiff's failure to exhaust administrative remedies should be excused

due to special circumstances. Therefore, Defendants' motion for summary judgment is **DENIED** on exhaustion grounds.

## C. Personal Involvement

The Second Circuit has held that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citations omitted). Further, in regards to § 1983, "the doctrine of *respondeat superior* cannot be applied ... to satisfy the prerequisite of personal involvement." *Kinch v. Artuz,* No. 97 CIV. 2419, 1997 WL 576038, *2 (S.D.N.Y. Sept.15, 1997). Therefore, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the constitution." *Ashcroft v. Iqbal,* 556, U.S. 662, 676 (2009).

### 1. Defendant Simmons

**\*5** Plaintiff contends that, on April 6, Defendant Simmons delivered his a tray of food covered with hair in retaliation for a grievance Plaintiff had previously filed. Plaintiff did not see Defendant Simmons place hair on the food or see him remove the plastic wrap from the food. *See* Dkt. No. 50–3 at 26. According to Plaintiff, Defendant Simmons stated that he did not play with Plaintiff's food, and if he did, "[Plaintiff] would know it." *See id.* Plaintiff further testified that "the only reason why I held [Simmons] responsible is because he's the one that's giving me the tray." *See id.* at 28.

Based upon the evidence presented, no rational juror could conclude that Defendant Simmons was personally involved in tampering with Plaintiff's food on April 6 merely because he served the food that day. Therefore, Defendants' motion for summary judgment on this matter is **GRANTED,** and Plaintiff's claim against Defendant Simmons is **DISMISSED.**

### 2. Defendant Bush

Similar to the claims against Defendant Simmons, Plaintiff claims Defendant Bush contaminated his food by placing a piece of metal in the meal served on April 28. *See id.* at 38. Plaintiff testified that Defendant Bush delivered his meal on this date, but Plaintiff did not see Defendant Bush tamper with the food. *See id* . Plaintiff assumed Defendant Bush was responsible for the metal because of "the relationship of ... the officers and when I told him that I had the metal in there, the smirk, the look that he had, that's what made me think he purposely put it in there, because he was smirking like it was a joke or something." *See id.*

Based upon the evidence presented, no rational juror could conclude that Defendant Bush was personally involved in contaminating Plaintiff's food simply because he delivered the meal and then "smirked" after Plaintiff complained of the metal. Therefore, Defendants' motion for summary judgment on this claim is **GRANTED,** and Plaintiff's claim against Defendant Bush is **DISMISSED.**

## D. Deliberate Indifference

In order for a plaintiff to effectively state an Eighth Amendment claim for denial of adequate medical care, he must demonstrate that the prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). This does not mean that every prisoner that has not received adequate medical attention has an Eighth Amendment claim, but rather the alleged conduct must be "repugnant to the conscience of mankind" and constitute "an unnecessary and wanton infliction of pain." *Id.* at 105–06.

The deliberate indifference standard for denial of medical care requires demonstration of (1) a sufficiently serious depravation, and (2) deliberate indifference with a "sufficiently culpable state of mind." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (citation omitted). The first element is an objective standard to assess the seriousness of a prisoner's medical condition. *See Brock v. Wright,* 315 F.3d 158, 162 (2d Cir.2003) (citation omitted). This standard includes consideration of "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) 'the existence of chronic and substantial pain.' " *Id.* (quoting *McGuckin v. Smith,* 974 F.2d 1050, 1059–60 (9th Cir.1992)) (other citation omitted). The Second Circuit has recognized that dental injuries may require unique attention due to the likelihood of continuing pain and discomfort, however, "not all claims regarding improper dental care will be constitutionally cognizable." *Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998). While the decision of whether or not to treat a prisoner's injury may rely on an assessment of its seriousness at the moment it occurs, "in most cases, the actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm." *Smith v. Carpenter,* 316 F.3d 178, 187 (2d Cir.2003).

**\*6** The second element of the deliberate indifference standard is a subjective test requiring the plaintiff to show that the defendant acted with the requisite culpable state of mind. This state of mind is similar to criminal recklessness and requires "something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer v. Brennan,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

In this case, it is uncontroverted that Defendant Garneau responded to Plaintiff's cell after he cut his mouth biting into a piece of metal on April 28, 2009. It is also uncontroverted that Defendant Garneau did not inspect Plaintiff's mouth and told him not to "be a cry baby." *See* Dkt. No. 50–3 at 34. Plaintiff testified that he experienced "pain in [his] teeth" and that, while he "was not leaking blood, [he] was cut, you know in the mouth." *See id.* at 49. The bleeding in Plaintiff's mouth completely stopped within one hour and the cut healed without medical attention within three or four days. *See id.* at 50. Plaintiff experienced some mild difficulty eating and sleeping directly after the incident but was still able to get the "right amount" of food and sleep. *See id.* at 54, 56. About a week after the incident, when Plaintiff requested sick call, his injury was "no longer a cut" and a subsequent examination by a dentist revealed no dental injuries. *See id.* at 54.

While Plaintiff claims that his injury was sufficiently serious to require medical care, "[t]he mere fact that plaintiff disagrees with defendants about the nature of his condition does not give rise to a genuine issue of material fact." *Tindal v. Goord,* 530 F.Supp.2d 465, 467 (W.D.N.Y.2008) (citing *Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998)). Based on the evidence presented, no reasonable juror could conclude that Plaintiff's injury, which stopped bleeding within an hour and completely healed on its own accord within three or four days, was objectively a sufficiently serious injury. Since the Court finds that Plaintiff did not suffer a sufficiently serious medical injury, the Court need not determine if Defendant Garneau's actions of ignoring medical complaints and calling Plaintiff a "cry baby" rise to the requisite culpable state of mind of deliberate indifference. Therefore, Defendants' motion for summary judgment on this claim is **GRANTED** and the claims against Defendant Garneau are **DISMISSED.**

**E. Defendant Doe**

In Plaintiff's October 31, 2010 complaint, he named a John Doe Defendant. While the Court has reminded Plaintiff several times that he must ascertain the true identity of, and serve the Doe Defendant, Plaintiff has failed to do so. Rule 4 of the Federal Rules of Civil Procedure states that the plaintiff is responsible for service of the summons and complaint on each defendant within 120 days of filing the complaint. *See* FED. R. CIV. P. 4(c)(1), (m). The Northern District of New York requires that the plaintiff must effectuate service within sixty days. The Court may, upon motion or its own initiative, dismiss a case without prejudice as to any defendant that has not been properly served. *See id.* at 4(m). Since Plaintiff has failed to timely identify and serve the John Doe Defendant and no valid cause of action has been asserted, all claims against Defendant John Doe are **DISMISSED.**

## IV. CONCLUSION

**\*7** After carefully considering Magistrate Judge Treece's Report–Recommendation, Plaintiff's objections thereto, and the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Magistrate Judge Treece's May 23, 2013 Report–Recommendation and Order is **ADOPTED** in its entirety for the reasons stated therein; and the Court further

**ORDERS** that Defendants' motion for summary judgment is **GRANTED** in its entirety; and the Court further

**ORDERS** that the Defendant John Doe is **DISMISSED** due to Plaintiff's failure to timely identify and serve him; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum–Decision and Order on all parties in accordance with Local Rules.

**IT IS SO ORDERED.**

### *REPORT–RECOMMENDATION and ORDER*

RANDOLPH F. TREECE, United States Magistrate Judge.

*Pro se* Plaintiff Ronnie Thaxton brings this civil rights action, pursuant to 42 U.S.C. § 1983, alleging that (1) Defendant Simmons retaliated against him for grievances

Plaintiff filed against him, (2) Defendants Bush and Doe deprived him of nutritional meals, and (3) Defendant Garneau was deliberately indifferent to his serious medical needs, in violation of his First and Eighth Amendment rights. *See* Dkt. No. 1, Compl. [1] Defendants have moved for Summary Judgment on the grounds that (1) Plaintiff failed to exhaust his administrative remedies regarding his claims against Defendants Bush and Garneau, (2) Defendants Simmons and Bush were not personally involved in any constitutional violations, and (3) Plaintiff did not suffer a sufficiently serious injury to support his medical deliberate indifference claim against Defendant Garneau. *See generally* Dkt. No. 50–5, Defs.' Mem. of Law. We recommend that Defendants' Motion be **GRANTED.**

---

[1]      Plaintiff's Complaint contained additional claims and Defendants. However, the claims and Defendants outlined above are all that remain after the Court's initial review of the Complaint and Defendants' Motion to Dismiss. *See* Dkt. Nos. 6, Mem.-Dec. and Order, dated Mar. 29, 2011, & 31, Rep.-Rec. and Order, dated Jan. 5, 2012.

## I. STANDARD OF REVIEW

Pursuant to FED. R. CIV. P. 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

**\*8** To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d

Cir.2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525–26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) and *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), *accord, Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

## II. DISCUSSION

### A. Summary of Facts

The following facts are uncontroverted.

Plaintiff's claims arise out of events which occurred while he was an inmate at Upstate Correctional Facility ("UCF"), in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). Dkt. No. 50–1, Defs.' Statement of Material Facts Pursuant to Local Rule 7.1(A)(3) (hereinafter "Defs.' 7.1 Statement"), at ¶ 1; *see generally* Compl.

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 4806457

On January 12, 2009, Plaintiff filed a grievance, complaining that he was getting his meals later than other prisoners; although not mentioned by name, it is agreed by the parties that this grievance implicated Defendant Simmons. Defs.' 7.1 Statement at ¶¶ 2 & 3. On April 6, Plaintiff found several strands of hair in the evening meal that Defendant Simmons had delivered to him. He talked to Defendant Simmons about the hair and Defendant Simmons stated that he had not "played" with Plaintiff's food, and if he had that Plaintiff "would know it." *Id.* at ¶¶ 7–10. Plaintiff did not see Defendant Simmons tamper with his meal. *Id.* at ¶ 13. After Plaintiff complained, Defendant Simmons gave him another food tray. *Id.* at ¶ 15.

**\*9** On April 28, 2009, Defendants Bush and Doe served Plaintiff his dinner meal. *Id.* at ¶¶ 16 & 25. Plaintiff later found a piece of metal in his food when he bit into his sardine sandwich. *Id.* at ¶ 17. Plaintiff "noticed drops of blood in the food," and requested medical attention. *Id.* at ¶¶ 17 & 31. Defendant Bush then left to get a sergeant and a nurse. *Id.* at ¶ 23. Plaintiff did not see Defendant Bush nor Defendant Doe tamper with his meal. *Id.* at ¶¶ 20 & 25.

Thereafter, Defendant Nurse Garneau and Sergeant Lombard [2] appeared at Plaintiff's cell. *Id.* at ¶ 27. Plaintiff requested that Defendant Garneau examine his mouth, to which Defendant Garneau stated that "she did not see much damage," that Plaintiff should not "be a cry baby," and then "walked off" without examining Plaintiff's mouth. *Id.* at ¶¶ 29–30.

[2]     Sergeant Lombard was dismissed as a Defendant in this action. Dkt. No. 32.

### B. Exhaustion

The Prison Litigation Reform Act ("PLRA") provides, in pertinent part, that "no action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Supreme Court has held that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002) (citations omitted). Exhaustion

is similarly required even if the prisoner asserts futility as an excuse. *See Booth v. Churner,* 531 U.S. 731, 741 n. 6 (2001) (refusing to "read futility or other exceptions into statutory exhaustion requirements where Congress has provided otherwise") (cited in *Marvin v. Goord,* 255 F.3d 40, 43 (2d Cir.2001)). Accordingly, the exhaustion requirements apply even where the grievance process does not permit an award of money damages and the prisoner seeks only money damages, provided the grievance tribunal has the authority to take some responsive action. *See Thomas v. Wright,* 2002 WL 31309190, at *5 (N.D.N.Y. Oct.11, 2002) (citing *Booth v. Churner,* 531 U.S. 731 (2001)).

In New York State, the administrative remedies consist of a three-step review process. First, a grievance is submitted to the Inmate Grievance Resolution Committee ("IGRC"), a committee comprised of both inmates and facility employees. [3] N.Y. COMP.CODES R. & REGS. tit. 7, § 701.5(b). The IGRC reviews and investigates the formal complaints and then issues a written determination. *Id.* Second, if the IGRC decision is appealed, the superintendent of the facility reviews the IGRCs determination and issues a decision. *Id.* at § 701.5(c). Finally, if the superintendent's decision is appealed, the Cental Office Review Committee ("CORC") makes the final administrative determination. *Id.* at § 701.5(d). Only upon exhaustion of these three levels of review may a prisoner seek relief pursuant to § 1983 in federal court. *Bridgeforth v. .Bartlett,* 686 F.Supp.2d 238, 239 (W.D.N.Y.2010) (citing, *inter alia, Porter v. Nussle,* 534 U.S. 516, 524, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002)); *see also Neal v. Goord,* 267 F.3d 116, 121 (2d Cir.2001), *overruled on other grounds by Porter v. Nussle,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12.

[3]     The IGRC is a five-member body consisting of two voting inmates, two voting staff members, and a non-voting chair (who may be an inmate, staff member of volunteer). N.Y. COMP.CODES R. & REGS tit.7, § 701.4.

**\*10** In determining whether a prisoner has failed to exhaust all available administrative remedies, the Second Circuit has instructed district courts to ask: "(1) whether administrative remedies were actually available, (2) whether the defendants forfeited their right to raise the affirmative defense or by their own actions precluded the plaintiff from using administrative grievance procedures, and (3) whether special circumstances have been plausibly alleged that justify the prisoner's failure to comply with administrative procedural requirements."

*Singh v. Goord,* 520 F.Supp.2d 487, 495–96 (S.D.N.Y.2007) (quoting *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)).

Here, Defendants argue that Plaintiff's claims against Defendant Bush, for meal tampering, and Defendant Garneau, for deliberate indifference, were not properly exhausted because Plaintiff failed to timely file a grievance regarding the events of April 28, 2009. Defs.' Mem. of Law at pp. 8–11. Plaintiff alleges that certain special circumstances justify his failure in this regard. Dkt. No. 54, Pl.'s Mem. of Law, at pp. 5–7. Because we find that a material issue of fact exists as to whether Plaintiff's failure to exhaust should be excused, we recommend that Defendants' Motion for Summary Judgment be **DENIED** on exhaustion grounds.

Plaintiff's claims against Defendants Bush and Garneau arise out of Plaintiff's allegations that on April 28, 2009, Defendant Bush put metal in his food in which he bit into causing him to injure his mouth, and that thereafter, Defendant Garneau refused to treat his injury. *See* Compl. at ¶ 6, pp. 3–4. Plaintiff claims that on April 29, 2009, he grieved both of these issues and sent the superintendent a letter describing these events. Pl.'s Mem. of Law at p. 5. In support of this claim Plaintiff has produced a copy of both the grievance and the letter. *See* Dkt. No. 55, Pl.'s Exs., at (unnumbered) pp. 4–5, Lt., dated Apr. 28, 2009, & Grievance, dated Apr. 28, 2009. Defendants maintain that no such grievance was ever filed. Defs.' Mem. of Law at pp. 9–10; Dkt. No. 50–4, Grievance R.

On or about May 3, Plaintiff was transferred to Attica Correctional Facility ("ACF"). Dkt. No. 50–3, Ronnie Thaxton Dep., dated Aug. 3, 2012, at p. 50. On June 1, 2009, Plaintiff wrote to UCF's Superintendent inquiring about the status of his April 28, 2009, grievance. *Id.* at (unnumbered) p. 3, Lt., dated June 1, 2009. On June 8, 2009, while Plaintiff was incarcerated at Lakeview Correctional Facility ("LCF"), Plaintiff received a response to his June 1 letter, informing him that "there is no grievance on file ... with a written date of 4/28/09 concerning metal being put in your food .... [and that i]n accordance with [DOCCS] Directive # 4040 .... your complaint is being returned to you to file at your present facility." *Id.* at (unnumbered) p. 7, Mem., dated June 8, 2009. On June 15, 2009, Plaintiff filed a grievance at LCF about the incidents which occurred on April 28, 2009, and further complained that his grievance was tampered with in retaliation for previous grievances he filed. That grievance was rejected as untimely. It is uncontroverted that Plaintiff appealed the determination that his June 15, 2009 grievance

was untimely through each and every level of administrative appeal that was available to him. *Id.* at (unnumbered) pp. 8–13; Dkt. No. 50–4, Grievance R.; Defs.' Mem. of Law at pp. 8–11; Pl.'s Mem. of Law at pp. 5–7.

**\*11** Although it is true that filing an untimely grievance does not properly exhaust an issue for purposes of the PLRA, *see Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006), a question of fact exists as to whether or not Plaintiff actually filed a timely grievance on April 29, 2009, and whether it was lost or tampered with by Defendants. If Defendants lost or tampered with Plaintiff's April 29 grievance, then this Court would be inclined to recommend that Defendants' actions bar them from asserting the affirmative defense of exhaustion. *See Singh v. Goord,* 520 F.Supp.2d at 495–96. However, given that both sides have produced documentary evidence, in order to reach such a determination we would have to make credibility assessments that would be improper at the summary judgment stage. *See Scott v. Coughlin,* 344 F.3d at 287–89. Because such a determination can only be made by a trier of fact, we recommend that Defendants' Motion for Summary Judgment be **DENIED** on this ground.

## C. Personal Involvement

Plaintiff claims that Defendant Simmons put hair in his food on April 6, 2009, in retaliation for a grievance that he filed against Defendant Simmons on January 12, 2009, and that Defendant Bush deprived him of adequate nutrition by giving him a tray of food contaminated with a piece of metal on April 28, 2009. Compl. at ¶ 7, Third and Fourth Causes of Action. Defendants argue that Plaintiff cannot prove that Defendant Simmons or Defendant Bush were personally involved in either incident. Defs.' Mem. of Law at pp. 5–7.

The Second Circuit has held that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citations omitted). Moreover, "the doctrine of *respondeat superior* cannot be applied to section 1983 actions to satisfy the prerequisite of personal involvement." *Kinch v. Artuz,* 1997 WL 576038, at \*2 (S.D.N.Y. Sept.15, 1997) (citing *Colon v. Coughlin,* 58 F.3d 865, 874 (2d Cir.1995) & *Wright v. Smith,* 21 F.3d at 501) (further citations omitted). Thus, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the constitution."

*Ashcroft v. Iqbal,* 556 U.S. 662, 676, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

### i. Defendant Simmons

Plaintiff claims that on April 6, Defendant Simmons delivered him a tray of food that was covered in hair. Compl. at ¶ 6, p. 1. According to Plaintiff's Deposition testimony, the meals at UCF are served in styrofoam containers that are assembled in the kitchen, completely wrapped in cellophane, and then brought to the inmates in their cells on a cart. The cellophane is then removed from the styrofoam and the meal is given to the inmate through the feed up slot in the cell door. Thaxton Dep. at pp. 25–26. It is uncontroverted that on April 6, the cellophane wrapper was removed from Plaintiff's meal before it was given to him, however, it is also uncontroverted that Plaintiff did not see Defendant Simmons either remove the cellophane wrapper nor tamper with his food. *Id* . at p. 26–27. Plaintiff alleges that he confronted Defendant Simmons, asking him why "it seems like he always had an attitude and a problem when dealing with [his] food," and Defendant Simmons stated "I don't play with your food. I wouldn't play with your food. If I did, you would know it." *Id.* at p. 19. Plaintiff testified that "the only reason why I held him responsible is because he's the one that's giving me the tray." *Id.* at p. 27.

 **\*12** Based upon the evidence presented, no rational juror could conclude that Defendant Simmons tampered with Plaintiff's food on April 6, 2009, merely because he happened to deliver it that day and made a statement denying he had done so. Therefore, we recommend that Defendant Simmons be **DISMISSED.**

### ii. Defendant Bush

Likewise, based on the record, no reasonable juror could conclude that Defendant Bush contaminated Plaintiff's food with a piece of metal on April 28, 2009. Just as above, it is uncontroverted that Plaintiff did not see Defendant Bush tamper with his food. Thaxton Dep. at pp. 36–37. Moreover, when asked how he knows that Defendant Bush was responsible for placing the piece of metal in his food, Plaintiff admitted that he assumed Defendant Bush was responsible "because of his reaction with the smirk on his face." *Id.* at p. 37. And stated further that "I believe it because the relationship of, you know, the officers and when I told

him that I had the metal in there, the smirk, the look that he had, that's what made me think he purposely put it in there, because he was smirking like it was a joke or something." *Id.*

Because no rational juror could conclude that Defendant Bush was personally involved in contaminating Plaintiff's food merely because Defendant Bush delivered Plaintiff's meal and then smirked at Plaintiff, we recommend that Defendant Bush be **DISMISSED.**

### D. Eighth Amendment

Plaintiff claims that Defendant Garneau was deliberately indifferent to his serious medical needs in contravention of the Eighth Amendment when she failed to examine or treat him for injuries he claims he sustained after biting into a piece of metal concealed in his anchovy sandwich. Compl. at ¶ 7, Second Cause of Action. Defendants argue that Plaintiff cannot establish such a claim because he did not suffer from a sufficiently serious medical condition. Defs.' Mem. of Law at pp. 11–13. We agree.

To state an Eighth Amendment claim for denial of adequate medical care, a prisoner must demonstrate that prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). "[T]he plaintiff must allege conduct that is 'repugnant to the conscience of mankind' or 'incompatible with the evolving standards of decency that mark the progress of a maturing society.' " *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.1992) (quoting *Estelle v. Gamble,* 429 U.S. at 102, 105–06).

To state a claim for denial of medical care, a prisoner must demonstrate (1) a serious medical condition and (2) deliberate indifference. *Farmer v. Brennan,* 511 U.S. 825, 834–35, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Hathaway v. Coughlin ("Hathaway I"),* 37 F.3d 63, 66 (2d Cir.1994). The first prong is an objective standard and considers whether the medical condition is sufficiently serious. The Second Circuit has stated that a medical need is serious if it presents "a condition of urgency that may result in degeneration or extreme pain ." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (internal quotation marks and citation omitted). Among the relevant factors to consider are "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects

an individuals' daily activities; or the existence of chronic and substantial pain." *Chance v. Armstrong,* 143 F.3d at 702 (quoting *McGuckin v. Smith,* 974 F.2d 1050, 1059–60 (9th Cir.1992)). The second prong is a subjective standard requiring a plaintiff to demonstrate that the defendant acted with the requisite culpable mental state similar to that of criminal recklessness. *Wilson v. Seiter,* 501 U.S. 294, 301–03, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991); *Hathaway I,* 37 F.3d at 66. A plaintiff must demonstrate that the defendant acted with reckless disregard to a known substantial risk of harm. *Farmer v. Brennan,* 511 U.S. at 836. This requires "something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* at 835; *see also Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996) (citing *Farmer* ). Further, a showing of medical malpractice is insufficient to support an Eighth Amendment claim unless "the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance v. Armstrong,* 143 F.3d at 702 (quoting *Hathaway v. Coughlin ("Hathaway II"),* 99 F.3d 550, 553 (2d Cir.1996)); *see also Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (citations omitted).

 **\*13** It is uncontroverted that Defendant Garneau responded to Plaintiff's cell on April 28, 2009, in response to his claims that he had injured his mouth by biting down on a piece of metal concealed in his food. It is also uncontroverted that she neither examined the inside of Plaintiff's mouth nor provided him with any treatment. With regards to the extent of his injury Plaintiff maintains that while "I was not leaking blood, I was cut, you know in the mouth. It was a little bit on the side of my jaw and it was more to my teeth. The pain in [his] teeth was more actually than the blood was." And that, within an hour the bleeding stopped. Thaxton Dep. at p. 49. Thereafter, Plaintiff experienced some continuing pain, an inability to eat on the right side of his mouth, paranoia, and some sleeplessness. *Id.* at pp. 52–55. Three or four days after the incident, Plaintiff was transferred to Attica Correctional Facility ("ACF"). *Id.* at p. 50. Plaintiff did not request sick call between April 28 and the day that he was transferred to ACF. By the time he requested sick call at ACF, about a week after April 28, his injury was "no longer a cut," and he was given Tylenol. *Id.* at pp. 49–51 & 53.

Although we certainly do not countenance ignoring the medical complaints of inmates as merely the petulant whining of a "cry baby," it is clear that the Constitution is not invoked every time a prison nurse chooses not to immediately treat a broken lip or cut tongue. While Plaintiff's injury may have been painful, no rational juror could conclude that an injury which healed on its own in a matter of days was objectively sufficiently serious to sustain an Eighth Amendment deliberate indifference claim. Therefore, we recommend that Defendants' Motion for Summary Judgment be **GRANTED** as to this claim.

### E. Defendant Doe

In his Complaint, filed on October 31, 2010, Plaintiff named a John Doe Defendant. *See generally* Compl. However, to date, and despite multiple reminders by this Court, [4] Plaintiff has failed to identify the Doe Defendant. Under FED. R. CIV. P. 4(c)(1) and 4(m), the plaintiff is responsible for service of the summons and complaint for each defendant within 120 days of the filing of the complaint. [5] Failure to properly serve any defendant in accordance with the Federal Rules will result in the court, upon motion or on its own initiative, to dismiss the case without prejudice as to that defendant. *Id.* at 4(m). Because Plaintiff has failed to timely identify and serve the John Doe Defendant, and because as outlined above, no cognizeable cause of action is asserted herein, we recommend dismissal of all claims asserted against him. *Cooks v. Delpiano,* 2008 WL 4186337, at *1 n. 1 (N.D.N.Y. Sept.10, 2008); *Pravada v. City of Albany,* 178 F.R.D. 25, 26 (N.D.N.Y.1998).

[4]     This Court has specifically directed, or reminded, Plaintiff of his obligation to ascertain the true identity of, and serve the Doe Defendant on at least four separate occasions. *See* Dkt. Nos. 6, Order, dated Mar. 29, 2011, at pp. 9–10, 31, Rep.-Rec., dated Jan. 5, 2012, at p. 7 n. 6, & 32, Order, dated Feb. 2, 2012, at p. 5; *See also* Text Order, dated June 14, 2012.

[5]     Under the Local Rules for the Northern District of New York, a plaintiff must effectuate service within sixty (60) days. N.D.N.Y.L .R. 4.1(b)

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendants' Motion for Summary Judgment (Dkt. No. 50), be **GRANTED in its entirety;** and it is further

 **\*14 RECOMMENDED,** that the Doe Defendant be dismissed due to Plaintiff's failure to timely identify and serve him; and it is further

**RECOMMENDED,** that, in light of the above recommendations, this matter be closed; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.* *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs. .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72 & 6(a).

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 4806457

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

Terry v. Hulse, Not Reported in Fed. Supp. (2018)

2018 WL 4682784

KeyCite Yellow Flag - Negative Treatment

Distinguished by White v. Westchester County, S.D.N.Y., December 21, 2018

2018 WL 4682784
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Joseph TERRY, Plaintiff,

v.

CO James HULSE Jr.; CO Matthew Burns; CO
Chad Esterbrook; CO Bruce Tucker; CO Alan
Hanson; Sergeant William Cole, Defendants.

16-CV-252 (KMK)
|
Signed 09/28/2018

**Attorneys and Law Firms**

Joseph Terry, Elmira, NY, Pro Se Plaintiff.

Bradley Gordon Wilson, Esq., New York State Office of the
Attorney General, New York, NY, Counsel for Defendant.

OPINION & ORDER

KENNETH M. KARAS, United States District Judge

*1 Plaintiff Joseph Terry ("Plaintiff"), currently an inmate
at Elmira Correctional Facility Facility ("Elmira"), brings this
pro se action under 42 U.S.C. § 1983 against Defendants
Correction Officer ("CO") James Hulse Jr. ("Hulse"),
CO Matthews Burns ("Burns"), CO Chad Estabrook
("Estabrook"), CO Bruce Tucker ("Tucker"), CO Alan
Hanson ("Hanson"), and Sergeant William Cole ("Cole,"
and collectively with Hulse, Burns, Estabrook, Tucker, and
Hanson, "Defendants"). (See Compl. (Dkt. No. 2).) [1] Plaintiff
alleges that Defendants violated his constitutional rights by
assaulting him and then retaliating against him after he
reported the assault. (Id. ¶¶ 30–47.) Before the Court is
Defendants' Motion for Summary Judgment (the "Motion").
(Notice of Motion (Dkt. No. 66).) For the reasons that follow,
Defendants' Motion is granted in part and denied in part.

[1]   Plaintiff's Complaint also named New York
State Department of Corrections and Community
Supervision ("DOCCS") as a Defendant. In

response to an Order to Show Cause as to why
the claims against DOCCS should not be dismissed
under the Eleventh Amendment, (Dkt. No. 8),
Plaintiff consented to the dismissal of DOCCS as a
Defendant, (Dkt. No. 11).

I. Background

A. Factual Background
The following facts are taken from Defendants' statement
pursuant to Local Civil Rule 56.1, (Defs.' Rule 56.1 Statement
("Defs.' 56.1") (Dkt. No. 68) ), the exhibits submitted by
Defendants, (Decl. of Matthew Burns in Supp. of Mot. for
Summ. J. ("Burns Decl.") (Dkt. No. 69); Decl. of William
Cole in Supp. of Mot. for Summ. J. ("Cole Decl.") (Dkt. No.
70); Decl. of Chad Estabrook in Supp. of Mot. for Summ. J.
("Estabrook Decl.") (Dkt. No. 71); Decl. of Alan Hanson in
Supp. of Mot. for Summ. J. ("Hanson Decl.") (Dkt. No. 72);
Decl. of Bruce Tucker in Supp. of Mot. for Summ. J. ("Tucker
Decl.") (Dkt. No. 73); Decl. of Cory Proscia in Supp. of
Mot. for Summ. J. ("Proscia Decl.") (Dkt. No. 74); Decl.
of Rachel Seguin in Supp. of Mot. for Summ. J. ("Seguin
Decl.") (Dkt. No. 75); Decl. of Bradley G. Wilson, Esq. in
Supp. of Mot. for Summ. J. ("Wilson Decl.") (Dkt. No. 76),
as well as Plaintiff's Complaint, (Compl.), his Opposition and
accompanying exhibits, (Pl.'s Opp'n to Defs.' Mot. for Summ
J. ("Pl.'s Opp'n") (Dkt. No. 96) ), and Plaintiff's deposition
transcript, (Letter from Barbara K. Hathaway, Esq. to Court,
Ex. A ("Pl.'s Dep.") (Dkt. No. 100) ), and are recounted in
the light most favorable to Plaintiff, the non-movant. See
Wandering Dago, Inc. v. Destito, 879 F.3d 20, 30 (2d Cir.
2018). [2] The facts as described below are not in dispute,
except where indicated.

[2]   Local Civil Rule 56.1(a) requires the moving
party to submit a "short and concise statement,
in numbered paragraphs, of the material facts
as to which the moving party contends there is
no genuine issue to be tried." The nonmoving
party, in turn, must submit "a correspondingly
numbered paragraph responding to each numbered
paragraph in the statement of the moving party,
and if necessary, additional paragraphs containing
a separate, short[,] and concise statement of
additional material facts as to which it is contended
that there exists a genuine issue to be tried." Local
Civ. R. 56.1(b). "A pro se litigant is not excused
from this rule," Brandever v. Port Imperial Ferry

Terry v. Hulse, Not Reported in Fed. Supp. (2018)

2018 WL 4682784

Case 9:19-cv-00427-DNH-TWD    Document 62    Filed 12/17/21    Page 171 of 193

*Corp.*, No. 13-CV-2813, 2014 WL 1053774, at *3 (S.D.N.Y. Mar. 13, 2014) (italics omitted), and "[a] nonmoving party's failure to respond to a Rule 56.1 statement permits the [C]ourt to conclude that the facts asserted in the statement are uncontested and admissible," *T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009); *see also Biberaj v. Pritchard Indus., Inc.*, 859 F. Supp. 2d 549, 553 n.3 (S.D.N.Y. 2012) (same). Here, Defendants filed and served their statement pursuant to Rule 56.1, (Defs.' 56.1), and filed and served a statement notifying Plaintiff of the potential consequences of not responding to the Motion, as required by Local Rule 56.2, (Notice to Pro Se Litigant (Dkt. No. 77) ). Despite this notice, Plaintiff failed to submit a response to Defendants' 56.1 Statement of Facts. Accordingly, the Court may conclude that the facts in Defendants' 56.1 Statement are uncontested and admissible. *See Brandever*, 2014 WL 1053774, at *3 (concluding that because the pro se plaintiff did not submit a Rule 56.1 statement in response to the defendant's statement of facts, "there [were] no material issues of fact"); *Anand v. N.Y. State Div. of Hous. & Cmty. Renewal*, No. 11-CV-9616, 2013 WL 4757837, at *7 (S.D.N.Y. Aug. 29, 2013) (same).

Nevertheless, in light of the "special solicitude" afforded to pro se litigants "when confronted with motions for summary judgment," *Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988), the Court will "in its discretion opt to conduct an assiduous review of the record," including Plaintiff's deposition testimony, when deciding the instant Motion, *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001); *see also Houston v. Teamsters Local 210, Affiliated Health & Ins. Fund-Vacation Fringe Ben. Fund*, 27 F. Supp. 3d 346, 349 (E.D.N.Y. 2014) ("Although [the] plaintiffs did not file a Rule 56.1 statement, the Court has independently reviewed the record to ensure that there is uncontroverted evidence to support the paragraphs referenced in [the] defendants' Rule 56.1 statement."); *Cherry v. Byram Hills Cent. Sch. Dist.*, No. 11-CV-3872, 2013 WL 2922483, at *1 (S.D.N.Y. June 14, 2013) (italics omitted) ("[W]here a pro se plaintiff fails to submit a proper ...Rule 56.1 statement in opposition to a summary judgment motion, the [c]ourt retains some discretion to consider the substance of the plaintiff's arguments, where actually supported by evidentiary submissions." (italics and internal quotation marks omitted) ); *Pagan v. Corr. Med. Servs.*, No. 11-CV-1357, 2013 WL 5425587, at *2 (S.D.N.Y. Sept. 27, 2013) (explaining that "[t]he [c]ourt ha[d] considered the [motions for summary judgment] in light of the entirety of the record to afford [the pro se] [p]laintiff the special solicitude to which he [was] entitled" where the plaintiff failed to submit a Rule 56.1 response).

### 1. The January 13, 2013 Assault

**\*2** Plaintiff asserts that on January 13, 2013, he was working in the pantry at Sullivan Correctional Facility ("Sullivan") serving inmates food. (Compl. ¶ 20; Pl.'s Dep. 9.) Plaintiff alerted Burns, who then alerted Hulse, of a food shortage during the evening meal. (Pl.'s Dep. 9; Compl. ¶¶ 21–23.) Hulse allegedly told Plaintiff "I don't give a shit," (Compl. ¶ 24), and Plaintiff replied "that's fucked up," (*id.* ¶ 25). Hulse, however, "thought that [Plaintiff] said fuck him," which caused a verbal altercation between the two. (Pl.'s Dep. 9.) Plaintiff was then instructed to "lock into his cell," but Hulse blocked Plaintiff from doing so. (*Id.*) Hulse told Plaintiff to hit him and that he "need[ed] a vacation," and Plaintiff asked if he could move out of the way. (*Id.*) Hulse spit on and punched Plaintiff and then Hulse and Burns threw Plaintiff to the ground, and Plaintiff ended up on top of Hulse and Burns landed on top of Plaintiff. (Pl.'s Dep. 10; Compl. ¶¶ 30–31.) Both continued to punch and poke Plaintiff in the eye. (Pl.'s Dep. 10; Compl. ¶ 30.)

A response team arrived, consisting of Estabrook and Tucker, who also allegedly assaulted Plaintiff. (Compl. ¶ 32; Pl.'s Dep. 12.) Plaintiff alleges he was placed in mechanical restraints and Hulse grabbed Plaintiff by his hair and "starting banging [his] head against the ground." (Pl.'s Dep. 10.) The attack continued, despite Plaintiff being in mechanical restraints. (Pl.'s Opp'n ¶ 3.) Plaintiff further contends that as he was being escorted out of his housing unit, Estabrook and Tucker "bang[ed] ... [P]laintiff['s] head against the gate and choked [him]." (Compl. ¶ 34; Pl.'s Dep. 10.) However, "the other officers said there w[ere] cameras in the hallways" and to "stop hitting [Plaintiff] until [they] g[o]t to the dry cell area." (Pl.'s Dep. 11.) After Plaintiff was escorted to the dry cell area the "attacks started again." (*Id.*) One of the Defendants allegedly "thr[ew] [Plaintiff] to the floor and hit [him] with a nite [sic] stick/baton." (Compl. ¶ 37; Pl.'s Dep. 11.) Plaintiff alleges that Estabrook stated "I will kill you

nigger," (Compl. ¶ 37), and "put the nightstick ... between [the] crack of [his] ass" and threatened to "shove it in until it came out of [his] mouth," (Pl.'s Dep. 11); *see also id.* at 8 ("I had a nightstick placed between my ... buttocks ... and said it would be shoved in there if I didn't stop screaming until it came out of my mouth."). Cole came in, and Plaintiff asked him to "take it easy on [him];" however, Cole stepped out and Plaintiff was beat again. (Pl.'s Dep. 11.) [3]

[3]    Plaintiff testified at his deposition that Cole "didn't lay a hand on [him]" but that he saw the attack and "did nothing to prevent it." (Pl.'s Dep. 40.) Additionally, "[Cole] knew of the possible initial attack that was going to take place and he still did nothing to stop it." (*Id.*)

Following the incident, Plaintiff was ordered to strip down to his boxers so that Hanson could take photos of his injuries. (Compl. ¶ 39; Pl.'s Opp'n ¶ 7.) Hanson was not present during the use of force incident. (Defs.' 56.1 ¶ 11; *see also* Pl.'s Dep. 40.) According to Plaintiff, Cole allegedly told Hanson that "we can't let the superintendent see this," (Pl.'s Opp'n ¶ 7), and not to "show the close up ... [w]e can't let that register," (Pl.'s Dep. 11–12), so Hanson "made sure that out of all photos the close up facial photo didn't register," (Pl.'s Opp'n ¶ 7; Pl.'s Dep. 40 (testifying that Hanson made the first picture "not register[ ] intentionally after being instructed by Sergeant Cole").) According to Hanson, "one photograph was cut off because of a software glitch. This was unintentional, and [he] do[es] not even know if it is possible to intentionally create such a glitch. In any event, [he] did not do so." (Hanson Decl. ¶ 7; *see also id.* ¶ 9 ("The failure to register the close-up photographs was a software glitch. There was no conspiracy to cover up any of [Plaintiff's] injuries, as demonstrated by the other pictures and by the immediate attempts to rectify the situation after the glitch was discovered. [Hanson] never conspired with the other officers to cover up anything.").) Two or three days later, Officer Roser re-took the photos, (Pl.'s Opp'n ¶ 7), and they "revealed that [Plaintiff] had more injuries" than previously documented, (Pl.'s Dep. 12). [4]

[4]    As a result of the injuries sustained in the incident, Hulse went on medical leave until at least June 30, 2013. (Defs.'56.1 ¶ 9.)

### 2. Plaintiff's Grievances

**\*3** On or about January 13, 2013, Plaintiff "wrote to the superintendent and ... wrote numerous grievances all to no avail." (Pl.'s Opp'n ¶ 3; *see also id.* ¶ 5 (stating "[P]laintiff wrote a grievance multiple times").) In total, Plaintiff wrote around three or four grievances. (Pl.'s Dep. 33; *see also id.* at 34 (testifying that Plaintiff couldn't remember exactly how many he wrote, but it was somewhere between three and six).) At the time, Plaintiff was housed in the Special Housing Unit ("SHU"), and in accordance with prison procedures for filing grievances in SHU, Plaintiff gave his grievances to a corrections officer in SHU to be turned in and filed. (Pl.'s Opp'n ¶ 5; *see also* Pl.'s Dep. 34 (testifying that Plaintiff "can't go to the grievance department ... It's in the officers' hands to do that. The officers ... are supposed to turn them in and they didn't").) However, "[o]nce Plaintiff s[aw] that they weren't being turned in," he started writing letters to other people informing them of the assault. (Pl.'s Dep. 33; *see also* Seguin Decl. Ex. B (memorandum to Plaintiff regarding letter he sent to Superintendent Griffin regarding the January 2013 incident).) Between January and March 2013, Plaintiff also wrote the Inspector General; the Superintendent; the Commissioner of Corrections; the Department of Justice; the FBI; the New York State Trooper barracks at Liberty, New York; Senator Kirsten Gillibrand; and unnamed lawyers. (Pl.'s Dep. 33–34.) [5]

[5]    In response to his letter to the Inspector General, Plaintiff was interviewed by "Investigator Smith." (Pl.'s Opp'n ¶ 6; Pl.'s Dep. 33.) However, "instead of punishing the officers ... [P]aintiff was charged in Sullivan County Court with assault." (Pl.'s Opp'n ¶ 5; *see also* Pl.'s Dep. 12.) However, following a trial, Plaintiff was found not guilty. (Pl.'s Dep. 12.)

Plaintiff was transferred from Sullivan to Upstate Correctional Facility on February 24, 2013. (Defs.' 56.1 ¶ 14.) After numerous other transfers, (Pl.'s Dep. 36), Plaintiff was then transferred to Auburn Correctional Facility in 2014, and, having never received a response to the grievances filed at Sullivan, Plaintiff filed another grievance at Auburn complaining about the fact that he received no response to the grievance filed at Sullivan. (Pl.'s Opp'n ¶ 6; Pl.'s Compl. ¶ 45; Seguin Decl. ¶ 6.) Following an investigation, Plaintiff was told there was no record of a grievance at Sullivan regarding the January 2013 incident. (Pl.'s Compl. ¶ 45; Seguin Decl. ¶ 6; Seguin Decl. Ex. B (Auburn grievance forms).) Someone at Auburn allegedly informed Plaintiff "that staff assaults are

Terry v. Hulse, Not Reported in Fed. Supp. (2018)

2018 WL 4682784

not grievable" and according to "grievance [staff] at Auburn and Directive 4040," there was no "remedy." (Pl.'s Opp'n ¶ 6.)

There is no record of a grievance concerning the January 13, 2013 incident ever being filed in Sullivan records. (Defs.' 56.1 ¶ 15; Seguin Decl. ¶ 6; Proscia Decl. ¶ 4.) And, no record of an appeal exists with the Central Office Review Committee ("CORC"). (Defs.' 56.1 ¶ 16; Seguin Decl. ¶ 6.) The only grievance on record that Plaintiff filed and appealed as of May 2016 was related to his grievance at Sullivan going unanswered. (Seguin Decl. ¶ 6.)

### 3. Retaliation

Because he wrote a grievance, Plaintiff alleges he was "retaliated against," and "officers in the SHU area deprived [him] of his normal rations of food, [his] mail was not sent out," he was delayed in receiving his property and some of his property was lost, and he was denied callouts. (Pl.'s Opp'n ¶¶ 5, 7; *see also* Pl.'s Dep. 8 ("I was harassed, deprived of food, a whole bunch of things."); *id.* at 28 (testifying that he received empty food trays); *id.* at 29–30 (testifying he was denied callouts, was not receiving his mail, and his property was lost).) Plaintiff also claims he was "threaten[ed] repeatedly," (Pl.'s Opp'n ¶ 7), and told to "drop the lawsuit," and that "they [were] gonna [sic] kill [him]," (Pl.'s Dep. 30). In 2017, Plaintiff's jaw was broken by someone he does not know, and he believes corrections officers "put a hit out on [him]." (Pl.'s Opp'n ¶ 7.) Plaintiff believes he was transferred to other prisons as a "tactic" to get the instant Action thrown out. (*Id.*) Plaintiff reported the retaliation, and "the Superintendent sent someone to investigate, but the [investigator] tr[i]ed to misconstrue and discredit [Plaintiff]." (*Id.*)

Defendants contend that they were not aware that Plaintiff filed a grievance, (Defs.' 56.1 ¶¶ 20–24); they had no practical ability to interfere with Plaintiff's meals or mail, (*id.* ¶¶ 25–29); and they did not arrange for or personally cause Plaintiff to be deprived of food or mail, nor did they retaliate against Plaintiff any other way, (*id.* ¶¶ 30–34).

### B. Procedural History

**\*4** Plaintiff filed the Complaint on January 12, 2016. (Compl.) After receiving two extensions, (Dkt. Nos. 31, 33), Defendants filed an Answer on July 6, 2016, (Dkt. No. 34). On October 13, 2016, the Court held an initial conference;

however, Plaintiff refused to come to the phone for the conference, (*see* Dkt. (entry for Oct. 13, 2016) ), and the Court adopted a discovery schedule, (Dkt. No. 37). [6] On August 24, 2017, Defendants filed a pre-motion letter indicating the grounds on which they would move for summary judgment. (Letter from Bradley G. Wilson, Esq. to Court (Aug. 24, 2017) (Dkt. No. 61).) The Court held a pre-motion conference on September 8, 2017 and set a briefing schedule. (Dkt. No. 64.)

[6]     On October 21, 2016, Plaintiff's first Application for Appointment of Counsel was docketed. (*See* Application for Appointment of Counsel (Dkt. No. 38).) In an Order dated November 4, 2016, the Court denied the request without prejudice. (Dkt. No. 39.) On October 16, 2017, Plaintiff's second Application for Appointment of Counsel was docketed. (*See* Second Application for Appointment of Counsel (Dkt. No. 65).) On February 6, 2018, the Court denied the second request without prejudice. (Dkt. No. 83.) Plaintiff again requested counsel on February 12, 2018, (Dkt. No. 87), which the Court again denied without prejudice, (Dkt. No. 88).

Defendants filed the instant Motion and accompanying papers on November 8, 2017. (Notice of Motion; Defs.' Mem. of Law in Supp. of Mot. for Summ. J. ("Defs.' Mem.") (Dkt. No. 67); Defs.' 56.1; Burns Decl.; Cole Decl.; Estabrook Decl.; Hanson Decl.; Tucker Decl.; Proscia Decl.; Seguin Decl.; Wilson Decl.) Plaintiff did not oppose the Motion by the January 5, 2018 deadline, and on January 17, 2018, counsel for Defendants wrote to the Court requesting the Motion be deemed fully submitted. (Dkt. No. 79.) The Court granted the request. (Dkt. No. 80.) In a letter dated January 14, 2018, Plaintiff wrote to the Court requesting an extension of time to respond to the Motion because he was in the hospital with a broken jaw, (Dkt. No. 81), which Defendants opposed, (Dkt. No. 82.) The Court granted Plaintiff an extension until March 8, 2018. (Dkt. No. 83.) In a letter dated February 4, 2018, Plaintiff wrote to the Court requesting another extension, (Dkt. No. 87), and the Court granted Plaintiff an extension until March 20, 2018, (Dkt. No. 88.) Plaintiff missed the March 20, 2018 deadline, and at Defendants' request, (Dkt. No. 89), the Court deemed the Motion fully submitted, (Dkt. No. 91.) On April 20, 2018, Plaintiff filed an Opposition to the Motion, (Pl.'s Opp'n), and a letter explaining that he was transferred to other facilities and hindered from sending the Opposition, (Dkt. No. 93.) Defendants requested the Court decline to consider the untimely Opposition or, in the

Terry v. Hulse, Not Reported in Fed. Supp. (2018)

Case 9:19-cv-00427-DNH-TWD   Document 62   Filed 12/17/21   Page 174 of 193

2018 WL 4682784

alternative, to grant Defendants an extension to reply. (Dkt. No. 97.) The Court granted the extension request. (Dkt. No. 98.) On May 11, 2018, Defendants filed their reply. (Reply Mem. of Law in Supp. of Mot. for Summ. J. ("Defs.' Reply") (Dkt. No. 99).)

## II. Discussion

### A. Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*; *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same). "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and ... resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (internal quotation marks omitted); *see also Borough of Upper Saddle River v. Rockland Cty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same). "It is the movant's burden to show that no genuine factual dispute exists." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Berry*, 137 F. Supp. at 521 (same).

**\*5** "However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration and internal quotation marks omitted). Further, "[t]o survive a [summary judgment] motion ..., [a nonmovant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,' " *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) ), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (internal quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents

or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading...."). And, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (internal quotation marks omitted). At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod*, 653 F.3d at 164 (internal quotation marks omitted). Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (internal quotation marks omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986) ). However, a district court should consider only evidence that would be admissible at trial. *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998). "[W]here a party relies on [declarations] ... to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant ... is competent to testify on the matters stated.' " *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4) ).

Finally, the Second Circuit has instructed that when a court considers a motion for summary judgment, "special solicitude" should be afforded a pro se litigant, *see Graham*, 848 F.2d at 344, and a court should construe "the submissions of a pro se litigant ... liberally" and interpret them "to raise the strongest arguments that they suggest," *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (italics and internal quotation marks omitted). And, "the failure to oppose a motion for summary judgment alone does not justify the granting of summary judgment." *Vermont Teddy Bear Co.*, 373 F.3d at 244; *see also Jackson v. Fed. Exp.*, 766 F.3d 189, 196 (2d Cir. 2014) (explaining that "an examination of the legal validity of an entry of summary judgment should ... be[ ] made in light of the opposing party's pro se status" (italics omitted) ). "Nonetheless, proceeding pro se does not otherwise relieve a litigant of the usual requirements of summary judgment, and a pro se party's bald assertions unsupported by evidence ... are insufficient

Terry v. Hulse, Not Reported in Fed. Supp. (2018)

2018 WL 4682784

Case 9:19-cv-00427-DNH-TWD    Document 62    Filed 12/17/21    Page 175 of 193

to overcome a motion for summary judgment." *Houston*, 27 F. Supp. 3d at 351 (alterations, italics, and internal quotation marks omitted); *see also Flores v. City of New York*, No. 15-CV-2903, 2017 WL 3263147, at *2 (S.D.N.Y. July 31, 2017) (same).

### B. Analysis

Defendants move for summary judgment as to all claims on the ground that Plaintiff has failed to exhaust his administrative remedies. Additionally, Defendants seek dismissal on the merits only of Plaintiff's (1) First Amendment retaliation claims against all Defendants and (2) all claims against Hanson. The Court will address each of these arguments in turn.

### 1. Exhaustion of Administrative Remedies

**\*6** As an initial matter, Defendants move for summary judgment on the ground that Plaintiff failed to exhaust his administrative remedies pursuant to the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e *et seq.* (Defs.' Mem. 4–7.)

### a. Administrative Exhaustion

The PLRA provides that "[n]o action shall be brought with respect to prison conditions under [§] 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The exhaustion requirement applies to all personal incidents while in prison, *see Porter v. Nussle*, 534 U.S. 516, 532 (2002) (holding exhaustion is required for "all inmate suits about prison life, whether they involve general circumstances or particular episodes"); *see also Johnson v. Killian*, 680 F.3d 234, 238 (2d Cir. 2012) (per curiam) (same), and includes actions for monetary damages despite the fact that monetary damages are not available as an administrative remedy, *Booth v. Churner*, 532 U.S. 731, 741 (2001) (holding exhaustion is required "regardless of the relief offered through administrative procedures"). Moreover, the PLRA mandates " 'proper exhaustion'—that is, 'using all steps that the agency holds out, and doing so properly,' ... [which] entails ... 'completing the administrative review process in accordance with the applicable procedural rules.' " *Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (alteration and citations

omitted) (quoting *Woodford v. Ngo*, 548 U.S. 81, 88, 90 (2006) ); *see also Jones v. Bock*, 549 U.S. 199, 211 (2007) ("There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court.").

As a general matter, the New York State Department of Corrections and Community Supervision ("DOCCS") Inmate Grievance Program ("IGP") outlines the procedures that apply to grievances filed by inmates in New York State correctional facilities. The IGP provides for a three-step grievance process. *See* 7 N.Y. Comp. Codes R. & Regs. ("N.Y.C.R.R.") § 701 *et seq.*; *see also Abdallah v. Ragner*, No. 12-CV-8840, 2013 WL 7118083, at *2 (S.D.N.Y. Nov. 22, 2013) (noting that "[DOCCS] provides an administrative remedy for many prisoners' claims," which is "a grievance system available to prisoners in custody at state prisons" (citing 7 N.Y.C.R.R. § 701.1(c) ) ). Under the framework used in typical cases, an inmate must first file a complaint at the facility where the inmate is housed within 21 calendar days of an alleged occurrence. *See* 7 N.Y.C.R.R. § 701.5(a)(1). That complaint must provide a specific description of the problem. *See id.* § 701.5(a)(2). The second step in the tripartite framework is for the grievant or any direct party to appeal the Inmate Grievance Resolution Committee's ("IGRC") decision to the prison superintendent within seven calendar days after receipt of the written response, although the appealing party can seek an exception to the time limit. *See id.* § 701.5(c)(1). The third and final step is to appeal the superintendent's decision to the CORC, which the prisoner must do within seven days of the superintendent's written response to the grievance. *See id.* § 701.5(d)(1)(i). Here, too, an inmate may request an exception to the time limit. *See id.* "[O]nly after CORC has reviewed the appeal and rendered a decision are New York's grievance procedures exhausted." *Gardner v. Daddezio*, No. 07-CV-7201, 2008 WL 4826025, at *2 (S.D.N.Y. Nov. 5, 2008).

**\*7** Grievances claiming employee harassment "are of particular concern to the administration of [DOCCS] facilities," and subject to an expedited procedure whereby the grievance goes directly to the facility superintendent. 7 N.Y.C.R.R. § 701.8.[7] Although an inmate must still follow the procedures identified above and contained in 7 N.Y.C.R.R. § 701.5(a), the regulations also provide that "[a]n inmate who feels that he/she has been the victim of harassment should report such occurrences to the immediate supervisor of that employee," although "this is not a prerequisite for filing a grievance with the IGP." *Id.* § 701.9(a). Additionally, the framework provides that "[a]ll

Terry v. Hulse, Not Reported in Fed. Supp. (2018)

2018 WL 4682784

documents submitted with [a grievance alleging harassment] must be forwarded to the superintendent by close of business that day," *id.* § 701.8(b), and that the superintendent personally or through a designee "shall promptly determine whether the grievance, if true, would represent a bona fide case of harassment as defined in [§] 701.2," *id.* § 701.8(c), which defines "[h]arassment grievances" as "those grievances that allege employee misconduct meant to annoy, intimidate or harm an inmate," *id.* § 701.2(e). If it is not, the grievance is returned to the IGRC for normal processing. *Id.* § 701.8(c). If it is a bona fide harassment issue, however, the superintendent must then (1) initiate an in-house investigation into the allegations by higher-ranking supervisory personnel, (2) request an investigation by the inspector general's office, or (3) if the superintendent determines that criminal activity may be involved, request an investigation by the New York State Police, Bureau of Criminal Investigation. *Id.* § 701.8(d). The superintendent then must render a decision within 25 calendar days of receipt of the grievance, *id.* § 701.8(f), and, if she does not, the grievant may appeal to the CORC, *id.* § 701.8(g). When a grievant wishes to appeal the superintendent's response to the CORC, the grievant must do so within seven days of the receipt of that response. *Id.* § 701.8(h).

7      Section 701.8 has been found applicable to claims of excessive force. *See, e.g., Torres v. Carry*, 691 F. Supp. 2d 366, 369–70 (S.D.N.Y. 2009).

A plaintiff must exhaust his administrative remedies *before* filing his initial complaint in federal court. Indeed, "[w]hen a prisoner does not properly exhaust his administrative remedies before filing suit, the action *must* be dismissed." *Mateo v. Alexander*, No. 08-CV-8797, 2010 WL 431718, at *3 (S.D.N.Y. Feb. 9, 2010); *see also Harris v. Gunsett*, No. 12-CV-3578, 2013 WL 3816590, at *6 (S.D.N.Y. July 22, 2013) (same). "This is so even if the claim has since been exhausted." *Mateo v. Ercole*, No. 08-CV-10450, 2010 WL 3629520, at *8 (S.D.N.Y. Sept. 17, 2010). Defendants bear the burden of proving that Plaintiff failed to exhaust available administrative remedies. *See Hubbs v. Suffolk Cty. Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015) ("Because failure to exhaust is an affirmative defense, defendants bear the initial burden of establishing, by pointing to legally sufficient sources such as statutes, regulations, or grievance procedures, that a grievance process exists and applies to the underlying dispute." (alteration, citations, and internal quotation marks omitted) ); *see also Powell v. Schriro*, No. 14-CV-6207, 2015 WL 7017516, at *6 (S.D.N.Y. Nov. 12, 2015) (same).

Here, it is undisputed that Plaintiff did not complete the requisite three-step grievance process before filing his lawsuit related to the January 2013 incident, and thus failed to exhaust his administrative remedies. (Proscia Decl. ¶ 4; Seguin Decl. ¶ 5.)

### b. Availability of Administrative Remedies

Failure to exhaust a technically available administrative remedy, however, does not end the inquiry. The PLRA "contains its own, textual exception to mandatory exhaustion." *Ross v. Blake*, 136 S. Ct. 1850, 1858 (2016). The Supreme Court recently explained in *Ross*:

> Under § 1997e(a), the exhaustion requirement hinges on the "availab[ility]" of administrative remedies: An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones. And that limitation on an inmate's duty to exhaust ... has real content.... [A]n inmate is required to exhaust those, but only those, grievance procedures that are "capable of use" to obtain "some relief for the action complained of."

*Id.* at 1858–59 (quoting *Booth*, 532 U.S. at 738).

There are at least "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." *Id.* at 1859; *see also Williams v. Priatno*, 829 F.3d 118, 123–24 & n.2 (2d Cir. 2016) (applying *Ross* but noting that "the three circumstances discussed in *Ross* do not appear to be exhaustive"). [8] First, an "administrative procedure is unavailable when ... it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Ross*, 136 S. Ct. at 1859 (citing *Booth*, 532 U.S. at 736, 738). Second, a remedy is unavailable where "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id.* Third, an administrative remedy may be unavailable "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860. These three circumstances "do not appear to be exhaustive," *Williams*, 829 F.3d at 123 n.2, but they do "guide the Court's inquiry," *Khudan v. Lee*, No. 12-CV-8147, 2016 WL 4735364, at *5 (S.D.N.Y. Sept. 8, 2016).

Terry v. Hulse, Not Reported in Fed. Supp. (2018)

2018 WL 4682784

8    Because, as in *Williams*, the circumstances delineated in *Ross* are also relevant to the facts of this case, the Court "do[es] not opine on what other circumstances might render an otherwise available administrative remedy actually incapable of use." *Williams*, 829 F.3d at 123 n.2.

**\*8** Shortly after *Ross*, the Second Circuit applied the *Ross* availability analysis in *Williams*. 829 F.3d 118. The question of availability addressed by the court in *Williams* governs this case as well. In *Williams*, the plaintiff alleged he was beaten by two correction officers. *Id*. at 120. On January 15, 2015, Williams claimed to have drafted a grievance while he was in SHU, and gave it to a corrections officer to forward to the grievance office as required by the grievance procedures that applied to inmates in SHU. *Id*. at 120–21. A week later, Williams asked the superintendent why he had not received a response and was told she knew nothing about it and would look into it. *Id*. at 121. Several days later, Williams was transferred to another facility. *Id*. He never received a response to his grievance and claimed that the correction officer never filed it for him. *Id*. He never appealed the grievance but commenced a § 1983 action, and the defendants moved to dismiss on the basis that Williams failed to exhaust his administrative remedies. *Id*. Accepting as true the allegation that the corrections officer never filed Williams' grievance, the *Williams* court determined that the governing regulations only contemplated appeals of grievances that are actually filed; the regulations did not specify a process to appeal or otherwise exhaust when a grievance by a prisoner housed in SHU is given to a corrections officer to file as per the specified procedure, but the officer fails to file it. *Id*. at 124. As "the regulations give no guidance whatsoever to an inmate whose grievance was never filed," the Second Circuit concluded that the regulations were " 'so opaque' and 'so confusing that ... no reasonable prisoner can use [them].' " *Id*. (quoting *Ross*, 136 S. Ct. at 1859.); *id*. at 126 (finding "the process to appeal an unfiled and unanswered grievance is prohibitively opaque, such that no inmate could actually make use of it"). In so concluding, the Second Circuit noted that the fact that the inmate in *Williams* was transferred between facilities approximately two weeks after handing off his grievance made the procedure even more obscure. *See id*. at 126. "At the heart of the Second Circuit's analysis was the inescapable quandary that inmates find themselves in when their grievances are not filed—namely, that current regulations do not guarantee recourse for an inmate whose grievance was never filed." *McRae v. Cordero*, No. 15-CV-4334, 2018 WL 3611964, at \*6 (S.D.N.Y. July 26, 2018)

The Court in *Williams* analyzed the same regulations as the instant case. 829 F.3d at 125– 26 (citing 7 N.Y.C.R.R. §§ 701.5, 701.6, 701.8). As in *Williams*, Plaintiff here has similarly alleged that he gave his grievance to an officer while housed in SHU, and his grievance was never filed. (Pl.'s Dep. 26 (testifying "[m]y grievance was never turned in" and "[t]hey were never even submitted"); *id*. at 33 (testifying his grievances "weren't being turned in"); *id*. at 34 (testifying the officers were "supposed to turn [the grievances] in and they didn't"); Pl.'s Opp'n ¶ 5 (stating that Plaintiff "gave [the grievances] to the officers in the SHU area to be turned in and filed"); *id*. ¶ 7 (stating that an exception to exhaustion should apply because "the officer's [sic] are not filing [the grievances]").) Like the Plaintiff in *Williams*, Plaintiff was transferred from Sullivan to Upstate about a month and a half after allegedly filing his grievance. (Defs.' 56.1 ¶ 14 (stating Plaintiff was transferred from Sullivan to Upstate on February 24, 2013).)9 Plaintiff also argues that "Directive 4040 is confusing and [there] isn't any procedure[ ] in place ... that explains how to report when these types of misdeeds on behalf of staff happens if an officer throws your grievance in the trash." (Pl.'s Opp'n ¶ 7.)10 The Court agrees. Plaintiff was faced with the same "opaque" and "confusing" set of regulations the *Williams* court found "incapable of use." *Williams*, 829 F.3d at 126 (internal quotation marks omitted).11 However, because the Motion before the Court is one for summary judgment, unlike in *Williams*, the Court need not accept as true the allegation that the corrections officer never filed Plaintiff's grievance. *See id*. at 124 (accepting as true the allegation that the correction officer never filed the plaintiff's grievance). Thus, the Court must determine whether the record adequately supports Plaintiff's contention that the corrections officer never filed Plaintiff's grievances.

9    It bears noting that the transfer was not itself determinative in *Williams*. The Court specifically noted that "if the regulations ... were not already so confusing that no ordinary prisoner can discern or navigate them, their obscurity was compounded by the fact that Williams was transferred to another facility approximately two weeks after giving his grievance to the correction officer." *Id*. at 126 (alteration, citation, and internal quotation marks omitted).

10    DOCCS Directive 4040 is the document given to inmates that outlines the DOCCS inmate grievance regulations. (Defs.' Reply Mem. 2.)

Terry v. Hulse, Not Reported in Fed. Supp. (2018)

2018 WL 4682784

11    Although the Second Circuit in *Williams* addressed a motion to dismiss, the legal analysis for determining whether an exception to exhaustion applies is the same for a summary judgment motion. *McRae*, 2018 WL 3611964, at *5 n.7 (noting that '[the fact] that Williams was decided on a motion to dismiss and not on a summary judgment motion does not change the analysis.' " (quoting *Medina v. Napoli*, 725 F. App'x. 51, 54 (2d Cir. 2018) ).

**\*9** The Second Circuit has not yet provided published guidance regarding what record evidence is sufficient to find a genuine issue of material fact as to whether the grievance process was "available" under the *Ross* and *Williams* exhaustion analysis. However, in a recent unpublished opinion, the Second Circuit considered alleged actions that "b[ore] a strong similarity to those of the defendants in *Williams*." *Medina v. Napoli*, 725 F. App'x. 51, 53 (2d Cir. 2018). The plaintiff, Medina, like Williams, was an inmate in SHU who was required to rely on correction officers to file his grievances, and "both Medina and Williams alleged that those officers intentionally discarded the grievances or prevented them from being filed." *Id.* at 53–54. The Second Circuit concluded that "[t]he record establishes that Medina's allegations, supported by witness testimony, about defendants' actions to prevent the filing of Medina's grievances concerning the June 2007 incident are sufficient, when viewed in the light most favorable to Medina, to raise a genuine issue of material fact as to whether the grievance process was 'available' to Medina." *Id.* at 54. Although not in the context of a summary judgment motion, the Second Circuit in *Williams* considered the claim plausible that the correction officer never filed his grievance "given Williams's allegations that he asked superintendent Perez about his grievance one week after giving it to the correction officer and Perez said that she had no knowledge of it." 829 F.3d at 124 & n.3. Because it was a harassment grievance, had it been filed, it should have been forwarded to Perez the same day. *Id.* at 124 n.3. Thus, "[a]t the motion to dismiss stage, the allegation that she had no knowledge of the grievance support[ed] Williams's allegation that it was not filed." *Id.* In contrast, in *Hicks v. Adams*, 692 F. App'x 647 (2d Cir. 2017), the Second Circuit found the allegation "that prison staff did not transmit appeals [the plaintiff] attempted to submit" insufficient to plausibly allege that prison officials thwarted his attempt to appeal, because "he d[id] not state when he submitted the appeals, to whom, and what, if any, steps he took after the documents were not filed." *Id.* at 648.

Here, Plaintiff has consistently alleged in his Complaint, (Compl. ¶¶ 17, 42, 48), deposition testimony, (Pl.'s Dep. 26, 33–34), and Opposition to the Motion, (Pl.'s Opp'n ¶¶ 3, 5, 7), that around January 13, 2018, he wrote at least three grievances, and, as required by regulations for an inmate in SHU, gave those grievances to officers to file for him. Plaintiff testified that he kept a copy of the grievance; however, his property was either destroyed or taken by a corrections officer. (Pl.'s Dep. 32, 35.) After changing facilities multiple times, (Pl.'s Dep. 36), on February 7, 2014, Plaintiff filed another grievance regarding the unanswered grievances he had filed at Sullivan, (Compl. ¶ 17; Pl.'s Opp'n ¶ 6). Furthermore, deposition testimony, as well as the subsequent grievance from Auburn regarding the unanswered grievance from Sullivan, also work to create a genuine dispute of material fact regarding whether Plaintiff attempted to filed a timely grievance at Sullivan in January 2013. Viewing these facts in the light most favorable to Plaintiff, the Court finds the record evidence sufficient to raise a genuine issue of material fact as to whether the grievance process was "available" to Plaintiff. Although there is no witness testimony other than Plaintiff's to support the allegation, *Medina*, 725 F. App'x at 54 (finding additional witness testimony sufficient to create genuine dispute of material fact), the evidence in the record contains sufficient detail regarding when and how Plaintiff attempted to file his grievances. This holding is in accord with numerous other district courts in the Second Circuit that have denied summary judgment based on similar record evidence. *See, e.g.*, *Jackson v. Downstate Corr. Facility*, No. 16-CV-0267, 2018 WL 3650136, at *8 (S.D.N.Y. July 31, 2018) (finding "[the] [d]efendants' argument that [the] [p]laintiff never actually filed his grievance ... of no moment," because the plaintiff's deposition "demonstrates that [the] [p]laintiff made attempts to file a grievance in October of 2015, though there is no record of such a grievance with the IGRC"); *McRae*, 2018 WL 3611964, at *6 (finding the plaintiff's deposition testimony, and a subsequent grievance concerning the superintendent's non-response to his grievance, sufficient to create a material dispute of fact regarding whether the plaintiff had filed a grievance); *Trahan v. Capozzola*, No. 12-CV-4353, 2017 WL 9512406, at *5–6 (E.D.N.Y. June 26, 2017) (denying summary judgment for two claims based on sworn testimony that the plaintiff filed his grievance by giving it to a corrections officer, but granting summary judgment for the one claim where the plaintiff did "not state when he filed the grievance and otherwise proffer[ed] no details regarding its submission"), *adopted by* 2017 WL 4286620 (E.D.N.Y. Sept. 27, 2017); *Carter v. Revine*, No. 14-CV-1553, 2017 WL 2111594, at *12 (D. Conn. May 15,

Terry v. Hulse, Not Reported in Fed. Supp. (2018)

2018 WL 4682784

2017) (finding the plaintiff's affidavit that he submitted to two named individuals, and "other available employees," six medical requests and a "written grievance in reference to the lack of response to [his] requests for medical care ... sufficient evidence for the [c]ourt to conclude he tried to submit the grievance by and through the assistance of correctional officers while he was housed in the [Restrictive Housing Unit]" (alterations and internal quotation marks omitted); *Reid v. Marzano*, No. 15-CV-761, 2017 WL 1040420, at *3 (N.D.N.Y. Mar. 17, 2017) (denying summary judgment based on the plaintiff's deposition testimony that his grievance was not filed); *Juarbe v. Carnegie*, No. 15-CV-1485, 2016 WL 6901277, at *4 (N.D.N.Y. Nov. 23, 2016) (concluding "questions of fact remain regarding the filing of the grievances, which precludes summary judgment," where the plaintiff alleged he filed grievances, but no record of the grievances being received or processed existed). *But see Hicks*, 692 F. App'x at 648 (approving dismissal where there was no assertion regarding when and to whom a grievance was filed, and what subsequent steps were taken after the grievance was not filed).

**\*10** Defendants argue that Plaintiff has to provide "something more than the general claims made in his deposition that his grievance was thrown away," and cite to cases from the Northern District holding that the "mere contentions or speculation of grievances being misplaced by officers do not create a genuine issue of material fact when there is no evidence to support the allegations." (Defs.' Mem. 6 (quoting *Rodriguez v. Cross*, No. 15-CV-1079, 2017 WL 2791063, at *7 (N.D.N.Y. May 9, 2017), *adopted by* 2017 WL 2790530 (N.D.N.Y. June 27, 2017) ).) However, *Rodriguez* did not involve an inmate housed in SHU who was dependent on the officers to file a grievance for him, and the court explicitly distinguished its holding granting summary judgment from those cases "den[ying] a defendant's motion for summary judgment when faced with an unanswered and unfiled grievance drafted in SHU," because "[i]nmates not housed in the SHU are in a different position to SHU inmates when determining if grievance procedures are essentially unknowable or unavailable." *Rodriguez*, 2017 WL 2791063, at *7 (internal quotation marks omitted). And, as explained above, the Court agrees with the numerous courts that have denied summary judgment based on sworn deposition testimony from the Plaintiff creating a dispute of material fact regarding whether a Plaintiff's grievance was submitted. *See, e.g., Trahan*, 2017 WL 9512406, at *5 ("While [the] [d]efendants argue that there is no evidence to support [the] [p]laintiff's claim that he handed timely grievances to

corrections officers, [the] [p]laintiff's position is supported by his sworn testimony, which is sufficient to defeat summary judgment."); *Reid*, 2017 WL 1040420, at *3 (finding that the plaintiff could rely on his deposition testimony and rejecting the defendants' argument that "mere allegation of submitting a grievance, without supporting evidence" was insufficient to withstand summary judgment as "it [wa]s unclear what evidence [the] [d]efendants expect[ed] [the] [p]laintiff to produce of his grievances that were allegedly discarded by corrections officers") (italics and internal quotation marks omitted); *see also Icangelo v. Cty. of Suffolk*, No. 16-CV-1982, 2018 WL 1867108, at *6–7 (E.D.N.Y. Feb. 8, 2018) (finding that despite testimony from the plaintiff that was contradicted by his own deposition testimony regarding whether he did, in fact, write a grievance, and testimony from a Correction Sergeant with the Claim Investigation section at the jail who searched for and was unable to find the grievance, the court nonetheless, "drawing all inferences in the light most favorable to [the plaintiff]," concluded "the facts ... weigh against a finding of non-exhaustion"), *adopted by* 2018 WL 1115349 (E.D.N.Y. Feb. 28, 2018).

As such, drawing all inferences in Plaintiff's favor, there is a dispute of material fact regarding whether Plaintiff's grievance went unfiled. Because the grievance procedures were incapable of use, they are considered "unavailable" to Plaintiff, and Plaintiff "need not exhaust remedies if they are not 'available.' " *Ross*, 136 S. Ct. at 1855, 1858. Accordingly, Defendants' motion for summary judgment based upon lack of exhaustion is denied.

## 2. First Amendment Retaliation

Plaintiff also alleges First Amendment retaliation claims against Defendants, which fail as a matter of law. (Pl.'s Dep. 26.) "To state a First Amendment retaliation claim ..., a plaintiff must allege '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.' " *Dolan v. Connolly*, 794 F.3d 290, 294 (2d Cir. 2015) (quoting *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009) ); *see also Quezada v. Roy*, No. 14-CV-4056, 2015 WL 5970355, at *19 (S.D.N.Y. Oct. 13, 2015) (same); *Ramrattan v. Fischer*, No. 13-CV-6890, 2015 WL 3604242, at *12 (S.D.N.Y. June 9, 2015) (same). The Second Circuit has made clear that courts are to "approach prisoner retaliation claims with skepticism and particular care, because virtually any adverse action taken

Terry v. Hulse, Not Reported in Fed. Supp. (2018)

2018 WL 4682784

against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act." *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003) (internal quotation marks omitted); *see also Dolan*, 794 F.3d at 295 (same); *Corley v. City of New York*, No. 14-CV-3202, 2015 WL 5729985, at *8 (S.D.N.Y. Sept. 30, 2015) (same).

"It is well-established that inmates' filing of grievances is a constitutionally protected exercise of their right under the First Amendment to petition the government for the redress of grievances." *Mateo v. Bristow*, No. 12-CV-5052, 2013 WL 3863865, at *4 (S.D.N.Y. July 16, 2013) (citing *Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996) ); *see also Andino v. Fischer*, 698 F. Supp. 2d 362, 382 (S.D.N.Y. 2010) (same). However, with respect to the second prong, "[o]nly retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action." *Davis*, 320 F.3d at 353 (internal quotation marks omitted). The "ordinary firmness" inquiry is not subjective, and a prisoner may still suffer adverse action even where undeterred. *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004); *see also id.* at 384 ("[T]he fact that a particular plaintiff ... responded to retaliation with greater than 'ordinary firmness' does not deprive him of a cause of action."); *Nelson v. McGrain*, No. 12-CV-6292, 2015 WL 7571911, at *1 (W.D.N.Y. Nov. 24, 2015) ("[A] prisoner can state a retaliation claim in the absence of actual deterrence." (quoting *Nelson v. McGrain*, 596 F. App'x 37, 38 (2d Cir. 2015) ) ). Plaintiff alleges he was subject to two types of adverse actions: first, verbal threats, (Pl.'s Dep. 30, 35; Pl.'s Opp'n ¶ 7), and second, harassing conduct, that included serving him empty food trays, tampering with his mail, and destroying and taking his property, (Pl.'s Dep. 8, 28–30; Pl.'s Opp'n ¶¶ 5, 7). The Court addresses each in turn.

**\*11** Courts have found that, while verbal threats may qualify as adverse actions, they must be "sufficiently specific and direct" to be actionable. *Mateo*, 2013 WL 3863865, at *5; *see also Quezada*, 2015 WL 5970355, at *21 ("The less direct and specific a threat, the less likely it will deter an inmate from exercising his First Amendment rights." (internal quotation marks omitted) ); *Lunney v. Brureton*, No. 04-CV-2438, 2007 WL 1544629, at *23 (S.D.N.Y. May 29, 2007) (noting that "verbal threats may constitute adverse action ... depend[ing] on their specificity and the context in which they are uttered"). Plaintiff does not know the names of the officers who threatened him. (Pl.'s Dep. 35 (responding to a question about which officers threatened him with, "[h]ow

am I supposed to know their names when I'm sitting in a cell, locked inside a cell. [They] [w]alk by and threaten me.").) The threats Plaintiff received including "telling him to drop the lawsuit," (*id.* at 30), and that they were "gonna kill [him]," (*id.* at 30– 31). The Court finds these threats to be lacking in specificity and directness. "[S]o long as the putative threat's directness and specificity matter, it is difficult to understand how Plaintiff's claims ... are sufficient." *Albritton v. Morris*, No. 13-CV-3708, 2016 WL 1267799, at *18 (S.D.N.Y. Mar. 30, 2016) (citation omitted) (holding statement that officer "told Plaintiff that grievances were unlikely to succeed and said that he would handle things 'his way' " was insufficiently specific or direct); *see also Mateo v. Fischer*, 682 F. Supp. 2d 423, 434 (S.D.N.Y. 2010) ("The opacity of [the defendant's] threats to [the plaintiff]—that [the plaintiff] should 'wait till he put his hands on me,' and that 'one day he and I will party,'—softens the deterrent effect considerably." (citations omitted) ); *Barrington v. New York*, 806 F. Supp. 2d 730, 746 (S.D.N.Y. 2011) (granting summary judgment in favor of a defendant who told an inmate that " 'me and my boys ... going to get you' while brandishing a copy of a grievance"); *Bilal v. N.Y. State Dep't of Corr.*, No. 09-CV-8433, 2010 WL 2506988, at *16 (S.D.N.Y. June 21, 2010) ("Neither [the defendant's] comment ... that [the plaintiff] was 'lucky' because correction officers 'usually fuck people up for writing a bunch of bullshit grievances' nor his ... comment that "[y]ou're not the only one who can write. I'm willing to bet you'll break or get broke up,' was a 'direct' nor 'specific' threat." (alterations and citations omitted) ), *aff'd sub nom. Bilal v. White*, 494 F. App'x 143 (2d Cir. 2012). There is nothing in the record to indicate that any Defendant made a sufficiently direct or specific threat to Plaintiff to state a retaliation claim based on alleged verbal threats.

Defendants also argue that Plaintiff's other allegations of harassing conduct lack specificity, as "Plaintiff has provided minimal detail about the actual actions purportedly taken against him: no description of when they occurred, who did it, or how the Defendants were behind it." (Defs.' Mem. 8.) The Court agrees. Plaintiff testified that "a couple of times ... 'they' would send a tray in my cell, but then you open the top and it's only like a half a spoon of food inside the tray." (Pl.'s Dep. 27.) Plaintiff "wouldn't count" how many times this happened, because "nobody counts shit like this." (*Id.* at 28.) Also, Plaintiff speculates that he "could have 30, 40 letters sitting up in the mail room" because he "ha[s] people telling [him] that mail was written to [him] [but] [he] never received it." (*Id.* at 30.) Additionally, "property" of Plaintiff's "was lost," and he was getting items stolen from his cell by officers.

Terry v. Hulse, Not Reported in Fed. Supp. (2018)

2018 WL 4682784

(*Id.* at 30; *see also id.* at 35 (testifying he was not able to keep a copy of the grievance because his "property [wa]s being destroyed").) As is true in response to any motion for summary judgment, Plaintiff is required to provide evidence sufficient to allow a jury to find in his favor, as "[c]onclusory allegations, conjecture, and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998). Plaintiff's allegations regarding this harassing conduct are lacking in any specifics regarding how Defendants were involved in the alleged conduct and how frequently it occurred. Defendants provided sworn statements that they did not even know a grievance was filed, did not have the capacity to interfere with Plaintiff's food or mail, and did not arrange for or personally retaliate against Plaintiff, (Defs.' 56.1 ¶¶ 25–29), which Plaintiff does not contest. This fatally undercuts Plaintiff's claim. *See Mateo v. Dawn*, No. 14-CV-2620, 2016 WL 5478431, at *8 (S.D.N.Y. Sept. 28, 2016) ("Plaintiff's claim is similarly handicapped by its failure to allege or otherwise suggest that Defendants even knew of the complaints filed against other correction officers."); *Alston v. Pafumi*, No. 09-CV-1978, 2016 WL 81785, at *7 (D. Conn. Jan. 7, 2016) (granting partial summary judgment where the plaintiff identified "no record evidence from which a reasonable jury could infer that any other defendant was aware of [the plaintiff's] complaints"), *reconsideration denied*, 2016 WL 447423 (D. Conn. Feb. 4, 2016); *Tirado v. Shutt*, No. 13-CV-2848, 2015 WL 774982, at *10 (S.D.N.Y. Feb. 23, 2015) ("Absent evidence that any defendant knew about his ... grievance, [the plaintiff] has failed to provide any basis to believe that they retaliated against him for a grievance in which they were not named."), *adopted in relevant part by* 2015 WL 4476027 (S.D.N.Y. July 22, 2015); *Wesley v. Kalos*, No. 97-CV-1598, 1997 WL 767557, at *5 (S.D.N.Y. Dec. 11, 1997) ("To establish a claim of retaliatory transfer requires [the plaintiff], at a minimum, to assert facts to show that the [d]efendants knew of [the plaintiff's] complaints prior to the transfer.").

**\*12** To the extent Plaintiff alleges that other—unnamed— officers retaliated against him based on Plaintiff's attempt to grieve the January 2013 incident, Plaintiff has not established a nexus between his protected activity and the alleged retaliation. "Retaliation claims have been dismissed when they are supported only by conclusory allegations that the retaliation was based upon complaints against another officer." *Jones v. Fischer*, No. 10-CV-1331, 2013 WL 5441353, at *21 (N.D.N.Y. Sept. 27, 2013); *see also Henson v. Gagnon*, No. 13-CV-590, 2015 WL 9809874, at *12 (N.D.N.Y. Dec. 10, 2015) ("The record is devoid

of evidence ... that supports [the] [p]laintiff's conclusory assertion that [the defendant] planted evidence and issued the [m]isbehavior [r]eport based upon evidence in retaliation for grievances [the] [p]laintiff had filed against other corrections officers."), *adopted by* 2016 WL 204494 (N.D.N.Y. Jan. 15, 2016); *Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 369 (S.D.N.Y. 2011) (holding that the plaintiff failed to provide any basis to believe that a corrections counselor would retaliate for a grievance that she was not personally named in) (collecting cases); *Hare v. Hayden*, 09-CV-3135, 2011 WL 1453789, at *4 (S.D.N.Y. Apr. 14, 2011) ("As a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant.") (citing *Wright*, 554 F.3d at 274) (dismissing retaliation claim against a corrections officer when only alleged basis for retaliation was a complaint about a prior incident by another corrections officer). In this case, Plaintiff's speculation that unnamed individuals retaliated against Plaintiff based on his attempt to grieve the 2013 incident is not supported by the record. Therefore, Defendants' Motion is granted as to the First Amendment retaliation claims, and Plaintiff's retaliation claims against Defendants are dismissed.

### 3. Claims Against Hanson

Defendants argue the claims against Hanson should be dismissed, because there is no dispute that Hanson's only involvement in the alleged constitutional deprivations was taking photographs of Plaintiff after the alleged assault and Plaintiff has failed to allege a conspiracy to cover up the extent of Plaintiff's injuries. (Defs.' Mem. 9.)

A Section 1983 conspiracy claim requires "(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999); *see also Ciambriello v. Cty. of Nassau*, 292 F.3d 307, 324–25 (2d Cir. 2002) (same); *Deskovic v. City of Peekskill*, 894 F. Supp. 2d 443, 464–65 (S.D.N.Y. 2012) (same). "[C]onspiracies are by their very nature secretive operations, and may have to be proven by circumstantial, rather than direct, evidence." *Pangburn*, 200 F.3d at 72 (internal quotation marks omitted). [12] To state a conspiracy claim, Plaintiff "must provide some factual basis supporting a meeting of the minds." *Webb v. Goord*, 340 F.3d 105, 110 (2d Cir. 2003) (internal quotation marks omitted). Thus, Plaintiff must

Terry v. Hulse, Not Reported in Fed. Supp. (2018)

Case 9:19-cv-00427-DNH-TWD    Document 62    Filed 12/17/21    Page 182 of 193

2018 WL 4682784

"make an effort to provide some details of time and place and the alleged effects of the conspiracy ... [including] facts to demonstrate that the defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Warren v. Fischl*, 33 F. Supp.2d 171, 177 (E.D.N.Y. 1999) (citations and internal quotation marks omitted).

12    Defendants argue that Plaintiff's conspiracy claims should be dismissed according to the "intracorporate conspiracy doctrine," which provides that employees or agents of a single corporate entity, acting within the scope of their employment, are legally incapable of conspiring together. (Defs.' Mem. 9–10.) *Hill v. City of New York*. No. 03-CV-1283, 2005 WL 3591719, at *6 (E.D.N.Y. Dec. 30, 2005) (citing *Herrmann v. Moore*, 576 F.2d 453, 459 (2d Cir. 1978) ). Although the Second Circuit has recognized the intracorporate conspiracy doctrine in the context of § 1985, *see Herrmann*, 576 F.2d at 459; *Girard v. 94th St. & Fifth Ave. Corp.*, 530 F.2d 66, 72 (2d Cir. 1976), it has not yet extended the doctrine to § 1983, *see Ali v. Connick*, 136 F. Supp. 3d 270, 282 (E.D.N.Y. 2015) (collecting cases). The Court therefore declines to grants summary judgment based on this argument. Regardless, Plaintiff's claims fit within the "personal stake" exception to the rule. "The intracorporate conspiracy doctrine does not apply to bar conspiracy claims against individuals within a single entity when they are pursuing personal interests wholly separate and apart from the entity." *Id.* at 282 (internal quotation marks omitted). Construing the facts in the light most favorable to Plaintiff, Plaintiff has alleged facts which, if true, would show that Defendants acted in their own interests and outside the normal course of their duties for DOCCS if they did indeed attempt to cover up the use of force against Plaintiff. "This is consistent with cases from th[e] [Second] [C]ircuit in which district courts have found that the personal stake exception applied when police officers were alleged to have: covered up the use of excessive force, engaged in race-based false arrests to improve their chances of promotions and benefits, and assaulted a prisoner in retaliation for his participation in a federal lawsuit." *Id.* (collecting cases) (citations omitted).

*13    Plaintiff alleges that Defendants, including Hanson, conspired to cover up the alleged use of excessive force against him. (Pl.'s Dep. 40.) As evidence, he points to the conversation between Cole and Hanson as the photographs were being taken on January 13, 2013 immediately following the assault. According to Plaintiff, Cole told Hanson to not let the superintendent see the close up photo, and that they "can't let [the close up] register." (Pl.'s Dep. 11; Pl.'s Opp'n ¶ 7.) Further, the close-up photos did not, in fact, register. (Pl.'s Dep. 12, 40; Pl.'s Opp'n ¶ 7.) Based on this evidence, Plaintiff has created a fact dispute regarding whether there was an agreement between Cole and Hanson. "[T]his is not a case where evidence shows that the defendants merely worked together, or communicated generally with each other." *Deskovic*, 894 F. Supp. 2d at 466 (collecting cases). Further, Plaintiff has also provided "details of time and place and the alleged effects of the conspiracy," *Warren*, 33 F. Supp. 2d at 177 (internal quotation marks omitted), as well as "overt acts which [D]efendants engaged in which were reasonably related to the promotion of the alleged conspiracy," *Mitchell v. Cty. of Nassau*, 786 F. Supp. 2d 545,565 (E.D.N.Y. 2011) (internal quotation marks omitted). *See also Hill v. City of New York*, No. 03-CV-1283, 2005 WL 3591719, at *5 (E.D.N.Y. Dec. 30, 2005) ("Given that a jury may rationally infer that the defendant officers participated in a conspiracy to cover-up unconstitutional acts, summary judgment is not appropriate on [the] plaintiff's conspiracy claim."). And, the fact that the close-up photo was, in fact, unable to be recovered serves as circumstantial evidence in further support of the conspiracy. *See DeMeo v. Kean*, 754 F. Supp. 2d 435,447 (N.D.N.Y. 2010) (finding that erased and destroyed video recordings in control of defendants was "sufficient circumstantial evidence to permit a jury to determine whether [the defendants] conspired ... to partially erase and/or destroy the video evidence."). Thus, the Court denies Defendants' motion for summary judgment as to the claims again Hanson.

### III. Conclusion

For the foregoing reasons, the Motion for Summary Judgment is granted as to the First Amendment retaliation claim, and denied as to the rest of Plaintiff's Claims. The Court will hold a conference on November 8, 2018 at 10:30 a.m. to discuss the status of the remaining claims. The Clerk of Court is respectfully directed to terminate the pending Motion, (Dkt. No. 66), and mail a copy of this Opinion to Plaintiff.

SO ORDERED.

Terry v. Hulse, Not Reported in Fed. Supp. (2018)
2018 WL 4682784

Case 9:19-cv-00427-DNH-TWD    Document 62    Filed 12/17/21    Page 183 of 193

**All Citations**

Not Reported in Fed. Supp., 2018 WL 4682784

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

Woodward v. Lytle, Not Reported in Fed. Supp. (2018)

2018 WL 4643036

KeyCite Yellow Flag - Negative Treatment

Distinguished by Sawyer v. Locy, N.D.N.Y., October 21, 2020

2018 WL 4643036
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Shawn WOODWARD, Plaintiff,

v.

LYTLE, Correctional Officer, Cape Vincent
Correctional Facility, et al., Defendants.

9:16-CV-1174 (NAM/DEP)
|
Signed 09/27/2018

**Attorneys and Law Firms**

SHAWN WOODWARD, Plaintiff Pro Se, 00-A-6563,
Collins Correctional Facility, P.O. Box 340, Collins, New
York 14034.

Attorneys for Defendants: Hon. Barbara D. Underwood,
Attorney General of the State of New York, Helena Lynch,
Esq., Assistant Attorney General, The Capitol, Albany, New
York 12224.

**MEMORANDUM-DECISION AND ORDER**

Hon. Norman A. Mordue, Senior U. S. District Judge

**I. INTRODUCTION**

**\*1** Plaintiff *pro se* Shawn Woodward, a New York State
prison inmate, brings this 42 U.S.C. § 1983 action against
seven individual Defendants employed by the New York
State Department of Corrections and Community Supervision
("DOCCS"), alleging civil rights claims related to his
confinement at Cape Vincent Correctional Facility ("Cape
Vincent"). (Dkt. No. 1). Plaintiff's remaining claims are
for First Amendment retaliation against all Defendants
and Eighth Amendment excessive force against Defendant
Dawley. (Dkt. Nos. 30, 36). On February 9, 2018, Defendants
filed for summary judgment, on the basis that Plaintiff's
claims are barred based on his failure to exhaust the
available administrative remedies prior to filing this action.
(Dkt. No. 41). The matter was referred to United States
Magistrate Judge David E. Peebles, who, on August 13,
2018, issued a Report & Recommendation, recommending

that Defendants' motion for summary judgment be granted
and that the case be dismissed because Plaintiff failed to
exhaust his available administrative remedies. (Dkt. No.
57). Plaintiff then filed timely objections to the Report
& Recommendation, arguing, *inter alia*, that he could not
have exhausted his administrative remedies since they were
"opaque and incapable of use." (Dkt. No. 60, p. 12).

**II. STANDARD OF REVIEW**

This court reviews *de novo* those portions of the Magistrate
Judge's findings and recommendations that have been
properly preserved with a specific objection, as is the case
here. *Petersen v. Astrue*, 2 F.Supp.3d 223, 228-29 (N.D.N.Y.
2012); 28 U.S.C. § 636(b)(1)(C).

Summary judgment may be granted only if all the
submissions taken together "show that there is no genuine
issue as to any material fact and that the moving party is
entitled to judgment as a matter of law." *In re World Trade
Center Lower Manhattan Disaster Site Litig.*, 758 F.3d 202,
210 (2d Cir. 2014). A fact is material if it "might affect the
outcome of the suit under the governing law." *Anderson v.
Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91
L.Ed.2d 202 (1986); *see also Jeffreys v. City of New York*, 426
F.3d 549, 553 (2d Cir. 2005). A fact is genuinely in dispute
"if the evidence is such that a reasonable jury could return a
verdict for the nonmoving party." *Id.* In ruling on a summary
judgment motion, the court "must construe the facts in the
light most favorable to the non-moving party and must resolve
all ambiguities and draw all reasonable inferences against the
movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d
775, 780 (2d Cir. 2003). Where the plaintiff proceeds *pro se*,
the Court must read his submissions liberally and interpret
them "to raise the strongest arguments that they suggest."
*McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999)
(quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)).

**III. DISCUSSION**

**a. Exhaustion of Administrative Remedies**

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C.
§ 1997e(a), requires an inmate to exhaust all available
administrative remedies prior to bringing a federal civil rights
action. *See Espinal v. Goord*, 558 F.3d 119, 123–24 (2d Cir.
2009). To properly exhaust his administrative remedies, an
inmate must complete the administrative review process in
accord with the applicable state procedural rules. *Jones v.*

Case 9:19-cv-00427-DNH-TWD    Document 62    Filed 12/17/21    Page 185 of 193

Woodward v. Lytle, Not Reported in Fed. Supp. (2018)

2018 WL 4643036

*Bock*, 549 U.S. 199, 218–19, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007) (citing *Woodford v. Ngo*, 548 U.S. 81, 88, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006) ). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules." *Woodford*, 548 U.S. at 90–91, 126 S.Ct. 2378. The defendant bears the burden of proving that a plaintiff failed to exhaust available administrative remedies. *See Samuels v. Fischer*, 168 F.Supp.3d 625, 651 (S.D.N.Y. 2016).

 *2  The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee ("IGRC"). 7 N.Y.C.R.R. §§ 701.5(a)(1), (b). The grievance must be filed within 21 days of the alleged occurrence, using an "inmate grievance complaint form (form #2131)," but if this form is not readily available, "a complaint may be submitted on plain paper." *Id.* at § 701.5(a)(1). An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. *Id.* at § 701.5(c)(1). If the grievant wishes to appeal to the Superintendent, "he or she must complete and sign the appeal section on the IGRC response form (form #2131) and submit it to the grievance clerk within seven calendar days after receipt of the IGRC's written response." *Id.* Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee ("CORC"). *Id.* at § 701.5(d)(1). If the grievant wishes to appeal to the CORC, "he or she must complete and sign form #2133 and submit it to the grievance clerk within seven calendar days after receipt of the superintendent's written response to the grievance." *Id.* If the grievance concerns employee harassment, there is an expedited process: the grievance skips the IGRC level and goes to the Superintendent, who has twenty-five days to make a decision, after which the inmate has seven days to appeal to the CORC. *Id.* at § 701.8. During the grievance process, "matters not decided within the time limits may be appealed to the next step." *Id.* at § 701.6(g)(2). Inmates in special housing units have access to Form #2131, and "[t]he IGP supervisor shall monitor and ensure the proper functioning of the grievance procedure in SHU's." *Id.* at § 701.7.

There is also an exception to the mandatory exhaustion requirement, in the event the administrative remedies are "unavailable." *Williams v. Correction Officer Priatno*, 829 F.3d 118, 123 (2d Cir. 2016) (quoting *Ross v. Blake*, —— U.S. ——, 136 S.Ct. 1850, 1858, 195 L.Ed.2d 117 (2016) ). An inmate "must exhaust available remedies, but need not exhaust unavailable ones." *Ross*, 136 S.Ct. at 1858. The Supreme Court has identified three circumstances in which

an administrative remedy, while "officially on the books," is not available. *Id.* at 1859. An administrative remedy is unavailable when: (1) "it operates a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) it is "so opaque that it becomes, practically speaking, incapable of use"; or (3) "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Williams*, 829 F.3d at 123–24 (quoting *Ross*, 136 S.Ct. at 1859–60).

### b. Evidence of Exhaustion & Availability

On or about April 3, 2015, Plaintiff was incarcerated at Cape Vincent Correctional Facility in Cape Vincent, New York. (Dkt. No. 1, p. 3). Plaintiff helped other inmates prepare complaints about corrections staff, and he was allegedly warned by the staff against "writing up staff" and "testifying at hearings" in support of other inmates, and he was allegedly subjected to retaliation for doing so. (*Id.*, pp. 7–12). On or about July 3, 2015, Plaintiff was confined to the Special Housing Unit ("SHU"), after being found guilty of charges of fighting and drug use. (*Id.*, p. 13). Although the determinations were eventually reversed, Plaintiff spent nearly two months in the SHU as a result of the charges. (*Id.*). Plaintiff alleges that, on July 14, 2015, while in the SHU, he submitted a grievance complaining of retaliatory conduct by various Defendants, but that "[l]ater that week when the Inmate Grievance Program Supervisor made her rounds [,] she told me that she was not filing my grievance because she knew some of the officers and did not believe what I was saying." (Dkt. No. 52-2, pp. 1–2). There is no record of this particular grievance being filed. (*See* Dkt. No. 41-3). On July 22, 2015, Plaintiff successfully filed a grievance related to the food served in the SHU. (Dkt. No. 41-4).

On July 27, 2015, Plaintiff wrote a letter to Acting DOCCS Commissioner Anthony Annucci, informing him that Plaintiff had attempted to file a grievance on July 14, 2015 but was thwarted by the IGP Supervisor. (Dkt. No. 52-2, p. 1). Plaintiff wrote that "because of this [,] I sent a handwritten copy to the facility's superintendent since he is the next in the chain of the grievance appeal process." (*Id.*, p. 2). Plaintiff wrote that he spoke with the Superintendent on July 27, 2015, who referred him back to the "grievance department." (*Id.*). Plaintiff continued:

Case 9:19-cv-00427-DNH-TWD    Document 62    Filed 12/17/21    Page 186 of 193

Woodward v. Lytle, Not Reported in Fed. Supp. (2018)

2018 WL 4643036

**\*3**  Therefore, because step one (1) and two (2) in the grievance level are refusing to file my complaint, I'm sending it to you to either one (1) order the facility's Grievance Program Supervisor to file such or two (2) delegate this matter to Central Office Review Committee (CORC)[.]

(*Id.*). Annucci referred Plaintiff's letter to Karen Bellamy, the DOCCS Director of the IGP, who wrote Plaintiff in response on August 3, 2015. (Dkt. No. 52-3). In relevant part, Bellamy wrote as follows:

Contact with the [Cape Vincent] administration reveals that the IGP Supervisor did not receive or refuse to file a July 15, 2015 complaint from you alleging staff misconduct. Further, she does not recall speaking with you during rounds on July 15, 2015.

You are advised that Directive #4040 makes no provision for an inmate to refer grievances directly to Central Office, and that specific grievance concerns should be directed to the IGP Supervisor for the most expeditious means of resolution.

(*Id.*). On August 27, 2015, Plaintiff wrote again to Annucci, addressing the Bellamy letter. (Dkt. No. 52-4). Plaintiff expressed confusion as to what to do next, writing that:

This is problematic because if a facility's IGP's Supervisor refuses to file an inmate grievance [,] then what can the inmate do? Especially when as in this case the facility's Superintendent also refuses to except [sic] an inmate's grievance for filing?

(*Id.*). Plaintiff asked that his grievance be forwarded "to the proper facility's staff for filing," since by that time he had been transferred to Southport Correctional Facility in Pine City, New York. (*Id.*). By letter dated October 8, 2015, Bellamy responded to Plaintiff, writing in relevant part that: "Please be advised that your IGP issues were addressed in my

August 3, 2015 letter to you ... You have not presented any compelling evidence to indicate that your grievances are not being processed in accordance with Directive #4040." (Dkt. No. 52-5). According to DOCCS, "[n]either Plaintiff's July 27, 2015 letter nor his August 27, 2015 letter was a grievance or an appeal of a grievance." (Dkt. No. 52-1, ¶ 7). There is no record of an appeal related to the alleged July 14, 2015 grievance. (*See* Dkt. No. 41-5).

### c. Analysis

In their motion for summary judgment, Defendants argued that Plaintiff failed to exhaust his administrative remedies and could not show that the administrative remedies were unavailable to him. (Dkt. No. 41-1). In the Report & Recommendation, Magistrate Judge Peebles correctly found that Plaintiff failed to exhaust his administrative remedies, since Plaintiff never actually filed a grievance related to the claims in this action, nor did he appeal any such grievance to the CORC. (Dkt. No. 57). That left one question: "whether the IGP was unavailable to plaintiff such that he may be excused from his failure to fully exhaust the administrative remedies." (*Id.*, p. 18). After careful review of the record, the Court finds that an issue of fact remains as to this question, in accordance with the Second Circuit's decision in *Williams v. Correction Officer Priatno*, 829 F.3d 118, 123 (2d Cir. 2016).

In that case, the plaintiff was housed in the SHU at Downstate Correctional Facility, and while there, he allegedly drafted a grievance concerning staff misconduct and then gave it to a correction officer to forward to the grievance office on his behalf. *Williams*, 829 F.3d at 120–21. The plaintiff never received a response to the grievance, he never appealed it, and he was transferred to another facility about two weeks later. *Id.* at 121. He alleged that the correction officer in the SHU never filed the grievance for him. *Id.* The plaintiff filed a civil rights action, but the defendants successfully moved to dismiss, on the basis that the plaintiff failed to exhaust his administrative remedies, citing records that he never filed an appeal of the grievance. *Id.* But the Second Circuit reversed, finding that the administrative remedies were unavailable to the plaintiff under the circumstances, where he had an unfiled and unanswered grievance:

**\*4**  However, even if Williams technically could have appealed his grievance, we conclude that the regulatory scheme providing for that appeal is "so opaque" and "so confusing that ... no reasonable prisoner can use [it]."

Woodward v. Lytle, Not Reported in Fed. Supp. (2018)

2018 WL 4643036

Case 9:19-cv-00427-DNH-TWD   Document 62   Filed 12/17/21   Page 187 of 193

*Ross*, 136 S.Ct. at 1859 (quoting Tr. of Oral Arg. 23). The regulations simply do not contemplate the situation in which Williams found himself, making it practically impossible for him to ascertain whether and how he could pursue his grievance.

*Williams*, 829 F.3d at 124. The Circuit explained that the regulations do not outline any process to appeal an unfiled grievance:

> On their face, the regulations only contemplate appeals of grievances that were actually filed. For example, if the grievance had never been filed, the superintendent would never have received it and the timeline for her to provide a response within 25 days "of receipt of the grievance" would never have been triggered. NYCRR tit. 7, § 701.8(f). In turn, the textual provision allowing a grievant to appeal to the CORC would never have come into effect. *See id.* § 701.8(g) ("If the superintendent fails to respond within the required 25 calendar day time limit the grievant may appeal his/her grievance to CORC.").

*Id.* The Circuit concluded that "the process to appeal an unfiled and unanswered grievance is prohibitively opaque, such that no inmate could actually make use of it." *Id.* at 126. Further, the "obscurity" of the regulations "was compounded by the fact that Williams was transferred to another facility approximately two weeks after giving his grievance to the correction officer," since the regulations also do not provide guidance "on how a transferred inmate can appeal his grievance with the original facility without having received a response." *Id.* The Circuit recommended that, to avoid confusion going forward, "DOCCS revise its grievance procedures to instruct inmates how to appeal grievances that were not properly filed by prison staff, and how to appeal a grievance, to which the inmate never received a response, after being transferred." *Id.* at 126–27.

Likewise, there is evidence in this case that: 1) Plaintiff drafted a grievance while in the SHU on or about July 14, 2015; 2) he gave it the IGP Supervisor for filing; and 3) the grievance was never filed or answered. (Dkt. No. 1; Dkt. No. 52-2). On the other hand, there is evidence that the IGP Supervisor never received or refused to file any such grievance. (Dkt. No. 52-3). It is undisputed that DOCCS has no record of this grievance or any related appeal. Drawing all inferences in the non-moving party's favor, Plaintiff drafted and submitted the grievance, but it went unfiled and unanswered. Under these particular circumstances, "the process to appeal an unfiled and unanswered grievance is

prohibitively opaque, such that no inmate could actually make use of it." *Williams*, 829 F.3d at 126. Moreover, Plaintiff was also transferred after attempting to file the grievance, further compounding the problem. *Id.* Plaintiff's understandable confusion about the process is evident in his letters dated July 27, 2015 and August 27, 2015 to Acting Commissioner Annucci. (Dkt. No. 52-2, 52-4). And in response, DOCCS made no attempt to explain that Plaintiff had to appeal the non-response to his alleged unfiled grievance to the CORC, the position taken by Defendants in this case.[1] In fact, Plaintiff was advised that "Directive #4040 makes no provision for an inmate to refer grievances directly to Central Office, and that specific grievance concerns should be directed to the IGP Supervisor for the most expeditious means of resolution." (Dkt. No. 53-3). Plaintiff correctly identifies this confounding situation in his objections to the Report & Recommendation. (Dkt. No. 60, p. 16).

---

[1]   The obscurity of this Kafkaesque suggested process is further demonstrated by the fact that the regulations spell out that any appeal to the CORC requires Form #2133, while inmates in the SHU only have access to Form #2131. *Compare* N.Y.C.R.R. §§ 701.5(d)(1), 701.7(a); *see also Davis v. State of New York*, 311 F. App'x 397, 399 n.2 (2d Cir. 2009) (explaining that Form #2133 is the form which has the Superintendent's grievance decision printed on the top half of a single sheet and on the bottom half contains the form an inmate is required to file to appeal the Superintendent's decision to the CORC).

**\*5**   In sum, viewing the evidence in the light most favorable to Plaintiff, the Court finds that an issue of fact exists as to the availability of the grievance process, which precludes summary judgment.[2] *See Williams*, 829 F.3d at 126–27; *see also Medina v. Napoli*, 725 F. App'x 51, 54 (2d Cir. 2018) ("The record establishes that Medina's allegations, supported by witness testimony, about defendants' actions to prevent the filing of Medina's grievances concerning the June 2007 incident are sufficient, when viewed in the light most favorable to Medina, to raise a genuine issue of material fact as to whether the grievance process was 'available' to Medina under the *Ross* and *Williams* exhaustion analysis."); *Jackson v. Downstate Correctional Facility*, No. 16 Civ. 267, 2018 WL 3650136, at \*9, 2018 U.S. Dist. LEXIS 128980 (S.D.N.Y. July 31, 2018) (denying summary judgment motion based on failure to exhaust administrative remedies where evidence showed that the plaintiff "submitted a grievance, but that

Case 9:19-cv-00427-DNH-TWD    Document 62    Filed 12/17/21    Page 188 of 193

Woodward v. Lytle, Not Reported in Fed. Supp. (2018)

2018 WL 4643036

grievance was never filed," and the appeal procedures were "prohibitively opaque") (citing *Williams* ); *Hurst v. Mollnow*, No. 16 Civ. 1062, 2018 WL 4178226, at *10, 2018 U.S. Dist. LEXIS 122624 (N.D.N.Y. July 20, 2018) ("In light of *Williams*, the Court finds material issues of fact as to the availability of the grievance process and whether Plaintiff attempted to exhaust his administrative remedies, precluding summary judgment."), *report and recommendation adopted*, No. 16 Civ. 1062, 2018 WL 4153926, 2018 U.S. Dist. LEXIS 147670 (N.D.N.Y. Aug. 30, 2018); *Fann v. Graham*, No. 15 Civ. 1339, 2018 WL 1399331, at *6, 2018 U.S. Dist. LEXIS 6717 (N.D.N.Y. Jan. 11, 2018) ("Viewing the facts in the light most favorable to plaintiff, the record suggests that plaintiff's grievances were submitted, but were unfiled and unanswered, creating an issue of fact as to whether the grievance process was available and whether plaintiff attempted to exhaust his administrative remedies...."), *report and recommendation adopted*, No. 15 Civ. 1339, 2018 WL 1399340, 2018 U.S. Dist. LEXIS 43887 (N.D.N.Y. Mar. 19, 2018); *Reid v. Marzano*, No. 15 Civ. 761, 2017 WL 1040420, at *3, 2017 U.S. Dist. LEXIS 38547 (N.D.N.Y. Mar. 17, 2017) (denying summary judgment motion based on exhaustion argument, noting that "it is DOCCS' borderline incomprehensible regulation governing this situation that is to blame").

2    The fact that Plaintiff successfully filed one grievance while in the SHU related to the food served there does not demonstrate that he could have filed one about employee misconduct or that he could have appealed an unfiled grievance to the CORC, so as to eliminate the issue of fact as to the availability of administrative remedies.

**IV. CONCLUSION**

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that Magistrate Judge Peebles's Report & Recommendation (Dkt. No. 57) is **REJECTED**; and it is further

**ORDERED** that Defendants' Motion for Summary Judgment (Dkt. No. 41) is **DENIED without prejudice** to renew should the Defendants request an exhaustion hearing pursuant to *Messa v. Goord*, 652 F.3d 305 (2d Cir. 2011); and it is further

**ORDERED** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order in accordance with the Local Rules of the Northern District of New York.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2018 WL 4643036

---

End of Document    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:19-cv-00427-DNH-TWD    Document 62    Filed 12/17/21    Page 189 of 193

Burrell v. Zurek, Not Reported in Fed. Supp. (2019)

2019 WL 4051596

2019 WL 4051596
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Ako K. BURRELL, Plaintiff,
v.
Lisa ZUREK, et al., Defendants.

9:17-CV-0906 (LEK/TWD)
|
Signed 08/27/2019
|
Filed 08/28/2019

**Attorneys and Law Firms**

Ako K. Burrell, Attica, NY, pro se.

David A. Bagley, Kernan Professional Group, LLP, Oriskany, NY, for Defendants.

**DECISION AND ORDER**

Lawrence E. Kahn, U.S. District Judge

**I. INTRODUCTION**

 **\*1** Pro se plaintiff Ako Burrell filed this 42 U.S.C. § 1983 action alleging that his constitutional rights were violated while he was in pretrial custody at Oneida County Correctional Facility ("Oneida CCF"). This Court reviewed the sufficiency of Plaintiff's Complaint, Dkt. No. 1 ("Complaint"), pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915(A) and ordered that the following claims survived initial review: (1) Fourteenth Amendment excessive force, sexual abuse, and failure to intervene against Defendants Lieutenant Jack Breen, Deputy Dustin Lewis, and Deputy Jeffrey Jones; (2) First Amendment claims against Defendants Captain Lisa Zurek, Sergeant Clayton Smith, Lewis, and Jones stemming from denial of Plaintiff's access to newspapers and other reading material; (3) Fourteenth Amendment due process claims relating to Plaintiff's L-2 classification against Defendant Deputy Todd Woodland; and (4) First Amendment retaliation claims against Defendants Breen, Lewis, and Deputy Christopher Getchell. Dkt. No. 10 ("November 2, 2017 Order").

The parties conducted discovery and Defendants have now moved for Summary Judgment. Dkt. Nos. 41 ("Summary Judgment Motion"); 45 ("Response"); 46 ("Reply"); 47 ("Supplemental Response"). The Honorable Thérèse Wiley Dancks, United States Magistrate Judge, issued a Report-Recommendation and Order, recommending Defendants' Motion for Summary Judgment be granted in part and denied in part. Dkt. No. 50 ("Report-Recommendation"). Defendants timely filed objections to the Magistrate Judge's Report-Recommendation. Dkt. No. 51 ("Objections"). For the reasons that follow, the Court approves and adopts the Report-Recommendation.

**II. RELEVANT BACKGROUND**

The facts and allegations in this case were detailed in the November 2, 2017 Order and the Report-Recommendation, familiarity with which is assumed.

**A. Magistrate Judge Dancks's Report-Recommendation**

Magistrate Judge Dancks recommends granting summary judgment on: (1) the Fourteenth Amendment due process claims relating to Plaintiff's L-2 classification against Woodland; (2) the First Amendment retaliation claims against Breen, Lewis, and Getchell; and (3) all claims against Defendants in their official capacities. She recommends denying summary judgment on: (1) the Fourteenth Amendment excessive force, sexual abuse, and failure to intervene claims against Breen, Lewis, and Jones based on failure to exhaust administrative remedies; (2) the First Amendment denial of access to newspapers and other reading material claims against Zurek, Smith, Lewis, and Jones; and (3) the affirmative defense of qualified immunity raised by Zurek, Smith, Lewis, and Jones. She further recommended that Court conduct a hearing on the administrative exhaustion issue or refer the hearing to her to conduct. R & R at 33–34.

**B. Defendants' Objection to the Report-Recommendation**

Defendants raise three objections to the Report-Recommendation: (1) Breen, Lewis, and Jones should have been granted summary judgment on Fourteenth Amendment excessive force, sexual abuse, and failure to intervene claims because Plaintiff failed to exhaust administrative remedies; (2) Zurek, Smith, Lewis, and Jones should have been granted summary judgment on the First Amendment claim based on denial of access to newspapers and other reading materials because this limitation had a legitimate penological basis; and (3) Zurek, Smith, Lewis, and Jones should have been granted

Case 9:19-cv-00427-DNH-TWD    Document 62    Filed 12/17/21    Page 190 of 193

Burrell v. Zurek, Not Reported in Fed. Supp. (2019)

2019 WL 4051596

summary judgment on qualified immunity grounds because it was objectively reasonable for them to believe the limitation on reading materials was constitutional. Objs.

## III. LEGAL STANDARD

*2 Within fourteen days after a party has been served with a copy of a magistrate judge's report-recommendation, the party "may serve and file specific, written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b); L.R. 72.1(c). If objections are timely filed, a court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b). However, if no objections are made, or if an objection is general, conclusory, perfunctory, or a mere reiteration of an argument made to the magistrate judge, a district court need review that aspect of a report-recommendation only for clear error. Barnes v. Prack, No. 11-CV-857, 2013 WL 1121353, at *1 (N.D.N.Y. Mar. 18, 2013); Farid v. Bouey, 554 F. Supp. 2d 301, 306–07 (N.D.N.Y. 2008), abrogated on other grounds by Widomski v. State Univ. of N.Y. at Orange, 748 F.3d 471 (2d Cir. 2014). "A [district] judge ... may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." § 636(b).

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).

## IV. ANALYSIS

After carful review of the papers and Magistrate Judge Dancks's Report-Recommendation, the Court finds no clear error in the unobjected-to portions of the Report-Recommendation. And after reviewing de novo the portions of the Report-Recommendation to which Defendants object, the Court finds no error. Magistrate Judge Danck's employed the proper legal standards, accurately recited the facts alleged, and correctly applies the law to those facts. As a result, the Court accepts and adopts the Report-Recommendation for the reasons stated therein.[1] The Court adds the following discussion of Defendants' three objections.

[1] As noted below, the while the Court reaches the same conclusion as the R & R on the issue of qualified immunity, its differs in its reasoning.

### A. Exhaustion of Fourteenth Amendment claims against Breen, Jones, and Lewis

On the issue of Plaintiff's Fourteenth Amendment claims, there is no dispute that Plaintiff was required to exhaust his administrative remedies, 42 U.S.C. § 1997e(a), that Plaintiff was required to file a formal grievance within five days of the incident complained about in order exhaust those remedies, Dkt. 41-4, Exhibit 1 ("Oneida County Sheriff's Office Policy") at 11,[2] and that Plaintiff did not timely file a formal grievance. R & R at 18; Objs. at 2. Rather, the dispute hinges on whether Oneida CCF staff members prevented Plaintiff from timely filing a formal grievance. See Ross v. Blake, 136 S. Ct. 1850, 1858, 1860 (2016) ("Under § 1997e(a), the exhaustion requirement hinges on the "availab[ility]" of administrative remedies." A remedy is unavailable and thus exhaustion is not required "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.").

[2] The cited page numbers for documents refer to those generated by the Court's electronic filing system ("CM/ECF").

The alleged incidents giving rise to the excessive force, sexual abuse, and failure to intervene claims took place on March 30 and April 1, 2017. Plaintiff claims that after he filed informal complaints on April 2, 2017, grievance coordinator Robert Carollo was supposed to provide him with formal grievance forms but failed to do so. Pl.'s Resp. at 6. While Defendants do not provide evidence directly contradicting this claim, they counter that an April 7, 2017 Incident Report, No. 17-0678, documents that Plaintiff "improperly assigned his own numbers" to some grievances that he had submitted to Carollo. Objs. at 2; Dkt. No. 45-1 at 182 ("Incident Report, No. 17-0678"). Defendants state that after Plaintiff was informed he needed to re-file those grievances, Plaintiff did not "mak[e] any complaints of having been hindered in the process" and "waited a month, until May 6, 2017, when he filed additional Complaints regarding the same incidents." Id. However, as the incident report itself notes, Plaintiff apparently stated that Carollo was "a liar and that he didn't get the complaint forms." Incident Report, No. 17-0678. Thus, while Defendants claim Plaintiff is "using unsupported averments, to manufacture an issue of fact," Objs. at 4, the

Burrell v. Zurek, Not Reported in Fed. Supp. (2019)

2019 WL 4051596

evidence suggests Plaintiff had at least raised the issue of not being provided the formal grievance forms at the time.

**\*3** Defendants' suggest that "the fact that Plaintiff was thoroughly versed in grievance procedures, having filed 178 of them" indicates that Plaintiff alone was responsible for his failure to file a formal timely grievance in this case. Objs. at 2 n.2; SJ Mot. at 7 n.2. But this does not necessarily weaken Plaintiff's claims—his extensive history of filing grievances could also suggest that, absent interference, he was aware of the five day rule and capable of complying with it.

The R & R found that this dispute creates a genuine issue of material fact about whether Plaintiff's effort to administratively exhaust his claim was thwarted. R & R at 19. The Court agrees. See Ortiz v. Annucci, No. 17-CV-3620, 2019 WL 1438006, at \*8 (S.D.N.Y. Mar. 29, 2019) ("If, in fact, Plaintiff timely attempted to file his grievance by handing it to an officer while in SHU and that officer failed to file the grievance, Plaintiff's avenues for pursuing the grievance would be unavailable ... excusing him from any further exhaustion requirements."). However, as the burden is on Plaintiff to show unavailability of the grievance procedure, Jenkins v. Cordero, No. 17-CV-1592, 2019 WL 2121655, at \*3 (S.D.N.Y. May 15, 2019) (citing Mojias v. Johnson, 351 F.3d 606, 610 (2d Cir. 2003)), and there remains "confusion regarding whether the [grievance process] was available to Plaintiff," R & R at 19, the Court also agrees that a hearing on the exhaustion issue would be beneficial, and refers the hearing Judge Dancks to conduct.

**B. First Amendment Claims again Zurek, Smith, Lewis, and Jones for denial of access to reading materials**

Defendants argue that denying Plaintiff all reading materials except a Bible, Koran, or holy book on account of his L-2 Classification did not violate the First Amendment because it was "based on legitimate penological interests."[3] Objs. at 4. The R & R correctly assessed whether this was a "reasonable" limitation on Plaintiff's First Amendment rights by applying Turner v. Safley, 482 U.S. 78, 89–91 (1987). See Young v. Scott, No. 16-CV-44, 2017 WL 3662443, at \*6 (M.D. Fla. Aug. 24, 2017), reconsideration denied, No. 16-CV-44, 2018 WL 1805147 (M.D. Fla. Apr. 17, 2018) (applying Turner factors to First Amendment claim raised by pre-trial detainee); Mauro v. Arpaio, 188 F.3d 1054, 1059 (9th Cir. 1999) (same). Under Turner, the Court assesses four factors to determine whether a regulation is reasonable: 1)

whether "there is a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; 2) "whether there are alternative means of exercising the right that remain open to prison inmates"; 3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates"; and 4) whether there is "an alternative that fully accommodates the prisoner's rights at de minimis cost to valid penological interests." Turner 482 U.S. at 89–91 (internal quotations omitted).

3    As detailed in the R & R, L-2 classification was for inmates "reclassified 'due to their propensity towards facility violence and/or repeated non-compliance with facility rules and regulations' ... Inmates on L2 status were, among other things, restricted to one hour of recreation a day or one and a half hours five days a week, limited to non-contact visits at special times, allowed limited telephone calls and commissary privileges, and allowed no books other than the Bible, Koran, or Holy book." R & R at 5. Plaintiff was placed on L-2 status on December 26, 2016, after an incident in which he injured a guard. See Dkt. No. 41-4 at 56 ("Incident Report"). The classification was abolished in August 2017 after the Citizen's Policy and Complaint Review Council ("CPCRC") determined that the restrictions violated New York Regulations. See Dkt. No. 41-4 at 121–22 ("CPCRC Letter").

**\*4** With respect to the first and fourth factors, Defendants state "there was a clear relationship to a legitimate government interest in the good order of the Facility" and "it is difficult to imagine a less onerous alternative means in the circumstances for the Correction Facility to have acted in relation to Plaintiff." Objs. at 7. But Defendants are unable to substantiate these conclusory claims. Their Objection asserts that the regulations "were intended to give inmates who were determined ... to be prone to conduct inimical to good order, an incentive to correct their behavior," Id. at 6, but the only citation for this is the Affidavit of Deputy Woodland, which merely states that the L-2 classification was "intended to ensure the safety and good order of the Facility" and makes no direct claims about how limiting reading materials promotes good behavior. Dkt. No. 41-5 ("Woodland Affidavit") ¶ 16. Defendants' reliance on Beard v. Banks, 548 U.S. 521 (2006), which upheld limitations on the most uncooperative prisoners' access to reading materials on the grounds that such limitations could incentivize good behavior, is misplaced. In that case, the defendants "articulated connections between

2019 WL 4051596

newspapers and magazines, the deprivation of virtually the last privilege left to an inmate, and a significant incentive to improve behavior." [4] *Id.* at 531–32. Here, in contrast, as the Report-Recommendation correctly notes, Defendants "failed to identify specific legitimate penological interests for the ban." R & R at 22. Further, despite the Beard defendants' acknowledgment that they were depriving prisoners of "virtually the last privilege left," the regulations were still more generous than the L-2 regulations at issue here, as they allowed for "legal and personal correspondence, religious and legal materials, two library books, and writing paper." *Id.* at 526.

[4]    The Beard court further noted that "[t]he undisputed facts statement added that the Policy encourages progress and discourages backsliding by level 1 inmates. These statements point to evidence that the regulations serve the function identified." *Beard v. Banks,* 548 U.S. 521, 522 (2006).

The second factor also favors Plaintiff because there was no apparent alternative means for Plaintiff to exercise his First Amendment rights. While Defendants state that Plaintiff could have modified his behavior and been reclassified during the monthly classification review, Plaintiff states that Woodland told him "you have 19 felonies, you might never come off this status." Compl. ¶ 59. Finally, on the third factor, Defendants' assertion that "allowing Plaintiff to escape any consequences of having injured an officer could well have an undesirable 'ripple effect' on the behavior of other inmates" is unpersuasive as it provides no explanation for why anything short of a blanket deprivation on reading materials would be "allowing Plaintiff to escape any consequences." Objs. at 7.

Thus, while Courts "must accord substantial deference to the professional judgment of prison administrators," *Overton v. Bazzetta,* 539 U.S. 126, 132 (2003), Defendants' failure to articulate any specific justification means this case follows the "general rule" that "[a]bsolute bans on inmate access to newspapers and magazines ... violate the First Amendment because they are an 'exaggerated response' to legitimate penological needs." *Nelson v. Hjorth,* No. 18-CV-88, 2018 WL 2050571, at *6 (D. Neb. May 2, 2018) (quoting *Mann v. Smith,* 796 F.2d 79, 82 (5th Cir. 1986)).

**C. Qualified Immunity for First Amendment claims against Defendants Zurek, Smith, Lewis, and Jones**

Defendants' Objections raises only one ground on which they are entitled to qualified immunity: "it was objectively reasonable for them to believe" that "the limitations imposed by L-2 status were indeed proper penologically-based restrictions" because the L-2 classification "had remained in place and operation unquestioned for over 20 years." Objs. at 8. Defendants do not, however, cite any cases to back the assertion that because a policy has been in effect for a long time, it is objectively reasonable to believe it is constitutional. And the Second Circuit has held a defendant's actions can be objectively unreasonable even if that defendant was following a policy. *See Sorensen v. City of New York,* 42 F. App'x 507, 510–11 (2d Cir. 2002) (affirming denial of qualified immunity and rejecting defendants' argument "that they were simply low-level employees following orders and that it was objectively reasonable for them to believe that a policy promulgated by the City was constitutional ... immunity has been granted [in such cases] only when the orders were facially valid ... the strip-search policy at issue here, however, had twice been declared unconstitutional by this court, and so was not facially valid.")[5],[6] Thus, Defendants are not entitled to qualified immunity at this time.

[5]    Defendants do not object to the Report-Recommendation's finding that a detainee's First Amendment right of access to reading material is "clearly established." R & R at 23–24 (citing *Turner* 482 U.S. at 89–90; *Beard* 548 U.S. at 535). The Court notes that because "public officials are held to constructive knowledge of the law, the issue here is not whether a reasonable person would have known what the law was, but simply whether the law was clearly established." *Sorensen* 42 F. App'x at 510.

[6]    The R & R found that Defendants were not entitled to qualified immunity in part because there was a need for more fact finding about whether Zurek denied reading materials to punish Plaintiff's filing of a sexual abuse claim. R & R at 24 n.9. The Court notes that because it is denying summary judgment based on qualified immunity on the grounds that Defendants have not shown that their reliance on a longstanding policy is per se objectively reasonable, the Court does not rely on the Report-Recommendations reasoning on the issue of qualified immunity. Not relying the ambiguity of Zurek's motivations does not, of

course, preclude additional fact finding on the issue should it be relevant.

## V. CONCLUSION

**\*5** Accordingly, it is hereby:

**ORDERED**, that the Report-Recommendation (Dkt. No. 50) is **APPROVED and ADOPTED in its entirety**, except that Defendants' assertion they are entitled to qualified immunity is denied because they have not shown that their compliance with a longstanding policy was objectively reasonable; and it is further

**ORDERED**, that Defendants' Motion for Summary Judgment (Dkt. No. 41) on all claims asserted against them in their official capacities is **GRANTED**; and it is further

**ORDERED**, that Defendants Woodland and Getchell's Motion for Summary Judgment is **GRANTED**; and it is further

**ORDERED**, that Defendants Breen and Lewis's Motion for Summary Judgment on Plaintiff's First Amendment retaliation claims is **GRANTED**; and it is further

**ORDERED**, that Defendants' Motion for Summary Judgment is **DENIED** with respect to Plaintiff's Fourteenth Amendment claims for excessive force, sexual abuse, and failure to intervene against Defendants Breen, Jones, and Lewis; and it is further

**ORDERED**, that Defendants' Motion for Summary Judgment is **DENIED** with respect to Plaintiff's First Amendment claims for denial of access to reading material against Defendants Zurek, Smith, Lewis, and Jones; and it is further

**ORDERED**, that Defendants Motion for Summary Judgement is **DENIED** with respect to Defendants Zurek, Smith, Lewis, and Jones's assertion of qualified immunity, without prejudice to reconsideration of the issue of qualified immunity at trial; and it is further

**ORDERED**, that Judge Dancks recommendation that a hearing be conducted on the issue of exhaustion is **GRANTED and REFERRED** to Judge Dancks to conduct; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

## All Citations

Not Reported in Fed. Supp., 2019 WL 4051596

---

**End of Document**                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.